UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 719 PENSION TRUST FUND, on Behalf of Itself and All Others Similarly Situated, | : : : : : : : : : : : : : : : : : | Civil Action No. <br><br> <u>CLASS ACTION</u> <br><br> AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | | |
| vs. | | |
| CONSECO INC., WILLIAM KIRSCH, EUGENE BULLIS, MICHAEL DUBES, JAMES HOHMANN, JIM PRIEUR, EDWARD BONACH, and JOHN WELLS, | | |
| Defendants. | | |
| | x | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................................1

BASIS OF ALLEGATIONS ..................................................................................................4

JURISDICTION AND VENUE ..............................................................................................4

PARTIES .................................................................................................................................5

CLASS ACTION ALLEGATIONS ........................................................................................8

CONFIDENTIAL SOURCES ................................................................................................9

SUBSTANTIVE ALLEGATIONS........................................................................................11

    The Company and It's Business.................................................................................11

    Conseco Moves from Chicago to Carmel..................................................................13

    Conseco Concealed Significant Problems with Policy Administration and Claims
    Processing ..................................................................................................................13

    Conseco Deliberately and Improperly Delayed or Eliminated Claims Under
    Policies Through the No Letter "NL" Close Process ................................................16

    Conseco Compensated and Rewarded Employees for Denying Insurance Claims ..........19

    Conseco Bundled and Unbundled Claims to Manipulate Claims Ratios ........................19

    Conseco Was Unable to Determine It's Liability under Policies Because It Did
    Not Maintain Sufficient Information about Policies ..................................................21

    Conseco's Computer Systems Failed to Adequately Automate and Handle Claims ........24

    Conseco's Myriad of Computer Systems Caused Information to Be Inaccurate and
    Incomplete..................................................................................................................26

    Conseco's Computer Systems Had Serious Coding Problems Rendering Data
    Unreliable and Conseco's Financial Statements False and Misleading ..........................27

    The Genelco Project Was Intended to Automate Claims Management, but Was
    Abandoned ..................................................................................................................27

    The Groomer System: A Low Cost Alternative to Genelco that Failed to Address
    the Significant Problems with Conseco's Claims Processes ............................................28

**Page**

Conseco Overpaid Providers for LTC and Group Health Lines Claims .........................29

Conseco Did Not Audit Third-Party Administrators for the Group Health Block of Business ........................................................................................................................30

Conseco's Senior Executives Were Aware of the Significant Problems and Material Internal Control Deficiencies ............................................................................30

Outside Consultants Were "Blown Away" by the "Mess" at Conseco ...........................36

Project Rubik and Conseco's Efforts to Dispose of LTC ...............................................36

Defendants Carefully Prepared What to Say – and What Not to Say – on Analyst Conference Calls ..........................................................................................................39

Additional Material Weaknesses in Internal Controls....................................................40

Conseco Failed to Maintain Adequate Controls over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations...............40

State Insurance Regulators Investigate Conseco's Claims and Complaint Handling Practices and Sales and Marketing Practices ................................................................42

Conseco Misrepresented Facts to the Multistate Examiners ...........................................45

Congress Investigates and Hold Hearings on Conseco's Improper Claims Practices ......................................................................................................................47

MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD..........................................................................................................48

2Q05 Financial Results...................................................................................................48

3Q05 Financial Results...................................................................................................52

Full Year 2005 Financial Results ...................................................................................54

1Q06 Financial Results...................................................................................................58

2Q06 Financial Results...................................................................................................59

3Q06 Financial Results...................................................................................................64

Full Year 2006 Financial Results ...................................................................................67

**Page**

1Q07 Financial Results ..................................................................................79

2Q07 Financial Results ..................................................................................87

CONSECO'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS
MATERIALLY FALSE AND MISLEADING..................................................................96

    Conseco's Admissions Regarding Its Material Financial Misstatements.........................97

    Conseco's Dramatic Increase to Its LTC Claims Reserves ............................................107

    Conseco's System of Internal Controls Was Grossly Inadequate................................1099

    Conseco Lacked a Reasonable Basis for Estimating Its IBNR Reserve .......................109

ADDITIONAL SCIENTER ALLEGATIONS............................................................................114

LOSS CAUSATION/ECONOMIC LOSS ..................................................................................115

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE.................................................................................................................................117

    No Safe Harbor.................................................................................................................118

COUNT I.....................................................................................................................................119

    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
    Thereunder Against All Defendants.................................................................................119

COUNT II....................................................................................................................................122

    Violation of Section 20(a) of the Exchange Act Against the Individual Defendants .....122

JURY TRIAL DEMANDED......................................................................................................123

Lead Plaintiff Monroe County Employees' Retirement System ("Lead Plaintiff" or "Plaintiff"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Amended Complaint for Violation of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Lead Plaintiff's counsel as detailed below.

## NATURE OF THE ACTION

1.     Lead Plaintiff brings this securities fraud class action against Conseco Inc. ("Conseco" or the "Company"), William Kirsch, Eugene Bullis, Michael Dubes, James Hohmann, Jim Prieur, Edward Bonach, and John Wells on behalf of purchasers of the common stock of Conseco between August 4, 2005 and March 17, 2008, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated thereunder.

2.     Defendant Conseco engages in the development, marketing, and administration of supplemental health insurance, annuity, individual life insurance, and other insurance products for senior and middle-income markets in the United States. This case concerns Conseco's Long Term Care ("LTC") business. Prior to and throughout the Class Period, Conseco did not know how its LTC business was performing, what reserves should be set for LTC claims or even what LTC policies had been written. Conseco did not even have copies of many LTC policies or records of those policies and often did not record basic information, such as the sex of its customers, which was necessary to properly set reserves. Adding to and exacerbating these problems, Conseco engaged in numerous improper claims practices in its LTC business which materially distorted and understated the Company's true claims exposure. As a result, Conseco's Class Period financial results were artificially inflated and its financial statements were materially false and misleading and not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). At the end of the Class

Period, Conseco admitted that its financial statements were materially false and misleading when issued and restated its financial statements. The Company also settled with 40 states as the result of a multi-state examination of Conseco's improper claims practices in LTC and paid millions of dollars in fines and improvements to its claims processes.

3.    Conseco's complete lack of information concerning the financial performance of its LTC business is shocking. As alleged in detail below, during the Class Period, Conseco, among other things: (i) did not adequately comprehend the terms of its insurance policies; (ii) did not record or know basic information about claims payments under policies, such as the diagnostic code a payment fell under or whether policy limits were reached or exceeded; (iii) did not have an automated system capable of recording or analyzing necessary policy information, or claims or payment data to accurately set reserves; (iv) deliberately and improperly ignored valid claims and failed to pay claims in a timely manner; (v) incentivized employees to inappropriately deny claims; (vi) manipulated claims data to improve metrics and financial ratios; and (vii) did not have the tools necessary to properly calculate reserves, rendering Conseco's financial statements false, unreliable and without adequate basis.

4.    Former Conseco employees and internal Conseco documents generated throughout the Class Period that were provided to senior Company executives detailed many of the problems and material internal control deficiencies alleged herein and Defendants' knowledge, or reckless disregard, of these material facts. Conseco's senior management, including Defendants, knew, or recklessly disregarded, that they needed to substantially increase reserves for claims but refused to do so. Defendants improperly managed Conseco's earnings by increasing reserves in small increments in an effort to minimize any negative impact on Conseco's stock price.

5.       By the end of 2006, various state regulators became aware of several potential infractions by Conseco so they launched a multistate investigation of Conseco's claims practices. Recognizing that the regulators would uncover some wrong-doing, in early 2007 Conseco disclosed to investors that it had recently uncovered material internal control deficiencies in its LTC business. Contrary to their statements, however, Defendants had known about these issues – and many more - since before the beginning of the Class Period.  Moreover, Defendants downplayed the extent and magnitude of the problems and the steps required to fix the problems and misrepresented to investors that the problems were being addressed.  In reality, Defendants were not committed to spending the money necessary to try to fix the problems, but instead sought to give themselves some time, at minimum expense, to figure out a way to dispose of LTC, but failed to disclose these facts to investors.  By August 2007, however, Defendants realized that they could no longer hide the fact that reserves would need to be substantially increased so they increased reserves for LTC by $118 million for claims incurred in prior periods, resulting in a significant hit to the Company's earnings and causing Conseco's stock to plummet by nearly 19%.  Defendants, however, continued to hide the extent, cause or true nature of its problems from investors.

6.       Then, on February 25, 2008, Conseco announced that it would delay the filing of its Form 10-K for the year ended December 31, 2007 and restate its financial results for the years ended December 31, 2006 and 2005, along with affected financial data for 2004 and 2003, and quarterly financial information for 2006 and the first three quarters of 2007.  Conseco restated those financial results on March 28, 2008.  Shortly thereafter, on May 7, 2008, it was announced that Conseco entered into a settlement with the Multistate Examiners for "serious issues in complaint and claims handling" for claims filed from January 1, 2005 through April 30, 2007.  As a result, Conseco agreed to pay a $2.3 million fine and spend $26 million in improvements to the Company's claims

adjudication processes and procedures. Finally, in late 2008, after Defendants were unable to sell LTC, Conseco effectively paid the Pennsylvania Insurance Department $175 million to take LTC off of its hands with the most significant problems at LTC still not corrected and many more still not disclosed to investors.

## BASIS OF ALLEGATIONS

7.      The allegations herein are based upon the investigation conducted by and under the supervision of Lead Plaintiff's counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis®, Dow Jones and Bloomberg, Inc.) – including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead Lead Plaintiff's claims with particularity. In the course of their investigation of the underlying claims, a number of former Conseco employees who possessed direct knowledge of the wrongdoing alleged herein were interviewed. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the false and misleading statements identified herein were distributed

throughout this District, the Company conducts substantial business in this District and the Company's stock trades on the New York Stock Exchange ("NYSE"), which is located in this District.

11.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

12.    Plaintiff Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Conseco during the Class Period and has been damaged thereby.

13.    Defendant Conseco, through its subsidiaries, engages in the development, marketing, and administration of supplemental health insurance, annuity, individual life insurance, and other insurance products for senior and middle-income markets in the United States. Conseco's primary executive offices are located in Carmel, Indiana.

14.    (a)    Defendant William Kirsch ("Kirsch") served as President and Chief Executive Officer ("CEO") of Conseco from August 2004 until May 2006;

(b)    Defendant Eugene Bullis ("Bullis") served as Executive Vice President and Chief Financial Officer ("CFO") of Conseco from November 2002 until May 2007;

(c)    Defendant Michael Dubes ("Dubes") served as President of Conseco from May 2005 until December 2007;

(d)    Defendant James Hohmann ("Hohmann") served as Executive Vice President and Chief Administrative Officer of Conseco from December 2004 until September 2006. From May 2006 through September 2006, Hohmann also assumed the role of Interim CEO of the

Company. In September 2006, Hohmann's duties changed and he assumed the roles of President and Chief Operating Officer of Conseco until December 2006;

(e)    Defendant Jim Prieur ("Prieur") has served as CEO of Conseco since September 2006;

(f)    Defendant Ed Bonach ("Bonach") has served as Executive Vice President and CFO of Conseco since May 2007; and

(g)    Defendant John Wells ("Wells") has served as Senior Vice President, Long Term Care of Conseco since December 2006. Wells has also served as Senior Vice President, Operations of Bankers Life and Casualty Company ("Bankers Life"), a subsidiary of Conseco, since November 2004.

15.    Defendants Kirsch, Bullis, Dubes, Hohmann, Prieur, Bonach and Wells are collectively referred to herein as the "Individual Defendants."

16.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Conseco, were privy to confidential and proprietary information concerning Conseco, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Conseco, as discussed in detail below. Because of their positions with Conseco, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants

knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Conseco's business.

18.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Conseco's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Conseco common stock would be based upon truthful and accurate information.  The

Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Conseco common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Conseco's business, operations and management and the intrinsic value of Conseco common stock; and (ii) caused Plaintiff and members of the Class to purchase Conseco common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers of the common stock of Conseco between August 4, 2005 and March 17, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Conseco common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Conseco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

       (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

       (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Conseco;

       (c)     whether the price of Conseco common stock was artificially inflated during the Class Period; and

       (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

27.     The allegations made herein are based upon information and belief and are supported by the first-hand knowledge of five (5) confidential witnesses ("CWs").  These informants have

direct first-hand knowledge about Conseco's business and operations prior to and during the Class Period.

28.     Confidential Witness 1 ("CW1") worked at Conseco during the Class Period as a Director and Vice President.  CW1 was responsible for auditing, controlling, and monitoring key risk areas of all business departments at Conseco, including the LTC business, and was involved with a wide-array of investigations into problems at the Company.  CW1 directly reported to the Chief Compliance Officer who reported to senior executives at the Company and indirectly reported to the Company's Board of Directors.

29.     Confidential Witness 2 ("CW2") worked at Conseco during the Class Period as a Director and Vice President and worked closely with Defendant Wells.  CW2 directed a team of project managers and business analysts in insurance claims for Conseco's Life, Health and Annuity lines of business and was directly involved with the implementation of software projects and modifications.  CW2 was directly involved with Conseco's closed-block LTC line of business and worked with all of Conseco's business departments including Claims, Finance, Actuarial, Treasury, and Compliance.

30.     Confidential Witness 3 ("CW3") served as VP of Financial Operations at Conseco during the Class Period.  CW3's duties involved performing internal audits across Conseco's operations and was involved in the administration of various financial systems.  CW3 reported to Conseco's CEO during the Class Period.

31.     Confidential Witness 4 ("CW4") served as an Internal Auditor at Conseco during the Class Period and performed internal audits across Conseco's operations.  CW4 also ensured that the different operating units of Conseco were complying with company standard operating procedures that had been established for the specific departments.

32.    Confidential Witness 5 ("CW5") served as an actuary at Conseco during the Class Period and was directly involved with the setting of reserves and is knowledgeable about the numerous problems at Conseco that rendered its reserves unreliable.  CW5 participated in regular meetings with Conseco executives, including senior personnel in Conseco's Finance and Actuarial departments, where problems with LTC and other business lines were discussed.

## SUBSTANTIVE ALLEGATIONS

### The Company and It's Business

33.    Defendant Conseco is a Delaware Corporation that describes itself as the holding company for a group of insurance companies operating throughout the United States that develop, market and administer supplemental health insurance, annuity, individual life insurance and other insurance products.  Conseco became the successor to Conseco, Inc., an Indiana corporation, in connection with its bankruptcy reorganization which became effective on September 10, 2003.

34.    During the Class Period, Conseco described its business as being organized through the following: three primary operating segments, Bankers Life, Conseco Insurance Group and Colonial Penn, which are defined on the basis of product distributions; a fourth segment comprised of other business in run-off which contained much of the Company's LTC business; and corporate operations.

35.    Conseco was originally formed in Pennsylvania on July 5, 1887, as a society for beneficial purposes named the Home Beneficial Society.  On December 1, 1964, the Company was reincorporated as a stock limited life insurance Company and the name was changed to Signal Life Insurance Company.  The Company changed its name in 1968 to Penn Treaty Life Insurance Company. Penn Treaty was suspended in January of 1970 and all of its business was reinsured by Pilgrim Life Insurance Company.  The Company was subsequently sold and the suspension lifted. On June 10, 1976, the Company changed its name to American Travellers Life Insurance Company.

In January 1977, Great Valley Investors, Inc., purchased all of the issued and outstanding shares of common stock of the Company. In November 1985, Great Valley Investors, Inc. changed its name to American Travellers Corporation.

36.    On December 17, 1996, Conseco, Inc., acquired American Travellers Insurance Company when it purchased American Travellers Corporation. Centralization of the common service functions moved to Carmel, Indiana in September 1997 with claims processing being performed in Chicago, Illinois, until 2004. In 2004, claims processing moved to Carmel, Indiana.

37.    In 1997, Conseco reorganized its holding company structure with American Travellers Insurance Company becoming a wholly-owned subsidiary of Jefferson National Life Insurance Company of Texas. In addition, Continental Life Insurance Company was acquired. On November 10, 1997, American Travellers Insurance Company became the surviving entity in a merger with another Company, Transport Life Insurance Company. On November 2, 1998, the name of the Company was changed to Conseco Senior Health Insurance Company. Effective September 30, 1999, United General Life Insurance Company was merged with the Company. Continental Life Insurance Company was merged with the Company on October 1, 2000.

38.    On December 17, 2002, Conseco, Inc., filed for permission to reorganize under Chapter 11 bankruptcy protection. Conseco, Inc., completed its reorganization and emerged from Chapter 11 bankruptcy on September 10, 2003.

39.    From 1997 to 2000, a number of other long term care insurance companies merged into, or were acquired by Conseco Senior Health Insurance Company, including, Transport Life Insurance Company, American Travellers Life Insurance Company, United General Life Insurance Company, and Continental Life Insurance Company.

- 12 -

40.     Conseco's long history of mergers and acquisitions was the root of several of the problems alleged herein since the companies utilized different operating procedures, practices and computer systems that were never properly integrated Company-wide.

### Conseco Moves from Chicago to Carmel

41.     Beginning in 2004, Conseco began transferring certain businesses, including its LTC business, from Chicago to Carmel.  As part of that transfer, many of the personnel in Chicago did not transfer over to Carmel.  Since much of their knowledge of LTC was not documented anywhere, this knowledge was no longer available once the LTC operations transferred to Carmel.

42.     According to CW2, who was personally involved with the move from Chicago to Carmel, it was clear that the Chicago operations had not employed standardized processes for LTC. According to CW2, Conseco worked with consultants from Deloitte & Touche ("Deloitte") during 2004 and 2005 and it was determined that the Chicago LTC group had "no standardized processes" that were consistent from one employee to another.  According to CW2, not only were there no standardized processes, but the actuaries in Chicago were "flying blind" with respect to LTC.

### Conseco Concealed Significant Problems with Policy Administration and Claims Processing

43.     Throughout the Class Period, Conseco concealed significant and widespread problems with their claims handling process that directly impacted Conseco's ability to accurately determine its liabilities and establish reserves.

44.     During the Class Period, among other things, Conseco: (i) did not adequately comprehend the terms of insurance policies; (ii) did not record or know basic information about claims payments under policies, such as the diagnostic code a payment fell under or whether policy limits were reached or exceeded; (iii) did not have an automated system capable of recording or analyzing necessary policy information, or claims or payment data to accurately set reserves; (iv)

- 13 -

Conseco deliberately and improperly ignored valid claims and failed to pay claims in a timely manner; (v) Conseco often incentivized employees to inappropriately deny claims; (vi) Conseco manipulated claims data to improve metrics and financial ratios; and (vii) did not have the tools necessary to properly calculate reserves, rendering Conseco's financial statements false, unreliable and without adequate basis.

45.    Internal Conseco documents generated throughout the Class Period that were provided to senior Company executives detailed many of the problems and material internal control deficiencies alleged herein.  Even though some of these documents recommended steps to fix certain problems, many were not implemented.  For example, Conseco documents generated during the summer of 2006 listed numerous material deficiencies in Conseco's LTC (and other business lines) operations that negatively impacted claim costs, claim accuracy, the number of state insurance department complaints and quality of services.  These documents recognized, among other things: (i) Conseco failed to have a comprehensive understanding of all policy contracts; (ii) Conseco overpaid providers; (iii) numerous problems arose form the fact that the claims and managed care processing was primarily conducted in a manual – as opposed to – automated environment; (iv) Conseco had serious problems with claims leakage; and (iv) Conseco did not maintain "accumulators" so Conseco did not track when policy benefits reached their maximum payouts.

46.    As discussed more fully below, many of the problems at Conseco stemmed from the Company's failure to utilize an automated computer system to maintain, analyze, and handle policies and claims.  The lack of adequate automated claims processes forced Conseco to handle many claims processes manually and rendered reserve calculations inaccurate and unreliable.  According to CW2, Conseco's systems weaknesses meant the company lacked "the actuarial science" necessary to calculate reserves.  According to CW2, Conseco's top executives were aware of Conseco's need

for an automated system to process claims, but failed to take meaningful steps to address the problem. According to CW2, Conseco had "no map, no clue" for claims processing and that "for years" they had had "no business reporting any of it [reserves]." According to CW1, Conseco's senior management knew about the critical problems with LTC but the company had "very little strategy" on how to deal with the problems.

47.    According to CW4, the consistently inadequate reserving at Conseco was in part due to a clear failure on the part of Conseco's actuarial staff to accurately forecast reserves for LTC policies. According to CW4, the ultimate failure to take adequate reserves was due to Conseco's senior management who took "nickel and dime" reserves, but failed to take sufficiently large reserves ahead of time because of the negative impact this would have had on Conseco's financial results. According to CW4, Conseco increased reserves "incrementally" even though they should have been taken all at once.

48.    The representations by former Conseco employees alleged herein have been validated by findings of the Multistate Examination, discussed below, which announced a settlement between Conseco and the Multistate Examiners for "*serious issues in* complaint and *claims handling*" for claims filed *from January 1, 2005 through April 30, 2007*.[1] As a result, Conseco agreed to pay a $2.3 million fine and spend *$26 million in improvements to the Company's claims adjudication processes and procedures*. Conseco was also required to "review and re-adjudicate all 'True Initial Denials' of claims denied between 2005 and 2007."

---

[1]    Emphasis added unless otherwise indicated.

**Conseco Deliberately and Improperly Delayed or**
**Eliminated Claims Under Policies Through the No Letter "NL" Close Process**

49.     During the Class Period, Conseco failed to timely and accurately process claims, which, as Defendants knew or recklessly ignored, also materially impaired its ability to issue true and accurate financial statements.

50.     Beginning in 2005 and continuing throughout most of the Class Period, including during much of 2007, Conseco abused a procedure known as the No Letter – or NL – Closed process to improperly delay or eliminate the payment of claims to customers under Conseco insurance policies.  NL Close was supposed to be utilized to eliminate certain duplicate or redundant claims so they would not be included in the reserve assumptions for how many claims needed to be paid.  The NL Close was done on a daily, weekly, and monthly basis.  As discussed below, the NL Close had the effect of eliminating claims from the historical data used to set reserves, even if the claims were ultimately paid.

51.     Conseco abused the NL Close process across Conseco's various blocks of business, including LTC, Annuity, Life and Specified Disease blocks.  Defendants knew, or recklessly disregarded, that during the Class Period, Conseco's reserves were materially understated as a result of the NL Close process.  Furthermore, according to CW2, the improper application of the NL Close process to eliminate claims was "sanctioned by management."

52.     Conseco's reserves were falsely stated since claims that were eliminated by the NL Close were not included in the ratios and calculations of Conseco's actuaries.  According to CW2, Defendant Wells and Conseco's actuaries participated in numerous conversations during the Class Period about this fact.

53.     Claims processors at Conseco were supposed to first handle the claims that were oldest to ensure they did not fall out of "prompt pay" guidelines that required adjudication of claims

within a specified timeframe (*i.e.*, 30 days). Reports at Conseco were generated that showed all the claims in queue by age and by claims processor. The VP of Claims would instruct the Claims Manager to "clear the queue" of claims that were getting ready to fall out of the prompt pay guidelines.

54.     After a claim was received, Conseco had three basic options: (i) pay a claim; (ii) deny a claim; or (iii) or "make it go away" so that the existence of the claim would not be included in the data for a particular time period. The proper purpose of NL Close was to avoid including duplicate claims so that actuaries did not mistakenly include these duplicates in their actuarial calculations. Conseco however, improperly used the NL Close to "make claims go away." If a claim was voided, it showed up in a report, but a claim eliminated by the NL Close was "invisible."

55.     According to CW2, a claimant who was left wondering why their claim was not paid, would call Conseco and then be told that no record of their claim could be found and that the claimant should resubmit the claim. As discussed below, Conseco's claim abuses became so rampant and serious that the U.S. Congress launched an investigation and held congressional hearings on their improper practices.

56.     Conseco knowingly eliminated a very significant number of valid claims through the NL Close process. CW2 said that as many as one in three LTC claims were being improperly eliminated from the queue of claims and this information was discussed with senior Conseco employees, including Brian Wagner ("Wagner"), VP of Long Term Care Claims, who reported directly to Defendant Wells.

57.     According to CW2, "only a fraction" of the claims being "eliminated" by the NL Close process were actually duplicate claims. According to CW2, by eliminating these valid claims from the system, Conseco was "artificially deflating" the number of claims that needed to be

included in the Company's actuarial assumptions thereby resulting in lower reserves. According to CW2, the amount of claims that were being improperly "voided out of the system" by way of the NL Closed had reserve implications of "tens of millions of dollars." CW2 stated that this practice by Conseco was "absolutely inexcusable [and] . . . a big problem" and this practice was "a deliberate avoidance" of claims and "a technique to make claims go away for a period of time," but not for good, because once the claimants resubmitted their legitimate claims, Conseco would be obligated to pay the claim. In other words, the NL Closed temporarily eliminated claims, resulting in a lower reserve, but since the claims would eventually be reinstated, Conseco's liabilities were much greater than represented on Conseco's financial statements.

58.    To further obfuscate the true extent of Conseco's claims exposure, re-submitted claims were paid by Conseco's Risk Management Group, which was not the normal process by which claims were processed. Even though the Risk Management Group paid the resubmitted claims, the group had no standardized process for how the resubmitted claims were to be paid. According to CW2, Conseco engaged in a deliberate practice of first "exhausting the policyholder" by requiring the claimant to resubmit the claim and then, if the claimant did resubmit the claim, "fast-tracking" payment of the claim "to make it go away."

59.    According to CW2, the NL Closed process was "deliberately abused" to deflate the number of claims in "the open claims book." According to CW2, Conseco executives were told by employees that Conseco needed to stop this practice right away and "tell the Street" what had been happening. CW2 said that this was explicitly discussed at a 3-hour meeting with senior Company executives on the Wednesday before Thanksgiving, 2007.

60.     Ali Inanilan ("Inanilan"), who had been Executive Vice President of LTC and had reported to whoever was CEO of Conseco at that time, was a key player in authorizing the improper use of the NL Closed.

### Conseco Compensated and Rewarded
### Employees for Denying Insurance Claims

61.     After LTC moved from Chicago to Carmel, it was headed by Inanilan, who pressured employees to eliminate claims, and in violation of state insurance regulations, rewarded them for doing so.

62.     During the Class Period, Conseco formed the Long Term Care Risk Management Group that, according to CW1, was run by "some of the most unethical" people at Conseco.  The head of this group implemented a program that compensated employees based upon the number of claims that a person denied.  Employees were awarded with flat panel televisions as a result of a high number of claim denials and two secretaries in the group were tasked with buying gift cards that were issued as rewards for denying claims.  LTC employees who denied the most claims were rewarded with various perquisites, including a lavish Christmas party in 2007 where extravagant gifts, food and alcoholic beverages were provided by the Company to over 100 employees.

63.     CW2 attended a meeting with Inanilan in spring 2007 where Inanilan ***directed that claims should be denied whenever and however possible***.  According to CW1, the attitude in the group was to deny a claim "and see what happens."  According to CW1, if a policyholder complained about being denied for a claim, Conseco may have to ultimately pay the claim, but in the meanwhile had "bought time."

### Conseco Bundled and Unbundled Claims to Manipulate Claims Ratios

64.     Conseco also manipulated LTC claims through the use of a procedure known as "bundling."  Customers often submitted individual claims on different dates within a specified time

period.  When claims were bundled (or consolidated), multiple claims submitted by a customer on different dates would be counted as a single claim and paid at the same time.  Bundling multiple claims in this manner reduced the total number of claims in a given period since several individual claims from a single claimant were being counted as a single claim.  If the claims were not bundled together, there would be an increase in the number of claims for that period.  If claims were bundled together and all claims were paid, it would be recorded as a paid claim, but if a single claim in the bundle was denied, it would be recorded as a denial.  Thus, bundling claims negatively impacted the denial rate and unbundling claims improved the denial rate (*i.e.*, – it appeared that Conseco was paying a greater percentage of claims).

65.    During the Class Period, Conseco held quarterly staff meetings to decide whether to bundle or unbundle claims in order to yield desired statistical benefits.  According to CW2, ***Conseco changed its bundling policies several times a year in order to manipulate the claims volume to best serve its interests by manipulating its "denial rates."***  Bundling, however, served to complicate the analysis of claims by Conseco's actuaries and rendered data unreliable.  Bundling claims caused certain claims to be paid earlier in the cycle because they were being included with older claims from the same claimant.  The average claim dollar increased with bundling, which caused problems with actuarial assumptions.

66.    According to CW2, Conseco executives, including Defendant Wells, Wagner  and David Vega ("Vega") were all "very aware" of these bundling issues.  Indeed, when Vega was hired, he set up a procedure whereby employees would maintain a log of different practices that would affect Conseco's actuarial science, including the NL Closed and bundling.

**Conseco Was Unable to Determine It's Liability under Policies
Because It Did Not Maintain Sufficient Information about Policies**

67.    Many problems with setting Conseco's reserves stemmed from the terms of the policies themselves.  All of the LTC policies in Conseco's Closed Block, which was Conseco's block of business where Conseco was not selling new policies but just managing existing policies, were written prior to the start of the Class Period.  These policies were sold with the purpose of enabling the policyholders to live with integrity while receiving care at the policyholder's home or nursing home.  The policies were poorly written and agents were able to modify individual policies.

68.    According to CW1, many of the LTC policies were "not well-written" and had numerous "holes and gaps" that entitled policyholders to file claims for various types of services, including baby-sitting, maid service, and chauffeur service.  Furthermore, the policies typically did not exclude family members from being caregivers resulting in Conseco being obligated to make payments for such claims.  CW2 also stated that the LTC policies were "poorly written, non-specific and non-standard" and resulted in policies unlike anything experienced by even leading consultants and experts in the insurance industry.  According to CW2, the LTC policies were also "priced inappropriately" for the amount of care the policyholders were eligible to receive.

69.    The situation was made even worse in October 2005, when Conseco transferred LTC from Chicago to Carmel and fired most of the employees working in LTC.  Many of the Chicago employees were longtime employees who had worked at the Company for almost their entire working lives.  According to CW1, with news of their impending loss of employment, many of these employees began "throwing stuff away" instead of transferring it to Carmel.  Additionally, according to CW1, since the claims management process was not automated and a significant amount of institutional knowledge about LTC was "in th[e] heads" of employees, this information was no longer available to Conseco when the operations transferred to Carmel.  According to CW1, matters

got so bad that in 2007 and 2008 that Human Resources personnel tried to track down some of the former Chicago personnel so that Conseco's actuaries could interview them to set reserves since without this knowledge "they [the actuaries] couldn't figure out" what needed to be done.

70.     Furthermore, not only did policies have unusual and non-conventional provisions, but there was very little consistency or uniformity across the various policies, rendering assumptions across all policies extremely difficult, if not impossible.  According to CW1, problems were aggravated because so many different types of LTC policies had been sold and one agent could sell numerous versions of a base contract.  Even though each individual policy should have been maintained in Conseco's systems to accurately and effectively manage and forecast expected costs of the policies, many of the policies could not be found and, according to CW1, were "lost forever." According to CW5, Conseco was unable to accurately predict LTC or specified disease claims because of poor data and because many policies had "a gaggle of riders."

71.     According to CW2, the lack of standardization and differences from policy to policy meant that exercising "actuarial science was impossible," and as such, Conseco was unable to accurately set up reserves.  Further adding to the problem was the fact that the appropriate terms of the insurance policies were not loaded into a computer system.  As such, according to CW2, Conseco maintained a "policy library" composed of bookcases filled with binders four to five inches thick with policies going back 20 to 30 years, some of which included handwritten comments and notes that added further nuances and details to the already complex and voluminous policies.

72.     The majority of agents who had sold the policies no longer worked with Conseco and had no ties or connections to the customers, and according to CW1, Conseco did not know what had or had not been represented to the customers.  There was also considerable turnover of actuaries assigned to handle policies.  To make matters even worse, in many cases, Conseco did not even have

copies of many policies that had been sold to customers.  In late 2007 and early 2008, Conseco was forced to have its actuaries personally call policyholders, and based on a pre-written script, request copies of their LTC policies.

73.    Since Conseco did not maintain a central repository of the various contract provisions, claims examiners often paid claims incorrectly, only to find out later that a particular contract was structured differently.  Internal Conseco documents during the Class Period, including a document titled "Conseco Long Term Care Operations Strategic Plan Overview", noted that because the provisions of policies were not well documented, training of claims examiners was challenging and inadequate and because the claims process was manual, there were no "checks and balances" to catch errors.  These documents generated during the summer of 2006, recognized the need for Conseco to leverage the expertise of a consulting firm known to have tools that collect and organize policy contract provisions and to develop a policy repository.  According to CW2, Tim Bischoff, Conseco's senior actuary, stated that a policy repository was needed for all of Conseco's business lines, not just LTC, to accurately compute reserves and that the repository must be scalable so it can be used for all business lines.

74.    The failure to maintain a central repository caused Conseco to not have access to even basic information about policies and claimants.  For example, according to CW2, policy holders would call Conseco requesting coverage information but Conseco would be unable to pull up their coverage information on a computer.  Conseco was forced to attempt to find the paper copies of the policies and review the terms of each policy.  Many times Conseco did not even have paper copies of policies and Conseco employees were forced to request that the policy holder send a copy to Conseco.

75.     During 2005 and 2006, Defendants knew, or recklessly disregarded, that Conseco did not have a comprehensive understanding of insurance policy contracts but refused to fix the problem. In connection with Conseco's "purported" remediation efforts in 2007, discussed below, Conseco attempted to develop a policy repository and retained the Long Term Care Group to assist with the development of the project. Even though this project was started in 2007, it encountered numerous problems and delays and Defendants misrepresented the progress achieved or the benefits derived therefrom. According to CW2, since Defendants were reporting information of this project to investors, the project was split into phases so that management could report that progress was being made, even though the benefit of the repository would not be realized until the project was completed.

76.     The project was broken down into three phases: Phase 1 constituted the scanning of policies as ".pdf" files into a computer system and the ability to print out policy pages; Phase II constituted the loading of benefits under the policies into the computer system; and Phase III constituted the ability to run all claims data to make sure values were correct and the ability to use that data to compute reserves. Thus, at a minimum, Phase II needed to be completed before the system could be used to begin to improve the setting of Conseco's reserves and Phase III needed to be completed before the data could be accurate. According to CW2, Phase II was not completed until 2009 and without the completion of all three phases, there was "absolutely no basis for Conseco to represent that its reserves were accurate" because it did not have the information it needed about its customers' policies to set reserves.

### Conseco's Computer Systems Failed to Adequately Automate and Handle Claims

77.     Inadequate computer systems caused two fundamental problems for Conseco that rendered its reserves unreliable. First, as discussed above, Conseco failed to maintain data and

policy information in a central computer repository so Conseco could not calculate actual or estimated liabilities under its policies to set reserves. Second, Conseco did not utilize a computer system for recording claims data, including the payment of claims, that provided the information necessary to accurately determine liabilities or calculate reserves. Furthermore, Conseco was unable to determine when policy benefits had – or would be – be exhausted, impairing Conseco's ability to calculate reserves and causing Conseco to over-pay on policies that had already reached policy limits.

78.    From the start of the Class Period, Conseco utilized a computer system known as the "BICPs" system for handling of claims across all business lines. According to CW2, BICPs was essentially a "homegrown check writing" system that required claims processing to be handled manually in order to print checks to pay for claims and this system was extremely unsophisticated, unwieldy and inadequate for the complexities of Conseco's LTC claims processing requirements. Once a claim was paid under BICPs, information about that claim was written in a "text field" in BICPs and not stored in a database in the event that any information was recorded at all. Thus, Conseco was unable to generate reports or obtain granular data about claims. These types of reports and data were essential for actuaries to determine potential liabilities. As a result, Conseco did not have the information necessary to accurately calculate reserves.

79.    Additionally, since the BICPs system did not enable Conseco to allocate policy benefits payments, Conseco was unable to determine when limits on a policy were reached or how much exposure was left under its policies. For example, if a claim was paid for a nursing home, Conseco did not record that the payment was a nursing home payment as opposed to a payment for medical services or other covered items. According to CW2, this significant problem was known by Conseco's senior management during the Class Period but was never corrected.

- 25 -

80.     Policy accumulators track the total amount of benefits paid on a particular policy, and alert claims adjusters as to when benefits have expired.  According to internal Conseco documents from the summer of 2006, since Conseco did not utilize accumulators and information was paper based, Conseco regularly paid claims in excess of the benefit maximums. Internal Conseco documents stated that this problem must be addressed.

### Conseco's Myriad of Computer Systems
### Caused Information to Be Inaccurate and Incomplete

81.     Conseco was built through numerous acquisitions of various companies operating different computer systems to keep track of data, including claims information and financial information.  According to CW3, during the Class Period, there were as many as 19 different computer systems in use.  The large number of computer systems created serious problems with compiling, organizing and computing data.  One problem with the different systems was that the business segments used different accounting methods to account for very similar or identical transaction resulting in errors in the "consolidation in the general ledger."

82.     According to CW3, and people s/he discussed this with in Conseco's accounting department, because of the use of the different computer systems and errors with those systems, Conseco's corporate accounting staff was aware that accounting information from Conseco's different segments "was not accurate" during the Class Period.  CW3 discussed with "a lot of people" in Conseco's corporate accounting department that accounting information being reported to investors was not correct.  According to CW5, LTC and other blocks at Conseco lacked reliable data and that "over the years" there were too many "changes in the claims flow administration" to reliably make actuarial assumptions.  According to CW5, these "constant" changes "wrecked the actuarial data" for LTC and CW5 recalled frequent complaints and concerns from the actuaries working on LTC about "how fragile the data was."  According to CW4, the company had so many

systems in place because of acquisitions the company had made over the years, and trying to integrate all of these systems at one time was "a nightmare."

### Conseco's Computer Systems Had Serious Coding Problems Rendering Data Unreliable and Conseco's Financial Statements False and Misleading

83.    Throughout the Class Period, Conseco had ongoing coding issues which caused misrepresentations in Conseco's financial statements.  Coding issues are gaps between known issues in claims processing and assumptions in Conseco's computer system that caused large changes to actuarial assumptions and results derived from those assumptions.   Unresolved, a coding issue becomes more and more incorrect.  For example, different blocs of business that Conseco had acquired used different processes and codes.

84.    According to CW2, during the Class Period, Conseco employees told Conseco's executives about the coding problems and "how out of whack" Conseco's actuarial assumptions were because of these coding issues.  According to CW2, many of the reported coding issues were never corrected because of the substantial impact they would have on Conseco's financial results and its reserves in particular.  According to CW2, although it was "technically possible to fix" the problems that were identified and reported, Conseco's executives would delay implementing any solutions because resolving the problems would reveal that Conseco had been "under-reserving." Thus, Defendants were aware of coding problems resulting in insufficient reserves for claims but they intentionally refused to fix the problems in an effort to manipulate Conseco's financial performance.

### The Genelco Project Was Intended to Automate Claims Management, but Was Abandoned

85.    According to CW2, after Conseco moved the claims operations from Chicago to Carmel, an IT project under SVP of IT Gary Brown, was undertaken aimed at reducing the number of "homegrown and cobbled together" platforms and systems at Conseco.  This so-called "health

system simplification" project led Conseco, with the assistance of IBM, to select an application from Genelco with a cost of approximately $45 million. The Genelco Project was a proposed computer program that would automate – across all of Conseco's business lines – claims handling, claims payments and the setting of reserves for claims. This initiative was supposed to rectify LTC system deficiencies and enable Conseco to correctly set reserves for LTC and to pay LTC claims in a timely and accurate manner. The Genelco system was supposed to enable Conseco to record and maintain the information it lacked through the BICPs and other systems.

86.    CW2 emphasized how the Genelco "project existed" because it would "allow us to finally control and standardize" claims processing. CW2 noted that by pursuing the Genelco application, Conseco was tacitly acknowledging the existing shortcomings and deficiencies of its existing systems, and that Conseco – and LTC, in particular – was incapable of adequately adjudicating claims.

87.    According to CW1, Defendants ultimately cancelled the Genelco Project because of "cost issues" and one-time CEO Bill Shea and Defendant Hohmann were involved in this decision. Without Genelco, or a similar alternative, Conseco was forced to continue to handle claims, make payments and set reserves manually, resulting in Conseco's continued inability to accurately set reserves. According to CW2, *when Genelco was cancelled, Conseco employees were told by management to destroy any related documents; many of which listed the problems with claims adjudication*. According to CW2, by cancelling the Genelco Project, Conseco "purposefully never addressed" the major systems shortcomings that the company knew existed.

**The Groomer System: A Low Cost Alternative to Genelco that Failed to Address the Significant Problems with Conseco's Claims Processes**

88.    After the Genelco Project was cancelled, Conseco created the "Groomer" system as a substitute for Genelco. The Groomer system was a "slat file" that "pulls data" from a computer

mainframe. This data, however, did not have "integrity" in order for Conseco to set accurate reserves. Lacking this integrity, Conseco "made assumptions" for the LTC reserves instead. According to CW1, Conseco changed the assumptions used for deriving the reserves and made certain changes in the Groomer system "to look good" or otherwise legitimize the reserves that were taken.

89.    According to CW2, the Groomer system was essentially "an assumption engine" that takes in to account many different types of data to derive different assumptions and it was highly unreliable. For example, nowhere in the Groomer system was a field to indicate if a claim had been previously voided in the NL Close process and was now being resubmitted. The Gromer File was used to determine the Company's claims exposure and set reserves. Since the Gromer File did not incorporate the misuse of NL Close and resubmission of claims, Conseco's reserves could not have been - and were not – accurate during the Class Period and this was known by Defendants.

90.    According to CW2, *Conseco's Groomer system was so primitive and lacking in "science" that Conseco's actuaries could not even determine the sex of the policyholders*.

### Conseco Overpaid Providers for LTC and Group Health Lines Claims

91.    Since Conseco had a manual processing environment, claims were often overpaid due to incorrect processing, duplicate bills or errors on bills from providers. Internal Conseco documents during Summer 2006 recognized this problem and the need to employ a strategy to recover overpayments to providers through a third-party vendor specializing in claim recoveries. Even though Conseco was aware of this problem from the start of the Class Period (and earlier), it was not until the summer 2006 that there was a formal recommendation at Conseco to attempt to recover overpayments. Prior to this time, Conseco determined that recovering overpayments from policyholders was not desired due to the negative image that could result, even though such recovery

efforts were common and accepted practice in the industry.  Conseco's data related to payments on claims was inaccurate as a result of overpayments.

92.    A related problem concerned something referred to as "claims leakage."  Claims leakage is the difference between what Conseco spent on a claim and what should have been spent. Internal Conseco documents during the summer of 2006 discussed the claims leakage problems and recommended that a claims leakage study was needed to identify specific claim errors and to enable Conseco to make corrections.

**Conseco Did Not Audit Third-Party
Administrators for the Group Health Block of Business**

93.    For a number of insurance policies in the Group Health block of Conseco's business, Conseco retained a third-party administrator to manage claims.  For much of the Class Period, Conseco failed to audit this third-party administrator.  Indeed, internal Conseco documents from summer 2006 state that since this third-party administrator had not been audited, Conseco did not know whether and to what degree errors were being made, including overpayment of claims, which may be impacting the financial performance of the Company.  It was recommended internally at Conseco at this time to establish an audit process to attempt to address this issue.

**Conseco's Senior Executives Were Aware of the
Significant Problems and Material Internal Control Deficiencies**

94.    Defendants knew, or recklessly disregarded, that Conseco's financial statements were materially false and misleading and could not be relied upon by investors.  According to CW2, there were conversations among Conseco personnel "all the time" that there were problems with Conseco's financial statements due to the lack of integrity with Conseco's data concerning its insurance policies, claims and payment data.  Internal documents generated during the Class Period discussed that the manual environment for claims and managed care processing caused problems and that this was a "known issue in the organization."

95.    Conseco's senior executives, including Defendants, knew of, or recklessly disregarded the widespread Company problems, which included, *inter alia*: (i) claims processing and adjudication; (ii) the setting of reserves; (iii) unreliable financial reporting; (iv) problems caused by the lack of an automated computer system to handle claims and record and analyze data; (v) lack of any real progress on fixing problems; and (vi) the resulting false and misleading statements issued by Defendants during the Class Period.

96.    As early as 2004, then CEO Bill Shea ("Shea") worked closely with Conseco's Fraud Department on LTC issues.  According to CW2, beginning in 2004, LTC was "the headline" topic for "all conversations."  During the Class Period, Conseco dedicated an entire conference room known as the "War Room" solely for addressing the multiple and serious problems with LTC, equipped with a large conference table and white-boards.  According to CW2, Shea declared that Conseco "needed a War Room" specifically dedicated to LTC.

97.    According to CW5, in 2006 and 2007, there were "terrible issues" with LTC and Conseco management was clearly "troubled."   During the Class Period, CW5 participated in quarterly meetings with senior personnel in Conseco's Finance and Actuarial departments, including Defendant Bonach, where "lots of data issues" were discussed.  It was discussed at these meetings that LTC was relying on information systems and databases that were "the crudest possible" and that the LTC actuaries were unable to "line up data" regarding when claims were incurred, the kinds of claims incurred, and when a claim was closed.  Instead, LTC actuaries were only able to get "a big bucket" of data with very little clear or specific detail.

98.    According to CW1, throughout the Class Period, each individual who held the position of CEO, including Defendants Preier and Kirsch, held and participated in meetings in the War Room – ***on a daily basis*** – to discuss problems in LTC.  According to CW2, daily meetings

began in the War Room at 8:00 a.m. and became something of an "oh, s*** room" where the question "What the h*** are we going to do?" was often asked in response to some new development involving LTC. According to CW1, the sense of crisis pervasive in the War Room meetings contrasted markedly with the Company's soothing comments "to the Street" during much of the Class Period that "all was fine."

99.  The problems with Conseco's LTC division were so severe – and widely known – at Conseco that the Company was forced to pay LTC employees more favorably than employees in other departments. According to CW2, it was necessary for Conseco to offer generous benefits to LTC personnel because "no one wanted to go into the department" because it was "so screwed up." CW2 had been explicitly cautioned that if s/he were to accept a position in LTC it would likely be the last position s/he ever had at the Company. In fact, Conseco's Human Resources department also cautioned CW2 about taking a position with LTC, acknowledging that the department was "poaching" personnel by tempting them with high salaries.

100.  According to CW2, executives in LTC routinely needed data and asked for data "on this or that policy type." But, when the data was pulled and reported to Company executives, including the Director of Claims, the responses were often, "Oh, my G_d! We're going to get in trouble with the regulators . . ." or "We've got to call the actuaries" to discuss this data. However, according to CW2, time would go by and CW2 would be told that Conseco's actuarial models and methodologies could not be "tuned" to absorb the correct data and the use of the data would negatively "affect [Conseco's] stock." According to CW2, Conseco's actuaries utilized assumptions far more than the actuaries of other insurance companies and Conseco's actuaries deliberately excluded newly emerging information from their calculations because absorbing this data would throw off their previous calculations by too wide of a margin.

101.    According to CW2, who participated in meetings with senior Company executives during the Class Period, Conseco's top management knew about the problems with the data but did not care if it was resolved.  Furthermore, CW2 heard a Conseco executive state: "we have no idea how anyone knows" Conseco's actual financial position because Conseco's data integrity "was built on sand and shifting" constantly.

102.    The cause of the severe problems with claims handling at Conseco, while known or recklessly disregarded by Defendants, were not uncovered by outside insurance regulators. According to CW1, insurance regulators did not investigate the validity of Conseco's financial results and did not delve into Conseco's actuarial assumptions and processes for determining reserves, such as the inadequate Groomer system.  Similarly, Defendants hid many of the problems from its outside auditors.  According to CW1, Conseco's external auditors did not examine Conseco's "market conduct" such as the timeliness of claims or other problems with the handling of claims by Conseco.

103.    There was a Company wide culture at Conseco that placed pressure on – and financially rewarded – employees for reducing expenses by eliminating claims – regardless of whether the claims were actually valid.  Senior executives at Conseco also established a culture that encouraged employees to withhold important information from them about problems with Conseco's claims processes.  For example, CW2 recalled two Business Analysts coming to his/her office, closing the door and requesting a "sidebar meeting."  The Business Analysts had determined that Conseco's Groomer system was treating certain policies as not having certain benefits that the policies actually had.  The Business Analysts reported their determination to an actuarial analyst who "explicitly" told them not to report their findings to "management."  Nevertheless, a Conseco

employee reported this information to Wagner, who responded by stating that the employee was not supposed to have told him this information.

104.    Wagner's response was similar to instructions that employees received from Conseco Executive Vice President Russ Bostick, who told at least one Conseco employee: there are "going to be many things we are not going to discuss in this office. . . .  I [Bostick] am an officer and there are things I do not want to discuss."

105.    According to CW3, it was obvious to him/her and other personnel that LTC was "a big problem" for Conseco, particularly given "the size of the miscalculations" involving the costs and reserves that were necessary.  According to CW3, numerous reports provided to senior personnel of the Company mentioned the significant problems with LTC and indicated that Conseco was "under-reserved" and "the expenses [of Conseco] had been underestimated."

106.    It was clear to CW4 during the Class Period that Conseco's Run Off segment – particularly LTC – was "dragging down the company" and could eventually bring Conseco "down to its knees."  CW4 also had these concerns because of ongoing losses due to Conseco's failure to establish sufficient reserves.  According to CW4, the Run Off segment was receiving "more attention" than any other business segment or operation at Conseco, and not just from an internal audit standpoint, but also from Finance and "senior management."

107.    According to CW4, during 2004-2005, Conseco auditors performed a detailed audit lasting approximately nine months and developed "a real handle on what was going on and knew the nuts and bolts" of the problems with the LTC segment, including Conseco's failure to set adequate reserves.  The results of the detailed audit were submitted to the Company's audit committee of the board of directors.

108.    According to CW5, Conseco was concerned that the LTC problems could inflict "collateral damage" on the rest of Conseco if, for instance, regulators imposed penalties on Conseco requiring it to "fix" LTC regardless of the impact this might have on the rest of the Company and CW5 remained "very uneasy" about this risk at the end of 2007. CW5 had no sense that matters with LTC were ever improving because "the news was never good."

109.    According to CW1, *Conseco's senior management "deliberately" created the wrong reserves and "deliberately misled" investors regarding the costs and reserves for LTC*. CW1 was told by at least one other Conseco employee that Conseco's senior management "purposefully" came up with inadequate reserves. Furthermore, according to CW1, concerns about Conseco's incorrect and inadequate reserves were reported by Conseco employees to Conseco's internal audit staff, the board of directors, and personnel in Conseco's compliance group.

110.    Defendants knew, or recklessly disregarded during the Class Period, that Conseco had material weaknesses in internal controls. According to CW1, Conseco held regular monthly meetings attended by senior management to discuss compliance with federal regulations and internal controls. According to CW1, throughout the Class Period, material weaknesses in internal controls were brought to the attention of Conseco management, but those in charge refused to take the necessary steps to try to fix the problems. CW1 recalled that at one meeting it was suggested that a recommendation to remediate problems through the development of a "procedures manual" was flatly rejected by Conseco executives. Not only did Conseco executives refuse to fix problems, they also got angry when problems were uncovered by employees. *CW2 recalls presenting a problem and solution at one of these meetings and was told by a Conseco vice president that "you come before us again" reporting more internal control problems "we will scalp you."*

111.    Additionally, Conseco employees responded to questionnaires and certificates of compliance and disclosure that were submitted to Conseco's internal audit groups which stated that Conseco issued misleading information about its business but these complaints were not addressed.

### Outside Consultants Were "Blown Away" by the "Mess" at Conseco

112.    During 2007, Conseco retained the Long Term Care Group, Inc. ("Long Term Care Group"), a Minnesota-based consultant firm that specializes in LTC.  In addition to serving as a consultant, the Long Term Care Group handles the processing of LTC claims for various insurance companies.  According to CW2, when Long Term Care Group personnel began working with Conseco, they were "blown away by the mess" at Conseco's LTC block of business and the inadequacies of Conseco's systems.  According to CW2, the Long Term Care Group personnel told Conseco representatives that they had assumed, at a minimum, that Conseco would have in place certain systems (such as those of the cancelled Genelco project), to which Conseco personnel responded, "No, we don't."  And scenes like this were apparently repeated numerous times with other outside consultants, including Deloitte and other firms that focus on long term care issues – namely, that what the outsiders found at Conseco was "completely unexpected" and far worse than they had anticipated.

### Project Rubik and Conseco's Efforts to Dispose of LTC

113.    During late 2006 and early 2007, due to the serious nature of the Multistate Examination (discussed below), Defendants were forced to reveal some information about the problems at Conseco and slightly increased Conseco's reserves for LTC.  Conseco selectively and in a calculated fashion released information about problems with its internal controls and procedures and inadequate reserves but continued to hide the most significant problems.  Even though Conseco disclosed limited information about its problems, Defendants withheld a considerable amount of material information from investors.

114.    Defendants also resisted increasing reserves as much as they knew – or recklessly disregarded – were required in order to minimize the negative impact that full and complete disclosure would have had on Conseco's financial results and stock price.  A significant motivator for the selective release of truthful and negative information was because the Company was attempting to sell or otherwise dispose of LTC.  In concert with the selective disclosure of information, Defendants engaged in a scheme to make it appear that they were taking steps to correct the problems that existed at LTC in order to appease regulators and best position itself to dispose of LTC.

115.    Thus, as detailed more fully below, in connection with its release of financial results for the fourth quarter and year ended December 31, 2006, Conseco disclosed that it uncovered some material weaknesses in its internal controls and procedures.  Conseco, however, portrayed these problems as being the result of innocent mistakes and that it was taking steps to identify and correct those problems.  In truth and in fact, however, the problems were much more severe and pervasive than disclosed.  Defendants were fully aware – for years – of the material weaknesses in internal controls, and that any efforts made to correct the problems were made merely for appearances. Defendants were not committed to actually addressing and fixing the numerous problems at the Company.  Instead, Defendants sought to apply "band-aids" to problems at a minimal cost in order to give them time to dispose of LTC before they would be forced to reveal the true extent of the problems.  Defendants were simply not willing to spend the money required to adequately fix the problems.

116.    The code name for the project to dispose of LTC was "Project Rubik."  According to CW1, Project Rubik was an effort by Conseco's "top layers of management" to get LTC "off the books" once and for all and an effort by Conseco to "wash its hands of Long Term Care

completely." As part of the initiative, Conseco hired a group of consultants to customize the LTC computers in an attempt to fix coding errors that resulted in unreliable data and assumptions, including with respect to potential liability under policies. The goal of this project was similar to the abandoned Genelco Project. Conseco, however, only dedicated approximately $10 million to Project Rubik, even though, according to CW1, Conseco's senior management knew that such an endeavor would cost approximately $45 million. Conseco adopted manual – as opposed to automated – processes to analyze and handle claims. This manual solution, however, was insufficient and destined to fail. According to CW1, the manual processes were inadequate to "fix the coding problems" in the LTC computers and "everyone knew it."

117.    Conseco was unable to find a buyer for LTC so it ultimately transferred LTC to the State of Pennsylvania. According to CW1, the State of Pennsylvania agreed to take over LTC to fulfill its "duty to protect consumers."

118.    In an August 11, 2008 press release titled, *Conseco Announces Plan to Transfer Conseco Senior Health Insurance Company to Independent Trust*, Conseco announced its plan to transfer Conseco Senior Health Insurance Company to an independent trust to be named Senior Health Care Oversight Trust, subject to the receipt of approval of the Pennsylvania Insurance Department. The Pennsylvania Insurance Department approved the transfer of SHIP from Conseco on November 12, 2008.

119.    Under the terms of the transaction, all of the stock of CSHI, including its approximately $2.9 billion in assets (as calculated in accordance with statutory accounting principles) supporting CSHI's long-term care liabilities were transferred to the Independent Trust. In connection with the transaction, Conseco contributed $175 million of additional capital to CSHI and

- 38 -

the Independent Trust.  Following the transfer, CSHI was re-named Senior Health Insurance Company of Pennsylvania or SHIP.

120.    Thus, the problems at LTC were so severe that Conseco was unable to sell these assets to a buyer and instead was forced to transfer the assets to a trust and contribute an additional $175 million.  In other words, instead of selling LTC, Conseco paid $175 million to get rid of it.

### Defendants Carefully Prepared What to Say – and What Not to Say – on Analyst Conference Calls

121.    Throughout the Class Period, Defendants withheld material information from investors about the substantial problems at the Company.  After Defendants disclosed limited information about material weaknesses in the Company's internal controls and procedures in connection with the Company's financial results for the period ended December 31, 2006, Defendants became even more careful and calculated in their disclosures.  Thus, during 2007 and 2008, before earnings conference calls with analysts, Defendants held in-person meetings to strategize on how to respond to potential questions that could lead to the discovery of concealed material information.  According to CW2, the purpose of these calls was to "brainstorm" and to outline what the Company's senior executives were "going to say and what questions" might be asked during the earnings calls.  CW2 attended these meetings in 2007 and 2008, which were also attended by Conseco's senior executives and "very senior actuarial executives," where attendees helped prepare written responses for questions that were anticipated to be asked by analysts on the earnings calls.

122.    CW2 recalled Company executives on these calls saying: "Oh, my G_d, come up with something else, because we cannot say this."  CW2 was often alarmed at how Conseco management chose to address and disclose certain matters because they misrepresented facts to investors.

**Additional Material Weaknesses in Internal Controls**

123.    According to CW4, Conseco had "a pretty big mountain to climb" in terms of identifying and mitigating internal control deficiencies and risks.  Departments often did not have defined standard operating procedures, or – if they did have them – did not adhere to what the procedures specified.  According to CW4, during the Class Period, Conseco's internal audit staff "were not welcomed" by the managers of Conseco's various departments, which manifested into "a lack of cooperation" on the part of the managers and their personnel.  According to CW4, this "speaks volumes of the mentality" throughout the company about how internal audit was perceived.  According to CW4, "controls" to mitigate risks were not being put in to place or not being followed in those instances when controls were in place.  According to CW4, the staff internal auditors and their managers recognized the high degree of internal control risk at Conseco.

**Conseco Failed to Maintain Adequate Controls over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations**

124.    The SEC defines "disclosure controls and procedures" as follows, in relevant part:

> [c]ontrols and procedures . . . of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

17 C.F.R. §240.13a-15(e).

125.    "Internal control over financial reporting" is defined by the SEC, as follows:

> [A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* and includes those policies and procedures that:

(1)    Pertain to the maintenance of records that, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2)    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3)    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. §240.13a-15(f).

126.    Exchange Act Rule 13a-15 requires the Company's principal executive officer and principal financial officer to annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures, and provide management's assessment of the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year.  17 C.F.R. §240.13a-15(b)(1) and (c).

127.    In the Company's 2005 second and third quarter Forms 10-Q, and 2005-2007 Forms 10-Q and 10-K, Defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting, insofar as they falsely and misleadingly failed to disclose that the Company's disclosure controls and procedures, and internal controls over financial reporting were materially deficient for the reasons set forth herein.

128.    In addition, the Company's 2005 second and third quarter Forms 10-Q, and 2005-2007 Forms 10-Q and 10-K contained the Sarbanes-Oxley certifications, signed by Conseco's CEO and CFO at each relevant time period.  As alleged in detail below, the statements made in the

certifications were each materially false and/or misleading when made for the reasons set forth herein.

### State Insurance Regulators Investigate Conseco's Claims and
### Complaint Handling Practices and Sales and Marketing Practices

129.    Normally, the individual states in which Conseco operated reviewed and audited Conseco on an individual state basis, were not meaningful investigations and did not garner much attention from the press or analysts.  During 2007, however, numerous states in which Conseco operated conducted a so-called "multistate" regulatory audit of Conseco.  According to CW1, because Conseco "kept screwing up" on regulatory matters, the states – led by Pennsylvania – undertook a coordinated, multistate regulatory audit.  CW2 stated that this multistate audit was "a big deal" and could have led Conseco to "losing their license" depending on the findings.

130.    On or about April 10, 2007, forty state insurance regulators began the investigation (the "Multistate Examination") into improper business practices at certain Conseco subsidiaries, including, Conseco Senior and Bankers Life.  The Commissioner of Florida Office of Insurance Regulation, the Director of the Illinois Division of Insurance, the Commissioner of the Indiana Department of Insurance, the Commissioner of the Pennsylvania Insurance Department, and the Commissioner of the Texas Department of Insurance were the lead regulators in the investigation (the "Lead Regulators").  The Pennsylvania Insurance Department led the entire Multistate Examination.  The Multistate Examination was coordinated with the National Association of Insurance Commissioners' ("NAIC") Market Analysis Working Group.

131.    The purpose of the Multistate Examination, which was conducted between July 9, 2007 and October 19, 2007, was to determine if Conseco was maintaining – previously and at that time – appropriate business practices, especially in the LTC insurance lines.  The time period

covered by the Multistate Examination was January 1, 2005 through April 30, 2007. The Multistate Examination focused on claims and complaint handling.

132.    The Multistate Examination revealed many problems with Conseco's claims and complaint handling process throughout the Class Period but failed to reveal others. Indeed, as discussed below, Conseco provided false and misleading information to the Multistate Examiners.

133.    On May 7, 2008, the NAIC announced a 40-state settlement with Conseco as a result of the Multistate Examination. The May 7, 2008 press release stated, in pertinent part:

> State insurance regulators, working together through the National Association of Insurance Commissioners (NAIC), today announced the details of a regulatory settlement agreement between 40 jurisdictions and Conseco, Inc., due to a pattern of consumer harm in the company's long-term care insurance business. This multistate investigation has resulted in a $2.3 million fine and $30 million in claims-handling improvements and restitution.

> "Consumers need to have confidence in the insurance products they're buying and in the companies they're doing business with," said Montana State Auditor John Morrison, who chairs the NAIC Market Regulation and Consumer Affairs Committee, which oversees multistate examinations. "As state insurance regulators, our No. 1 job is to protect consumers by making sure companies pay claims in a prompt and appropriate manner – and to take regulatory action when they fail to do so."

> The states of Florida, Illinois, Indiana, Pennsylvania and Texas led the settlement negotiations. According to the terms of the settlement, Conseco will pay a $2.3 million penalty to be shared by all participating states; pay at least $4 million in restitution and administrative costs to harmed policyholders; and invest $26 million in system upgrades and improved claims administration. Conseco is also obligated to pay an additional $10 million in fines if problems are not corrected.

> "Conseco is among the nation's largest long-term care insurers," said Pennsylvania Acting Insurance Commissioner Joel Ario, whose department served as the lead state on the investigation. "It is vital that long-term care insurers make prompt and appropriate payment of claims to consumers who are older and whose life and well-being are dependent upon it. Conseco failed this test."

> Specifically, the on-site examination showed that:

> - *Investigation of pending claims were not handled in a timely manner*;

> - *Claim files were not properly documented or maintained*; and

- 43 -

- ***Time frames for company responses to claimants did not adhere to applicable regulations.***

The settlement involves two Conseco subsidiaries – Conseco Senior Health Insurance Company and Bankers Life and Casualty Insurance Company – and covers claims filed from Jan. 1, 2005, through April 30, 2007.

\*       \*       \*

According to the terms of the settlement, Conseco Senior Health Insurance Company, which is not actively writing new policies, will automatically review 1,112 claims that were initially denied; will provide notices to another 18,000 policyholders covering 49,000 claims that may have been partially denied or subsequently denied after initial payment; and will set up a toll-free call center for all claimants who believe their claim settlement was not handled properly. The investigation found that the primary problems in most cases were delays in claim payments, rather than outright claim denials.

In the case of Bankers Life and Casualty Insurance Company, which is writing new policies, the investigation uncovered inadequate marketing and sales compliance issues. The settlement requires Bankers to:

- Enhance its producer (agent) training program;

- Eliminate producer complaint thresholds, so that a single complaint can result in disciplinary action;

- Regularly review experience-period results for all producers; and

- Supervise all producers and terminate them due to non-compliance with marketing standards.

Going forward, both companies are required to:

- Revise claims-handling procedures to guarantee timely and accurate processing;

- Handle all complaints completely and in a timely fashion;

- Create a centralized complaint database; and

- Establish a countrywide contact for complaints.

State insurance regulators will conduct ongoing monitoring for appropriate compliance benchmarks for complaint and claims processing; implement quarterly reporting requirements; and, ultimately, conduct a re-examination of the companies to ensure that all problems have been corrected.

**Conseco Misrepresented Facts to the Multistate Examiners**

134.    As discussed below, even though the Multistate Examination revealed problems, Conseco hid information from and misrepresented facts to the Multistate Examiners.

135.    The Multistate Examination Report found that Conseco failed to adequately send out acknowledgement letters to customers after receiving claims under insurance policies.  As stated in the Multistate Examination Report:

> The Company created a system in August 2005 that automatically generates an acknowledgment letter upon the receipt of a claim.  This acknowledgment letter is a form letter and does not include the assigned claim number.  Therefore, when a claimant submits more than one claim to the Company, it has no way of identifying to which claim the acknowledgement letter pertains.  Many of the claim files produced in 2005 do not have acknowledgement letters.  Automatically generated acknowledgement letters were often not included in the files provided to the examiners.

136.    Defendants misrepresented to the Multistate Examiners that after 2005 Conseco created a system in August 2005 that automatically generates an acknowledgment letter upon receipt of a claim.  According to CW1, Conseco had not developed a system to automatically generate acknowledgment letters upon receipt of claims after 2005.  Indeed, the Multistate Examination Report states: "Automatically generated acknowledgement letters were often not included in the files provided to the examiners."  These letters were not in the files because the computer system did not exist.

137.    Conseco misrepresented to the Multistate Examiners steps it was taking in May 2007 to address claims payments or denials not in compliance with state prompt pay requirements. Conseco falsely reported to the Multistate Examiners that: (i) Conseco generated management reports to allow for daily review of claims work in process so that claims can be monitored against each state's prompt pay requirements; (ii) claims adjusters have been trained to refer to the date the claim was actually received to determine accurate pay or deny due dates; (iii) the Company

- 45 -

implemented a work management system in November 2006 that tracks and reports work items by state; and (iv) claims units have been regionalized to allow individuals to focus on specific states, thereby becoming more familiar with the unique regulations of the state they support.

138.    Conseco misrepresented to the Multistate Examiners steps it was taking in May 2007 to address the fact that claims were incorrectly processed and benefit payments were incorrectly calculated.  Conseco misrepresented to the Multistate Examiners that the claims auditing processes had been improved and remediation had been performed as requested or required by the departments as part of market conduct exams.  Conseco failed to disclose to the Multistate Examiners that actual remediation would require the implementation of an automated computer system along the lines of the Genelco project; something that Conseco had abandoned and had no plans to reinstate.

139.    Conseco misrepresented to the Multistate Examiners that the inappropriate use of the NL Close claims designation was discontinued by May 2007 even though Conseco employees continued to use NL Close well after that point in time.

140.    Thus, at the same time that Defendants were misrepresenting the true nature and extent of its problems to investors, Conseco was misrepresenting many of these facts to the Multistate Examiners.  Conseco's senior executives, including Defendants, knew, or recklessly disregarded, that Conseco misrepresented facts to the Multistate Examiners.  For example, a January 2008 Questionnaire and Certification of Compliance and Disclosure informed Conseco's internal audit group that Conseco had made misleading statements to the Multistate Examiners in connection with their investigation.  That individual never received a single follow-up question or inquiry about that serious complaint.

### Congress Investigates and Hold Hearings
### on Conseco's Improper Claims Practices

141.    As a result of Conseco's abuses of the claims process, during 2007, the House

Committee on Energy and Commerce of the United States House of Representatives began an

investigation and requested that the Company provide it with "anything in writing" that indicated

Conseco rewarded or motivated personnel to deny claims.

142.    On May 25, 2007, *The New York Times,* reported, in part:

The House Committee on Energy and Commerce has asked Conseco and the Penn
Treaty American Corporation, two of the nation's largest sellers of long-term care
insurance, to produce documents showing how the companies market long-term care
policies and handle policyholder claims.

*            *            *

According to court documents, Conseco, Penn Treaty and other insurers developed
policies that rejected policyholders' claims because they had failed to submit
unimportant paperwork, filled out the wrong forms after receiving them from the
insurance companies or because facilities had been deemed inappropriate even
though they were licensed by state regulators.  In California alone, nearly one in
every four long-term care claims was denied in 2005, according to the state.

Those details, when reported by *The Times* in March, prompted an outcry of
complaints among insurers who said that most long-term care policyholders were
satisfied with how their claims had been handled.

143.    According to CW2, the committee wanted Conseco to "send everything" about "how

do your manuals talk about claims processing and your claims denial basis."  Conseco employees

prepared approximately 40 bankers boxes of the requested materials, including manuals and

descriptions of internal controls.  Wagner, however, did not want to turn over all of the materials and

on more than one occasion asked a Conseco employee whether it was possible to not turn over some

of the materials to the Committee and indicated that materials should be destroyed as opposed to

turning them over.  That employee, however, refused to destroy any documents.  Concerned that

Wagner would destroy documents, this Conseco employee personally made sure that the boxes were turned over to Conseco's counsel.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### 2Q05 Financial Results

144. The Class Period begins on August 4, 2005. On that date, Conseco issued a press release announcing its financial results for the second quarter of 2005, the period ended June 30, 2005 ("8/4/05 Press Release"), which stated, in pertinent part, as follows:

> Conseco, Inc. (NYSE:CNO) today reported results for the second quarter of 2005 -- the company's seventh consecutive quarter of strong earnings. Net income applicable to common stock was a record $78.6 million, a 76% increase versus $44.6 million in 2Q04. Net Operating Income (1) was $74.1 million, a 58% increase versus $46.9 million in 2Q04. Net Income per share was 48 cents versus 34 cents in 2Q04. Net Operating Income per share was 45 cents versus 36 cents in 2Q04. All per-share results are on a diluted basis. Earnings before corporate interest, net realized investment gains and taxes ("EBIT") (2) were $146.2 million in 2Q05, an 11% increase versus $131.5 million in 2Q04.

> President and CEO William Kirsch said, "During the past 12 months, Conseco has achieved steady and consistent progress on each of our key initiatives. **We have fundamentally strengthened our balance sheet, expense management, operations, product offerings, distribution systems, internal controls and, most importantly, our management team**. Building on these accomplishments, we have now posted a record quarter and our seventh consecutive quarter of strong earnings.

>         *      *      *

> "We will continue to deliver on our key initiatives, and will invest in building a strong platform as we reduce costs, grow sales and provide excellent customer service," Kirsch said.

>         *      *      *

> **Best practices in governance and compliance. We continue to enhance internal controls across our business activities and are making steady progress toward best practices across all our business units**.

- 48 -

145.    The statements referenced above in ¶144 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    Conseco's reported financial results were materially misstated and did not present the true operating performance of the Company as set forth in ¶¶240-77 below;

(b)    Conseco lacked the internal controls necessary to properly report its liabilities, reserves, earnings and other financial metrics;

(c)    Conseco's financial statements were not prepared in accordance with GAAP and were therefore materially false and misleading;

(d)    Conseco lacked the actuarial science necessary to calculate reserves;

(e)    Conseco employees, sanctioned by management, deliberately and improperly delayed or eliminated claims submitted by customers;

(f)    Conseco compensated and rewarded employees for denying claims;

(g)    Conseco manipulated claim ratios by "bundling" and "unbundling" claims;

(h)    Conseco did not adequately comprehend the terms of its insurance policies;

(i)    Conseco did not maintain a database or central repository of policy information so Conseco often did not have access to even basic policy information necessary to compute reserves;

(j)    Conseco did not maintain accurate or detailed claims data necessary for the calculation of reserves or determination of the exhaustion of policy limits;

(k)    Conseco's various computer systems were not properly integrated and caused information used for Conseco's financial statements to be inaccurate and incomplete;

(l)    serious computer coding issues caused Conseco's actuarial assumptions and financial results to be inaccurate and unreliable;

(m)    Conseco misrepresented facts to state regulators; and

(n)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its corporate governance practices, its prospects and earnings growth.

146.    On August 4, 2005, Conseco held a conference call with investors (the "8/4/05 Conf. Call") and reiterated its financial results set forth in its 8/4/05 Press Release.  On the conference call, Defendant Kirsch stated:

> Our second initiative is operational excellence.  We continue to make progress improving our operating platform designed to provide excellent customer service in a scalable, low cost environment that will accommodate anticipated revenue growth over the next several years.
>
> *       *       *
>
> In Conseco Insurance Group, highlights included substantial improvements in call center support and transaction processing and significant progress on the Transformational Road Map program, a group of projects designed to establish a more effective operating platform.

147.    The statements referenced above in ¶146 were materially false and misleading when made because of the reasons set forth in ¶145.  Furthermore, the statement that the Company provides "scalable" customer service was materially false and misleading when made because Conseco failed to maintain a central repository for policy data.

148.    On the 8/4/05 Conf. Call, Russ Bostick, Conseco's Chief Information Officer stated:

> The enterprise help platform is based upon IBM and proprietary technology.  It will address the replacement of several 20 to 25-year old systems that currently support our MedSupplement, Long-Term Care, and Specified Disease product lines.  Unlike the life systems simplification, this project will address the improvement of claims and the management of them.  It will also address the largest opportunities for expense containment first.  But with better tools, we expect to resolve our claims faster and with greater attention to the specific benefits that the policyholder requires.

- 50 -

149.    The statements referenced above in ¶148 were materially false and misleading when made because they misrepresented and failed to disclose the true nature and extent of the problems with Conseco's current systems.

150.    On the August 4th Conference Call, Defendant Kirsch stated:

Our fifth initiative is best practices in governance and compliance, and we continue to enhance our internal controls across all of our business activities.

151.    The statements referenced above in ¶150 were materially false and misleading when made because of the reasons set forth in ¶145.

152.    On August 8, 2005, Conseco filed its Form 10-Q with the SEC ("2Q05 10-Q") and reiterated the financial results reported in the 8/4/05 Press Release.  The 2Q05 10-Q described the Company's internal controls and procedures and stated in pertinent part as follows:

Changes to Internal Controls and Procedures for Financial Reporting.  We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions, such as the elimination of multiple systems for similar lines of business. During the first six months of 2005, we implemented new administrative systems for certain life and long-term care products and a new actuarial valuation system for our equity-indexed annuities.  We expect to implement additional system conversions in the future.  *We believe that the new systems will provide better information and will enhance our operational efficiencies*.  As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness.  We believe the changes will also result in improvements to our internal controls over financial reporting.

153.    The statements referenced above in ¶152 were materially false and misleading when made because of the reasons set forth in ¶145.

154.    Investors were pleased with Conseco's financial results and statements of its operations reported in connection with Conseco's 2Q05 results.  For example, a Morgan Stanley August 4, 2005 research report commented favorably on Conseco's financial performance and prospects: "We believe Conseco remains on track to slowly improve its fundamentals through

- 51 -

modest sales growth, back office consolidation, and, ultimately, higher financial strength ratings." A JP Morgan August 4, 2005 research report reiterated its "Overweight" rating on Conseco and stated that it "view[ed] CNO as undervalued . . . and expect . . . operational efficiency to enable the stock to outperform the life insurance group over the next few years." An Advest August 5, 2005 research report rated Conseco a "Buy" and stated: "We believe the company is building credibility and making progress in the areas of expense control and strengthening the balance sheet."

**3Q05 Financial Results**

155.    On November 3, 2005, Conseco issued a press release announcing its financial results for the third quarter of 2005, the period ended September 30, 2005 ("11/3/05 Press Release"), which stated, in pertinent part, as follows:

> Conseco, Inc. (NYSE:CNO) today reported results for the third quarter of 2005 – the company's eighth consecutive quarter of strong earnings. Net operating income (1) was $72.1 million, up 24% versus $58.0 million in 3Q04. Net operating income per share was 44 cents, up 22% versus 36 cents in 3Q04. Net income applicable to common stock was $68.4 million, up 18% versus $58.0 million in 3Q04. Net income per share was 42 cents, up 17% versus 36 cents in 3Q04. Earnings before net realized investment gains, corporate interest and taxes ("EBIT") (2) were $142.8 million in 3Q05, up 23% versus $116.1 million in 3Q04. All per-share results are on a diluted basis.

> *        *        *

> President and CEO William Kirsch said, "Conseco has posted its eighth consecutive quarter of strong earnings growth, reflecting the consistent progress we have made on our key initiatives. While much work remains to be done in our mission to establish Conseco as a premier insurance company serving middle market Americans with life, annuity and supplemental health products, our efforts to improve the company's distribution, technology, product offerings, operations and expense management are producing meaningful results. In particular, I'm very proud that our team continues to effectively execute on our strategies and initiatives to grow sales while reducing expenses."

> *        *        *

> **"In addition to our success in sales and expense management, our initiatives to achieve technological excellence, implement a more efficient, low-cost operating platform designed to provide excellent customer service, and adopt best**

**practices in governance and compliance all contributed to our third quarter performance,**" Kirsch said.

156.    The statements referenced above in ¶155 were materially false and misleading when made because of the reasons set forth in ¶145.

157.    On November 3, 2005, Conseco held a conference call ("11/3/05 Conf Call") with investors and reiterated its financial results set forth in the 11/3/05 Press Release.  On the 11/3/05 Conf Call, Defendant Kirsch stated:

> In addition to our success on sales and expenses, our initiatives to achieve technological excellence, implement the more efficient and effective operating platform, deliver excellent customer service, and adopt best practices in governance and compliance all contributed to our strong third quarter.

> In technology, we are consolidating and simplifying data processing and management systems, in order to provide better and more cost-effective service to policyholders and distribution partners. We are continuing to make major investments in systems designed to simplify our operations and improve their cost and scalability.

158.    The statements referenced above in ¶157 were materially false and misleading when made because of the reasons set forth in ¶145.

159.    On November 7, 2005, Conseco filed its Form 10-Q with the SEC ("3Q05 10-Q") and reiterated the Company's financial results reported in the 11/3/05 Press Release.  The 3Q05 10-Q described the Company's internal controls and procedures and stated in pertinent part as follows:

> Changes to Internal Controls and Procedures for Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and *improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions*, such as the elimination of multiple systems for similar lines of business. During the first nine months of 2005, we implemented new administrative systems for certain life and long-term care products and a new actuarial valuation system for our equity-indexed annuities. We expect to implement additional system conversions in the future. We believe that the new systems will provide better information and will enhance our operational efficiencies. As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

Other than the changes related to new system conversions, no significant changes in Conseco's internal controls over financial reporting have occurred during the quarter ended September 30, 2005, that have materially affected, or are reasonably likely to materially affect, Conseco's internal controls over financial reporting.

160.    The statements referenced above in ¶159 were materially false and misleading when made because of the reasons set forth in ¶145.

161.    Investors were pleased with Conseco's financial results and statements of operations reported in connection with Conseco's 3Q05 results.  For example, a November 4, 2005 research report issued by Advest continued to rate Conseco a "Buy" and stated: "We believe the company is building credibility and making progress in the areas of expense control and strengthening the balance sheet.  We believe the shares of Conseco should trade at $24 or 12 times our 2006 EPS estimate."

**Full Year 2005 Financial Results**

162.    On February 27, 2006, Conseco issued a press release announcing its financial results for the fourth quarter and year-end of 2005, the period ended December 31, 2005 ("2/27/06 Press Release"), which stated, in pertinent part:

Fourth quarter 2005 results:

*  Net operating income (1):  $70.4 million, up 1% over 4Q04

*  Net operating income per diluted share:  44 cents, up 5% over 4Q04

*  Net income applicable to common stock:  $67.6 million, down 12% from 4Q04 (including $2.8 million of net realized investment losses in 4Q05 vs. $7.3 million of net realized investment gains in 4Q04)

*  Net income per diluted share:  42 cents, down 9% from 4Q04 (including 2 cents of net realized investment losses in 4Q05 vs. 4 cents of net realized investment gains in 4Q04)

*  Earnings before net realized investment gains (losses), corporate interest and taxes ("EBIT") (2):  $130.2 million, flat with 4Q04

*  Sales (new annualized premium):  $89.7 million, up 19% over 4Q04

Full year 2005 results:

- 54 -

* Net operating income (1):  $286.9 million, up 36% over 2004

* Net operating income per diluted share:  $1.76, up 17% over 2004

* Net income applicable to common stock:  $286.9 million, up 25% over 2004

* Net income per diluted share:  $1.76, up 8% over 2004

* Earnings before net realized investment gains (losses), corporate interest, gain (loss) on extinguishment of debt and taxes ("EBIT") (2): $555.3 million, up 12% over 2004

* Sales (new annualized premium):  $332.6 million, up 10% over 2004

*       *       *

President and CEO William Kirsch said, "Conseco's operating performance in 2005 reflects the progress we are making on our key initiatives.  **In addition to higher sales and lower expenses, our initiatives related to technology, operations, customer service and governance and compliance all contributed to our fourth quarter and full-year performance**.  We are continuing to make the necessary investments to expand our capabilities in each of these critical areas.  In particular, we have restructured our product development capabilities on an enterprise-wide basis to better meet customer requirements across the middle market and to better support our expanding distribution.  We are moving ahead with a clear focus on the driving factors behind our profitable growth to establish Conseco as a leading provider of financial security for the life, health and retirement needs of middle market Americans."

163.     The statements referenced above in ¶162 were materially false and misleading when made because of the reasons set forth in ¶145.

164.     On March 15, 2006, Conseco filed its Form 10-K with the SEC ("2005 10-K") and reiterated the Company's financial results that were contained in the 2/27/06 Press Release.

165.     The 2005 10-K discussed Conseco's internal controls and procedures:

ITEM 9A. CONTROLS AND PROCEDURES.

Evaluation of Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended).  Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2005, Conseco's disclosure controls and procedures were effective to ensure that information required to be disclosed by Conseco in reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and

reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

Management's Report on Internal Control over Financial Reporting. Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

*       *       *

Conseco's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework. Based on our assessment we have concluded, as of December 31, 2005, the Company's internal control over financial reporting was effective based on those criteria.

Our management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

Changes to Internal Controls and Procedures for Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions, such as the elimination of multiple systems for similar lines of business. During 2005, we implemented new administrative systems for certain life, long-term care and annuity products and new actuarial valuation systems for our equity-indexed annuities and certain universal life products. We expect to implement additional system conversions in the future. We believe that the new systems will provide better information and will enhance our operational efficiencies. As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

Other than the changes related to new system conversions, no significant changes in Conseco's internal controls over financial reporting have occurred during 2005, that have materially affected, or are reasonably likely to materially affect, Conseco's internal controls over financial reporting.

- 56 -

166.    The statements referenced above in ¶165 were materially false and misleading when made because of the reasons set forth in ¶145.

167.    The false and misleading statements referenced above in ¶165, which were known to the Individual Defendants to be materially false and misleading, were then falsely certified by Defendants Kirsch and Bullis and included in the 2005 10-K:

CERTIFICATION

I, . . . , certify that:

1.    I have reviewed this annual report on Form 10-K of Conseco, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the year covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the years presented in this annual report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the year in which this annual report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the year covered by this annual report based on such evaluation; and

(d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

168.    The statements referenced above in ¶167 were each materially false and misleading when made because Defendants knew, or recklessly disregarded, that Conseco's financial statements violated GAAP disclosure requirements during the Class Period.

**1Q06 Financial Results**

169.    On May 4, 2006, Conseco issued a press release announcing its financial results for the first quarter of 2006, the period ended March 31, 2006 ("5/4/06 Press Release"), which stated, in pertinent part:

Conseco, Inc. (NYSE:CNO) today reported results for the first quarter of 2006:

*   Net operating income (1): $55.8 million (including after-tax expenses of $9.6 million related to certain litigation reserves), down 21% from 1Q05

*   Net operating income per diluted share: 36 cents (including after-tax expenses of 5 cents per share related to certain litigation reserves), down 16% from 1Q05

*   Net income applicable to common stock: $55.1 million, down 24% from 1Q05 (including $.7 million of net realized investment losses in 1Q06 vs. $2.0 million of net realized investment gains in 1Q05)

- 58 -

    * Net income per diluted share: 35 cents, down 20% from 1Q05 (including 1 cent of net realized investment losses in 1Q06 vs. 1 cent of net realized investment gains in 1Q05)

    * Sales (new annualized premium): $85.8 million, up 7% over 1Q05

**During the quarter, Conseco continued to make progress on its initiatives to increase sales, aggressively manage expenses, enhance its technology and operating platform, build a high-performance culture and maintain top-tier corporate governance practices.** Conseco's vision and mission are clear and consistent: to establish Conseco as a leading provider of financial security for the life, health and retirement needs of middle market Americans.

170.    The statements referenced above in ¶169 were materially false and misleading when made because of the reasons set forth in ¶145.

171.    On May 8, 2006, Conseco filed its Form 10-Q with the SEC ("1Q06 10-Q") and reiterated the Company's financial results that were contained in the 5/4/06 Press Release. The 1Q06 10-Q described the setting of reserves for the long-term block of business in run-off:

During the first quarter of 2006, we upgraded the prior version of the valuation system used to determine reserves for the long-term care block of business in run-off. The new version includes enhancements to more precisely estimate insurance liabilities for policies with return of premium benefits. The effect of this refinement and certain other reserve adjustments resulted in decreases to our insurance liabilities of approximately $14 million in the first quarter of 2006.

172.    The statements referenced above in ¶171 were materially false and misleading when made because of the reasons set forth in ¶145. The statement "more precisely estimate insurance liabilities" was materially false and misleading when made because Conseco was unable to "precisely estimate insurance liabilities" and any small changes Conseco may have made did not change this fact.

**2Q06 Financial Results**

173.    On August 2, 2006, Conseco issued a press release announcing its financial results for the second quarter of 2006, the period ended June 30, 2006 ("8/2/06 Press Release"). In that regard, the press release stated:

Conseco, Inc. (NYSE:CNO) today reported results for the second quarter and six months of 2006. The quarter's results reflect the impact of the previously announced tentative litigation settlement that resulted in after-tax costs of approximately $100.3 million and finalized tax settlement that resulted in a direct increase to shareholders' equity of approximately $260 million.

Second quarter 2006 results:

* Net operating income (loss) (1): ($31.7) million (including after-tax costs related to the tentative litigation settlement of $100.3 million), compared to $74.1 million in 2Q05

* Net operating income (loss) per diluted share: (21) cents (including after-tax costs related to the tentative litigation settlement of 66 cents per share), compared to 45 cents in 2Q05

* Net income (loss) applicable to common stock: ($31.8) million, compared to $78.6 million in 2Q05 (including $0.1 million of net realized investment losses in 2Q06 vs. $4.5 million of net realized investment gains in 2Q05)

* Net income (loss) per diluted share: (21) cents, compared to 48 cents in 2Q05 (including no net realized investment losses in 2Q06 vs. 3 cents of net realized investment gains in 2Q05)

* Earnings (loss) before net realized investment gains (losses), corporate interest and taxes ("EBIT") (2): ($22.7) million (including pre-tax costs related to the tentative litigation settlement of $157.0 million), compared to $146.2 million in 2Q05

* Sales (4): $89.1 million, up 8% over 2Q05

Six months 2006 results:

* Net operating income (1): $24.1 million (including after-tax costs related to the tentative litigation settlement of $111.6 million), down 83% from the first six months of 2005

* Net operating income per diluted share: 16 cents (including after-tax costs related to the tentative litigation settlement of 73 cents per share), down 82% from the first six months of 2005

* Net income applicable to common stock: $23.3 million, down 85% from the first six months of 2005

* Net income per diluted share: 15 cents, down 84% from the first six months of 2005

  * EBIT (2):  $91.9 million (including pre-tax costs related to the tentative
    litigation settlement of $174.7 million), down 67% from the first six months
    of 2005

  * Sales (4): $174.9 million, up 7% over the first six months of 2005

Financial strength at June 30, 2006:

  * Book value per share, excluding accumulated other comprehensive income
    (loss) (3), was $26.89, compared to $24.95 at December 31, 2005

  * Debt-to-total capital ratio, excluding accumulated other comprehensive
    income (loss) (3), was 14.5%, compared to 16.1% at December 31, 2005

*      *      *

**"These events are evidence of our progress as an organization," Hohmann said.
"We are making significant strides on many fronts as we establish Conseco as a
leading provider of financial security for the life, health and retirement needs of
middle market America."**

174.    The statements referenced above in ¶173 were materially false and misleading when

made because of the reasons set forth in ¶145.

175.    On August 3, 2006, Conseco held a conference call with investors ("8/3/06 Conf

Call") and reiterated its financial results set forth in the 8/2/06 Press Release.  During the 8/3/06

Conf Call, Defendant Hohmann discussed changes in the LTC book of business:

> Concerning claims, after the first quarter, we instituted several changes aimed at
> improving our claims management.  Specifically, we have aligned all of our LTC
> claims management under common leadership.  This change will ensure the sharing
> of best practices and create a single voice on LTC system requirements as we
> implement additional work management tools in 2007.  Bankers has already
> completed an LTC claim leakage study and implemented the findings. We are
> performing a similar analysis on the closed block. We expect improvements in the
> closed block beginning in 2007.
>
> Compliance is and has been a focal point.  While not an explicit revenue generator, it
> is part of the Conseco value system and a necessary component of any claims
> management initiative.  We have embedded a legal and compliance function within
> our closed block and we have conducted an external review of our practices and
> procedures.  We have established a compliance oversight committee that meets
> regularly and monitors business compliance.

176.    The statements referenced above in ¶175 were materially false and misleading when made because of the reasons set forth in ¶145.

177.    On the 8/3/06 Conf Call, Defendant Bullis discussed claims management:

**Jukka Lipponen – KBW – Analyst**

Good morning. I think you made already some comments with respect to this run-off book, but can you just further try to amplify *why you are confident that the loss ratio won't further deteriorate* and that you can now sort of get things on a more even keel, if you will.

**Gene Bullis – Conseco, Inc. – CFO**

The direct answer to that would relate to the things we've discussed. I think our ability to – it is a kind of business that is susceptible or appropriate for rerating and we have a program underway that will result in the increases in premium. *We do have renewed focus on claims management. This book is running off. There are policy limits associated with the policies underlined in the book. So we think that while we are concerned about the volatility and frankly our visibility into benefit ratios has to realistically have a range of outcomes. We think that over time, we can manage this book reasonably consistent with what our expectations are.*

\*       \*       \*

**Nigel Dally – Morgan Stanley – Analyst**

Would it be fair to say on your long-term care loss ratio assumptions that you're taking what you consider to be a more conservative view on where the ratio could end up and there are factors which could actually flow the other way and lead to loss ratios that they've been somewhat better than what you're conservatively projecting today?

**Gene Bullis – Conseco, Inc. – CFO**

Yes, I would say in taking a look at the back half of the year, *we have not expected that the full severity of the experience that we saw in the third quarter will continue, but we're also not considering that it's a complete anomaly and isolated it out from our expectations*. So we try to take a balanced view that there's a bit of a spike, but we're not prepared to believe that it's going to fully reverse itself. And frankly, it's not knowable. We're going to have to see how claims develop before we can take a more precise view.

178.    The statements referenced above in ¶177 were materially false and misleading when made because of the reasons set forth in ¶145. In addition, Defendant Bullis' statements about the

loss ratio were materially false and misleading because Defendant Bullis knew or recklessly disregarded that Conseco manipulated data that impacted the loss ratio and Conseco was unable to accurately calculate reserves.

179.    On August 8, 2006, Conseco filed its Form 10-Q with the SEC ("2Q06 10-Q") and reiterated the Company's financial results that were contained in the 8/2/06 Press Release.  The 2Q06 10-Q described the Company's internal controls and procedures and stated, in pertinent part, as follows:

ITEM 4. CONTROLS AND PROCEDURES.

Evaluation of Interim Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Interim Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on this evaluation, the Interim Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2006, Conseco's disclosure controls and procedures were effective to ensure that information required to be disclosed by Conseco in reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

Changes to Internal Controls and Procedures for Financial Reporting.  We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries.  Our efforts include improvements to our policy administrative procedures and significant system conversions.  During the first six months of 2006, we implemented new actuarial valuation systems for our long-term care products in our Other Business in Run-off segment and our traditional life products in our Bankers Life segment. In addition, we implemented a new mortgage loan processing system.  We expect to implement additional system conversions in the future.  We believe that the new systems will provide better information and will enhance our operational efficiencies.  As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

Other than the changes described above, no significant changes in Conseco's internal controls over financial reporting have occurred during the six months ended June 30, 2006, that have materially affected, or are reasonably likely to materially affect, Conseco's internal controls over financial reporting.

- 63 -

180.    The statements referenced above in ¶179 were materially false and misleading when made because of the reasons set forth in ¶145.

181.    The 2Q06 10-Q discussed Conseco's valuation system used to determine reserves for LTC:

> During the second quarter of 2006, we recognized a non-recurring benefit of $9.4 million related to the release of certain other redundant reserve liabilities. ***During the first quarter of 2006, we upgraded the prior version of the valuation system used to determine reserves for the long-term care block of business in run-off. The new version includes enhancements to more precisely estimate insurance liabilities for policies with return of premium benefits. The effect of this refinement and certain other reserve adjustments resulted in decreases to our insurance liabilities of approximately $14 million in the first quarter of 2006.***

182.    The statements referenced above in ¶181 were materially false and misleading when made because of the reasons set forth in ¶145. The statement "more precisely estimate insurance liabilities" was materially false and misleading when made because Conseco was unable to "precisely estimate insurance liabilities" and any small changes Conseco may have made did not change this fact. Indeed, Conseco was unable to accurately or "precisely" estimate insurance liabilities.

**3Q06 Financial Results**

183.    On November 1, 2006, Conseco issued a press release announcing its financial results for the third quarter of 2006, the period ended September 30, 2006 ("11/1/06 Press Release"). In that regard, the press release stated:

> Conseco, Inc. (NYSE:CNO) today reported results for the third quarter and nine months of 2006. "Our results for the current quarter reflect solid performance in our core operating businesses but have been impacted by the poor results of the long-term care block in our run-off segment," said Chief Executive Officer Jim Prieur. "Core business results were consistent with our expectations, with operating earnings essentially flat in the third quarter of 2006 compared to the third quarter of 2005 reflecting some unusual items in last year's third quarter. Sales were up a strong 14% on a combined basis. The run-off segment's results were significantly less than last year's third quarter and our expectations, with a pre-tax operating loss of $13.0 million compared to a profit of $16.4 million in the prior year period. A combination

of higher than expected incurred claims and lower than expected reserve releases for policy terminations were the principal factors contributing to the poor results."

Third quarter 2006 results:

* Net operating income (1): $52.8 million, compared to $72.1 million in 3Q05

* Net operating income per diluted share: 35 cents, compared to 44 cents in 3Q05

* Net income applicable to common stock: $38.9 million, compared to $68.4 million in 3Q05 (including $13.9 million of net realized investment losses in 3Q06 vs. $3.7 million of net realized investment losses in 3Q05)

* Net income per diluted share: 26 cents, compared to 42 cents in 3Q05 (including 9 cents of net realized investment losses in 3Q06 vs. 2 cents of net realized investment losses in 3Q05)

* Earnings before net realized investment gains (losses), corporate interest and taxes ("EBIT") (2): $110.4 million, compared to $142.8 million in 3Q05

* Sales (4): $91.6 million, up 14% over 3Q05

Nine months 2006 results:

* Net operating income (1): $76.9 million (including after-tax costs related to the tentative litigation settlement of $99.7 million), down 64% from the first nine months of 2005

* Net operating income per diluted share: 50 cents (including after-tax costs related to the tentative litigation settlement of 65 cents per share), down 62% from the first nine months of 2005

* Net income applicable to common stock: $62.2 million, down 72% from the first nine months of 2005

* Net income per diluted share: 41 cents, down 69% from the first nine months of 2005

* EBIT (2): $202.3 million (including pre-tax costs related to the tentative litigation settlement of $157.0 million), down 52% from the first nine months of 2005

*     *     *

In our Other Business in Run-off segment, EBIT was ($13.0) million in the third quarter of 2006, compared to $16.4 million in the third quarter of 2005. Results in the third quarter of 2006 were affected by the following items:

- 65 -

1) Adverse development of prior period claim reserves (approximately $11 million);

2) Higher than expected initial claim costs (approximately $2 million); and

3) Less than expected reserve releases for terminated policies (approximately $9 million).

*          *          *

Outlook

We expect the performance of our core businesses in the fourth quarter to approximate third quarter results. We are responding with increased focus and urgency to the emerging trends in the long-term care block in the non-core run-off segment, through ***vigilant claims management*** and a comprehensive premium re-rate process. However, these steps will likely take several quarters to influence results. The impact of small experience-driven changes in the approximately $3.3 billion of reserves held on this block can produce volatility in quarterly earnings.

184. The statements referenced above in ¶183 were materially false and misleading when made because of the reasons set forth in ¶145. The statement "vigilant claims management" was materially false and misleading when made because Conseco was not – nor was it capable of – "vigilant claims management" due to the significant problems with claims management and material internal control deficiencies as detailed herein.

185. On November 7, 2006, Conseco filed its Form 10-Q with the SEC ("3Q06 10-Q") and reiterated the Company's financial results that were contained in the 11/1/06 Press Release. The 3Q06 10-Q discussed the Company's internal controls and procedures:

ITEM 4.  CONTROLS AND PROCEDURES.

Evaluation of Interim Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2006, Conseco's disclosure controls and procedures were effective to ensure that information required to be disclosed by Conseco in reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed,

- 66 -

summarized and reported within the time periods specified in the SEC's rules and forms.

Changes to Internal Controls and Procedures for Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions. During the first nine months of 2006, we implemented new actuarial valuation systems for our long-term care products in our Other Business in Run-off segment, our traditional life, equity-indexed and Medicare supplement products in our Bankers Life segment, and certain universal life products in our Conseco Insurance Group segment. In addition, we implemented a new mortgage loan processing system. We expect to implement additional system conversions in the future. We believe that the new systems will provide better information and will enhance our operational efficiencies. As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

Other than the changes described above, no significant changes in Conseco's internal controls over financial reporting have occurred during the nine months ended September 30, 2006, that have materially affected, or are reasonably likely to materially affect, Conseco's internal controls over financial reporting.

186. The statements referenced above in ¶185 were materially false and misleading when made because of the reasons set forth in ¶145.

**Full Year 2006 Financial Results**

187. On March 6, 2007, Conseco issued a press release announcing its financial results for the fourth quarter and year-end of 2006, the period ended December 31, 2006 ("3/6/07 Press Release"). In that regard, the press release stated:

Conseco, Inc. (NYSE:CNO) today reported results for the fourth quarter and full year 2006. "I'm disappointed with our poor overall financial results," said Jim Prieur, reporting on his first full quarter as CEO, "but we are taking the necessary steps that will fundamentally change Conseco for the better. ***The results for the quarter reflect a number of adjustments, many of which we believe are one- time in nature, and there are many signs of progress, including strong full year sales growth in our core operating businesses, emerging efficiencies from the consolidation of our back office operations, and progress on our initiatives to improve the performance of our run-off long-term care block.***"

Fourth quarter 2006 results:

- Net operating income (1):  $5.7 million, compared to $70.4 million in 4Q05

- Net operating income per diluted share:  4 cents, compared to 44 cents in 4Q05

- Net income (loss) applicable to common stock: $(3.7) million, compared to $67.6 million in 4Q05 (including $9.4 million of net realized investment losses in 4Q06 vs. $2.8 million of net realized investment losses in 4Q05)

- Net income (loss) per diluted share: (2) cents, compared to 42 cents in 4Q05 (including 6 cents of net realized investment losses in 4Q06 vs. 2 cents of net realized investment losses in 4Q05)

- Earnings before net realized investment losses, corporate interest and taxes ("EBIT") (2): $40.7 million, compared to $130.2 million in 4Q05

- Sales (4): $87.2 million, down 3% from 4Q05

Full year 2006 results:

- Net operating income (1): $82.6 million (including after-tax costs related to the tentative litigation settlement of $102.1 million), down 71% from 2005

- Net operating income per diluted share: 54 cents (including after-tax costs related to the tentative litigation settlement of 67 cents per share), down 69% from 2005

- Net income applicable to common stock:  $58.5 million, down 80% from 2005

- Net income per diluted share: 38 cents, down 78% from 2005

- EBIT (2):  $243.0 million (including pre-tax costs related to the tentative litigation settlement of $157.0 million), down 56% from 2005

- Sales (4): $353.7 million, up 6% over 2005

Financial strength at December 31, 2006:

- Book value per common share, excluding accumulated other comprehensive income (loss) (3), was $27.06, compared to $24.95 at December 31, 2005

- Book value per diluted share, excluding accumulated other comprehensive income (loss) (3), was $25.64, compared to $24.26 at December 31, 2005

- 68 -

- Debt-to-total capital ratio, excluding accumulated other comprehensive income (loss) (3), was 17.3%, compared to 16.1% at December 31, 2005

*    *    *

Internal Controls over Financial Reporting

We expect to file our annual report on Form 10-K on or about March 9, 2007. *As a result of certain adjustments identified by management and made during our year-end closing process, we have concluded that, as of December 31, 2006, we did not maintain effective control over certain actuarial financial reporting processes. The related control deficiencies, taken in the aggregate, constitute a material weakness. None of the adjustments were material individually, or in the aggregate, to our current year or prior period financial statements taken as a whole. We have taken steps to address the control deficiencies which will not be considered fully remediated until the revised control processes have been operating for a sufficient period of time to provide reasonable assurance as to their effectiveness.*

Outlook

The significant losses recently incurred in our run-off block of long-term care insurance have led to corrective action plans involving accelerated premium increase activity, enhanced care management and claim adjudication practices, upgrading of management talent and focused accountability, and improved technology based tools. However, more time is necessary to achieve the necessary visibility to improving trends in operating results in order to provide any commentary on outlook. As these results are significant to our overall operating performance, we cannot comment on overall outlook at this time. See note on forward-looking statements below.

188.    The statements referenced above in ¶187 were materially false and misleading when made because of the reasons set forth in ¶145. The statements were also materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; and (ii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC. Furthermore, the statement "None of the adjustments were material individually, or in the aggregate, to our current year or prior period financial statements taken as a whole," was materially false and misleading when made

- 69 -

because the adjustments were material individually, or in the aggregate as evidenced by the

Company's eventual restatement of those items as discussed in ¶¶242-55 below.

189.    On March 7, 2007, Conseco held a conference call with investors ("3/7/07 Conf

Call") and reiterated its financial results set forth in the 3/6/07 Press Release.

190.    On the 3/7/07 Conf Call, Defendant Wells stated, in pertinent part:

> We're beginning to see the positive effects of changes in our protocols for
> administering claims.  We're beginning to see the positive effects of changes in our
> protocols for administering claims.    We have engaged two leading LTC
> administration companies to conduct studies of our claims practices and are in the
> process of implementing many improvements.  These practice improvements will
> help us more accurately adjudicate claims in accordance with contract provisions.
> **We expect that these improvements will reduce our claim leakage by more than
> $10 million per quarter by the end of 2007**.
>
> *            *            *
>
> In the fourth quarter, we implemented a new work flow system which will help us
> better manage our claims.  **We're also making progress in another important
> technology initiative, which is an improved integrated policy benefit repository and
> accumulator tool**.  The tool will enhance electronic access to policy benefit and
> payment history, which will drive more accurate efficient claim adjudication and
> reduce leakage.  We're also in the process of selecting a claim processing system that
> together with the changes in claim protocols, will better enable us to pay claims more
> accurately and reduce claim leakage.

191.    The statements referenced above in ¶190 were materially false and misleading when

made because of the reasons set forth in ¶145.  the statements referenced above were materially false

and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the

problems with its claims procedures and what steps were required to correctly fix the problems; (ii)

proper remediation efforts to correctly fix the Company's material internal control weaknesses

would incur significant costs involving system upgrades, coding fixes and other major changes; and

(iii) Conseco was not willing to dedicate the resources that were required to correctly fix many

internal control deficiencies because it sought to sell or dispose of LTC.

192.    The statement referenced above in ¶190 that Conseco "expects . . . improvements will reduce . . . claim leakage by more than $10 million per quarter" was materially false and misleading when made because there was no reasonable basis to make this statement due to the significant material weaknesses in internal controls that existed at the Company at that time. Indeed, according to CW2, this $10 million per quarter targeted savings was mandated by Conseco executives but was considered "arbitrary" by actuaries and other claims personnel and was based very heavily on assumptions. Furthermore, Defendants knew, or recklessly disregarded, that in an attempt to meet these cost savings goals, Conseco's LTC employees provided false statements and reports to support cost savings.

193.    The statement referenced above in ¶190 that Conseco was "making progress" on "an improved integrated policy benefit repository and accumulator tool" was materially false and misleading when made because at that time Conseco was not "making progress" on an "accumulator tool." Indeed, according to an internal Conseco document during summer 2007 titled "LTC Closed Block Operations", the status of the Accumulator project was "Yellow/Red" and the document stated that the accumulator functionality is in jeopardy and that the conversion effort is at "risk."

194.    The statements referenced above in ¶190 were also materially false and misleading when made because Defendants had no objective qualitative basis to report that they "see the positive effects of changes in our protocols for administering claims." Indeed, the problems were so severe that major steps were required to fix the problems but these steps were not taken or were far from being completed.

195.    On the 3/7/07 Conf Call, Defendants Prieur and Bullis stated that the appropriate reserves were set aside for the Run-off book during the quarter:

*Tom VanBuskirk – McMahan Securities – Analyst*

- 71 -

I had just a couple of questions. . . .  And then I guess the second one is within the Run-off book.  If you said this, I apologize.  But do you have a sense of whether we've seen the last of the reserves strengthenings, or where you would expect that to go from here?

*        *        *

**Jim Prieur – Conseco, Inc. – CEO**

Second question was the Run-off book.  And I mean, the Run-off book, ***what we set aside is what we think is the appropriate amount to set aside in any quarter.***  So I think that's the answer.

**Tom VanBuskirk – McMahan Securities – Analyst**

Okay. It obviously, just from trending it, it kind of looks like it's snowballing.  And I guess the question is, is this really it?  ***And I guess what you're answering is you think that now you're essentially there in terms of adverse development***.

**Gene Bullis – Conseco, Inc. – CFO**

The accounting would require that we reflect what we think the claim experience on existing claims is.  The net present value of all of those claims have to be recorded. ***So we think that given the way that we're required to account for the book, that it is at its current level***.  If there is future deterioration of claims incidents and severity further increases, then that will impact the results of the book.

196.    The statements referenced above in ¶195 were materially false and misleading when made because of the reasons set forth in ¶145.  The statements referenced above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that due to the significant problems with the setting of reserves and the lack of actuarial science to set reserves, Conseco had no basis to represent that its reserves were, or could be, accurate.

197.    On the 3/7/07 Conf Call, Defendant Bullis misrepresented the costs associated with the remediation efforts:

**Mark Finkelstein – Cochran Caronia Waller – Analyst**

Okay. And then I guess just finally, are there any material costs associated with some of the remediation of the control weaknesses? Or is it more process oriented?

**Gene Bullis – Conseco, Inc. – CFO**

- 72 -

*It's principally process oriented. There aren't any one-time incremental costs, except overtime*.

198.    The statements referenced above in ¶197 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that there were significant costs associated with remediation, including fees paid for legal services, to external contractors and third-parties and significant regulatory fines.    Furthermore, the statements referenced above were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

199.    On March 9, 2007, Conseco filed its Form 10-K with the SEC and reiterated the Company's financial results that were contained in the 3/6/07 Press Release.  The 2006 10-K stated in pertinent part as follows:

ITEM 9A. CONTROLS AND PROCEDURES.

Evaluation of Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended).  Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Conseco's disclosure controls and procedures were not effective as of December 31, 2006, as a result of a material weakness in internal control over financial reporting.

In light of the material weakness, the Company performed additional analyses and other post-closing procedures to ensure that its consolidated financial statements included in this Form 10-K were prepared in accordance with generally accepted accounting principles and presented fairly in all material respects its financial position, results of operations and cash flows for the periods presented.

*        *        *

- 73 -

Evaluation of Changes in Internal Controls over Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions. ***During 2006, we implemented new actuarial valuation systems for our long-term care products in our Other Business in Run-off segment, our traditional life, equity-indexed and Medicare supplement products in our Bankers Life segment, and certain universal life products in our Conseco Insurance Group segment.*** In addition, we implemented a new mortgage loan processing system.

200.     The statements referenced above in ¶199 were materially false and misleading when made because of the reasons set forth in ¶145. The statement "implemented new actuarial valuation systems for our long-term care products" was materially false and misleading when made because Conseco failed to implement new actuarial valuation systems. Instead, according to both CW1 and CW2, a new actuarial valuation system was not implemented at this time and Conseco instead simply relied on its old and inadequate computer systems even though it was recommended by outside consultants that a new system needed to be implemented.

201.     The 2006 10-K discussed the impact of governmental regulations and supervision by insurance regulatory agencies, and stated, in pertinent part, as follows:

In connection with monitoring the financial condition of insurers, certain state insurance departments have requested additional information from two of the Company's insurance subsidiaries, Conseco Senior and Conseco Life, as such insurance subsidiaries have incurred statutory losses in a 12 month period in excess of 50 percent of its capital and surplus.... The statutory losses of Conseco Senior are primarily attributable to the adverse development of prior period claim reserves and an increase in initial claims during 2006 related to long-term care policies. ***Based on our discussions with state insurance departments, we do not expect the regulators to take any actions against Conseco Senior or Conseco Life due to the causes of our statutory losses and the actions being undertaken by the Company.***

202.     The statement referenced above in ¶201 that "we do not expect the regulators to take any actions against Conseco . . ." was materially false and misleading when made because Conseco knew of, or recklessly disregarded, the existence of pending actions and fines directly related to Conseco Senior and LTC care policies. Indeed, Conseco's legal and claims departments modified

- 74 -

their specific operating budgets for very expensive market conduct exams, outside legal fees, and forecasted reserves for regulatory fines and remediation costs during this timeframe.

203.    The 2006 10-K discussed purported "remediation efforts" embarked on by the Company and stated, in pertinent part, as follows:

> Remediation Efforts. Since the time the above material weakness was identified, we have initiated the following remediation plans:
>
> (i)    adding additional procedures to the actuarial financial reporting process including a roll-forward reconciliation of single premium immediate annuity balances, additional testing of specified disease policy reserve calculations when new plans or benefits are introduced and for plan codes with significant new sales, and more comprehensive control procedures over changes made to our estimation processes;
>
> (ii)    adding or enhancing analytical procedures in an effort to ensure the accuracy of the long-term care claim reserve estimation methods in our Other Business in Run-off segment; and
>
> (iii)    strengthening management review of claim reserve trends and methods used to estimate long-term care claim reserves in our Other Business in Run-off segment.

204.    The statements referenced above in ¶203 were materially false and misleading when made because of the reasons set forth in ¶145.  Furthermore, the statements referenced above were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

205.    Furthermore, the statements referenced above in ¶203 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that the purported "remediation" efforts were not going to fix the issues with the setting of the Company's reserves due

to deficiencies in the administrative systems associated with claims. Indeed, at this time, Defendants had made a deliberate decision to keep Conseco Senior costs low (and not to invest in new administration and actuarial systems) instead of taking appropriate remedial steps as they tried to find a buyer for LTC. Defendants knew, or recklessly disregarded, that Conseco needed to implement new administrative systems to record and analyze policy terms and claims before the Company could accurately determine its liabilities and set reserves. The statement referenced above "adding or enhancing analytical procedures in an effort to ensure the accuracy of the long-term care claim reserve estimation methods in our Other Business in Run-off segment" was materially false and misleading when made because Defendants failed to disclose that steps that were taken were inadequate, such as having actuaries personally call policy holders to obtain copies of policies and learn the terms of coverage under those policies.

206. Furthermore, the statements referenced above in ¶203 were materially false and misleading when made because even though Conseco disclosed to investors that it identified material weaknesses in internal controls, Defendants portrayed the problems as being the result of innocent mistakes as opposed to knowing or reckless conduct. Defendants only generally described a limited number of issues, hid numerous problems from investors, and attempted to give comfort to investors that Conseco was addressing the problems. According to CW2, Conseco engaged in "sanitized disclosures" regarding the intense regulatory scrutiny the company was facing at that time in the Multistate Examination because the state insurance departments were "banging on the door" and threatening to "descend on your organization" and impose substantial fines on Conseco for all the infractions Conseco had committed. According to CW2, Conseco believed that the best defense was to go on offense and partially disclose some problems while hiding other problems so that

information is revealed on Conseco's own "timeline" in order to minimize the negative impact that full disclosure would have had on Conseco's stock price.

207.    Additionally, Defendants' statements above in ¶203 were materially false and misleading when made because Defendants made it appear that Conseco had just recently identified the material weaknesses and problems with internal controls even though Defendants knew about, or recklessly disregarded, these facts - and many more - since the beginning of the Class Period.

208.    Defendants' false words of comfort that they were taking the appropriate steps to remediate the material internal control issues misled investors.  Indeed, a March 8, 2007 Morgan Stanley research report on Conseco stated:

> Conclusion: While Conseco's results were actually marginally better than we expected, we remain concerned about the lack of visibility in future results and continued pressure on long term care results.  ***That said, we also believe the company is taking necessary steps to remediate these issues, and at today's valuation, we see little further downside but potentially significant upside if the company can stabilize its operations.***  At the end of the day, there are no changes in our future estimates, our $23 price target, or our Overweight rating on the stock.

209.    The false and misleading statements referenced above in ¶¶199, 201, 203, which were known to the Individual Defendants to be materially false and misleading, were then falsely certified by Defendants Prieur and Bullis and included in the 2006 10-K:

CERTIFICATION

I, . . . certify that:

1.  I have reviewed this annual report on Form 10-K of Conseco, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the year covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the years presented in this annual report;

- 77 -

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the year in which this annual report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the year covered by this annual report; and

(d)  Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

210.    The statements referenced above in ¶209 were each materially false and misleading when made because Defendants knew, or recklessly disregarded, that Conseco's financial statements violated GAAP disclosure requirements during the Class Period.

**1Q07 Financial Results**

211.     On May 8, 2007, Conseco issued a press release announcing its financial results for

the first quarter of 2007 ("1Q07"), the period ended March 31, 2007 ("5/8/07 Press Release").  In

that regard, the press release stated:

> Conseco, Inc. (NYSE:CNO) today reported results for the first quarter of 2007.
>
> "Although results for the quarter are below expectations, Conseco is making tangible progress across the organization," CEO Jim Prieur said regarding the first quarter results.  "Sales growth was very strong in both our Bankers Life and Colonial Penn businesses, and the sales mix at Conseco Insurance Group has improved.  *We experienced reduced losses in our other business in run-off segment, where we are beginning to see the anticipated improvements in claims management as well as the positive impact from the re-rate program.*  As we have reported previously, improvement in the performance of that block is expected to occur over several quarters."
>
> *          *          *
>
> First quarter 2007 results:
>
> -- Net operating income (1):  $14.6 million, compared to $55.8 million in 1Q06
>
> -- Net operating income per diluted share:  10 cents, compared to 36 cents in 1Q06
>
> -- Net income applicable to common stock:  $.9 million, compared to $55.1 million in 1Q06 (including $13.7 million of net realized investment losses in 1Q07 vs. $.7 million of net realized investment losses in 1Q06)
>
> -- Net income per diluted share:  1 cent, compared to 35 cents in 1Q06 (including 9 cents of net realized investment losses in 1Q07 vs. 1 cent of net realized investment losses in 1Q06)
>
> -- Earnings before net realized investment losses, corporate interest and taxes ("EBIT") (2):  $53.3 million, compared to $114.6 million in 1Q06
>
> -- Sales (3): $134.2 million, up 10% from 1Q06 (includes sales from Medicare Advantage Plans through our partnership with Coventry Health Care (Coventry))
>
> Financial strength at March 31, 2007:

-- Book value per common share, excluding accumulated other comprehensive income (loss) (4), was $27.17, compared to $27.06 at December 31, 2006

-- Book value per diluted share, excluding accumulated other comprehensive income (loss) (4), was $25.24, compared to $25.64 at December 31, 2006

-- Debt-to-total capital ratio, excluding accumulated other comprehensive income (loss) (4), was 17.3% at both March 31, 2007 and December 31, 2006

*      *      *

In our Other Business in Run-off segment, we recognized a pre-tax operating loss of $30.9 million in the first quarter of 2007, compared to earnings of $24.0 million in the first quarter of 2006. Results for the current period include claim reserve strengthening of $22.0 million resulting from changes in reserving methodology for a relatively small block of business (Transport Life) with a high concentration of policies with lifetime benefits and inflation riders. Results for the 2006 period include several adjustments to insurance liabilities that increased earnings by $14 million.

212.    The statements referenced above in ¶211 were materially false and misleading when made because of the reasons set forth in ¶145. The statements referenced above in ¶211 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC. The statement "the anticipated improvements in claims management" referenced above was materially false and misleading when made because it created the false impression Conseco achieved meaningful improvements to claims management when this was not the case.

213.    On May 9, 2007, Conseco held a conference call with investors ("5/9/07 Conf Call") and reiterated its financial results set forth in the 5/8/07 Press Release.

- 80 -

214.    On the 5/9/07 Conf Call, Defendant Prieur stated, in part:

**Jim Prieur – Conseco, Inc. – CEO**

Thanks, Dan.  The first quarter of 2007 produced **some real progress in the core business and improvements in the underlying economics of the run off Long Term Care business**. . . .  With the Other Business and Run-off segment, usually known as the run-off LTC block, there was progress in both the rerates where we now achieved our planned goal for rerates submitted to regulators, and with the management of claims where we're making significant progress in improving claims management.

215.    The statements referenced above in ¶214 were materially false and misleading when made because of the reasons set forth in ¶145.  The statements referenced above in ¶214 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.  The statements referenced above were materially false and misleading when made because Claim Management team projects and initiatives were over budget and experiencing significant delays and Conseco was not "making significant progress in improving claims management."

216.    On the 5/9/07 Conf Call, Defendant Bullis stated, in part:

**Gene Bullis – Conseco, Inc. – EVP; CFO, Outgoing**

*            *            *

Next we are going to be focusing on our run-off Long Term Care block. The Other Business and Run-off segment incurred a pre-tax operating loss of $30.9 million in Q1 '07 compared to operating income of $24 million in Q1 '06, and a loss of $57.3 million last quarter. Last year's results include several reserve adjustments that increased pre-tax earnings by $14 million. Q1 results were adversely affected by a $22 million claim reserve strengthening in the Transport Life block, which is a small component of the total Long Term Care Closed Block, with a high concentration of policies with lifetime benefits and inflation riders.  It is important to note that the

ATL block, which has had $54 million of reserve strengthening adjustments in Q4 2006, performed as expected this quarter. It is also notable that the number of new claimants this block were down approximately 15% from 2006 levels. We believe this reflects our claim adjudication improvements and, if sustained, should lead to significant bottom line impact in the coming quarters. The interest adjusted benefit ratio for Q1 2007 was 105.3%. The impact of the Transport Block claim strengthening was an increase of 28 percentage points. Now I will turn it over to John Wells to review progress on the turnaround program for the Closed Block.

217.     The statements referenced above in ¶216 were materially false and misleading when made because of the reasons set forth in ¶145.

218.     On the 5/9/07 Conf Call, Defendant Wells misrepresented the progress of Conseco's remediation efforts in LTC:

*John Wells – Conseco, Inc. – SVP – Long Term Care*

As in last quarter's call we would like to provide an update on our program for improvement which includes premium rerates, claims management improvements and technology.

*     *     *

Turning to claims management, ***the claims processes that we have implemented are beginning to show positive results.*** Through partnership with leading LTC administration companies, ***results are emerging that include both accuracy of payment to policy language, and enhanced customer experience. We expect that these operational improvements will drive increasingly material financial benefits as 2007 progresses***. To date, we project that this improved claims adjudication to policy language is resulting in a $4 million run rate benefit per quarter on the block. Slightly better than $1 million of these operational improvements are included in Q1's financial results. As discussed in Q4 investor call, we believe this higher level of precision in our LTC claims processes will ultimately result in a $10 million quarterly run rate impact by the end of this year. This impact comes at the same time with strength in compliance, meaning that the claims management improvements benefit our both our overall in-force policy base and our shareholder returns.

. . . Related to compliance, the claim appeal and claim review panels we discussed in the previous call have provided increasing focus in our efforts to ensure appropriate and compliant claims decisions. These panels are staffed with cross disciplinary resources where claims denials are reviewed for consistency with our improved adjudication processes and a claims appeal panel to review escalated cases. We also continue to retain Long Term Care industry experts to assist us in improving our operational efficiency and Customer Service. These experts are deployed on

multiple fronts including claims, policy administration, and in the rerate filing process.

*We are on track to implement an integrated policy benefit repository and accumulator tool in the middle of this year. This tool will enhance electronic access to policy benefits and payment history, which will drive more accurate and efficient claim adjudication* . . .

. . . *We remain focused on managing the LTC Closed Block initiatives as previously noted and fully expect accelerating progress, process, and financial implementation to become evident as we progress through 2007*. In summary, LTC Closed Block financial results for the quarter are again volatile, but reflect an improvement since the fourth quarter. Importantly we feel the Transport Life claim reserve strengthening of $22 million is not indicative of a trend for the larger LTC run-off book. As Gene mentioned, the experience of the ATL block, the largest block within LTC run-off, is demonstrating better results. We have made meaningful progress on our plan for improvement, including achieving key milestones in our $35 million rerate program, continuing improvements in claims management practices, and enhancing our systems tools.

219.    The statements referenced above in ¶218 were materially false and misleading when made because of the reasons set forth in ¶145. The statements referenced above in ¶218 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

220.    Furthermore, the statements referenced above in ¶218 were each materially false and misleading when made because of the following:

(a)    the statement that "the claims processes that we have implemented are beginning to show positive results" was materially false and misleading because significant and material internal control problems still existed and were not being addressed. Furthermore, there

was no reasonable basis for this statement.  Indeed, Conseco did not develop any internal metrics to measure the effectiveness of any small changes made to its claims procedures;

(b)    at a meeting from a LTC Closed Block off-site retreat around the time of these statements, there were discussions that the $35 million rerate program was behind schedule;

(c)    at this time, Conseco improperly denied claims and claims fell into paper "black holes" where claim forms were submitted to the Company but they never re-surface into the claim workflow system.  LTC Claim Management did not improve the claim adjudication process as later revealed by regulatory findings, consent orders and stipulations; and

(d)    the statement that Conseco was "on track to implement an integrated policy benefit repository and accumulator tool in the middle of this year" was materially false and misleading when made because the Company was not on track to implement these items by the middle of 2007.  In fact, Defendant Wells received weekly updates regarding the status of this project's scope, definition, and timeframe that described the problems with the project.  The project missed so many deadlines that Conseco implemented a "phased" approach whereby each phase would be completed one step at a time but the benefits of the project in connection with the setting of reserves would not be realized until all phases were completed.  According to CW2, Defendants used the "phased" approach to mislead investors by representing that progress was being made on the project even though Phase II was not completed until sometime in 2009.  Furthermore, according to an internal Conseco document during summer 2007, the status of the Accumulator project was "Yellow/Red" and the document stated that the accumulator functionality is in jeopardy and the conversion effort was at risk.

221. On May 9, 2007, Conseco filed its Form 10-Q with the SEC ("1Q07 10-Q") and reiterated the Company's financial results that were contained in the 5/8/07 Press Release. The 1Q07 10-Q discussed the Company's internal controls and procedures:

ITEM 4.  CONTROLS AND PROCEDURES.

Evaluation of Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on its evaluation, and in light of the material weakness in internal control over financial reporting identified as existing as of December 31, 2006, which is described in our Annual Report on Form 10-K, Item 9A, the Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2007, Conseco's disclosure controls and procedures were not effective.

As disclosed in our 2006 Annual Report on Form 10-K, we did not maintain effective controls over the accounting and disclosure of insurance policy benefits and the liabilities for insurance products. We identified a material weakness in internal control over the actuarial reporting process related to the design of controls to ensure the completeness and accuracy of certain inforce policies in our Bankers Life segment, Conseco Insurance Group segment, and Other Business in Run-off segment. This material weakness resulted in adjustments to insurance policy benefits and the liabilities for insurance products in the consolidated financial statements for the year ended December 31, 2006 and the quarter ended March 31, 2007.

A material weakness is a control deficiency or combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the Company's interim or annual financial statements will not be prevented or detected.

The Company is actively engaged in the implementation of remediation efforts to address the material weakness in internal control over financial reporting. These remediation efforts are outlined in our 2006 Annual Report on Form 10-K and further remediation developments will be described in future filings with the SEC. The material weakness will not be fully remediated until, in the opinion of the Company's management, the revised control processes have been operating for a sufficient period of time to provide reasonable assurance as to their effectiveness.

Changes to Internal Controls and Procedures for Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions. Although we did not implement any significant new systems in the first

three months of 2007, we expect to implement additional system conversions in the future that we believe will provide better information and will enhance our operational efficiencies. As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

222.    The statements referenced above in ¶221 were materially false and misleading when made because of the reasons set forth in ¶145. The statements referenced above in ¶221 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC. The statement that the "Company is actively engaged in the implementation of remediation efforts" was materially false and misleading when made because Defendants knew, or recklessly disregarded, that the proper steps were not being taken to fully correct the problems.

223.    Defendants' false and misleading statements about the remediation efforts and the progress of those efforts continued to mislead investors. Indeed, Morgan Stanley rated Conseco "Overweight-V" in a May 9, 2007 research report and favorably commented on the remediation efforts:

> Conclusion: While Conseco's first quarter results were marred by a range of abnormal charges, stabilization in the run-off block and significantly higher expected stock repurchases make us confident that we are beginning to see some light at the end of the tunnel.

*        *        *

> . . . we are encouraged that management is taking the necessary action to improve profitability.

- 86 -

**2Q07 Financial Results**

224.    On August 6, 2007, Conseco issued a press release announcing its financial results for

the second quarter of 2007, the period ended June 30, 2007 ("8/6/07 Press Release").  In that regard,

the press release stated:

Conseco, Inc. (NYSE:CNO) today reported results for the second quarter of 2007.

"Results for the second quarter reflect a significant strengthening of our claim reserves in our other business in run-off segment," CEO Jim Prieur said. "While this strengthening should reduce the volatility of the loss experience in future periods, progress in the turnaround of that block of business will take several quarters before improvements in claims management and our re-rate program show significant impact as we position Conseco for future growth."

**"During the second quarter, we strengthened run-off long-term care claim reserves by $110 million," said Ed Bonach, Chief Financial Officer. "We have made every effort to ensure that our claim reserves are appropriate and forward looking.  This action, which primarily relates to claims incurred in prior quarters, reflects our efforts to improve our re-serving process, using more detailed data and reserving techniques, and carefully evaluating new experience emerging in recent periods**."

*        *        *

Second quarter 2007 results:

*  Net operating loss (1):  $54.4 million, compared to $31.7 million in 2Q06 (including after-tax costs related to the proposed litigation settlement of $22.8 million and $102.1 million in 2Q07 and 2Q06, respectively)

*  Net operating loss per diluted share:  32 cents, compared to 21 cents in 2Q06 (including after-tax costs related to the proposed litigation settlement of 13 cents and 67 cents per share in 2Q07 and 2Q06, respectively)

*  Net loss applicable to common stock:  $64.5 million, compared to $31.8 million in 2Q06 (including $10.1 million of net realized investment losses in 2Q07 vs. $.1 million of net realized investment losses in 2Q06)

*  Net loss per diluted share:  38 cents, compared to 21 cents in 2Q06 (including 6 cents of net realized investment losses in 2Q07 vs. nil net realized investment losses in 2Q06)

*  Loss before net realized investment losses, corporate interest and taxes ("EBIT") (2):  $60.2 million, compared to $22.7 million in 2Q06 (including

- 87 -

pre-tax costs related to the proposed litigation settlement of $35.0 million and $157.0 million in 2Q07 and 2Q06, respectively)

* Sales (3): $108.0 million, up 10% over 2Q06 (includes sales from Medicare Advantage Plans through our partnership with Coventry Health Care (Coventry))

Six-month 2007 results:

* Net operating income (loss) (1):  $(39.8) million, compared to $24.1 million in the first six months of 2006

* Net operating income (loss) per diluted share: (25) cents, compared to 16 cents in the first six months of 2006

* Net income (loss) applicable to common stock:  $(63.6) million, compared to $23.3 million in the first six months of 2006

* Net income (loss) per diluted share: (40) cents, compared to 15 cents in the first six months of 2006

* EBIT (2):  $(6.9) million, compared to $91.9 million in the first six months of 2006

* Sales (4): $242.2 million, up 10% over the first six months of 2006

Financial strength at June 30, 2007:

* Book value per common share, excluding accumulated other comprehensive income (loss) (4), was $24.93, compared to $27.06 at December 31, 2006

* Book value per diluted share, excluding accumulated other comprehensive income (loss) (4), was $24.90, compared to $25.64 at December 31, 2006

* Debt-to-total capital ratio, excluding accumulated other comprehensive income (loss) (4), was 20.3%, compared to 17.3% at December 31, 2006

*     *     *

**In our Other Business in Run-off segment, we recognized a pre-tax operating loss of $133.2 million in the second quarter of 2007, compared to earnings of $4.4 million in the second quarter of 2006. Significant factors affecting the segment's earnings in these periods included**:

* A $118 million reduction in earnings in the second quarter of 2007 (compared to a $20 million reduction in 2006) for increases to our estimates of claims incurred in prior periods.  The reduction for the second quarter of 2007 includes $110 million of reserve strengthening resulting from

- 88 -

improvements to our reserving methods and assumptions to better reflect emerging trends.

* A $31 million reduction in earnings in the second quarter of 2007 for increases to the benefit ratio estimated for claims incurred in the quarter, compared to such benefit ratio estimated in the second quarter of 2006 for claims incurred in that quarter.

* A $9.4 million increase in earnings in the second quarter of 2006 due to release of certain reserve redundancies.

225.    The statements referenced above in ¶224 were materially false and misleading when made because of the reasons set forth in ¶145. The statement "we have made every effort to ensure that our claim reserves are appropriate" was materially false and misleading when made because Defendants refused to "make every effort" to correctly fix Conseco's problems and Defendants knew, or recklessly disregarded, that Conseco's reserves were not accurate, as detailed herein.

226.    On August 7, 2007, Conseco held a conference call with investors ("8/7/07 Conf Call") and reiterated its financial results set forth in the 8/6/07 Press Release. During the 8/7/07 Conf Call, Defendant Prieur attributed Conseco's poor financial results to "the significant increase in the LTC Run-Off block claim reserves" but at the same time continued to misrepresent to investors that Conseco "continued to make real progress in the underlying operations of that business." Defendant Prieur also stated: "We believe we have taken significant steps to reduce claim reserve volatility and we continue to make progress on improving the business." On the 8/7/07 Conf Call, Defendant Wells described the remediation of LTC:

As in last quarter's call, we would like to provide an update on our program for improvement, which includes premium re-rates, claims management improvements, technology, and organizational design. Important progress is being made in each of these areas . . . we continue to make steady progress toward our goal of an estimated $35 million in net revenue enhancement from this first round of rate increases. These metrics reflect the activity through August 3, 2007.

. . . *in the area of claims management, we continued to implement claims best practices* by partnering with leading LTC administration companies. The results include improved *accuracy of claim payments in accordance with policy language,*

- 89 -

*enhanced customer service and stronger compliance.* Specifically, we have begun recertifying our active long-term care claims. Recertifications are periodic reviews of previously approved claims, to ensure that policy benefits are payable, and that an appropriate level of care is being received by the claim. Through the utilization of more active case management, in person assessments and other actions, we project these recertifications to drive a reduction in unwarranted claims liabilities and more accurate payments in accordance with policy language.

. . . a positive development on the technology and organizational design fronts, which we announced in mid-July, is our study of a system and operational solution for a run-off long-term care group, better known at LTCG. LTCG is an industry leader with whom we are currently also working to implement best practices in our claims function. In addition to a review of their system tool, we are also considering the outsourcing of our run-off long-term care customer call center, continuing claim processing, and other operations transactions to long-term care group. Under the current proposal, Conseco would retain responsibility for adjudicating initial claims, handling claim appeals, compliance and financial reporting for the run-off loss. We are currently discussing requirements in related due diligence with LTCG and plan to make a decision regarding next steps by early fall.

227.    The statements referenced above in ¶226 were materially false and misleading when made because of the reasons set forth in ¶145. The statements referenced above in ¶226 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

228.    On the 8/7/07 Conf Call, Defendant Prieur responded to a question about the progress of the remediation as follows:

**Jukka Lipponen – KBW – Analyst**

Good morning. First of all, Jim, one of your themes -- your theme has been the fix, focus and grow. As far as the fixing part of it, how would you characterize, what inning are we in at this point? And how much longer do you expect that the fixing phase will take?

*Jim Prieur – Conseco, Inc. – CEO*

***Well, I think all along we have been thinking that the bulk of the fixing would get done in the first three quarters of this year, and we pretty much would be at a more ongoing run-rate by the fourth quarter. So that – there's been nothing, really, that has happened that would change that assessment.*** Although, in almost every company you work in, there is always something you can find to fix, right? But seriously, the real answer is it will all get done this year.

229.    The statements referenced above in ¶228 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.  Furthermore, Defendants knew, or recklessly disregarded, that the "bulk of the fixing" would not "get done in the first three quarters" of 2007.

230.    On the 8/7/07 Conf Call, Defendant Prieur responded to questions about a potential sale of LTC as follows:

*Jukka Lipponen – KBW – Analyst*

Back to the run-off block, what is your current thinking potentially considering a reinsurance transaction or securitization or some other way to remove that liability from your balance sheet?

*Jim Prieur – Conseco, Inc. – CEO*

Well, we consistently have said that – with respect to long-term care that we have an over-waiting in long-term care, and it's an unusual waiting for a company of our size and credit rating to have, and at some point we will search out ways to reduce that waiting. ***We continue to make all of the efforts that John is doing, to improve the performance of the block, because we feel that that's where you have to start first. So I guess, you can – I'm repeating what I have said before***.

*Jukka Lipponen - KBW - Analyst*

That's – so realistically, when would be – when could we get to the point where you might be in a position to seriously think about some of those options?

*Jim Prieur – Conseco, Inc. – CEO*

Well, we're continuing to work on improving the block, and I think that's probably all I can say at this point.

231.    The statements referenced above in ¶230 were each materially false and misleading when made because they at that time Conseco was actively seeking to sell or otherwise dispose of LTC.

232.    On August 9, 2007, Conseco filed its Form 10-Q with the SEC ("2Q07 10-Q") and reiterated the Company's financial results that were contained in the 8/6/07 Press Release.  The 2Q07 10-Q described the Company's internal controls and procedures and stated in pertinent part as follows:

Evaluation of Disclosure Controls and Procedures. Conseco's management, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of Conseco's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on its evaluation, and in light of the material weakness in internal control over financial reporting identified as existing as of December 31, 2006, which is described in our Annual Report on Form 10-K, Item 9A, the Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2007, Conseco's disclosure controls and procedures were not effective.

As disclosed in our 2006 Annual Report on Form 10-K, we did not maintain effective controls over the accounting and disclosure of insurance policy benefits and the liabilities for insurance products. We identified a material weakness in internal control over the actuarial reporting process related to the design of controls to ensure the completeness and accuracy of certain inforce policies in our Bankers Life segment, Conseco Insurance Group segment, and Other Business in Run-off segment.  This material weakness resulted in adjustments to insurance policy benefits and the liabilities for insurance products in the consolidated financial statements for the year ended December 31, 2006 and the quarter ended March 31, 2007.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

- 92 -

The Company is actively engaged in the implementation of remediation efforts to address the material weakness in internal control over financial reporting. These remediation efforts are outlined in our 2006 Annual Report on Form 10-K and further remediation developments will be described in future filings with the SEC. The material weakness will not be fully remediated until, in the opinion of the Company's management, the revised control processes have been operating for a sufficient period of time to provide reasonable assurance as to their effectiveness.

Changes to Internal Controls and Procedures for Financial Reporting. We have implemented several initiatives to streamline our administrative procedures and improve our actuarial valuation systems at our insurance subsidiaries. Our efforts include improvements to our policy administrative procedures and significant system conversions. Although we did not implement any significant new systems in the first six months of 2007, we expect to implement additional system conversions in the future that we believe will provide better information and will enhance our operational efficiencies. As part of the new system implementations, we expect to make further adjustments to our operating procedures in an effort to gain additional efficiencies and effectiveness. We believe the changes will also result in improvements to our internal controls over financial reporting.

There were no other changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) during the six months ended June 30, 2007, that have materially affected, or are reasonably likely to materially affect, Conseco's internal controls over financial reporting.

233.    The statements referenced above in ¶232 were materially false and misleading when made because of the reasons set forth in ¶145. The statements referenced above in ¶232 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

234.    Analyst Mark Finkelstein from Cochran Caronia Waller, commented on the long term care charge in a research report on August 7, 2007:

Given the sizeable LTC charge taken at Q4'06 related to a detailed review of the majority of the LTC blocks, followed by a smaller charge at Q1'07 on a specific block of business*, the size of this quarter's charge is highly surprising, particularly as it didn't involve an unlocking of FAS 60 assumptions*. Going forward, while we cannot dismiss the possibility of additional LTC charges on the claim reserve, this also places additional questions on whether the rate increases and claim handling improvements are enough to offset the continuing to deteriorate loss trends. Hence, without a further unanticipated round of rate increases, there is a risk that the run-off segment continues to produce meaningful losses and even more capital will have to be ploughed into Conseco Senior Health.

235.    In response to the Company's announcement on August 6, 2007, on August 7, 2007, shares of the Company's stock fell $1.45 per share, or 8%, from a close of $18.09 per share before the announcement, to close at $16.64 per share, on extremely heavy trading volume. The Company's shares continued to decline over the next several days and closed at $14.97 per share on August 9, 2007, down $3.12 per share, or 18.75%, from its close on August 6, 2007.

236.    On October 31, 2007, Conseco issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007 ("10/31/07 Press Release"). In that regard, the press release stated:

Conseco, Inc. (NYSE:CNO) today reported results for the third quarter of 2007.

"Third Quarter results reflect a number of significant events, as progress on our program to position Conseco for future profitability and growth is increasingly evident," CEO Jim Prieur said. "We saw continued strong growth in both our Bankers Life and Colonial Penn businesses, while Conseco Insurance Group, even with a decline in sales during the quarter, produced new business expected to be more profitable. *Importantly, continued progress also was evident on the turnaround in our run-off long-term care block, with our claims reserve volatility reduced this quarter following the re-serve strengthening of the previous quarter*. With only a small loss in the quarter, we are on target for that block to be-come profitable next year."

"The majority of our organizational realignment is now complete as well, with all of our customer service calls now being handled in our Carmel, Indiana offices," Prieur said.

\*        \*        \*

- 94 -

Third quarter 2007 results:

-- Net operating income (loss) (1): $(25.6) million, compared to $52.8 million in 3Q06

-- Net operating income (loss) per diluted share:  (14) cents, compared to 35 cents in 3Q06

-- Net income (loss) applicable to common stock:  $(53.7) million, compared to $38.9 million in 3Q06 (including $28.1 million of net realized investment losses in 3Q07 vs. $13.9 million of net realized investment losses in 3Q06)

-- Net income (loss) per diluted share:  (29) cents, compared to 26 cents in 3Q06 (including 15 cents of net realized investment losses in 3Q07 vs. 9 cents of net realized investment losses in 3Q06)

-- Income (loss) before net realized investment losses, corporate interest and taxes ("EBIT") (2):  $(23.4) million, compared to $110.4 million in 3Q06

-- Sales (3): $86.0 million, down 7% from 3Q06

Nine-month 2007 results:

-- Net operating income (loss) (1):  $(65.4) million, compared to $76.9 million in the first nine months of 2006

-- Net operating income (loss) per diluted share:  (39) cents, compared to 50 cents in the first nine months of 2006

-- Net income (loss) applicable to common stock:  $(117.3) million, compared to $62.2 million in the first nine months of 2006

-- Net income (loss) per diluted share: (69) cents, compared to 41 cents in the first nine months of 2006

-- EBIT (2):  $(30.3) million, compared to $202.3 million in the first nine months of 2006

-- Sales (4): $328.2 million, up 5% over the first nine months of 2006

Financial strength at September 30, 2007:

-- Book value per common share, excluding accumulated other comprehensive income (loss) (4), was $24.79, compared to $27.06 at December 31, 2006

-- Book value per diluted share, excluding accumulated other comprehensive income (loss) (4), was $24.77, compared to $25.64 at December 31, 2006

-- Debt-to-total capital ratio, excluding accumulated other comprehensive income (loss) (4), was 20.6%, compared to 17.3% at December 31, 2006

237.    The statements referenced above in ¶236 were materially false and misleading when made because of the reasons set forth in ¶145.  The statements referenced above in ¶236 were materially false and misleading when made because: (i) Defendants failed to disclose the true nature or extent of the problems with its claims procedures and what steps were required to correctly fix the problems; (ii) proper remediation efforts to correctly fix the Company's material internal control weaknesses would incur significant costs involving system upgrades, coding fixes and other major changes; and (iii) Conseco was not willing to dedicate the resources that were required to correctly fix many internal control deficiencies because it sought to sell or dispose of LTC.

238.    On November 8, 2007, Conseco filed its Form 10-Q with the SEC and reiterated the Company's financial results that were contained in the 10/31/07 Press Release.

239.    In response to the Company's announcement on October 31, 2007, on November 1, 2007, shares of the Company's stock fell $1.64 per share, or 10.3%, from a close of $15.79 per share before the announcement, to close at $14.15 per share, on extremely heavy trading volume.  The Company's shares continued to decline over the next several days and closed at $13.50 per share on November 8, 2007, down $2.29 per share, or 14.5%, from its close on October 31, 2007.

## CONSECO'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING

240.    At all relevant times during the Class Period, Defendants represented that Conseco's financial results were fairly presented in conformity with GAAP.  These representations were

materially false and misleading because Conseco's financial statements violated GAAP in numerous respects during the Class Period.[2]

241.    Conseco has now admitted that its previously issued interim and annual financial statements, spanning more than a *four year* period, were materially misstated and "*should no longer be relied upon*."   Indeed, given the myriad financial reporting improprieties and internal control deficiencies now admitted to by Conseco, Defendants knew, or were reckless in not knowing, that they had no reasonable basis for representing that the Company's financial reporting during the Class Period was fairly presented in conformity with GAAP.   Moreover, in addition to such admissions, Conseco's dramatic $110 million increase in its LTC claim reserves during the second quarter of 2007 further evidences Defendants' recklessness in representing that the Company's financial reporting during the Class Period was fairly presented in conformity with GAAP, as detailed below.

### Conseco's Admissions Regarding Its Material Financial Misstatements

242.    On February 25, 2008, Conseco issued a press release announcing that it would delay the filing of its Form 10-K for the year ended December 31, 2007, and that its previously issued financial reporting for the *years ended December 31, 2006, 2005, 2004 and 2003 and its interim 2006 and 2007 quarterly financial statements* were materially misstated and "should no longer be relied upon."   The press release stated, in part:

---

[2]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.   Generally Accepted Auditing Standard ("GAAS") §AU 411.02.   Regulation S-X [17 C.F.S. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.   Regulation S-X requires that interim financial statements must also comply with GAAP.   17 C.F.R. §210.01-01.

The extension (as permitted under Rule 12b-25 of the Securities Exchange Act of 1934) will allow the Company time to complete the December 31, 2007 financial statements and incorporate the correction of errors, the majority of which were identified during the remediation of the material weakness in internal controls disclosed in its 2006 Form 10-K and subsequent quarterly filings with the Securities and Exchange Commission. *Due to the significance of these corrections, Conseco will restate its financial statements for the years ended December 31, 2006 and 2005, along with affected Selected Consolidated Financial Data for 2004 and 2003, and quarterly financial information for 2006 and the first three quarters of 2007*. Therefore, *the previously issued financial statements of the Company for those periods should no longer be relied upon*.

Although the Company has not yet finalized its December 31, 2007 financial statements, we estimate that the errors identified in the fourth quarter of 2007 will result in an overstatement of previously reported consolidated shareholders' equity at September 30, 2007 in a range of $15 to $35 million. The effect on net income (loss) in prior periods may be positive or negative in a particular period and will vary in amount from period to period. We estimate that the correction to net income (loss) will not exceed plus or minus $15 million for any prior annual period. The Company will also correct previously identified immaterial errors, which had been recognized through cumulative adjustments to previously issued financial statements.

243.    On March 3, 2008, Conseco filed a Form 12b-25 with the SEC, notifying the agency that the Company's 2007 Form 10-K would be late. The filing disclosed that Conseco had been in contact with the SEC's Office of the Chief Accountant regarding its accounting policy for long-term care premium rate increases and that the SEC had told Conseco that its method of accounting for changes in premium rates was not consistent with certain financial accounting standards.

244.    In response to this announcement, the artificial inflation of the stock price dissipated as shares of the Company's stock on March 4, 2008 fell nearly 10%, from $11.64 to $10.49 per share, on extremely heavy trading volume.

245.    A few weeks later, on March 17, 2008, the Company issued a press release announcing preliminary financial information for the quarter and year ended December 31, 2007. The press release stated, in pertinent part:

Conseco, Inc. (NYSE: CNO) today reported preliminary results for the fourth quarter and year ended December 31, 2007.

- 98 -

"Overall, we continue to make steady progress on our plans to position Conseco for future growth," CEO Jim Prieur said.  "New business continues to be strong at Bankers and at Colonial Penn, and the expected future margins related to new business increased at Conseco Insurance Group despite declining sales.  Asset quality has remained a high priority and our portfolio continues to perform within expectations.  This is not to say that we are not without our challenges.  We will continue to move forward with our strategies to further stabilize our long-term care closed block of business and fully remediate the material weakness in internal controls."

Preliminary results subject to change

As previously announced, the Company has been consulting with the staff of the SEC's Office of the Chief Accountant (the "SEC staff") regarding its accounting policy for long-term care premium rate increases, as described in the Summary of Significant Accounting Policies in Conseco's 2006 Form 10-K.  As previously disclosed, Conseco has used a method which prospectively changes reserve assumptions for long-term care policies when premium rate increases differ from original assumptions.  ***On February 28, 2008, the SEC staff informed Conseco of their view that the use of this method is not consistent with the guidance of Statement of Financial Accounting Standards No. 60, "Accounting and Reporting by Insurance Enterprises."***  The Company is continuing to evaluate the SEC staff's view, including its effects on the preliminary earnings reported herein and the possible effects in prior periods.  Due to this ongoing evaluation, the Company has not completed its financial statements for the year ended December 31, 2007.  As a result, all financial results described in this press release should be considered preliminary, and are subject to change to reflect any necessary adjustments that are identified before the Company completes its financial statements and files its Form 10-K for the year ended December 31, 2007.

"The delay in completing our financial statements is as frustrating for management as it is for shareholders.  There is no difference in the economics of the long-term care business arising from the SEC's position; no changes at all in the cash flows or capital requirements – it is all about the timing of the recognition of earnings for a long term business," said Jim Prieur.

Preliminary fourth quarter 2007 results:

- Net operating income before valuation allowance for deferred tax assets: $18.8 million

- Net operating income before valuation allowance for deferred tax assets per diluted share: 10 cents

- Net loss applicable to common stock: $72.2 million (including $23.0 million of net realized investment losses and $68.0 million valuation allowance for deferred tax assets)

- Net loss per diluted share: 39 cents (including 12 cents of net realized investment losses and 37 cents of valuation allowance for deferred tax assets)

- Income before net realized investment losses, corporate interest and taxes ("EBIT"): $51.6 million

- Sales: $87.3 million

Preliminary full-year 2007 results:

- Net operating loss before valuation allowance for deferred tax assets: $50.2 million

- Net operating loss before valuation allowance for deferred tax assets per diluted share: 37 cents

- Net loss applicable to common stock: $210.1 million (including $77.8 million of net realized investment losses and $68.0 million valuation allowance for deferred tax assets)

- Net loss per diluted share: $1.21 (including 45 cents of net realized investment losses and 39 cents of valuation allowance for deferred tax assets)

- EBIT: $(6.3) million

- Sales: $415.5 million

Preliminary financial strength at December 31, 2007:

- Book value per diluted share, excluding accumulated other comprehensive income (loss) was $24.28

- Debt-to-total capital ratio, excluding accumulated other comprehensive income (loss), was 21.0%

The Company currently estimates that adjustments to reflect the SEC staff's view may have the effect of reducing the preliminary loss reported above for the fourth quarter of 2007 by up to $5 million (or 3 cents per share) and reducing the preliminary loss for the year ended December 31, 2007 by up to $15 million (or 9 cents per share). The Company is working diligently to complete its financial statements and Form 10-K for the year ended December 31, 2007, as soon as possible (expected to be no later than March 28, 2008).

*As announced in the Company's February 25, 2008 press release, due to the significance of errors identified in completing the December 31, 2007 financial statements (the majority of which were identified during the procedures performed in an effort to remediate the material weakness in internal controls disclosed in its 2006 Form 10-K and subsequent quarterly filings with the SEC), Conseco will*

*restate its financial statements for the years ended December 31, 2006 and 2005, along with affected selected financial data for 2004 and 2003 and the first three quarters of 2007. Therefore, the previously issued financial statements of the Company for those periods should no longer be relied upon.* [Footnotes omitted.]

246.    In response to this announcement, the artificial inflation of the stock price dissipated further as shares of the Company's stock fell nearly 14%, from $10.06 on March 14, 2008, to close at $8.76 per share on March 17, 2008, on extremely heavy trading volume.

247.    On March 28, 2008, the Company filed with the SEC its Form 10-K for the year ended December 31, 2009 (the "2007 10-K"), which detailed its financial results for the quarter and year ended December 31, 2007. This filing also restated the financial information Conseco had issued prior to and during the Class Period. By virtue of this restatement, Conseco has admitted that financial statements it issued prior to and during the Class Period were materially false and misleading as GAAP, in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 154, provides that only materially misstated financial statements need be restated.

248.    According to the 2007 Form 10-K, the most significant errors associated with the restatement of Conseco's Class Period financial information were related to the accounting of insurance products in the specified disease and life blocks in the Conseco Insurance Group segment and in the long-term care block of business in the Other Business in Run-off segment. According to the 2007 Form 10-K, these misstatements, which were purportedly identified in 2007 during the remediation of internal control deficiencies, and their related effect on Conseco's pre-tax earnings were as follows:

(a)    computer code errors the in actuarial system related to specified disease return of premium features. These errors resulted in the misstatement of Conseco's insurance policy liabilities and pre-tax income in the amount of $25.6 million;

- 101 -

(b)    errors associated with certain specified disease policies with a return of premium feature that had not been properly accounted for, which resulted in the understatement of Conseco's claim reserves and the overstatement of its pre-tax income in the amount of $15.9 million;

(c)    insurance policy liabilities for certain specified disease policies improperly accounted for a provision was not applicable to the policies.  As a result, Conseco's liabilities were understated and its pre-tax income was overstated by $18.0 million;

(d)    a key claims reserving factor used for certain specified disease insurance policies was wrongfully set to zero.  As a result, no claims reserve was established for these policies, causing the Company's liabilities to be understated and its pre-tax income to be overstated by $20.4 million;

(e)    procedures purportedly established to identify terminations of long-term care policies due to the death of the insured were not performed in a consistent manner.  As a result, Conseco's liabilities and its pre-tax income were misstated by $10.7 million;

(f)    certain computer coding errors in the actuarial valuation system for universal life policies resulted in the misstatement of Conseco's liabilities and its pre-tax income in the amount of $7.9 million;

(g)    certain universal life products that provided for future bonus credits were not properly accounted for, which resulted in the misstatement of the value of such policies and the overstatement of Conseco's pre-tax income in the amount of $6.5 million;

(h)    Conseco maintained "unusual" reserve or benefit balances associated with certain specified disease, long-term care and life policies.  These errors caused Conseco's pre-tax income to be overstated by $14.4 million; and

- 102 -

(i)     various miscellaneous errors, none of which exceeded $5.0 million, in the aggregate, caused Conseco's pre-tax income to be overstated by a $1.0 million.

249.    In addition, to the foregoing, the 2007 Form 10-K indicated that Conseco also restated the financial statements it issued during the Class Period to correct the following accounting improprieties:

- During 2006, we determined that we had been carrying insurance liabilities for certain single premium annuities that were no longer in force in the Bankers Life segment.  The error resulted in an overstatement of insurance policy liabilities of $7.4 million.

- During 2005, we determined the method that had been used to calculate insurance policy liabilities for future long-term care benefits on policies with inflation coverage was incorrect.  The error resulted in an overstatement of insurance policy liabilities of $6.4 million in the Bankers Life segment.

- In 2005, we identified errors in the calculation of insurance acquisition costs in the Bankers Life segment.  The errors resulted in an overstatement of insurance acquisition costs of $4.4 million.

- During 2006, we discovered that procedures to appropriately identify deceased policyholders on a timely basis and release the related insurance policy liabilities were not being performed in a consistent manner.  The error resulted in an overstatement of insurance policy liabilities of $4.7 million in the Conseco Insurance Group segment.

- In 2006, we discovered that we had not been establishing insurance policy liabilities for certain specified disease coverages and that factors used to determine these liabilities were incorrect.  The errors resulted in an understatement of insurance policy liabilities of $13.3 million in the Conseco Insurance Group segment.  This error was offset by a $1.6 million understatement of insurance acquisition costs related to the same policies.

- In 2006, we discovered that several errors had been made in estimating claim reserve liabilities for our long-term care business in the Other Business in Run-off segment. In the process of reviewing our claim estimates, we discovered that some claim liabilities related to policies with inflation riders had been estimated excluding inflation benefits.  We also discovered that some claim liabilities related to policies providing lifetime benefits had been estimated based on the assumption the benefit period was limited.  We also discovered that some claim liabilities for non-forfeiture benefits had been estimated based on the original pool of money benefit, rather than pool amounts reduced by benefits previously paid.  These errors resulted in an understatement of claim reserves of $7.1 million.

- 103 -

250.    Finally, Conseco restated the financial statements it issued during the Class Period to correct an accounting impropriety that was identified by the SEC.  With respect to this impropriety, which misstated Conseco's 2006 pre-tax income by approximately $14 million and its pre-tax income during the first nine months of 2007 by approximately $12 million, the 2007 Form 10-K disclosed, in pertinent part:

> In addition . . . on February 28, 2008, the SEC's Office of the Chief Accountant (the "SEC staff") informed us that the use of a method which prospectively changes reserve assumptions for long-term care policies when premium rate increases differ significantly from original assumptions is not consistent with [GAAP articulated in] Statement of Financial Standards No. 60, "Accounting and Reporting by Insurance Enterprises" ("SFAS 60").
>
> *          *          *
>
> Our restatement of previously issued financial statements for the year ended December 31, 2006 and quarterly information for 2006 and the first three quarters of 2007, includes adjustments to eliminate the use of the prospective revision methodology.  After the elimination of the additional reserves we established based on the prospective revision methodology, our liabilities for insurance products for long-term care policies in the two business segments with these blocks (Bankers Life and Other Business in Run-off) were not deficient in the aggregate, but our estimates of future earnings indicated that profits would be recognized in early periods and losses in later periods.  In accordance with paragraph 37 of SFAS 60, we are increasing the liabilities for insurance products over the period of profits, by an amount necessary to offset losses that are expected to be recognized in later periods.

251.    Pursuant to SEC regulations, Defendants had the responsibility to select GAAP that appropriately reflected Conseco's business activities in accordance with Section 13 of the Exchange Act.

252.    GAAP, as set forth in FASB's Statements of Concepts ("Concepts Statement") No. 1, provides that "a fundamental objective of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented."  In addition, GAAP, in Concepts Statement No. 2, provides that financial reporting should be "reliable"

- 104 -

in that it represents what it purports to represent and that "reliable and relevant financial information is a notion that is central to U.S. GAAP."

253.    Conseco has now acknowledged that it has violated these provisions of then existing GAAP by virtue of its admissions in ¶¶242-50 above.  In addition, Conseco issued financial statements during the Class Period which also violated at least the following provisions of GAAP:

(a)    the financial reporting provisions set forth in SFAS No. 60 associated with premium rate increases;

(b)    the financial reporting provisions set forth in SFAS No. 60 associated with the accrual of liabilities for unpaid claim costs;

(c)    the principle that financial statements recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*e.g.*, likely) that an asset has been impaired or a liability has been incurred, and the amount of such loss can be reasonably estimated (SFAS No. 5);

(d)    the principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred (SFAS No. 5);

(e)    the principal that financial statements disclose certain significant risks and uncertainties (Statement of Position 94-6);

(f)    the principle that interim financial statements are to include disclosures sufficient so as to make the financial information presented not misleading (Staff Accounting Bulletin Topic 10(a));

(g)    the concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of

- 105 -

the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶50);

        (h)     the concept that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Concepts Statement No. 2, ¶¶58-59);

        (i)     the concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶80); and

        (j)     the concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶95, 97).

      254.    As a result of the foregoing violations of GAAP, the Company issued materially false financial statements to investors that significantly distorted its true operating results during the Class Period.

255.    The following table summarizes the aggregate quantitative impact of Defendants' numerous and varied accounting improprieties on Conseco's previously reported pre-tax income (loss) during the Class Period:

| ($ in thousands, except % data) | Pre-Tax Income (Loss) As Reported | Pre-Tax Income (Loss) As Restated | % Overstated (Understated) |
|---|---|---|---|
| Year Ended December 31, 2005 | $503,400 | $484,300 | 3.94% |
| Quarter Ended March 31, 2006 | $101,100 | $93,600 | 8.01% |
| Quarter Ended June 30, 2006 | $(34,900) | $(32,400) | 7.72% |
| Quarter Ended September 30, 2006 | $76,700 | $82,000 | (6.46%) |
| Quarter Ended December 31, 2006 | $9,400 | $24,000 | (60.83%) |
| Year Ended December 31, 2006 | $152,300 | $167,200 | (8.91%) |
| Quarter Ended March 31, 2007 | $16,200 | $(800) | N/M |
| Quarter Ended June 30, 2007 | $(92,700) | $(85,300) | 8.68% |
| Quarter Ended September 30, 2007 | $86,800 | $85,300 | 1.76% |

**Conseco's Dramatic Increase to Its LTC Claims Reserves**

256.    The financial statements Conseco issued during the Class Period materially understated its claims reserves and its insurance claim related expenses.

257.    As alleged herein, prior to and during the Class Period, Conseco experienced severe difficulties with the Company's data processing systems. These difficulties were exacerbated by Conseco's material internal control deficiencies, particularly those associated with claims processing and the lack of a central policy repository. As a result, Conseco did not have access to data necessary to analyze actual policy or claims data, Conseco's insurance claims were not timely recorded, and the Company accumulated a significant backlog of unpaid claims. These facts, which were known to or recklessly disregarded by Defendants at all relevant times, rendered the Company's claims related expense and insurance reserve calculations inherently unreliable and with reasonable basis.

258.    GAAP and SEC accounting regulations require that financial statements account for and disclose existing uncertainties as to probable losses. *See, e.g.,* SFAS No. 5. Since a

- 107 -

fundamental precept of accounting requires expenses be matched with their related revenues, GAAP requires that financial statements account for, and provide disclosures about, liabilities for unpaid claim costs relating to insurance contracts based on the expected cost of settling the claims, using past experience adjusted for current trends and any other factors that would modify past experience. *See, e.g.,* SFAS No. 60.

259.    Since insurance companies frequently pay claims after the end of a particular accounting period, they are required to establish a liability to account for insurance claim costs incurred by it during an accounting period which remain unpaid at the end of the accounting period. In determining its liability for expected claim costs, it is necessary for insurance companies to establish a reserve for those claims that are both reported to it but not paid ("RBNP") and those claims that have been incurred but not reported ("IBNR") by policy holders to the insurance company at the end of the accounting period.

260.    During the Class Period, Conseco's financial statements falsely represented:

> We calculate and maintain reserves for the estimated future payment of claims to our policyholders primarily based on assumptions made by our actuaries. For our health insurance business, we establish an active life reserve, a liability for due and unpaid claims, claims in the course of settlement, and incurred but not reported claims, and a reserve for the present value of amounts on incurred claims not yet due. We establish reserves based on assumptions and estimates of factors either established at the fresh-start date for business inforce then or considered when we set premium rates for business written after that date.

261.    Defendants knew or recklessly disregarded that the above representations were materially false and misleading and that Conseco violated GAAP by failing to appropriately reserve for its unpaid insurance claim expenses, thereby rendering its financial statements during the Class Period materially false and misleading, because of the reasons set forth in ¶145. Furthermore, the statements were materially false and misleading when made because: (1) Conseco's system of internal control was grossly inadequate; (2) Conseco failed to timely and accurately process claims;

and (3) Conseco lacked a reasonable basis for estimating its IBNR reserve.  Each of these is discussed below.

## Conseco's System of Internal Controls Was Grossly Inadequate

262.    Under the federal securities laws, Section 13(b)(2) of the Exchange Act, public companies are required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  Adequate financial controls and systems are of paramount importance to the financial reporting process, particularly where, as in Conseco's case, a company has engaged in acquisitions that require it to marry disparate systems.

263.    As alleged above, Conseco has now admitted that during the Class Period, its system of internal controls was materially deficient and Conseco suffered from numerous material internal control deficiencies that were not revealed by Conseco.  Defendants *knew* that these deficiencies severely impaired the integrity of Conseco's financial reporting process.  Both CW1 and CW2 stated that Conseco's internal control deficiencies were "not isolated" to its Conseco's LTC group, but were, in fact, "enterprise-wide" with the Company also experiencing serious problems in its traditional life insurance business.

## Conseco Lacked a Reasonable Basis for Estimating Its IBNR Reserve

264.    During the Class Period, Defendants knew or recklessly disregarded that Conseco maintained a deficient and/or non-existent system of internal controls over claims processing methodology and that it did not timely and accurately process, quantify and record claims.  These factors, which caused the Company to issue financial statements that improperly failed to comply with GAAP and were materially false and misleading, also materially distorted the Company's calculation of its IBNR reserves during the Class Period.

265.    Generally, insurance companies, such as Conseco, utilize historical claims data to properly calculate an IBNR reserve.  As noted in the American Institute of Certified Public Accountants ("AICPA") Statement on Auditing Standard No. 57, the process of developing an accounting estimate, such as IBNR, requires the accumulation of *sufficient* and *reliable* data on which to base the estimate.  In fact, in its Statement of Position 92-4, the AICPA notes that historical experience is generally the primary source of information on which loss reserve estimates, such as IBNR, are based.

266.    As set forth above, Conseco's insurance claims were not accurately or timely processed, quantified or recorded and Conseco did not fully appreciate its exposure under policies. As such, Defendants knew or recklessly disregarded that there was not reliable historical information on which to base Conseco's IBNR reserves during the Class Period and, in fact, the Company's IBNR calculations were based on incomplete and inaccurate data.  Thus, Conseco's calculations of both its insurance claim expense and its insurance claim liabilities that were reported in its financial statements during the Class Period were materially false and misleading and without reasonable basis.

267.    CW2 stated Conseco's IBNR reserves "couldn't" be right because, among other things, claims that were eliminated by the NL Close were *not* included in Conseco's actuarial calculations.  CW2 noted that s/he had "a hundred conversations" with Conseco's actuaries about this topic.  CW2 also stated that his/her direct report stated "we have no idea how anyone knows" what Conseco's actual financial position is because Conseco's data integrity "is built on sand and shifting" constantly.

268.    CW2 indicated that because of the limitations of the Company's systems, Conseco's actuaries utilized "assumptions" far more than the actuaries of other insurance companies.  CW1

- 110 -

added that there was a great deal of turnover amongst the actuaries who were frustrated, in part, by newly emerging information resulting from the Company's prior failure to timely and accurately process, quantify and record claims. In certain instances, this information was deliberately excluded from actuarial calculations because absorbing this data would materially change previous reserve estimates.

269.    The system deficiencies and improper practice of denying claims caused Conseco's IBNR reserves to be inherently unreliable, as Defendants knew or recklessly disregarded.

270.    Ultimately, when Conseco reported its financial results for the second quarter of 2007, the Company announced a $110 million dramatic increase its LTC reserves "**which primarily relates to claims incurred in prior quarters,** reflects our efforts to improve our re-serving process, using more detailed data and reserving techniques, and carefully evaluating new experience emerging in recent periods."

271.    On August 6, 2007, Morgan Stanley issued a research report, which stated, in pertinent part:

> Results included a $110 million reserve strengthening related to changes in methodology. ***This was surprising given management had consistently downplayed the chances of a charge*** given they had a large provision for adverse deviation in their active life reserves.

272.    On August 7, 2007, Cochran Caronia Waller Securities LLC issued a research report, which stated, in pertinent part:

> Based on discussions with management last night, we understand that this particular claim reserve strengthening relates to two key factors: 1) incorporating more current than historical claim trends in the projection of the total claim reserve; and 2) breaking down the total claims inventory more finely between policies with lifetime and limited duration benefits as well as certain inflation riders. While this analysis makes sense to us, ***we were surprised that this was not incorporated into prior reserve reviews***. Further, management indicated that while these trends were incorporated into the full book, all blocks of business have not been fully reviewed. Hence, we cannot say with certainty that the reserve charges are at or near completion and that one-time hits will not re-emerge.

273.    On August 8, 2007, Fitch revised Conseco's rating outlook to Negative, stating, in

pertinent part:

> Fitch's change in Rating Outlook reflects CNO's recently announced financial results
> of the second quarter 2007. Fitch is particularly disappointed with the announcement
> of further losses on the company's run-off long-term care business, a related
> $110 million reserve strengthening, and the expectation of a continuing long
> recovery in that business. This charge, coupled with other previously announced
> charges, has lessened Fitch's confidence that the company is on a clear path towards
> earnings improvement and stable financial results. In addition, Fitch believes the
> announced $100 million capital infusion into Conseco Senior Health Insurance
> Company, will lessen the holding company's financial flexibility.

274.    On September 27, 2007, Conseco executives, including Defendants Bonach, Wells

and Prieur, and Chief Actuary Mark Alberts, held a conference call with analysts to provide details

on LTC and the significant increase in reserves taken in August 2007 ("9/27/07 Conf Call"). On the

9/27/076 Conf Call, Defendants admitted that Conseco significantly increased reserves in 2Q07 that

related to claims in prior periods. The slideshow presented on the 9/27/07 Conf Call stated in part:

> …the experience in Q2 2007 reflects $118 million of increases to prior-period incurred claim
> estimates. Such amount includes $110 million of strengthening adjustments to claim reserve
> methods and assumptions.

275.    The failure for Conseco to set appropriate reserves in prior periods was due to the

numerous problems and internal control deficiencies known by Defendants to have existed during

the Class Period, including, inter alia, the abuse of NL Close, bundling and unbundling of claims, the

lack of a central repository, the failure to record or analyze detailed or accurate claims payments

data, and payments over policy limits. On the 9/27/07 Conf Call, Mark Alberts, Conseco's Chief

Actuary stated in part:

> The loss in the closed block in the second quarter was $133 million. In Q2 we made several
> refinements to claim reserves and assumptions which strengthened our claim reserves by 110
> million. The strengthening in the quarter reflects an effort to be forward-looking in our claim
> reserve assumptions. Approximately, half or 55 million of our reserve strengthening reflects
> assumption changes designed to anticipate potential deterioration in future experience.

*      *      *

Claim reserves cover incurred claims that have been reported and incurred but not reported or IBNR…. Verified basis claims normalize results by looking back and assigning claim reserve changes to prior periods at levels where they would have been set if we knew then what we knew now.

276.    As a result of Conseco's: (i) lack of adequate internal controls over claims processing; (ii) failure to maintain accurate data about its policies; (iii) failure to accurately process claims; and (iv) failure to timely process claims – all of which were known or recklessly disregarded by Defendants – the Company lacked the sufficiently reliable historical data necessary to reasonably estimate the Company's IBNR reserve.  As a result, Conseco's calculation of its IBNR reserve was grossly misstated and without reasonable basis.

277.    As a result of these facts and other facts alleged herein, which were known to or recklessly disregarded by Defendants, Conseco had no reasonable basis for asserting during the Class Period that "[o]ur unaudited consolidated financial statements reflect normal recurring adjustments that are necessary for a fair statement of our financial position and results of operations" or that its financial statements were presented in conformity with GAAP and the Company's reported insurance claim liabilities and expense in its financial statements during the Class Period to be materially misstated.

278.    The market for Conseco common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Conseco common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Conseco common stock relying upon the integrity of the market price of Conseco common stock and market information relating to Conseco, and have been damaged thereby.

279.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Conseco common stock, by publicly issuing false and misleading statements

and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

280. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Conseco's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Conseco and its business, prospects and operations, thus causing the price of Conseco common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

281. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Conseco, their control over, and/or receipt and/or modification of Conseco's allegedly materially misleading misstatements and/or their associations

- 114 -

with the Company, which made them privy to confidential proprietary information concerning Conseco, participated in the fraudulent scheme alleged herein.

282.    Defendants possessed knowledge of facts or had access to information contradicting their public statements.  The substantial problems at Conseco and material internal control deficiencies were communicated to Defendants and other senior executives of the Company. Furthermore, Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud.

### LOSS CAUSATION/ECONOMIC LOSS

283.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Conseco's common stock and operated as a fraud or deceit on Class Period purchasers of Conseco common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Conseco common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Conseco common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

284.    Defendants' false and misleading statements had the intended effect and caused Conseco common stock to trade at artificially inflated levels throughout the Class Period.

285.    As a direct result of Defendants' disclosures set forth above, the price of Conseco common stock fell precipitously.  These drops removed the inflation from the price of Conseco common stock, causing real economic loss to investors who had purchased Conseco common stock during the Class Period.

286.    On August 6, 2007, Conseco announced its financial results for 2Q07 and revealed that the Company increased reserves for LTC by $110 million.  In response to the Company's

announcement on August 6, 2007, on August 7, 2007, shares of the Company's stock fell $1.45 per share, or 8%, from a close of $18.09 per share before the announcement, to close at $16.64 per share, on extremely heavy trading volume.  The Company's shares continued to decline over the next several days and closed at $14.97 per share on August 9, 2007, down $3.12 per share, or 18.75%, from its close on August 6, 2007.  The full extent of Defendants' fraud had not yet been revealed so Conseco's stock continued to remain artificially inflated.

287.    On October 31, 2007, Conseco announced disappointing financial results for 3Q07.  In response to the Company's announcement on October 31, 2007, on November 1, 2007, shares of the Company's stock fell $1.64 per share, or 10.3%, from a close of $15.79 per share before the announcement, to close at $14.15 per share, on extremely heavy trading volume.  The Company's shares continued to decline over the next several days and closed at $13.50 per share on November 8, 2007, down $2.29 per share, or 14.5%, from its close on October 31, 2007.  The full extent of Defendants' fraud had not yet been revealed so Conseco's stock continued to remain artificially inflated.

288.    On March 3, 2008, Conseco filed a Form 12b-25 with the SEC, notifying the agency that the Company's 2007 Form 10-K would be late and that Conseco had been in contact with the SEC's Office of the Chief Accountant regarding its accounting policy for long-term care premium rate increases and that the SEC had told Conseco that its method of accounting for changes in premium rates was not consistent with certain financial accounting standards.  In response to this announcement, the artificial inflation of the stock price dissipated as shares of the Company's stock on March 4, 2008 fell nearly 10%, from $11.64 to $10.49 per share, on extremely heavy trading volume.  The full extent of Defendants' fraud had not yet been revealed so Conseco's stock continued to remain artificially inflated.

- 116 -

289.    Then, on March 17, 2008, the Company issued a press release announcing preliminary financial information for the quarter and year ended December 31, 2007 and revealed additional negative information about Conseco's financial performance and restatement. In response to this announcement, the artificial inflation of the stock price dissipated further as shares of the Company's stock on fell nearly 14%, from $10.06 on March 14, 2008 to close at $8.76 per share on March 17, on extremely heavy trading volume.

290.    The declines in the price of Conseco common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in Conseco common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conseco common stock and the subsequent significant decline in the value of Conseco common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

291.    At all relevant times, the market for Conseco common stock was an efficient market for the following reasons, among others:

(a)    Conseco common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Conseco filed periodic public reports with the SEC and the NYSE;

- 117 -

(c)     Conseco regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Conseco was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

292.    As a result of the foregoing, the market for Conseco common stock promptly digested current information regarding Conseco from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Conseco common stock during the Class Period suffered similar injury through their purchase of Conseco common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

293.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of Conseco who knew that those statements were false when made.

### COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

294.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

295.    This Count is asserted against all Defendants for violations of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

296.    During the Class Period, Defendants disseminated or approved the materially false

and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

297.    Defendants, individually and in concert, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations

and future prospects of the Company as specified herein.

298.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the purchasers of the Company's common stock during the Class Period in an effort

to maintain artificially high market prices for the Company's stock in violation of Section 10(b) of

the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below

299.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, and/or projections; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and liabilities at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

300.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Conseco's operating condition, the problems with LTC and other business lines, and liabilities under insurance policies from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations, and reserves throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

301.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Conseco's shares were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Conseco's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Conseco securities during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

302.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the significant problems in Conseco's LTC business and other business lines, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Conseco shares, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

303.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

304.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Conseco common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

305.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

306.    The Individual Defendants acted as controlling persons of Conseco within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

307.    As set forth above, Conseco and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action is a proper class action and certifying Plaintiffs, among others, as class representatives and their counsel as Class counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

C. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert's fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 12, 2010  COUGHLIN STOIA GELLER RUDMAN &
           ROBBINS LLP
           SAMUEL H. RUDMAN
           DAVID A. ROSENFELD
           EVAN J. KAUFMAN

           _____
             SAMUEL H. RUDMAN

           58 South Service Road, Suite 200
           Melville, NY  11747
           Telephone:  631/367-7100
           631/367-1173 (fax)

*Counsel for Plaintiff*

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Evan J. Kaufman, hereby certify that on January 12, 2010, I caused a true and correct copy of the attached:

Amended Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

Evan J. Kaufman

CONSECO SEC
Service List - 1/6/2010    (09-0134)
Page 1 of 1

### Counsel For Defendant(s)

Andrew W. Stern
Dorothy J. Spenner
Sidley Austin LLP
787 7th Avenue, 22nd Floor
New York, NY 10019
   212/839-5300
   212/839-5599(Fax)

Walter C. Carlson
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
   312/853-7000
   312/853-7036(Fax)

### Counsel For Plaintiff(s)

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
   631/367-7100
   631/367-1173(Fax)

Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
   313/578-1200
   313/578-1201(Fax)