UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PLUMBERS AND PIPEFITTERS LOCAL UNION
NO. 719 PENSION TRUST FUND,
on Behalf of Itself and All Others Similarly Situated,

                   Plaintiff,

    vs.

CONSECO INC., WILLIAM KIRSCH, EUGENE
BULLIS, MICHAEL DUBES, JAMES HOHMANN,
JIM PRIEUR, EDWARD BONACH, and JOHN
WELLS,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:  09-cv-6966 (JGK)

:  ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

-and-

One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

PLAINTIFF'S COMPLAINT .................................................................................... 18

    1.    Remediation of The Material Weakness in Internal Controls ............................. 18

    2.    Reserves ................................................................................................ 19

    3.    Financial Performance and Operations ................................................. 19

    4.    Improvement of the LTC Run-off Business ......................................... 20

    5.    Customer Claims Handling and Regulatory Examinations ................... 21

ARGUMENT ............................................................................................................. 24

I.    PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED. ........................... 25

    A.    The Complaint Does Not Plead Scienter. ........................................ 25

        1.    Plaintiff's Allegations Of Fraud By Hindsight Do Not Plead A Strong Inference Of Scienter. ................................................. 26

        2.    Plaintiff's Allegations Based On Confidential Witnesses Do Not Plead A Strong Inference Of Scienter. ............................... 27

            a.    The Confidential Witnesses are not alleged to have had contact with the Individual Defendants. ..................... 27

            b.    The Confidential Witness allegations are vague and conclusory. ................................................................. 30

            c.    The Confidential Witness allegations are contradictory. .............. 32

        3.    Plaintiff Does Not Allege Motive. ........................................... 34

        4.    Plaintiff Does Not Allege Conscious Misbehavior or Recklessness. ........................................................................ 36

            a.    The existence of a restatement does not constitute strong circumstantial evidence of conscious misbehavior or recklessness. ............................................................... 37

b.    Plaintiff's allegations are too vague to constitute strong circumstantial evidence of conscious misbehavior or recklessness. ................................................................. 37

c.    Conseco's repeated disclosures of the difficulties with its LTC business make the inference of non-fraudulent intent far more compelling than any inference of scienter ..................... 40

B.    **The Alleged Misstatements And Omissions Are Not Actionable.** .................. 41

1.    **Many Of The Misstatements and Omissions Are Immaterial.** ........... 41

2.    **The Statements And Omissions Relating To Reserves Are Not Actionable.** ................................................................. 44

3.    **The Alleged Omissions Are Not Actionable Because Conseco Had No Duty To Disclose The Information Which Plaintiff Claims Was Withheld.** ................................................................. 45

C.    **Plaintiff's Claims Are Barred By The Applicable Statute Of Limitations.** ................................................................. 46

II.    **PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.** .......................... 49

**CONCLUSION** ................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Acito v. Imcera Group, Inc.,
   47 F.3d 47 (2d Cir. 1995) ..................................................................................................26

AOL Time Warner Sec. and ERISA Litig.,
   2004 WL 992991 (S.D.N.Y. May 5, 2004) ..........................................................................35

ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,
   493 F.3d 87 (2d Cir. 2007)..................................................................................................24

Basic Inc. v. Levinson,
   485 U.S. 224 (1988)............................................................................................................46

Boguslavsky v. Kaplan,
   159 F.3d 715 (2d Cir. 1998)................................................................................................49

Brimo v. Corporate Express, Inc.,
   229 F.3d 1135 (2d Cir. Oct. 6, 2000)..................................................................................47

Coronel v. Quanta Capital Holdings Ltd.,
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................................................................38

Dodds v. Cigna Sec., Inc.,
   12 F.3d 346 (2d Cir. 1993)............................................................................................46, 47

Druskin v. Answerthink, Inc.,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...............................................................................32

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
   553 F.3d 187 (2d Cir. 2009)........................................................................................... 41-42

Endovasc Ltd. v. J.P. Turner & Co.,
   2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) .......................................................................49

Geiger v. Solomon-Page Group, Ltd.,
   933 F. Supp. 1180 (S.D.N.Y. 1995).....................................................................................43

GVA Market Neutral Master Ltd. v. Versus Capital Partners Offshore Fund, Ltd.,
   580 F. Supp. 2d 321 (S.D.N.Y. 2008)..................................................................................46

Hess v. American Physicians Capital, Inc.,
   2005 WL 459638 (W.D. Mich. Jan. 11, 2005) ....................................................................45

Horizon Asset Mgmt Inc. v. H & R Block, Inc.,
   580 F.3d 755 (8th Cir. 2009) ..............................................................................................37

In re 2007 Novastar Fin., Inc., Sec. Litig.,
  2008 WL 2354367 (W.D. Mo. June 4, 2008) ............................................................. 2, 39-40

In re Allied Capital Corp. Sec. Litig.,
  2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003).......................................................................43

In re American Express Co. Sec. Litig.,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008).................................................................29, 32

In re Bausch & Lomb,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008).................................................................................29

In re Bristol-Myers Squibb Sec. Litig.,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................................37

In re Burlington Coat Factory Sec. Litig.,
  114 F.3d 1410 (3d Cir. 1997)...............................................................................................43

In re CIT Group, Inc. Sec. Litig.,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004)..................................................................................27

In re Doral Financial Corp. Sec. Litig.,
  563 F. Supp. 2d 461 (S.D.N.Y. 2008)..................................................................................32

In re Downey Sec. Litig.,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)........................................................... 32-33, 34

In re DRDGOLD Ltd. Sec. Litig.,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)..............................................................................27, 37

In re Duke Energy Corp. Sec. Litig.,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................................43

In re Elan Corp. Sec. Litig.,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................................... 30-31

In re Hudson Techs., Inc. Sec. Litig.,
  1999 WL 767418 (S.D.N.Y. Sept. 28, 1999)....................................................................27, 37

In re JP Morgan Chase Sec. Litig.,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................................35

In re Kindred Healthcare Inc. Sec. Litig.,
  299 F. Supp. 2d 724 (W.D. Ky. 2004)..................................................................................45

In re Livent, Inc. Noteholders Sec. Litig.,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)..................................................................................25

In re Loral Space & Commc'ns Ltd. Sec. Litig.,
    2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)........................................................ passim

In re MSC Industrial Direct Co.,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...................................................................27

In re National Auto Credit, Inc. Sec. Litig.,
    1999 WL 33919791 (N.D. Ohio Oct. 12, 1999) ....................................................44

In re Razorfish, Inc. Secs. Litig.,
    2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).......................................................50

In re Silicon Storage Tech., Inc., Sec. Litig.,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007)..........................................................34

In re Take-Two Interactive Sec. Litig.,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................. 36-37

In re Time Warner Inc. Sec. Litig.,
    9 F.3d 259 (2d Cir. 1993) ........................................................................... 45-46

Kalin v. Xanboo, Inc.,
    526 F. Supp. 2d 392 (S.D.N.Y. 2007)............................................................ 49-50

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001)...............................................................25, 35, 36

Konkol v. Diebold, Inc.,
    590 F.3d 390 (6th Cir. 2009) ...................................................................28, 32

LC Capital Partners, LP v. Frontier Ins. Group, Inc.,
    318 F.3d 148 (2d Cir. 2003)...................................................................4, 47

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005).................................................................24, 48

Malin v. XL Capital Ltd.,
    499 F. Supp. 2d 117 (D. Conn. 2007)...................................................32, 38, 44

McCasland v. FormFactor Inc.,
    2009 WL 2086168 (N.D. Cal. July 14, 2009).......................................................40

Miller v. Champion Enters., Inc.,
    346 F.3d 660 (6th Cir. 2003) ...............................................................................27

Miller v. Lazard, Ltd.,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)..................................................................13

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)....................................................................... 26-27, 37, 38

Ong ex rel. Ong v. Sears, Roebuck & Co.,
    2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) ..................................................39, 40

Parnes v. Gateway 2000, Inc.,
    122 F.3d 539 (8th Cir. 1997) ...........................................................................43

Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,
    2009 WL 4282940 (S.D. Ind. Dec. 1, 2009)........................................................33

PXRE Group, LTD., Sec. Litig.,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)................................................................40

Salinger v. Projectavision, Inc.,
    972 F. Supp. 222 (S.D.N.Y. 1997)....................................................................46

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,
    75 F.3d 801 (2d Cir. 1996)..........................................................................39, 46

Santa Fe Indus. v. Green,
    430 U.S. 462 (1977)....................................................................................26

Stevelman v. Alias Research Inc.,
    174 F.3d 79 (2d Cir. 1999)......................................................................26, 27, 37

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    531 F.3d 190 (2d Cir. 2008)........................................................................25, 38

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)................................................................................24, 25

Zirkin v. Quanta Capital Holdings, Ltd.,
    2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ........................................................44

## STATUTES

Fed. R. Civ. P. 9(b) .................................................................................1, 24

Fed. R. Civ. P. 12(b)(6) ................................................................................1

15 U.S.C. § 78u-4(b)(2) ...............................................................................25

28 U.S.C. § 1658(b)(1) ................................................................................46

Defendant Conseco, Inc. ("Conseco") and Defendants William Kirsch ("Kirsch"), Eugene Bullis ("Bullis"), Michael Dubes ("Dubes"), James Hohmann ("Hohmann"), Jim Prieur ("Prieur"), Edward Bonach ("Bonach"), and John Wells ("Wells") (collectively, the "Individual Defendants" and together with Conseco, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Amended Complaint (the "Complaint" or "Compl."), pursuant to the Private Securities Litigation Reform Act ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Before the market closed on March 28, 2008, Conseco filed its 2007 10-K in which it restated its financial statements for several years to correct a number of small items. Some of the items restated were favorable to Conseco's financial statements; others were unfavorable. The net effect of the restatement was to increase Conseco's net income for 2006 from $96.5 million to $106.0 million, and to decrease Conseco's net income for 2005 from $324.9 million to $312.7 million. The restatement had only a modest impact on each of the three prior quarters of 2007: worsening the first quarter and improving the second and third quarters. In light of the very modest nature of the restatement, Conseco's share price – which had closed at $10.32 on March 27 – closed at $10.41 on Friday, March 28; $10.20 on Monday, March 31; $10.55 on April 1; and $11.29 on April 2.

Notwithstanding the *de minimis* impact of the restatement, Plaintiff's Complaint seeks to build from it a purported tale of securities fraud. But the Complaint fundamentally mischaracterizes Conseco, its long-term care run-off ("LTC") business, and the disclosures that it made during the class period, and ignores many of Conseco's disclosures about its LTC business. Neither Rule 9(b) nor the PSLRA permit such pleading.

The Complaint compounds its errors by relying upon five confidential witnesses, whom it claims had access to certain events at Conseco during the class period.  But the allegations based upon those confidential witnesses are not of the type that courts credit to allow securities fraud cases to go forward.  The allegations are vague and conclusory, as well as contradictory.  And in almost all cases, they relate to purported events that involved no contact with the Individual Defendants and raise no issues of fraud with respect to the Company's actual disclosures.

Such allegations cannot make up for the Complaint's plain deficiencies.  At their core, although Plaintiff's allegations are lengthy, they are nothing but "smoke and mirrors," belied by the disclosures that Plaintiff cites and omits to cite.  See In re 2007 Novastar Fin., Inc., Sec. Litig., 2008 WL 2354367, at *2 (W.D. Mo. June 4, 2008), aff'd, 579 F.3d 878 (8th Cir. 2009) ("One might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific.  The temptation is dangerous and must be resisted.").  Plaintiff's Complaint does not plead a claim of securities fraud for several reasons.

*First*, Plaintiff fails to plead scienter.  Plaintiff's confidential witness allegations are vague, conclusory, and contradictory, and do not support a conclusion that the witnesses possess information indicating that Defendants engaged in fraud.  Moreover, Plaintiff offers no concrete or personal motive to deceive, nor any plausible allegations of intentional, or even reckless, conduct by Defendants.  Most importantly, Conseco's extensive public disclosures make the opposing inference of non-fraudulent intent far more plausible and compelling than any inference of scienter.

*Second*, the alleged misstatements are not actionable.  As an initial matter, many of the alleged misstatements are immaterial.  In addition, the alleged misstatements relating to

Conseco's LTC reserves are not actionable for many reasons, including that reserves are by their very nature estimates and Conseco repeatedly disclosed their volatility and susceptibility to fluctuation.  Finally, to the extent the claims are based upon omissions, they fail because Conseco had no duty to disclose the information claimed to have been omitted, such as information relating to the details of computer systems.  Without such a duty, no claim is stated.

*Third*, Plaintiff's claims are barred by the two-year statute of limitations applicable to securities fraud claims.  The Complaint rests on the allegation that Plaintiff had been misled to believe that "all was fine" with Conseco's LTC business.  (Compl. ¶ 98.)  But Conseco's extensive March 2007 disclosure of poor financial results and the existence of a material control weakness was unquestionably a "storm warning" that would have dispelled any such notion and triggered a duty to investigate the claims now asserted.  This is particularly the case in light of Conseco's repeated pre-March 2007 disclosures regarding the challenges facing the LTC business.  Plaintiff's failure diligently to inquire and to sue within two years of the March 2007 disclosure bars its claims.

*Finally*, the control person claims must be dismissed because Plaintiff fails to plead a primary violation and fails to allege culpable participation as to any Individual Defendant.

## BACKGROUND

### Overview of Conseco

Conseco is an insurance holding company.  During the putative class period, Conseco had several ongoing operating units, including Bankers Life and Casualty Company, Conseco Insurance Group, and Colonial Penn Life Insurance Company.  (Ex.[1] A at 3.)[2]  Bankers Life sold

---

[1] Exhibit references are to exhibits to the accompanying Declaration of Andrew W. Stern.

[2] In deciding a motion to dismiss, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the

*(cont'd)*

Medicare supplement insurance, life insurance, long term care insurance and annuity products. Conseco Insurance Group sold specified disease insurance, Medicare supplement insurance, and life and annuity products.  (Id.)  Colonial Penn sold various life insurance products.  (Id.)

In addition to these three business units, Conseco also operated a business segment called "Other Business in Run-off," which consisted of blocks of insurance that Conseco no longer marketed after 2003.  (Id.)  This segment was broken out and reported separately in Conseco's SEC filings.  (Id.)  It was predominantly comprised of long-term care insurance policies that were no longer marketed, but were still in force.  (Id.)

## Conseco's Long-Term Care Run-Off (LTC) Business

In Plaintiff's own words, "[t]his case concerns Conseco's Long Term Care ("LTC") business."  (Compl. ¶ 2.)  In the 1990s, Conseco acquired a number of companies that sold long term care insurance, and they were placed into Conseco Senior Health Insurance Company, a wholly-owned subsidiary of Conseco.  (Id. ¶¶ 35-39.)  Conseco Senior Health's long term care business thus had originated from a variety of different sources, including the long term care businesses of at least four other companies.  (Id. ¶ 39.)  The performance of these blocks after acquisition did not meet Conseco's expectations, and Conseco Senior Health ceased selling new long term care policies by 2003.  (Ex. A at 9.)  Thus, when Conseco emerged from bankruptcy in 2003, the closed blocks of long term care business were placed into the Other Business in Run-

---

plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  '[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the defendant[s]' motion to dismiss, without converting the proceeding to one for summary judgment.'"  In re Loral Space & Commc'ns Ltd. Sec. Litig., 2004 WL 376442, at *2 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.); see LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 153-55 (2d Cir. 2003) (taking judicial notice of press releases, articles and financial publications in deciding a motion to dismiss).

off segment (the "LTC business").  (Id.)[3]  This segment was less than 9% of Conseco's total

premium collected in 2005, less than 8% in 2006, and just slightly more than 7% in 2007.  (See

Exs. A at 7, B at 6,  C at 6.)

Although the LTC business was a comparatively small portion of Conseco's overall

business, Conseco did not hide the serious challenges that it faced.  Prior to and throughout the

class period, Conseco repeatedly disclosed those challenges.  Thus, in its 10-Q filed on August 8,

2005, Conseco described its LTC business:

> This segment includes long-term care insurance inforce,
> substantially all of which was issued through independent agents
> by certain subsidiaries prior to their acquisitions by Conseco in
> 1996 and 1997.  The loss experience on these products has been
> worse than we originally expected.  Although we anticipated a
> higher level of benefits to be paid on these products as the policies
> aged, the paid claims have exceeded our expectations. . . .  This
> adverse experience is reflected in our high benefit ratios.

(Ex. D at 50.)  Conseco also disclosed that it had periodically been required substantially to

increase claim reserves for its LTC business:

> We have incurred significant losses beyond our estimates as a
> result of actual claim costs and persistency of our long-term care
> business included in the other business in run-off segment.  For
> example, we increased claim reserves by $130 million during 2002
> and $85 million during the eight months ended August 31, 2003, as
> a result of adverse developments and changes in our estimates of
> ultimate claims for these products.

(Id. at 32.)

Nor did Conseco minimize the fact that it faced significant operational and systems

challenges because of its earlier acquisitions:

> We have implemented several initiatives to improve operating
> results, including: . . . (v) stabilizing the profitability of the long-

---

[3] Conseco continued to sell new long term care insurance through Bankers Life.  (Id.)  The
Bankers Life ongoing long term care insurance business is not the subject of the Complaint.

> term care block of business in run-off sold through independent
> agents through premium rate increases, improved claim
> adjudication procedures and other actions.  Many of our initiatives
> address issues resulting from the substantial number of acquisitions
> of our predecessor.  Between 1982 and 1997, our predecessor
> completed 19 transactions involving the acquisitions of 44 separate
> insurance companies.  Our efforts involve improvements to our
> policy administration procedures and significant systems
> conversions, such as the elimination of duplicate processing
> systems for similar business.  These initiatives may result in
> unforeseen expenses, complications or delays, and may be
> inadequate to address all issues.  Conversions to new processing
> systems can result in valuation differences between the prior
> system and the new system.

(Id. at 29.)

Moreover, Conseco did not obscure the fact that setting reserves for the LTC business

presented unique challenges because of the nature of that business and the many assumptions and

estimates that were used to estimate reserves:

> The limited historical claims experience on our long-term
> care products could negatively impact our operations if our
> estimates prove wrong and we have not adequately set premium
> rates.
>
> In setting premium rates, we consider historical claims
> information and other factors, but we cannot predict future claims
> with certainty.  This is particularly applicable to our long-term care
> insurance products, for which we have relatively limited historical
> claims experience.  Long-term care products tend to have fewer
> claims than other health products such as Medicare supplement,
> but when claims are incurred, they tend to be much higher in dollar
> amount.  Also, long-term care products have a much longer tail,
> meaning that claims are incurred much later in the life of the policy
> than most other supplemental health products.  As a result of these
> traits, longer historical experience is necessary to appropriately
> price products.
>
> *          *          *
>
> The long-term care insurance businesses included in the
> other business in run-off segment were acquired through
> acquisitions completed in 1996 and 1997.  The majority of such
> business was written between 1990 and 1997.  The experience on

> these acquired blocks has generally been worse than the acquired companies' original pricing expectations. We have received necessary regulatory approvals for numerous premium rate increases in recent years pertaining to these blocks. Even with these rate increases, these blocks experienced benefit ratios of 98 percent in the six months ended June 30, 2005, 103 percent in 2004, 103 percent in the four months ended December 31, 2003, 170 percent in the eight months ended August 31, 2003, and 139 percent in 2002. If future claims experience proves to be worse than anticipated as our long-term care blocks continue to age, our financial results could be adversely affected.

(Id. at 31.)

Finally, Conseco did not hide the seriously weakened financial condition of its subsidiary, Conseco Senior Health, in which most of the LTC business was held. Thus, the 10-Q disclosed that Conseco Senior Health was rated "B" from A.M. Best (seventh of sixteen possible ratings), "CCC" from Standard & Poors (eighteenth of twenty-one possible ratings), and "Caa1" from Moody's (seventeenth of twenty-one possible ratings). (Id. at 29.)

Although the Complaint purports to quote from Conseco's 2Q 2005 10-Q, it does not mention any of these important disclosures. Conseco never told the investing public that "all was fine" with its LTC business.

**Conseco's Disclosures from August 2005 through 2006**

Conseco continued regularly to disclose the performance of and challenges faced by the LTC business, including its ongoing efforts to stabilize it. (See Exs. E at 32-33, 53-54 (efforts to improve performance of LTC block); F at 4 (conversion of the LTC run-off business to a new actuarial valuation system and completion of a new claim cost study); A at 22, 24, 29, 119 (efforts to improve the LTC block; development of claims cost study; contribution of $24.9 million in capital to Conseco Senior Health because of its weak capital position; $40 million increase of LTC claim reserves); G at 45, 62 (upgrades to reserve valuation system for LTC business); H at 50 ($24 million in increased claims exposure).) The Complaint omits all of this.

7

The Complaint's repeated highly selective reference to excerpted (and often ellipsed) quotes from the referenced filing or transcript is highly misleading. For example, in connection with Conseco's 2Q 2006 earnings release, in Compl. ¶ 174, which challenges the highlighted quote at the end of paragraph 173, Plaintiff omits the paragraph in the original press release that immediately precedes the phrase, "[T]hese events . . ." The referenced "events" were a tax settlement and a litigation settlement – neither of which had anything to do with Conseco's operation of the LTC business. Plaintiff then omits the very next and relevant paragraph, in which Conseco specifically warned investors of the deterioration in the LTC business:

> Notwithstanding this progress, second quarter was a difficult quarter in certain of our health businesses, with incurred claims exceeding expectations in . . . the run-off long-term care block. Although we are responding to these challenges with increased claims management focus and pricing initiatives where appropriate, . . . we are lowering our outlook for 2006 operating earnings . . .

(Ex. AA at 2.) Likewise, in accusing Defendants of fraud based upon a snippet excerpted from the August 3, 2006 analyst call in Compl. ¶ 175, Plaintiff includes no reference to the preceding five paragraphs, in which Hohmann discussed what Conseco was doing about the challenges facing the LTC business. (See Ex. I at 2-3.)

Even more telling are Plaintiff's selective allegations as to Conseco's public statements regarding its results for 3Q 2006. Whereas for other quarters a stray snippet from an analyst call is pleaded, the Complaint entirely ignores Conseco's actual disclosures in the November 2, 2006 analyst call and the slides Conseco filed on Form 8-K and made available to the public. (See Ex. J.) As set forth in the 8-K and had been disclosed in the 3Q 2006 earnings release, the LTC business had deteriorated markedly. Conseco proceeded to explain a number of management changes taken to address the LTC business (slide 37); its ongoing work on technology (slide 38); and the work done by two highly regarded independent consulting firms as to claims leakage and

the actuarial assumptions used to establish claim reserves for the LTC business (slide 39).

Conseco's efforts to address LTC's problems also were reviewed at length in the analyst call.

(See Ex. K at 7-9 (comments of Hohmann).)[4]  Similarly, Conseco disclosed in its 3Q 2006 10-Q

steps it was taking to address operational issues in the LTC business.  (See Ex. L at 52-53.)

## Conseco's Disclosure of Its Material Control Weakness

As it closed its books for 2006, Conseco determined that it would need additional time to

complete that close.  Thus, on February 23, 2007, Conseco issued a press release stating:

> During the year-end closing process, management determined that
> an extended review is required of the claim reserves and internal
> controls over financial reporting related to its long-term care run-
> off block.  The Company expects to record estimated after tax
> reserve adjustments of approximately $39 million related to long-
> term care claim reserves in the run-off block . . .

(Ex. M.)

Thereafter, on March 6, 2007, Conseco announced full year 2006 results, and that it had

identified control deficiencies that, when taken in the aggregate, constituted a material control

weakness.  (See Ex. N.)  Significantly, while Compl. ¶ 187 purports to quote from this release, it

omits the detailed discussion of the deterioration in the LTC business, and the substantial $54.1

million claim reserve strengthening taken in 4Q 2006.  (Id.)

Conseco did not downplay the material weakness:

> As a result of certain adjustments identified by management and
> made during our year-end closing process, we have concluded that,
> as of December 31, 2006, we did not maintain effective control
> over certain actuarial financial reporting processes. The related
> control deficiencies, taken in the aggregate, constitute a material
> weakness. None of the adjustments were material individually, or
> in the aggregate, to our current year or prior period financial

---

[4] Plaintiff's omission of the disclosures made in the November 2, 2006 analyst call is telling in
light of its allegation, based in part on cherry-picking excerpts from other analyst calls, that
Conseco concealed these issues from the public.

> statements taken as a whole. We have taken steps to address the
> control deficiencies which will not be considered fully remediated
> until the revised control processes have been operating for a
> sufficient period of time to provide reasonable assurance as to their
> effectiveness.

(Id.)  Notably, Conseco emphasized that the remediation would take time, and that it could not

comment on the company's overall outlook because the significant losses incurred in the LTC

business had led to corrective action plans involving, among other things, enhanced care

management and claim adjudication practices.  (Id.)  Conseco made clear that it could not yet

reach any conclusions as to whether these changes had been effective, stating that "more time is

necessary to achieve the necessary visibility to improving trends in operating results in order to

provide any commentary on outlook."  (Id.)

On its conference call with analysts the next day, Conseco further explained the reason

for the determination of the material weakness, which related directly to reserves and included a

required $7.1 million increase in claim reserves in the LTC business.  (Ex. O at 2.)  Conseco also

described the volatility in the LTC business, and underscored that it was likely to continue for a

few more quarters.  (Id. at 8.)  Conseco made clear that the remediation would be extensive and

take significant time.  (See, e.g., id. at 2 ("passage of time is required before assertions can

confidently be made as to the effectiveness of the remediation")).

Significantly, although the Complaint purports to quote and challenge a number of

statements made during the March 7, 2007 analyst call, it does so only by taking snippets of

statements and omitting the full context.  In Paragraph 190, the Complaint quotes only two of the

six paragraphs in which Wells described the condition of the LTC run-off block, and then

purports to challenge his March 2007 statement about the use of a technology tool based upon a

report that purportedly was written sometime later in the summer of 2007.  Likewise, in

attacking statements made during that call with respect to the reserves set for year-end 2006,

Paragraph 196 of the Complaint accuses Prieur and Bullis of fraud for having no basis upon which to set reserves. But the quoted language in Paragraph 195 used to set up this false accusation omitted to include the very next Question and Answer in the transcript:

> **Tom Van Buskirk** – McMahan Securities – Analyst
>
> Do you have outside actuarial firms go over those reserves? And if so, how often?
>
> **Gene Bullis** – Conseco, Inc. – CFO
>
> Yes, and quarterly.

(Id. at 12.) As discussed below, Conseco used independent outside actuarial firms to review and confirm the adequacy of the reserves for its LTC run-off business.

Similarly, although the Complaint quotes a few excerpted passages from the 2006 10-K and proceeds to attack them, that 10-K was clear in disclosing the challenges confronting the LTC block. These disclosures included (1) that Conseco had contributed $80 million in capital to Conseco Senior Health at year-end 2006 (Ex. B at 14); (2) that Conseco Senior Health had weak rating agency rankings (id. at 14-15); (3) highlighting the risk that the limited historical claims experience for LTC could adversely affect Conseco (id. at 21-23); (4) emphasizing the risk arising from the material control weakness (id. at 23); (5) observing that efforts that had been undertaken to improve policy administration procedures had caused increased policyholder complaints and, in some cases, inquiries from regulators (id. at 27); (6) substantial increases to reserves taken during 2006 on the LTC business as a result of actual experience being worse than prior estimates (id. at 63); and (7) an explanation of the fourth quarter reserve increases for the LTC business (id. at 64). The Complaint ignores all of this.

**Conseco's Disclosures Through the Balance of 2007**

Conseco continued through 2007 to update investors, in its quarterly earnings releases and 10-Qs, on the results of operations and on the remediation undertaken to address the control weakness. When it announced its 1Q 2007 results, Conseco stated that it would strengthen reserves by $22 million in the LTC business (Ex. P at 2), and discussed steps being taken to improve that business' operations. Here, again, in quoting Prieur (in ¶ 214) and Wells (in ¶ 218), the Complaint omits significant information stated by each, including Prieur's statement that it would take "quarters" before the improvements to the LTC business had a positive impact (Ex. P at 2) and Wells' statement that the improvements would "take time" (id. at 4).[5]

On August 6, 2007, Conseco announced its 2Q 2007 results. Most significantly, it announced that it would strengthen its claim reserves for the LTC business by $110 million. (Ex. Q at 1, 4.) The next day, Conseco explained in detail the bases for its determination to strengthen reserves, and to modify the assumptions used to set those reserves. (Ex. R at 2, 3-4.) Again, the Complaint engages in highly selective and misleading excerpting of that call: among other things, (a) it omits any reference to the extensive commentary given by Conseco's chief actuary explaining the reserve increase (id. at 3-4); (b) it again omits Wells' statement that the improvements in administration of the LTC business would take time (id. at 5); and (c) it fails to reference the fact that Conseco had announced three weeks earlier that Conseco had undertaken for review a proposal from an outside consulting firm, Long Term Care Group, Inc. ("LTCG"), to take over much of the back-office administration of the LTC business.[6] Although the Complaint omits to mention it, Conseco's 2Q 2007 10-Q set forth in detail the methodologies

---

[5] Again, the Complaint (¶ 220) fails to explain how Wells can be accused of fraud with respect to his statements in May 2007 based upon a purported document created at some unidentified later time in the summer of 2007.

[6] In November 2007, Conseco announced the execution of that agreement with LTCG. (Ex. S.)

used to set the reserves, as well as the fact that Conseco continued to have an external actuarial

firm review its LTC reserves on a quarterly basis. (Ex. T at 52.) Significantly, Conseco's 3Q

2007 10-Q advised investors that it continued to be actively engaged in remediation efforts to

address the material weakness in internal controls and that it expected to complete that effort by

year end. (Ex. U at 75.)

**Conseco's February and March 2008 Disclosures and Restatement**

Following its substantial remediation efforts, Conseco announced on the morning of

February 25, 2008 that it would delay the filing of its 2007 10-K in order to complete its

financials and incorporate the correction of errors, "the majority of which were identified during

the remediation of the material weakness in internal controls." (Ex. V at 1.) Conseco also

announced that it would restate its financial statements for 2005 and 2006, and quarterly

information for 2006 and the first three quarters of 2007. (Id.) Conseco estimated that the

correction to net income (loss) would not exceed plus or minus $15 million for any prior annual

period, and stated that it would also correct "previously identified immaterial errors, which had

been recognized through cumulative adjustments to previously issued financial statements."

(Id.) Notably, Conseco's share price declined only $0.03 after this announcement before

rebounding the next day. It closed at $12.10 on February 22, 2008, $12.07 on Monday, February

25, and at $12.33 on February 26. (Ex. W.)[7]

Conseco thereafter learned on February 28, 2008 that the SEC disagreed with the

methodology Conseco had adopted to account for the impact of increasing premiums on its long

---

[7] The Court "'may take judicial notice of well-publicized stock prices without converting the
motion to dismiss into a motion for summary judgment.'"  Miller v. Lazard, Ltd., 473 F. Supp.
2d 571, 578 (S.D.N.Y. 2007).

term care insurance.[8]  Conseco promptly announced the SEC's position and that this would

require an additional delay in finalizing its 2007 financial statements.  (Ex. X.)  Having closed at

$11.64 on March 3, Conseco's stock price closed at $10.49 after this announcement.  (Ex. W.)

On March 17, 2008, although it had not yet finalized its financial statements because of

the SEC's position with respect to the pivot method, Conseco announced its preliminary

financial information for the 4Q and full year 2007 and confirmed that it would issue its restated

financial statements shortly.  (Ex. Y at 2.)  Conseco's share price had closed at $10.06 on March

14; it closed at $8.76 on Monday, March 17 and $9.34 on March 18.  (Ex. W.)

On March 28, 2008, Conseco completed its restatement and filed its 2007 10-K before

the market closed.  Conseco's stock price closed at $10.32 on March 27, 2008, at $10.41 on

March 28, at $10.20 on Monday, March 31, at $10.55 on April 1, and at $11.29 on April 2.  (Id.)

In the 2007 10-K, Conseco explained its restatement in detail.  (See Ex. C.)  As set forth

in footnote 2 to Conseco's financial statements, the restatement corrected:

- errors which had been identified through the 2007 remediation process;
- errors arising from Conseco's disclosed use of the "pivot method," which was disapproved by the SEC on February 28, 2008; and
- errors which had previously been identified and already recognized by Conseco through cumulative adjustments in its financial statements.

(Id. at 107-14.)  The impact of the adjustments for 2006 was to increase Conseco's 2006 net

income from $96.5 million to $106.0 million and the impact on 2005 was to decrease net income

from $324.9 million to $312.7 million.  (Id. at 111-12.)  The balance sheet impacts of the

restatement were similarly minor:  retained earnings were reduced as of December 31, 2006 from

---

[8] Conseco had fully disclosed the accounting treatment that it had used for these premium rate increases at the time it was adopted.  (See, e.g., Ex. B at 46 (adoption of the "pivot method.").)  PricewaterhouseCoopers had previously audited and signed-off on Conseco's financial statements using that method.  (See, e.g., id. at 90-91.)

$643.2 million to $635.4 million (approximately 1.2%), and as of December 31, 2005 from

$584.7 million to $567.4 million (less than 3%).  (Id. at 113.)

Not only was the effect of the restatement minimal, very few of the matters that required

restatement arose from issues with the LTC business.  As disclosed in the table and footnotes

within footnote 2, only three of the remediated items requiring restatement concerned the LTC

business:  a $10.7 million understatement of shareholders' equity; a $5.3 million overstatement

of shareholders' equity; and a $1.0 million understatement of shareholders' equity.  (Id. at 108-

09 (footnotes v, viii, and ix).)  Notably, the effect of Conseco being required to adopt the SEC's

interpretation regarding premium rate increases, as opposed to Conseco's more conservative

"pivot method", was to *increase* net income for 2006.  (Id. at 111.)  Finally, only one of the items

that Conseco had previously taken through a cumulative adjustment involved the LTC run-off

business:  a $7.1 million understatement of reserves.  (Id. at 110.)

In short, Conseco's restatement was extremely modest, and only a small portion of it

related to the LTC business.  This does not come close to supporting a claim of fraud.

**Conseco's Reserves and Disclosures Relating to Reserves**

Throughout the class period, Conseco each quarter undertook to set appropriate reserves

for its LTC business.  As discussed, Conseco repeatedly explained the challenges associated with

this task.  Its Q2 2005 10-Q, for example, stated the following risk factor, which was reiterated in

subsequent public filings:

> Our *reserves* for future insurance policy benefits and claims *may
> prove to be inadequate*, requiring us to increase liabilities and
> resulting in reduced net income and shareholders' equity.
>
> We calculate and maintain reserves for the estimated future
> payment of claims to our policyholders primarily *based on
> assumptions made by our actuaries*. . . .

Many factors can affect these reserves and liabilities, such as economic and social conditions, inflation, hospital and pharmaceutical costs, regulatory actions, changes in doctrines of legal liability and extra-contractual damage awards. Therefore, *the reserves and liabilities we establish are necessarily based on estimates, assumptions and prior years' statistics*. It is possible that actual claims will materially exceed our reserves and have a material adverse effect on our results of operations and financial condition. We have incurred significant losses beyond our estimates as a result of actual claim costs and persistency of our long-term care business included in the other business in run-off segment. For example, we increased claim reserves by $130 million during 2002 and $85 million during the eight months ended August 31, 2003, as a result of adverse developments and changes in our estimates of ultimate claims for these products. Our financial performance depends significantly upon the extent to which our actual claims experience is consistent with the assumptions we used in setting our reserves. If our assumptions with respect to future claims are incorrect, and our reserves prove to be insufficient to cover our actual losses and expenses, we would be required to increase our liabilities, and our financial results could be adversely affected.

(Ex. D at 31-32 (emphasis added).)[9]

Conseco likewise discussed during its analyst calls the inherent uncertainties in setting LTC reserves. (See Exs. Z at 14 ("claim reserves is a function of claim development, and as claim development reflects improvements from claims adjudication then it's possible to change the underlying assumptions in your claims reserve and we might see some of that"); I at 3 ("[W]ith so many moving parts, it is challenging to determine the extent to which slight timing or method differences influence ratios or the extent to which underlying premium and claim developments are fluctuations or trends"); K at 14 ("[W]e could have fluctuations in those claim reserves as experience related to how those claims run-off on already incurred claims develop over the next several quarters.").) As noted, in 2006 and thereafter, Conseco hired an

---

[9] (See also Exs. E at 34-35, A at 24, G at 62, H at 68, L at 34.)

independent actuarial consultant to ensure that Conseco was setting appropriate reserves for its LTC business.  (See Ex. K at 8.)

As is common in any business dealing with such forward-looking matters, Conseco increased its reserves from time to time as there were changes in its actuarial assumptions and claims experience.  In each case, Conseco announced and explained the reason for these increases.  Significantly, when Conseco made its restatement in March 2008, these periodic, ordinary course increases to the LTC business reserves were not restated, because they had at all times been proper.

**The Multistate Examination and Congressional Inquiry**

Between July 9, 2007 and October 19, 2007, a group of state insurance regulators conducted a multistate examination of certain Conseco subsidiaries (the "Multistate Exam"). (Compl. ¶¶ 130-32.)  Conseco disclosed the Multistate Exam to the public in its 2Q 2007 10-Q shortly after the examination had started:

> The states of Pennsylvania, Illinois, Texas, Florida and Indiana are leading a multistate examination of the long-term care claims administration and complaint handling practices of Conseco Senior Health Insurance Company and Bankers Life and Casualty Company, as well as the sales and marketing practices of Bankers Life and Casualty Company. This examination commenced in July 2007.  More than 30 other states have joined or expressed an interest in joining the multistate examination.  This examination will cover the years 2005, 2006, and the first quarter of 2007.

(Ex. T at 28.)[10]

Similarly, in May 2007, the House Committee on Energy and Commerce also asked Conseco for information.  (Compl. ¶¶ 141-43.)  Again, Conseco promptly disclosed in its 10-Q

---

[10] After the end of the class period, on May 7, 2008, the National Association of Insurance Commissioners announced a 40-state settlement pursuant to which Conseco paid a $2.3 million fine and agreed to invest in system upgrades and improved claims administration.  (Compl. ¶ 133.)

this investigation and its compliance with Congress' requests:

> Conseco received a letter from the Congressional Committee on Energy and Commerce (the "Committee") dated May 23, 2007 indicating the Committee is conducting an investigation of companies that underwrite, market, and sell long-term nursing home and home health care insurance policies.  In that letter, the Committee requested various documents from Conseco with regard to long-term care insurance.  Representatives from Conseco subsequently met with the Committee staffers and reached an agreement on the scope of the documents requested.  Conseco responded to all agreed upon document requests by June 27, 2007.  Conseco intends to continue to fully cooperate with regard to this investigation.

(Ex. T at 28.)

## PLAINTIFF'S COMPLAINT

The Complaint rests on the faulty foundation that Plaintiff was misled to believe that Conseco's LTC business was well-managed and successful, while Conseco concealed LTC's significant problems.  (See, e.g., Compl. ¶¶ 5, 41-143.)  Plaintiff alleges a hodgepodge of misstatements and omissions, and essentially claims that everything Conseco said about its LTC business was fraudulent.  Although Plaintiff's allegations are unfocused and vague, they can be grouped into five categories – (1) remediation of the material weakness in internal controls; (2) reserves; (3) financial performance and operations; (4) operation of the LTC business; and (5) customer claims handling and supervision by regulatory agencies.

### 1.     Remediation of The Material Weakness in Internal Controls

Plaintiff alleges that, following its March 2007 disclosure of a material control weakness, Conseco misrepresented that it was actively engaged in the implementation of remediation efforts and misled investors as to the costs that would be required to remediate Conseco's problems (Compl. ¶¶ 197-208, 218-29, 232-33), and failed to disclose that it allegedly was not willing to dedicate the resources required to correctly fix internal control deficiencies.  (See, e.g.,

id. ¶¶ 191(ii), 204, 219, 227, 233, 237; see also id. ¶¶ 5, 45, 75, 84, 108, 110, 113-17.)  As explained above, however, Conseco repeatedly disclosed that its remediation would take significant effort and time, and that it had engaged an outside firm, LTCG, to take over many of the functions that Plaintiff alleges were not addressed.

### 2.    Reserves

Plaintiff makes a number of allegations regarding the calculation and appropriateness of the LTC reserves.  (See, e.g., id. ¶¶ 171-72, 177-78, 181-82, 195-96, 218, 224-26, 256-61, 264-77.)  Among other things, Plaintiff claims that Conseco failed to disclose that it lacked the "actuarial science" necessary to calculate reserves, did not have access to policy information, and did not maintain accurate or detailed claims data.  (See, e.g., id. ¶¶ 145(d), (i), & (j), 151, 153, 156, 158, 160, 163, 166, 170, 174, 176, 180, 186, 204, 217, 219, 227, 233, 237; see also id. ¶¶ 46-47, 68-82, 85-92.)  As discussed above, however, Conseco's disclosures made clear the actuarial intricacies and challenges in setting the reserves for its LTC business, its hiring of outside actuaries to confirm its LTC reserves on a quarterly basis, and that the restatement did not challenge its periodic and appropriate increases to those reserves.

### 3.    Financial Performance and Operations

Plaintiff broadly contends that Conseco's quarterly and full year financial results for the second quarter of 2005 through the third quarter of 2007 were fraudulently misstated, and that Conseco made misleading statements about those financials in its Press Releases, 10-Qs, 10-Ks, Certifications, and analyst calls during the Class Period.  (See Compl. ¶¶ 144-255.)  According to Plaintiff, the fact of the restatement makes all of Conseco's statements about its financial results fraudulent.  (Id. ¶ 240.)  However, as demonstrated above, the restatement in its entirety was very small, with both favorable and unfavorable adjustments, and the restated items relating to the LTC business were extremely small.

### 4.    Improvement of the LTC Run-off Business

Plaintiff asserts that Conseco misled investors to believe that Conseco was improving the LTC business, while Conseco was secretly seeking to sell or otherwise dispose of it.  (See, e.g., id. ¶¶ 187-88, 214-15, 226-27, 230-31; see also id. ¶¶ 113-17, 191(iii), 204, 219, 233, 237.)

Again, Plaintiff glaringly omits that Conseco repeatedly disclosed to the public – in the very documents relied on by Plaintiff – that Conseco was considering transactions with respect to its LTC business, including reinsurance as well as a possible sale or other disposition.  (See Ex. I at 20-21 ("Q: . . . about the closed long-term care block.  What consideration have you given to reinsuring this and removing the earnings volatility from your ongoing earnings picture?"  Hohmann: "Well, I think we always look at all options for all of our business. . . . I think the impediment is, I don't think there's a lot of supply of reinsurance in the marketplace for long-term care.") & 22-23 ( "Q: . . . Is there a point at which you look at the run-off block as something that can basically be, in one way or the other, separated from the rest of Conseco?"  Hohmann: ". . . certainly [there] would be some strategic alternatives, I think the implementation of them would be a question.  . . .  While it's theoretically of interest and would be always of interest, I don't know that it's really something we could implement effectively."); see also Ex. K at 11 & 13 (when asked how might Conseco divest the LTC business, Prieur responded that "everything is on the table").)

Tellingly, Plaintiff also ignores that Conseco repeatedly advised the public that its LTC business faced serious challenges and that improvement would take significant time.  (See, e.g., Ex. K at 2-3 (discussing volatility and poor experience in LTC business) & 8 ("while improved performance in the LTC book is going to be a logical consequence of these actions I've described, it will take time to materialize"); O at 8 (LTC business volatility was likely to continue for a few more quarters as Conseco fixed its claims management); P at 6 ("turning

around the LTC run-off business will take a few quarters, and we're likely to have volatility in reported earnings during this interim period").)

### 5.    Customer Claims Handling and Regulatory Examinations

Plaintiff also alleges that Conseco made misleading statements about its customer claims handling and examination by regulatory agencies.  (See, e.g., Compl. ¶¶ 146-49, 177-78, 183-84, 187-88, 190-91, 201-02, 211-12, 218-20, 226-27, 230-31.)  Plaintiff further alleges that many of Conseco's public statements were misleading because Conseco failed to disclose that it allegedly improperly delayed or eliminated customer claims, compensated and rewarded employees for denying claims, manipulated claim ratios through "bundling," did not comprehend the terms of its insurance policies, and also failed to disclose the true nature or extent of the problems.  (See id. ¶¶ 145(e)-(h), 191(i), 151, 153, 156, 158, 160, 163, 166, 170, 174, 176, 180, 186, 204, 217, 219, 227, 233, 237; see also id. ¶¶ 44, 49-72, 75, 94-110.)

These allegations are, however, belied by Conseco's disclosures, which are replete with statements concerning Conseco's claims-handling and technological challenges.  (See, e.g., Ex. D at 29 (disclosing challenges that arose from combining operations of numerous insurance subsidiaries acquired in the late 1990s); K at 8 ("you can see that we have launched several IT related initiatives to better support the LTC operation and improve claims management . . . we continue to address deficiencies in the historically acquired platforms through manual processes . . . we have retained LifePlans to attack claim leakage . . . we have asked a major actuarial consulting firm, Milliman, to review our claims information to ensure that we capture and share all of the qualitative, as well as quantitative, information that would be helpful with establishing our claim reserves.").)  Plaintiff also claims that Conseco misstated in March 2007 that it did not expect regulators to take any actions against it.  (See id. ¶¶ 201-02.)  But Plaintiff conspicuously

ignores that the Multistate Exam is not alleged to have begun until later in 2007, and, as discussed above, was disclosed to the public after it had been commenced.  (See Ex. T at 28.)

### Plaintiff's Allegations Based On Confidential Witnesses

A number of Plaintiff's allegations are based on purported information provided by five confidential witnesses (the "CWs"), former employees who are described as follows:

- Confidential Witness 1 ("CW1"), a Director and Vice President, was responsible for auditing and monitoring key risk areas, and directly reported to the Chief Compliance Officer, who reported to "senior executives."  (Compl. ¶ 28.)

- Confidential Witness 2 ("CW2"), a Director and Vice President, "worked closely" with Defendant Wells, and was "directly involved" with the implementation of software projects and with Conseco's closed block LTC business.  (Id. ¶ 29.)

- Confidential Witness 3 ("CW3"), a "VP of Financial Operations," reported to Conseco's CEO, and was involved in performing internal audits and administering financial systems.  (Id. ¶ 30.)

- Confidential Witness 4 ("CW4"), an Internal Auditor, reported to Conseco's CEO. (Id. ¶ 31.)

- Confidential Witness 5 ("CW5"), an actuary, participated in "regular meetings" with "Conseco executives," was "directly involved" with the setting of reserves, and is "knowledgeable about the numerous problems at Conseco."  (Id. ¶ 32.)

Notably, Plaintiff does not allege, as to any of the CWs, their specific dates of employment, locations or sectors in which they worked, or specific interactions with particular Individual Defendants.  It is not even clear whether any of the CWs actually worked in the LTC business, as opposed to in one of Conseco's many other business units.

Although Plaintiff purports to attribute much to the CWs, the CW allegations are consistently vague and often contradict Plaintiff's other allegations.  CW1's allegations relate mainly to claims handling, reserves, and the alleged plan to sell the LTC business.  (See id. ¶¶ 28, 46, 62-63, 68-70, 72, 87-88, 98, 102, 109, 110, 116-17, 129, 136, 200, 263, 268.)  The CW2 allegations relate predominantly to the policy repository and claims handling processes, reserve issues, and preparation for analyst calls.  (See id. ¶¶ 29, 42, 46, 51-52, 55, 56-59, 63, 65-66, 68,

71, 73, 74-76, 78-79, 84-86, 87, 89-90, 94, 96, 98-101, 103, 110, 112, 121-22, 129, 143, 192, 200, 206, 220(d), 263, 268, 276.)  The CW3 allegations relate exclusively to Conseco's computer systems and related issues.  (See id.. ¶¶ 30, 81-82, 105.)  The CW4 allegations relate to internal control issues and the sufficiency of Conseco's reserves.  (See id. ¶¶ 31, 47, 82, 106, 107, 123.) The CW5 allegations relate to general issues in the LTC business and the setting of reserves. (See id. ¶¶ 32, 70, 82, 97, 108.)

**Plaintiff's Scienter Allegations**

As for scienter, the Complaint clumps the Individual Defendants together, and alleges in conclusory fashion that the Individual Defendants were privy to confidential and proprietary information concerning Conseco's operations, and had general access to material adverse non-public information.  (See, e.g., Compl. ¶¶ 16-20, 281-82.)  Similarly, Plaintiff repeatedly alleges that "Defendants" "knew" or "recklessly disregarded" the alleged facts that Plaintiff claims were omitted from public disclosures.  (See id. ¶¶ 4, 16, 46, 49, 51, 75, 87, 94, 95, 101, 102, 110, 114, 140, 145, 168, 178, 192, 196, 198, 202, 205, 207, 210, 222, 225, 229, 241, 257, 261, 263, 264, 266, 269, 276, 277, 281.)

The Individual Defendants are almost never mentioned by name and, in the few instances when they are, the allegations lack factual basis and are unspecific as to the particular Individual Defendant's involvement in the alleged meeting, document, or issue.  (See, e.g., Compl. ¶¶ 66 ("Conseco executives, including Defendant Wells, . . . were all 'very aware' of these bundling issues"); 87 ("CEO Bill Shea and Defendant Hohmann were involved in this decision [to cancel the Genelco Project]"); 97 ("CW5 participated in quarterly meetings with senior personnel in Conseco's Finance and Actuarial Departments, including Defendant Bonach, where lots of data issues were discussed."); 98 ("each individual who held the position of CEO, including Defendants Prieur and Kirsch, held and participated in meetings in the War Room"); 178

23

("Defendant Bullis knew or recklessly disregarded that Conseco manipulated data that impacted the loss ratio and Conseco was unable to accurately calculate reserves").)  Moreover, there is not one single allegation regarding Defendant Dubes other than the erroneous identification of his title at Conseco during the class period.  (Id. ¶ 14(c).)[11]

Significantly, Plaintiff does not even attempt to allege that any Individual Defendant had any personal financial (or other) incentive to mislead the public as to Conseco's financial health or future.  Nor does the Complaint contain allegations of any stock sales by the Individual Defendants.

## ARGUMENT

Plaintiff's Complaint does not state a claim of securities fraud.  Although it is true that Conseco restated its financial statements and operated an LTC business that faced significant challenges, these facts do not come close to supporting a fraud claim.

Because the Complaint alleges fraud, it must satisfy the heightened pleading standards mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ("private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal"); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005) (Rule 9(b) "is applied assiduously to securities fraud.  This Circuit's strict pleading requirements in securities-fraud cases . . . were (essentially) codified in the [PSLRA].").  The Complaint does not meet these stringent pleading requirements.

---

[11] Mr. Dubes was not the President of Conseco.  He was President of Conseco Insurance Group, which sold specified disease insurance, Medicare supplement insurance, and life and annuity products.  It had nothing to do with the LTC business.

I.    **PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED.**

    A.    <u>**The Complaint Does Not Plead Scienter.**</u>

Plaintiff's primary claim is for alleged violation of Section 10(b) of the Exchange Act and Rule 10b-5. To plead such a claim, a plaintiff must show that defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs</u>, 551 U.S. at 319. A complaint must be dismissed unless it pleads "with particularity facts giving rise to a strong inference" of scienter (15 U.S.C. § 78u-4(b)(2)) and "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324. Thus, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." <u>Id.</u> at 323-24.[12]

A plaintiff can plead the requisite strong inference of scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001). In either case, the inference of scienter must be strong and "at least as compelling" as any competing inference. <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 197 (2d Cir. 2008). Here, the Complaint does not plead any strong inference of scienter.

---

[12] Courts need not credit conclusory or unsupported factual assertions, or factual allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." <u>In re Livent, Inc. Noteholders Sec. Litig.</u>, 151 F. Supp. 2d 371, 404 & 405-06 (S.D.N.Y. 2001).

### 1.    Plaintiff's Allegations Of Fraud By Hindsight Do Not Plead A Strong Inference Of Scienter.

Plaintiff's claims are built on the premise that because Conseco restated its financial statements in March 2008, it must have earlier known the full extent of its accounting errors and therefore was defrauding the public.  This premise is classic fraud by hindsight, and ignores the obvious reality that fraud does not underlie every subsequently discovered problem.

Plaintiff alleges that Defendants lacked a basis for their statements about Conseco's LTC business and knowingly misled the public as to Conseco's financial condition and prospects.  The claim of fraud is largely based upon various technological, logistical, and accounting issues that ultimately caused Conseco to restate its financial statements.  Taken as a whole, these allegations amount at most to allegations of corporate mismanagement, the quintessential "fraud by hindsight" that courts have routinely rejected as a basis for a securities fraud complaint.  See Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("arguments with regard to [defendant's] accounting irregularities and overly optimistic disclosures, by themselves, appear to amount to allegations of 'fraud by hindsight'"); Acito v. Imcera Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud"); In re Loral Space & Commc'ns Ltd. Sec. Litig., 2004 WL 376442, at *13 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.) ("'[M]isguided optimism is not a cause of action, and does not support an inference of fraud.  We have rejected the legitimacy of alleging fraud by hindsight'"); Santa Fe Indus. v. Green, 430 U.S. 462, 479 (1977) ("Congress by [section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

Indeed, it is well settled that a failure "to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct

26

sufficient for [Section] 10(b) liability." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

Allegations of restatements, failures to comply with GAAP, or material control weaknesses are

similarly insufficient. Id.; In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 573-74

(S.D.N.Y. 2007) (scienter not alleged despite allegations of material control weaknesses that led

to accounting errors that likely resulted from negligence or inexperience and a restatement that

was not large); In re Hudson Techs., Inc. Sec. Litig., 1999 WL 767418, at *5 (S.D.N.Y. Sept. 28,

1999) (Koeltl, J.) (GAAP violations coupled with restatement insufficient to allege scienter).

Courts in this Circuit have likewise routinely dismissed "fraud by hindsight" allegations

based upon increases in reserves. See, e.g., Stevelman, 174 F.3d at 84-85 (allegations that the

defendant violated GAAP by failing to establish greater reserves insufficient); In re CIT Group,

Inc. Sec. Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) ("That defendants later decided to

revise the amount of loan loss reserves that it deemed adequate provides absolutely no

reasonable basis for concluding that defendants did not think reserves were adequate at the

time."); In re MSC Industrial Direct Co., 283 F. Supp. 2d 838, 849 (E.D.N.Y. 2003) (scienter not

alleged with respect to reserve manipulation claims where restatement resulted in 6% reduction

in net income); see also Miller v. Champion Enters., Inc., 346 F.3d 660, 687-89 (6th Cir. 2003)

(rejecting as fraud by hindsight allegations relating to setting of reserves).

> ### 2.    Plaintiff's Allegations Based On Confidential Witnesses Do Not Plead A Strong Inference Of Scienter.
>
> > a.    The Confidential Witnesses are not alleged to have had contact with the Individual Defendants.

Where allegations are based on confidential witnesses, the witnesses must be "described

. . . with sufficient particularity to support the probability that a person in the position occupied

by the source would possess the information alleged" in order to support the strong inference of

scienter required by the PSLRA. In re Loral Space & Commc'ns, 2004 WL 376442 at *11.

Plaintiff's description of the CWs does not support the probability that employees in their positions would possess the information they allege.  Notably, the Complaint does not allege the dates of the CWs' employment; the business unit in which they worked; or even whether they worked in the LTC business that is the Complaint's focus  – much less describe their interactions with the Individual Defendants.  See Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009) (discounting confidential witness allegations where complaint did not allege dates of employment, job description, employment location/sector, or interaction with defendants). Further, the CWs do not appear to have been in positions where they would have had sufficient access to the Individual Defendants to possess information about their knowledge of the allegedly omitted facts.  For example, CW1 did not report directly to (or even work with) any senior executive or Individual Defendant:  "CW1 directly reported to the Chief Compliance Officer who reported to senior executives at the Company and indirectly reported to the Company's Board of Directors."  (Compl. ¶ 28.)  CW1's lack of contact with the Individual Defendants renders not credible his/her contentions regarding the Defendants' purported knowledge.

Plaintiff's allegations with respect to CW2 are likewise deficient.  Although CW2 is vaguely described as "work[ing] closely with Defendant Wells" (id. ¶ 29), s/he is not described as either reporting directly to Wells, or even reporting to someone who reported to Wells.  CW2 did not have access to any other Individual Defendant and notably does not allege that Wells knew any particular information contradicting Conseco's public disclosures.  Rather, CW2 conclusorily alleges that "daily meetings began in the War Room at 8:00 a.m. and became something of an "oh, s*** room" where the question "What the h*** are we going to do?" was often asked in response to some new development involving LTC."  (Id. ¶ 98.)  That CW2

"worked closely" with Wells does not support an inference that CW2 would have known what actually was discussed in those meetings or, more importantly, that Wells or any other Defendant had knowledge of facts rendering any of the Company's public statements misleading. If anything, the allegations demonstrate that CW2 does *not* know what Wells knew, because, despite his/her alleged "closeness" with Wells, CW2 does not reference any discussions with Wells or allege any facts concerning Wells' access to information that conflicted with Conseco's public statements. Cf. In re American Express Co. Sec. Litig., 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) ("None of the confidential sources specifically states that any Individual Defendant had information or access to information indicating that Amex . . . was violating GAAP, or that contradicted the Company's statements in 2001."); In re Bausch & Lomb, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008) ("neither of the two confidential sources specifically state that any Individual Defendant had direct information or access to information of BLIO's illegal practices or that it was violating GAAP, or that it contradicted the company's financial statements").

Plaintiff's descriptions of the remaining CWs are similarly deficient. CW3, for instance, is alleged to have reported to unnamed CEOs (Compl. ¶ 30), but it is unspecified as to who, when, where, and on what subjects. Moreover, CW3 makes no allegations about any of the Individual Defendants or their knowledge with respect to Conseco's public statements. (See, e.g., id. ¶ 82 (alleging that CW3 had discussions with "a lot of people").) Likewise, Plaintiff's descriptions of CW4 and CW5 are devoid of allegations about their access to the Individual Defendants or other individuals responsible for Conseco's financial reporting or disclosures. (See, e.g., ¶ 31 (describing CW4 as an internal auditor but failing to allege that CW4 reported to or worked with any senior executive or Individual Defendant); ¶ 32 (describing CW5 as an

actuary who "participated in regular meetings with Conseco executives" but not identifying a single executive with whom CW5 is claimed to have worked).)  Tellingly, neither CW4 nor CW5 is the source of a single allegation regarding the Individual Defendants or anyone in Conseco senior management.

        b.       <u>The Confidential Witness allegations are vague and conclusory.</u>

       Vague statements by a confidential witness alleging that defendants knew or were aware of problems within a company "cannot support an inference of scienter, much less a 'strong inference.'"  <u>In re Elan Corp. Sec. Litig.</u>, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (disregarding confidential witness allegations).  In <u>In re Loral Space & Commc'ns</u>, 2004 WL 376442 at *11, this Court likewise found that a confidential witness' conclusory statement that defendants knew certain projections were unrealistic was not specific enough to raise a strong inference of fraudulent intent.  As this Court explained:

> To plead scienter, the information alleged to be contradictory must suggest that the defendants knew, or were reckless in not knowing, that the subscriber projections were false or without any reasonable basis. The plaintiffs do not allege that the Globalstar "senior business development manager" ever alleged that the projections were false or misleading or should be withdrawn. The plaintiffs also do not allege that the unnamed Globalstar manager ever stated that the projections could not be achieved by the end of 2000. While the plaintiffs conclusorily allege that the defendants knew that the delay in rolling out gateways made the subscriber projections unrealistic, they provide no factual basis for that assertion.

<u>Id</u>.

       The facts of <u>In re Elan Corp.</u>, 543 F. Supp. 2d at 204-05, are also instructive.  There, plaintiffs offered statements by several confidential witnesses suggesting that the defendant knew or should have known that its drug caused an unintended side effect, but failed to reveal that fact to investors.  The court rejected one informant's statement that "senior management was

aware . . . that [the drug] left patients 'vulnerable' to opportunistic infections" because the statement was "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached." Id. at 220.  Another informant's statement that "Defendants were aware of any concerns relating to the clinical trials" was similarly too vague, as "it [was] unclear from [her] statement what sort of 'concerns' she alleges Defendants were aware of." Id. at 221.

The CW allegations here are equally vague and unspecific.  CW1 states, for example, that "material weaknesses in internal controls were brought to the attention of *Conseco management*," and that "a recommendation to remediate problems through the development of a 'procedures manual' was flatly rejected by *Conseco executives*." (Compl. ¶ 110 (emphasis added).)  Similarly, CW2 claims that "there were conversations among Conseco personnel '*all the time*' that there were problems with Conseco's financial statements," that "Conseco's *top management knew* about the problems with the data but did not care if it was resolved," and that "CW2 was often alarmed at how *Conseco management* chose to address and disclose certain matters because they misrepresented facts to investors." (Id. ¶¶ 94, 101, 122 (emphasis added).)

The statements attributed to Plaintiff's other CWs are equally vague and conclusory.  CW3 states that s/he "discussed with '*a lot of people*' in Conseco's corporate accounting department that accounting information being reported to investors was not correct," and that "numerous reports provided to *senior personnel* of the Company mentioned the significant problems with LTC and indicated that Conseco was 'under-reserved' and 'the expenses [of Conseco] had been underestimated.'" (Id. ¶¶ 82, 105 (emphasis added).)  CW4 states that "[t]he results of [internal audit's] detailed audit [of Conseco's LTC business] were submitted to the Company's audit committee of the board of directors" (Id. ¶ 107), but does not elaborate as to

the substance of the report, who in management received the audit report, or whether Conseco's actions or public statements were in any way inconsistent with the report.  CW5 likewise claims that "[d]uring the Class Period, CW5 participated in quarterly meetings with senior personnel in Conseco's Finance and Actuarial departments, including Defendant Bonach, where *'lots of data issues' were discussed*."  (Id. ¶ 97 (emphasis added).)

These allegations attribute no specific knowledge or action to the Individual Defendants. They fail to specify with particularity *what* information any Defendant knew, or *when* and *how* the Defendants acquired that knowledge.  These types of allegations simply do not support an inference of scienter.  See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (allegation, based on confidential witness reports, that accounting problems were "well known" to defendant's management team was not sufficient); see also Konkol, 590 F.3d at 400-01 (rejecting witness allegations that practices were "obvious" and "openly known within the Company" because they were not connected to the defendants); Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (allegations that information was "known" or "common knowledge" were too vague and conclusory to support scienter).

Likewise, the CW allegations concerning purported meetings and reports (e.g., Compl. ¶¶ 96-98, 101, 103, 105, 110) are "so vague as to be meaningless, because [they] contain[] no time frame within which the meetings occurred . . . and no information regarding how extensively or in what manner the reports were discussed."  In re Doral Financial Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008); see also In re American Express, 2008 WL 4501928 at *7.

c.    The Confidential Witness allegations are contradictory.

Where confidential witness allegations of a defendant's knowledge of purported fraud contradict other statements made by the same or other confidential witnesses, such inconsistencies "severely undermine the reliability of the confidential witnesses and, as a result,

32

are insufficient to support a finding of scienter." See In re Downey Sec. Litig., 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (discounting allegations based on confidential witnesses where different witnesses made contradictory statements); see also Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc., 2009 WL 4282940, at *13 (S.D. Ind. Dec. 1, 2009) ("inconsistent, uncorroborated, and vague" confidential witness allegations did not support inference of knowledge).

Plaintiff's CW allegations contain several significant inconsistencies that seriously undermine them. For instance, CW1 and CW2 make contradictory allegations concerning management's involvement in remediating weaknesses identified in the LTC business. According to CW1, during the class period Conseco "dedicated an entire conference room known as the 'War Room' solely for addressing the multiple and serious problems with LTC." (Compl. ¶ 96.) Likewise, CW2 states that "throughout the Class Period, each individual who held the position of CEO, including Defendants Preier and Kirsch, held and participated in meetings in the War Room - on a daily basis - to discuss problems in LTC." (Id. ¶ 98.) These allegations directly contradict the contentions by these very same CWs that other managers attempted to ignore LTC problems. (See, e.g., id. ¶ 103 (allegation by CW2 that "a Conseco employee reported . . . information [about problems with claims processes] to [VP of Long Term Care Claims] Wagner, who responded by stating that the employee was not supposed to have told him this information."); ¶ 110 (allegations by CW1 that "material weaknesses in internal controls were brought to the attention of Conseco management, but those in charge refused to take the necessary steps to try to fix the problems").)

The CWs make similarly contradictory statements regarding the extent to which outside auditors were aware of the issues affecting Conseco's LTC business. CW1's entirely conclusory

and unsupported allegation that "Defendants hid many of the problems from its outside auditors" who "did not examine problems with the . . . handling of claims by Conseco" (id. ¶ 102) is contradicted by CW2's statement that Conseco had worked closely with other independent consultants, including Deloitte & Touche and Long Term Care Group (id. ¶ 112). Similarly, CW4's purported allegations also conflict. His/her claim that "during the Class Period, Conseco's internal audit staff 'were not welcomed' by the managers of Conseco's various departments" (id. ¶ 123) is completely inconsistent with his/her claim that "Conseco auditors performed a detailed audit lasting approximately nine months and developed 'a real handle on what was going on and knew the nuts and bolts' of the problems with the LTC segment" (id. ¶ 107). Such contradictory statements "severely undermine the reliability of the confidential witnesses," and those allegations should therefore be discounted. In re Downey, 2009 WL 2767670, at *10; see In re Silicon Storage Tech., Inc., Sec. Litig., 2007 WL 760535, at *26 (N.D. Cal. Mar. 9, 2007) (discounting witness allegations that one defendant kept secret information because they were inconsistent with other allegations in the complaint that the information was "talked about openly").

In sum, because the information allegedly based upon CWs is not probative with respect to Defendants' knowledge, and is vague, conclusory, and contradictory, it does not support a strong inference of scienter.

### 3. Plaintiff Does Not Allege Motive.

"The Court of Appeals has explained that allegations of motive are sufficient if they 'entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.' The plaintiffs 'must assert a concrete and personal benefit to the individual defendants resulting from the fraud.' Motives generally possessed by most corporate directors and officers do not suffice." In re Loral Space & Commc'ns, 2004 WL 376442, at *6.

Allegations of "a type of benefit that most corporations and insiders seek" are legally insufficient to establish motive. In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) (desire to increase stock prices, enhance ability to obtain fees and interest from clients, earn bonuses, and reduce credit exposure did not establish motive).

Plaintiff has not come close to meeting the PSLRA's pleading standard for motive. Nowhere in 123 pages of the Complaint does Plaintiff allege any concrete or personal benefit to any Individual Defendant. Indeed, there are no allegations of extraordinary salary or bonus payments to, nor any stock sales by, any Individual Defendant. And Plaintiff's conclusory allegations that senior management "deliberately misled" investors and that Defendants "phased" their disclosures and prepared in advance for the quarterly analyst conference calls (Compl. ¶¶ 109, 121-22, 206, 220(d)) do not constitute allegations of any concrete or personal benefit to any Defendant. Indeed, it is hard to imagine that the executives of any public corporation would not prepare prior to issuing disclosures or making public statements.

Plaintiff's allegations relating to Conseco's purported secret desire to sell the LTC business are equally insufficient. A goal to sell successfully a portion of a company is not a legally sufficient motive because it is "a type of benefit that most corporations and corporate insiders seek." In re JP Morgan Chase, 363 F. Supp. 2d at 620; see Kalnit, 264 F.3d at 141 ("the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired"); AOL Time Warner Sec. and ERISA Litig., 2004 WL 992991, at *15 (S.D.N.Y. May 5, 2004) (rejecting generalized allegations of motive to inflate stock price to effectuate a merger, even where accompanied by allegations that corporate officers had greedy intentions and desire to keep corporate positions and "access to corporate riches"). Thus, Plaintiff's contention that Defendants were supposedly downplaying problems in the LTC

business because they sought to sell it does not sufficiently allege motive to commit securities fraud. See In re Loral Space & Commc'ns, 2004 WL 376442, at *6 ("These are the types of generalized motives that the Court of Appeals has concluded do not suffice to establish scienter, because they 'could be imputed to any publicly-owned, for-profit endeavor.'").[13]

### 4. Plaintiff Does Not Allege Conscious Misbehavior Or Recklessness.

Nor does the Complaint allege conscious misbehavior or recklessness.

> The Court of Appeals has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." For example, plaintiffs can plead scienter based on recklessness when they "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements." In some cases, recklessness can be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful. . . ." In any event, the facts alleged must be sufficiently strong circumstantial evidence of the alleged recklessness that the alleged facts give rise to a strong inference of fraudulent intent.

In re Loral Space & Commc'ns, 2004 WL 376442, at *8 (citing Second Circuit cases). Where the plaintiff has pleaded no motive for the alleged fraud, as here, the allegations of conscious misbehavior or recklessness must be even stronger. Kalnit, 264 F.3d at 142. As explained below, Plaintiff has not alleged facts establishing conscious misbehavior or recklessness by the Defendants with respect to any of the alleged material misrepresentations or omissions.[14]

---

[13] Not only is the purported "motive" insufficient, it is belied by Conseco's public statements. As discussed above, and as set forth in Conseco's repeated disclosures, the LTC business was a run-off block of business with well-publicized, significant operational and profitability issues. Plaintiff's intimation that Conseco could or would try to pull the wool over the eyes of a potential buyer of the LTC business is illogical and unsupported.

[14] Plaintiff's allegations that Defendants Kirsch, Bullis and Prieur signed certifications as required by the Sarbanes-Oxley Act ("SOX") (see Compl. ¶¶ 167, 209) do not support any inference of scienter. See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 304-

*(cont'd)*

           a.      The existence of a restatement does not constitute strong
                    <u>circumstantial evidence of conscious misbehavior or recklessness.</u>

Plaintiff's reliance on Conseco's restatement as evidence of conscious misbehavior or recklessness is misplaced.  The law is clear that a failure "to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for [Section] 10(b) liability." <u>Novak</u>, 216 F.3d at 309.  Similarly, allegations of failure to comply with GAAP or other such irregularities do not establish recklessness. <u>Id.</u> Indeed, courts in the Second Circuit have consistently held that GAAP violations and restatements are insufficient to allege scienter. <u>See</u>, <u>e.g.</u>, <u>In re Hudson Techs.</u>, 1999 WL 767418, at *5 (GAAP violations coupled with restatement insufficient to allege scienter); <u>Stevelman</u>, 174 F.3d at 84-85 (allegations that defendant violated GAAP by failing to establish greater reserves and restated its financials did not plead scienter); <u>In re DRDGOLD Ltd.</u>, 472 F. Supp. 2d at 573-74 (scienter not alleged despite allegations of material control weaknesses which led to accounting errors and restatement).[15]

           b.      Plaintiff's allegations are too vague to constitute strong
                    <u>circumstantial evidence of conscious misbehavior or recklessness.</u>

Plaintiff's allegations regarding the Defendants' states of mind are vague and conclusory and therefore cannot constitute strong circumstantial evidence of conscious misbehavior or recklessness.  The Complaint impermissibly clumps the Defendants together and contains no specific facts demonstrating that any Individual Defendant knew of contrary information at the

---

05 (S.D.N.Y. 2008) (SOX certification not probative of scienter where complaint failed to allege that defendants possessed, or had access to, any specific, contemporaneous information that contradicted the company's public statements).

[15] <u>See also</u> <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d 549, 566-68 (S.D.N.Y. 2004) (allegations of conscious misbehavior and recklessness based on accounting errors insufficient); <u>Horizon Asset Mgmt Inc. v. H & R Block, Inc.</u>, 580 F.3d 755, 763-64 (8th Cir. 2009) (allegations of accounting and internal control issues leading to restatements insufficient where management promptly disclosed its control weaknesses).

time of the alleged misstatements.  As discussed above, the CW allegations of Defendants' involvement are vague and insufficient, and Plaintiff's conclusory assertion that Defendants "knew" public statements were false is entitled to no weight.  See, e.g., Coronel v. Quanta Capital Holdings Ltd., 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009) ("because the Complaint alleges no specific facts demonstrating that Defendants possessed – at the time they made the allegedly false statements concerning the reserve amounts – information contradicting their statements, fraud has not been shown"); Malin, 499 F. Supp. 2d at 141 (sources' statements that accounting deficiencies were well known were insufficient to establish scienter: "none . . . present any evidence that they communicated . . . the alleged problems . . . to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues").

Plaintiff's scattered references to documents purportedly contradicting Conseco's public statements also do not support conscious misbehavior or recklessness because the documents are not described with sufficient particularity, let alone connected with particular Defendants. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 309; see Teamsters Local 445 Freight Div. Pension Fund, 531 F.3d at 196 (same).  Here, Plaintiff does not identify the titles, dates, authors, or recipients of documents, nor does Plaintiff identify in any particularized fashion what the purported documents state.  (See, e.g., Compl. ¶¶ 4 ("internal Conseco documents generated throughout the Class Period"); 16 ("reports and other information"); 73 ("documents generated during the summer of 2006"); 80, 91-94, 105, 193, 220(d), 299.)  Vague allegations like these consistently have been rejected in the Second Circuit. See, e.g., In re Loral Space & Commc'ns, 2004 WL 376442, at *10 ("Because the plaintiffs have not alleged with sufficient particularity the nature, the content, the reliability, or the availability

of the allegedly contradictory internal reports, the allegations concerning this information do not provide sufficient circumstantial evidence to raise a strong inference of the defendants' fraudulent intent"); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812-13 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.").

Plaintiff's allegations of vaguely described meetings and conversations fare no better. Plaintiff does not allege which (if any) Individual Defendants participated in any particular meetings or conversations, what (if anything) they stated, who the other participants were, or what in particular was discussed.  (See, e.g., Compl. ¶ 52 (Wells and Conseco's actuaries "participated in numerous conversations [about NL Close]"); ¶ 56 ("this information was discussed with senior Conseco employees. . . who reported directly to Defendant Wells"); ¶ 59 ("3-hour meeting with senior Company executives"); ¶ 94 ("conversations among Conseco personnel 'all the time'"); ¶ 97 (quarterly meetings  with senior personnel including Bonach where "lots of data issues" were discussed); ¶ 98 ("Prieur and Kirsch[] held and participated in meetings in the War Room – on a daily basis – to discuss problems in LTC"); ¶ 101 ("meetings with senior Company executives"); ¶ 110 ("regular monthly meetings attended by senior management"; "was told by a Conseco vice president"); ¶ 121 (meetings attended by senior executives; ¶ 220(d) ("Wells received weekly updates"); ¶ 267 (a hundred conversations with Conseco's actuaries).)

These scattershot allegations are plainly insufficient to allege scienter.  See, e.g., In re 2007 Novastar Fin., Inc. Sec. Litig., 2008 WL 2354367, at *4 (W.D. Mo. Jun. 4, 2008) (dismissing complaint where plaintiff did not explain how alleged meetings alerted individual

defendant that public statements were false or misleading because conduct such as attending meetings is "normal and expected, and does not indicate fraudulent intent"); McCasland v. FormFactor Inc., 2009 WL 2086168, at *5 (N.D. Cal. July 14, 2009) (finding insufficient allegations that defendants attended regular meetings at which a project was discussed because the complaint did not allege that any confidential witnesses provided any specific information to defendants or that defendants received any such information from any other source); Ong ex rel. Ong v. Sears, Roebuck & Co., 2005 WL 2284285, at *23 (N.D. Ill. Sept. 14, 2005) ("Plaintiffs once again fail to identify a single meeting that these Defendants attended, much less the specific information they purportedly reviewed at those meetings.").

          c.      Conseco's repeated disclosures of the difficulties with its LTC business make the inference of non-fraudulent intent far more compelling than any inference of scienter.

As discussed above, in assessing scienter, this Court is to consider the allegations and Conseco's actual disclosures in their totality and, if the case is to proceed, the inference of scienter must be both strong and at least as compelling as any opposing inference of non-fraudulent intent. Thus, in In re Loral Space & Commc'ns, supra, this Court concluded that there was no sufficient basis for an inference of scienter based on the totality of the allegations of the complaint. This Court considered not only the vague and unsupported allegations of internal documents and meetings, but also the full content of the company's disclosures, which undercut plaintiffs' allegations of fraud. Id.; see PXRE Group, LTD., Sec. Litig., 600 F. Supp. 2d 510, 534 (S.D.N.Y. 2009) (finding inference that defendants "simply failed in their various models and internal mechanisms to calculate accurately the full extent of losses that were incurred by the unique phenomenon presented by [Hurricane Katrina] … more compelling than plaintiff's purported inference of scienter"). The same conclusion is warranted here.

As detailed above, the documents and transcripts which Plaintiff claims were fraudulent in fact disclosed the following:

- Conseco had ceased selling new policies in the LTC business because the financial results had been poor.

- Conseco had, in the past, substantially increased its reserves for the LTC business because of adverse claims experience.

- Conseco had significant operational issues with respect to its LTC business because it had acquired those businesses from multiple companies in the late 1990s.

- Conseco necessarily used a number of estimates to calculate the appropriate level of reserves, and it therefore underscored how small changes in those estimates could cause changes to the reserves.

- Conseco regularly during the class period increased the reserves for the LTC business as new calculations showed the need.

- Conseco used external actuaries on a quarterly basis to assist with its LTC reserves.

- Conseco made ongoing required capital infusions into Conseco Senior Health because of its poor performance and substantially weakened financial condition.

- Conseco would consider a sale or other disposition of the LTC business.

- A material control weakness had been identified and a remediation process was underway.

- Conseco undertook various steps to improve the operations of the LTC business.

- Conseco hired LTCG to take over a number of the functions of the LTC business.

- The existence of the Multistate Examination and the Congressional inquiry promptly after their commencement.

- A restatement that was very modest in amount, that included positive as well as negative adjustments, and of which only a trivial amount related to the LTC business.

In short, Conseco's actual disclosures preclude an inference of scienter.

### B.    The Alleged Misstatements And Omissions Are Not Actionable.

#### 1.    Many Of The Misstatements and Omissions Are Immaterial.

Plaintiff alleges a myriad of misstatements and omissions, but many of them are immaterial.  "The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act] . . . in order for the misstatement to be material, 'there must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" <u>ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 197 (2d Cir. 2009). Thus, materiality depends on all relevant circumstances, and a complaint may be dismissed where the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." <u>Id.</u>

Many of the alleged misstatements and omissions are so obviously unimportant that they are not actionable. First, the alleged misstatements and omissions relating to Conseco's financial performance are not material for Section 10(b) purposes. The Complaint assumes the materiality of these statements because Conseco restated its financial results but, when the restatement is viewed as a whole, in its entirety and context, its overall effect simply was not material to Conseco's overall business. In particular, Conseco's 2007 10-K setting forth the restatement made clear that it included three portions, including a change to the "pivot method" which impacted only 2006 and 2007, and the placement into the proper period of certain immaterial items that had already been disclosed. Indeed, the actual impact of the restatement was to *increase* Conseco's net income for 2006 from $96.5 million to $106.0 million. (Ex. C at 111.) Moreover, the net effect of all items identified during remediation was to reduce shareholder's equity at December 31, 2006 by $20.6 million (<u>Id</u>. at 113) In the context of Conseco's total shareholders' equity of more than $4.7 billion (Ex. B at 35), this *de minimis* reduction of less than one-half of one percent is immaterial as a matter of law.

Notably, Plaintiff does not allege that there was any stock drop when Conseco finalized its restatement on March 28, 2008. That is because there was none. Conseco's stock price closed at $10.41 on March 28 – the day the restatement was filed – up nine cents per share over

its close the previous day. (Ex. W.) Conseco's stock declined to close at $10.20 on the next

trading day, March 31, 2008, then rose to close at $10.55 on April 1, 2008, and at $11.29 on

April 2. (Id.)[16]

The alleged prior misstatements concerning Conseco's financial results cannot be

considered material under these circumstances. See In re Duke Energy Corp. Sec. Litig., 282 F.

Supp. 2d 158, 161 (S.D.N.Y. 2003) ("[A]n inflation of $217 million in the Company's revenues

for the relevant period amounts to about 0.3% of Duke Energy's total revenues for that period

[which constitutes] an immaterial percentage as a matter of law."); Parnes v. Gateway 2000, Inc.,

122 F.3d 539, 546-47 (8th Cir. 1997) (alleged overstatement of assets by 2 % was immaterial as

a matter of law).

The Complaint's alleged misstatements and omissions about the maintenance of policy

and claims information and computer systems and coding issues are likewise immaterial. The

disclosure of details regarding computer and document organization issues in the LTC business

could not have been viewed by a reasonable investor as having significantly altered the total mix

of information with respect to Conseco's overall business. See Geiger v. Solomon-Page Group,

Ltd., 933 F. Supp. 1180, 1188 (S.D.N.Y. 1995) (Koeltl, J.) (finding omitted information

immaterial based on its "plain unimportance").

---

[16] The market's reaction to the restatement is relevant to its immateriality. See In re Allied
Capital Corp. Sec. Litig., 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003) (granting motion to
dismiss and finding omitted information immaterial where stock price declined for only one day
after disclosure before recovering); see In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410,
1425 (3d Cir. 1997) ("Because the market for [defendant's] stock was 'efficient' and because the
July 29 disclosure had no effect on [defendant's] price, it follows that the information disclosed
on September 20 was immaterial as a matter of law.").

## 2.    The Statements And Omissions Relating To Reserves Are Not Actionable.

The Complaint's allegations concerning the reserves for the LTC business are also not actionable for several reasons.  First, Conseco was clear at all times that these reserves were based on actuarial *estimates*.  Such statements, therefore, are akin to projections and predictions, which cannot form the basis of fraud claim.  See Zirkin v. Quanta Capital Holdings, Ltd., 2009 WL 185940, at *11 (S.D.N.Y. Jan. 23, 2009) ("any hint of falsity in the initial estimate is belied by the fact that insurance reserves established for losses that have been incurred but not yet reported to an insurance company are, by their nature, 'extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect.'"); Malin, 499 F. Supp. 2d at 146 ("the process of estimating loss reserves is a difficult one, and even following these accounting policies might not result in adequate loss reserves . . . Plaintiffs must provide evidence of fraud, aside from the mere fact of the loss reserve increases, to prevail").

Second, Plaintiff has not plausibly alleged that Conseco's statements relating to reserves for the LTC business were false when made.  Reserve determinations are not false unless there was no good faith basis for them *at the time they were made*.  See Malin, 499 F. Supp. 2d at 148 (finding plaintiffs had not alleged that reinsurance reserves were inaccurate at the time reported); Zirkin, 2009 WL 185940, at *11 ("the Complaint here has not put forth sufficient factual allegations . . . that the estimate of hurricane losses included in the offering documents was a material untruth at the time it was made); In re National Auto Credit, Inc. Sec. Litig., 1999 WL 33919791, at *13-15 & 17 (N.D. Ohio Oct. 12, 1999) (allegations of "fraud by hindsight" that a company's reserves were inadequate were not sufficient to survive a motion to dismiss).  Here, Conseco's repeated warnings regarding the difficulties and uncertainties in setting reserves

preclude any claim that Conseco's reserves were deceptive, and Plaintiff offers no factual allegations to assert that Conseco's reserves were knowingly false at the time they were made.

Moreover, Conseco's disclosures render the alleged misleading statements relating to reserves not actionable under the bespeaks caution doctrine and the PSLRA statutory safe harbor for forward-looking statements. "As the Court of Appeals recently stated, '[u]nder the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" See In re Loral Space & Commc'ns, 2004 WL 376442, at *18. As detailed above, Conseco made clear that Conseco's reserves for long term care policies were based on estimates, assumptions, and statistics, and that it was possible that actual claims would materially exceed reserves. These types of disclosures render statements relating to reserves protected by the PSLRA safe harbor. See, e.g., In re Kindred Healthcare Inc. Sec. Litig., 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) ("The amount Kindred keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings. . . . It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA."); Hess v. American Physicians Capital, Inc., 2005 WL 459638, at *6-7 (W.D. Mich. Jan. 11, 2005) (same).

### 3. The Alleged Omissions Are Not Actionable Because Conseco Had No Duty To Disclose The Information Which Plaintiff Claims Was Withheld.

To the extent Plaintiff's claims are based upon alleged omissions, they fail because Conseco had no duty to disclose that information. It is well settled that there is no liability for an omission unless there is a specific duty to disclose the omitted information or the disclosure is necessary to make other *statements* not misleading. See In re Time Warner Inc. Sec. Litig., 9

45

F.3d 259, 267 (2d Cir. 1993) ("an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts"); Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading").

Notably, Plaintiff here does not allege any duty to disclose much of the allegedly omitted information on which its claims are based – because there is no such duty. For example, Conseco had no duty to disclose information relating to technical computer issues with respect to its LTC business. Nor did it have any duty to disclose the details of how it kept policy and claims information or the specifics relating to integration of information from its various legacy companies. All companies deal with these types of operational issues, and requiring them to disclose such information would bury shareholders in lengthy and useless public filings. See San Leandro, 75 F.3d at 810 ( "to require the public announcement of each [study] would risk 'bury[ing] the shareholders in an avalanche of trivial information'").

### C.    Plaintiff's Claims Are Barred By The Applicable Statute Of Limitations.

Plaintiff's claims are also time-barred because it was on inquiry notice of the facts underlying its claims more than two years prior to filing its original complaint on August 6, 2009. Section 804 of the Sarbanes-Oxley Act of 2002 set the statute of limitations for Section 10(b) (and Section 20(a)) claims at the earlier of two years after discovery of the facts constituting the violation or five years after such violation. See 28 U.S.C. § 1658(b)(1). The two-year limitations period begins to run either upon actual notice of the underlying facts or upon constructive inquiry notice. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993). The duty of inquiry arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" of a cause of action. Id. at 350; see Salinger v. Projectavision, Inc., 972 F. Supp. 222, 229 (S.D.N.Y. 1997) (Koeltl, J.); GVA Market Neutral

46

<u>Master Ltd. v. Versus Capital Partners Offshore Fund, Ltd.</u>, 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008).

The circumstances giving rise to the duty to inquire – and starting the clock running on the statute of limitations – are commonly referred to as "storm warnings." <u>See</u> <u>Dodds</u>, 12 F.3d at 350. Information that may constitute sufficient "storm warnings" includes "any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation . . ." <u>Brimo v. Corporate Express, Inc.</u>, 229 F.3d 1135, 1135 (2d Cir. 2000) (unpublished). Plaintiffs are charged with knowledge of public information at the time of its release. <u>See</u>, <u>e.g.</u>, <u>Dodds</u>, 12 F.3d at 350 ("[t]he means of knowledge are the same thing in effect as knowledge itself"). Importantly, "[a]n investor does not have to be on notice of the entire fraud being perpetrated to be on inquiry notice." <u>Id.</u> at 352.

The Second Circuit has acknowledged that when facts constituting actual or inquiry notice are clear from the pleadings and public disclosures, statute of limitations questions may be resolved on a motion to dismiss. <u>See</u>, <u>e.g.</u>, <u>LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 156 (2d Cir. 2003) (affirming dismissal of Section 10(b) claim based on statute of limitations); <u>Dodds</u>, 12 F.3d at 352 ("Where, as here, the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."). In fact, the Second Circuit has resolved the issue of notice for statute of limitations purposes on a motion to dismiss in a "vast number of cases." <u>LC Capital Partners, L.P.</u>, 318 F.3d at 156.

Here, Plaintiff was on inquiry notice of facts allegedly giving rise to its claims when Conseco announced its material control weakness on March 6, 2007, well more than two years

before the original complaint was filed.  Plaintiff alleges many misstatements and omissions, but its claims all rest on the fundamental notion that it was misled to believe that "all was fine" with Conseco's LTC business.  As detailed above on page 18, the Complaint's alleged misstatements and omissions fall into five categories:  (1) the material weakness in controls and remediation; (2) reserves; (3) financial performance and operations; (4) operation of the LTC business; and (5) customer claims handling and supervision by regulatory agencies.

Conseco's March 6, 2007 press release placed investors on notice that there were serious issues with respect to each of these areas.  (See Compl. ¶ 187.)  First, the press release expressed disappointment with Conseco's "poor overall financial results" and explained that the poor results in the LTC business were attributable to many factors, including claims reserve strengthening.  (Id.; Ex. N at 1, 3-4.)  Second, it announced that Conseco had identified a material weakness in internal controls and was taking steps to remediate the deficiencies, which would take significant time.  (Compl. ¶ 187.)  Third, it made clear that the significant losses incurred in the LTC business required corrective action plans involving enhanced care management and claim adjudication practices, and improved technology based tools.  (Id.)  Finally, Conseco made clear that Conseco could not reach any conclusions as to whether these changes had been effective, and that more time was necessary to provide any commentary on outlook.  (Id.)  In sum, the press release made clear that Conseco faced serious issues with respect to its LTC business.  Inasmuch as Plaintiff claims that it had been misled to believe that none of these problems existed, this statement was unquestionably a "storm warning," triggering a duty to investigate fraud.  See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 169 (2d Cir. 2005) ("Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate.")

This is all the more clear when considered in the context of Conseco's earlier disclosures. As discussed, Conseco candidly disclosed the challenges it faced in managing its LTC business long before March 2007. Indeed, in 2006, securities analysts repeatedly asked questions regarding removing the LTC business from Conseco's ongoing business (see, e.g., Ex. I at 20), and it was no secret that Conseco had issues with its LTC business (see, e.g., Ex. D at 29, 32, 50). The March 6, 2007 press release left no doubt. This news was so contrary to what Plaintiff claims it had been misled to believe that it surely triggered a duty to investigate. Thus, the two-year statute of limitations began to run at least by March 2007 and Plaintiff's claims are untimely.

## II.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

"In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998). Because Plaintiff has failed to plead a primary violation by any Defendant, Plaintiff's Section 20(a) claim must also be dismissed. See Endovasc Ltd. v. J.P. Turner & Co., 2004 WL 634171, at *14 (S.D.N.Y. Mar. 30, 2004).

In addition, Plaintiff does not plead that any Individual Defendant was a culpable participant in the alleged fraud. As one court explained:

> The weight of Second Circuit precedent favors the view that a Plaintiff plead "culpable participation" to state a section 20(a) claim, and that such participation must be plead with particularity. Thus, in order to withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness.

49

Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007).  Here, Plaintiff fails to allege

any involvement by the Individual Defendants in the alleged fraud, let alone any scienter, and

therefore does not allege any culpable participation.  See In re Razorfish, Inc. Secs. Litig., 2001

WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (dismissing § 20(a) claim where complaint failed

to allege false statement "made with the requisite fraudulent scienter").

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: New York, New York
       March 12, 2010

SIDLEY AUSTIN LLP

By: _____
     Andrew W. Stern
     astern@sidley.com
     Dorothy J. Spenner
     dspenner@sidley.com
     Tom A. Paskowitz
      tpaskowitz@sidley.com
     787 Seventh Avenue
     New York, New York 10019
     Telephone: (212) 839-5300
     Facsimile: (212) 839-5599

     – and –

     Walter C. Carlson (admitted pro hac vice)
     wcarlson@sidley.com
     One South Dearborn Street
     Chicago, Illinois  60603
     Telephone: (312) 853-7000
     Facsimile: (312) 853-7036

     Attorneys for Defendants