UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PLUMBERS AND PIPEFITTERS LOCAL UNION
NO. 719 PENSION TRUST FUND,
on Behalf of Itself and All Others Similarly Situated,

                    Plaintiff,

      vs.

CONSECO INC., WILLIAM KIRSCH, EUGENE
BULLIS, MICHAEL DUBES, JAMES HOHMANN,
JIM PRIEUR, EDWARD BONACH, and JOHN
WELLS,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09 Civ. 6966 (JGK)

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CORRECTED SECOND AMENDED COMPLAINT

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

-and-

One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Attorneys for Defendants

# <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................... ii

**INTRODUCTION** ............................................................................................... 1

**BACKGROUND** ................................................................................................ 4

**PLAINTIFF'S SECOND AMENDED COMPLAINT** ....................................... 18

    1.    Improvement of the LTC Run-off Business ............................................ 18

    2.    Remediation of The Material Weakness in Internal Controls ............................ 19

    3.    Reserves ............................................................................................ 20

    4.    Financial Performance and Operations ................................................ 20

    5     Customer Claims Handling and Regulatory Examinations. .................. 21

**ARGUMENT** .................................................................................................... 24

**I.**    **PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED.** ........................... 24

    **A.**    **The SAC Does Not Plead Scienter.** ................................................ 24

        **1.**    **Plaintiff's Allegations Of Fraud By Hindsight Do Not Plead A Strong Inference Of Scienter.** .................................. 25

        **2.**    **Plaintiff's Allegations Based On Confidential Witnesses Do Not Plead A Strong Inference Of Scienter.** ................... 27

            a.    The CWs do not allege contact with the Individual Defendants. ................................................ 27

            b.    The CW allegations are vague and conclusory. ........................... 29

            c.    The CW allegations are contradictory. ....................... 31

        **3.**    **Plaintiff Does Not Allege Any Motive.** ................................... 33

        **4.**    **Plaintiff Does Not Allege Conscious Misbehavior or Recklessness.** .... 34

            a.    The existence of a restatement does not constitute strong circumstantial evidence of conscious misbehavior or recklessness…………………………………………………………35

       b.     Plaintiff's allegations are too vague to constitute strong circumstantial evidence of conscious misbehavior or recklessness…………………….....................................................36

       c.     Conseco's repeated disclosures of the difficulties with its LTC business and Plaintiff's allegations regarding internal Conseco documents make the inference of non-fraudulent intent far more compelling than any inference of scienter………38

**B.**     **The Alleged Misstatements And Omissions Relating to Reserves Are Not Actionable.**…………………………………………………………41

**C.**     **The Alleged Misstatements And Omissions Are Not Actionable For Additional Reasons.**…………………………………………………………46

      **1.**     **The Forward-Looking Statements Are Not Actionable.** ...................... 46

      **2.**     **Many of the Misstatements And Omissions Are Immaterial**............. 49

      **3.**     **The Alleged Omissions Are Not Actionable Because Conseco Had No Duty To Disclose The Information At Issue.**.......................... 49

**II.**    **PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.**…………………49

**CONCLUSION** ......................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Acito v. Imcera Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) ...................................................................................25

AOL Time Warner Sec. and ERISA Litig.,
    2004 WL 992991 (S.D.N.Y. May 5, 2004) ..........................................................34

Ashland Inc. v. Morgan Stanley & Co., Inc.,
    2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010) ......................................................37

ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007)...................................................................................24

Basic Inc. v. Levinson,
    485 U.S. 224 (1988)..............................................................................................49

Coronel v. Quanta Capital Holdings Ltd.,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................................................36

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009)..................................................................................47

Endovasc Ltd. v. J.P. Turner & Co.,
    2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) ........................................................49

Geiger v. Solomon-Page Group, Ltd.,
    933 F. Supp. 1180 (S.D.N.Y. 1995)......................................................................48

Hess v. American Physicians Capital, Inc.,
    2005 WL 459638 (W.D. Mich. Jan. 11, 2005) .....................................................44

Higginbotham v. Baxter Int'l, Inc.,
    495 F.3d 753 (7th Cir. 2007) ..........................................................................45-46

Horizon Asset Mgmt Inc. v. H & R Block, Inc.,
    580 F.3d 755 (8th Cir. 2009) ................................................................................35

In re 2007 Novastar Fin., Inc., Sec. Litig.,
    2008 WL 2354367 (W.D. Mo. June 4, 2008) ............................................3, 38, 42

In re Allied Capital Corp. Sec. Litig.,
    2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)........................................................48

iii

In re America Serv. Grp., Inc.,
    2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ..........................................................44

In re American Express Co. Sec. Litig.,
    2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008)..................................................28, 31

In re Bausch & Lomb,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008) ..........................................................28

In re Bristol-Myers Squibb Sec. Litig.,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).............................................................35

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997)........................................................................48

In re CIT Group, Inc. Sec. Litig.,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004).............................................................26

In re Doral Financial Corp. Sec. Litig.,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008).............................................................31

In re Downey Sec. Litig.,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).........................................31, 32-33

In re DRDGOLD Ltd. Sec. Litig.,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................26, 35

In re Duke Energy Corp. Sec. Litig.,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................................48

In re Elan Corp. Sec. Litig.,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................29-30

In re Hudson Techs., Inc. Sec. Litig.,
    1999 WL 767418 (S.D.N.Y. Sept. 28, 1999)................................................26, 35

In re Huntington Bancshares Inc. Sec. Litig.,
    674 F. Supp. 2d 951 (S.D. Ohio 2009) ...........................................................42

In re IAC/InterActiveCorp Sec. Litig.,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010).............................................................29

In re JP Morgan Chase Sec. Litig.,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).........................................................33, 34

In re Kindred Healthcare Inc. Sec. Litig.,
    299 F. Supp. 2d 724 (W.D. Ky. 2004).............................................................44

In re Livent, Inc. Noteholders Sec. Litig.,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...............................................................24

In re Loral Space & Commc'ns Ltd. Sec. Litig.,
   2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ................................................. passim

In re MSC Industrial Direct Co.,
   283 F. Supp. 2d 838 (E.D.N.Y. 2003) ..............................................................26

In re National Auto Credit, Inc. Sec. Litig.,
   1999 WL 33919791 (N.D. Ohio Oct. 12, 1999) ...................................................41

In re Razorfish, Inc. Sec. Litig.,
   2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001) ....................................................50

In re Rhodia S.A. Sec. Litig.,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) ..............................................................37

In re Sec. Capital Assurance, Ltd. Sec. Litig.,
   2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) ....................................................33

In re Silicon Storage Tech., Inc., Sec. Litig.,
   2007 WL 760535 (N.D. Cal. Mar. 9, 2007) .......................................................33

In re Take-Two Interactive Sec. Litig.,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..............................................................35

In re Time Warner Inc. Sec. Litig.,
   9 F.3d 259 (2d Cir. 1993) .............................................................................49

Kalin v. Xanboo, Inc.,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ..............................................................50

Kalnit v. Eichler,
   264 F.3d 131 (2d Cir. 2001) ...............................................................25, 34, 35

Konkol v. Diebold, Inc.,
   590 F.3d 390 (6th Cir. 2009) ....................................................................27, 31

LC Capital Partners, LP v. Frontier Ins. Group, Inc.,
   318 F.3d 148 (2d Cir. 2003) ...........................................................................4

Lentell v. Merrill Lynch & Co.,
   396 F.3d 161 (2d Cir. 2005) ..........................................................................24

Malin v. XL Capital Ltd.,
   499 F. Supp. 2d 117 (D. Conn. 2007) .....................................................31, 36, 41, 42

McCasland v. FormFactor Inc.,
2009 WL 2086168 (N.D. Cal. July 14, 2009)........................................................38

Miller v. Champion Enters., Inc.,
346 F.3d 660 (6th Cir. 2003) ...............................................................................26

Miller v. Lazard, Ltd.,
473 F. Supp. 2d 571 (S.D.N.Y. 2007)..................................................................15

New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.,
2010 WL 1473265 (C.D. Cal. Mar. 29, 2010)................................................27, 29

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000)........................................................................26, 35, 36

Ong ex rel. Ong v. Sears, Roebuck & Co.,
2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) .......................................................38

Parnes v. Gateway 2000, Inc.,
122 F.3d 539 (8th Cir. 1997) ...............................................................................48

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
Commerce, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..........................................33, 45

Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,
2009 WL 4282940 (S.D. Ind. Dec. 1, 2009).........................................................31

PXRE Group, LTD., Sec. Litig.,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................................................39

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,
75 F.3d 801 (2d Cir. 1996).............................................................................37, 49

Santa Fe Indus. v. Green,
430 U.S. 462 (1977).............................................................................................26

Slayton v. American Exp. Co.,
604 F.3d 758 (2d Cir. 2010).................................................... 4, 43, 44-45, 46

Stevelman v. Alias Research Inc.,
174 F.3d 79 (2d Cir. 1999)...........................................................................25, 26, 35

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
531 F.3d 190 (2d Cir. 2008)..............................................................................25, 36

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308 (2007)............................................................................................24

Tsereteli v. Residential Asset Securitization Trust,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010)......................................................................41

Zirkin v. Quanta Capital Holdings, Ltd.,
  2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ...........................................................41

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ...............................................................................................24

15 U.S.C. § 78u-5(c) ...................................................................................................43

Fed. R. Civ. P. 9.....................................................................................................1, 24

Fed. R. Civ. P. 12.........................................................................................................1

Defendant Conseco, Inc. ("Conseco")[1] and Defendants William Kirsch ("Kirsch"), Eugene Bullis ("Bullis"), Michael Dubes ("Dubes"), James Hohmann ("Hohmann"), Jim Prieur ("Prieur"), Edward Bonach ("Bonach"), and John Wells ("Wells") (collectively, the "Individual Defendants" and with Conseco, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Corrected Second Amended Complaint (the "SAC"), pursuant to the Private Securities Litigation Reform Act ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Plaintiff's latest attempt to state a claim of securities fraud reflects a change in direction from its prior pleading.  Now, rather than alleging (falsely) that Conseco misled investors by purportedly reassuring them that "all was fine," Plaintiff makes the conclusory assertion that Conseco told investors that it "was making progress as a corporate entity" while it was actually "in a state of chaos and disarray."  According to Plaintiff, Conseco faced numerous undisclosed problems, including an inability to accurately set reserves in its long-term care run-off business ("LTC"), which caused Defendants to lack "a reasonable basis to report financial statements to investors because those financial statements could not be relied upon."

The SAC, however, suffers from the same fundamental flaws as its predecessor:  it ignores or mischaracterizes Conseco's numerous public statements about the challenges it faced. Conseco candidly updated the public regarding its progress and the obstacles it encountered. The full context of Conseco's disclosures, rather than the snippets which Plaintiff selectively quotes, makes clear that it transparently was taking appropriate time to address complex issues. Among other things, Conseco's disclosures about the difficulties faced by its LTC business

---

[1] In May 2010, Conseco changed its name to CNO Financial Group, Inc.

preclude the strong inference of scienter that is required to state a claim of securities fraud.

Faced with a highly challenging business that was a legacy of pre-bankruptcy acquisitions, Conseco addressed those challenges head-on and disclosed to the public the problems it discovered and its plans for resolving them. And, like other companies, Conseco made periodic adjustments to its reserves. Specifically, Conseco increased its reserves for the LTC business a number of times, including by $118 million in August 2007. In each case, Conseco explained the reason for its increase in reserves. For example, Conseco explained that the majority of the $118 million increase was to update Conseco's reserve assumptions and methodologies to reflect adverse developments in its recent claims experience. Because Plaintiff fails to allege any facts to support a conclusion that the reserves previously had been established with fraudulent intent, nothing about this prudent action supports Plaintiff's claim of fraud.

Similarly, Conseco informed the public in March 2007 that it had identified deficiencies that, in the aggregate, constituted a material control weakness that would require remediation. As with any complex business, remediation of these problems took time, and Conseco updated its shareholders along the way. The remediation process ultimately led Conseco to restate its financial statements in March 2008 to correct a number of small items in earlier periods. But Conseco's restatement does not support Plaintiff's allegations. Some of the items restated in Conseco's 2007 10-K were favorable to Conseco's financial statements; others were unfavorable. The net effect of the restatement was to increase Conseco's net income for 2006 from $96.5 million to $106.0 million, and to decrease Conseco's net income for 2005 from $324.9 million to $312.7 million. The restatement had only a modest impact on each of the quarters of 2007, worsening the first and improving the second and third. In light of the very modest nature of the restatement, which was filed before the market closed on March 28, 2008,

Conseco's share price – which had closed at $10.32 on March 27 – closed at $10.41 on Friday, March 28; $10.20 on Monday, March 31; $10.55 on April 1; and $11.29 on April 2.

The SAC fundamentally mischaracterizes Conseco's LTC business and the disclosures that Conseco made during the class period.  Although Plaintiff seeks to bolster its allegations by relying upon five confidential witnesses, the allegations based upon them are vague, conclusory, and contradictory.  And in almost all cases, the allegations involve no contact with the Individual Defendants and raise no inference of fraud.  Plaintiff's allegations about internal Conseco documents likewise are conclusory, unrelated to the Individual Defendants, and thus support no inference of fraud.  To the contrary, they support the more plausible inference that Conseco was striving to address well-known challenges and to make progress as a corporate entity.

The SAC, notwithstanding its length, is plainly deficient.  At their core, Plaintiff's allegations are nothing but "smoke and mirrors," belied by the disclosures that Plaintiff cites and omits to cite.  See In re 2007 Novastar Fin., Inc., Sec. Litig., 2008 WL 2354367, at *2 (W.D. Mo. June 4, 2008), aff'd, 579 F.3d 878 (8th Cir. 2009) ("One might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific.  The temptation is dangerous and must be resisted.").  Plaintiff's SAC does not plead a claim of securities fraud for several reasons:

- ***First***, Plaintiff fails to plead scienter.  Even in this third attempt at pleading a cognizable claim, Plaintiff's confidential witness allegations are vague, conclusory, and contradictory and, rather than supporting a strong inference of fraud, they demonstrate that the witnesses possess no information indicating that Defendants engaged in fraud.  Moreover, Plaintiff offers no concrete or personal motive to deceive, nor any plausible allegations of (or documents supporting) intentional, or even reckless, fraudulent conduct by Defendants.  Indeed, Conseco's extensive public disclosures and Plaintiff's allegations make the opposing inference of non-fraudulent intent far more plausible and compelling than any inference of scienter.

- ***Second***, the alleged misstatements relating to Conseco's LTC reserves are not actionable for several reasons.  As an initial matter, reserves are by their very nature

estimates and Conseco repeatedly emphasized their volatility and susceptibility to fluctuation.  Moreover, that Conseco determined to increase its LTC claims reserves by $118 million in August 2007 does not support a conclusion that Conseco's prior reserves were fraudulent or even erroneous.  Plaintiff's conclusory allegations simply do not support the conclusion that Defendants fraudulently set the LTC reserves.  Further, as the Second Circuit recently held in <u>Slayton v. American Exp. Co.</u>, 604 F.3d 758, 766, 773-77 (2d Cir. 2010), forward-looking statements, such as those concerning the adequacy of reserves about which Plaintiff complains, are not actionable where Plaintiff has not alleged that they were made with *actual knowledge* that they were false or misleading.  Plaintiff has not come close to meeting this burden.

- **Third**, the balance of the alleged misstatements are not actionable for additional reasons.  Many of the alleged misstatements are inactionable forward-looking statements and/or are immaterial.  Moreover, to the extent Plaintiff's claims are based upon omissions, they fail because Conseco had no duty to disclose the information claimed to have been omitted, such as the details of its computer systems.

- **Finally**, the control person claims must be dismissed because Plaintiff fails to plead a primary violation and fails to allege culpable participation by any Individual Defendant.

## **BACKGROUND**

### **Overview of Conseco**

Conseco is an insurance holding company.  During the putative class period, Conseco had several operating units, including Bankers Life and Casualty Company, Conseco Insurance Group, and Colonial Penn Life Insurance Company.  (Ex. A at 3.)[2]  Conseco also operated the LTC business segment, which was reported separately in Conseco's SEC filings and called "Other Business in Run-off."  LTC consisted of long-term care insurance policies that were no longer marketed, but were still in force.  (Id.)

---

[2] Exhibit references are to exhibits to the accompanying Declaration of Andrew W. Stern.  In deciding a motion to dismiss, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  <u>In re Loral Space & Commc'ns Ltd. Sec. Litig.</u>, 2004 WL 376442, at *2 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.); <u>see</u> <u>LC Capital Partners, LP v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 153-55 (2d Cir. 2003) (taking judicial notice of press releases, articles and financial publications).

**Conseco's Long-Term Care Run-Off (LTC) Business**

In Plaintiff's own words, "[a] large part of the fraud alleged [in the Complaint] concerns Conseco's LTC business."  (SAC ¶ 3.)  There are, however, essentially no substantive allegations relating to any of Conseco's other businesses; this case is about LTC.

In the 1990s, Conseco acquired three companies that sold long-term care insurance. After a merger and renaming of one subsidiary, Conseco's subsidiary, Conseco Senior Health Insurance Company ("CSH"), held most of the acquired business.  (Id. ¶¶ 43-47.)  The performance of these blocks after acquisition did not meet Conseco's expectations, and CSH ceased selling new long-term care policies by 2003.  (Ex. A at 9.)  When Conseco emerged from bankruptcy in 2003, the closed blocks of long-term care business were placed into the Other Business in Run-off segment, which was less than 9% of Conseco's total premium collected in 2005, 2006, and 2007.   (See Exs. A at 7, B at 6, C at 6.)[3]

Although the LTC business was a comparatively small portion of Conseco's overall business, Conseco did not hide the serious challenges that this business faced.  Rather, it repeatedly and candidly disclosed those challenges.  Thus, in its 10-Q filed on August 8, 2005, Conseco described its LTC business:

> This segment includes long-term care insurance inforce, substantially all of which was issued through independent agents by certain subsidiaries prior to their acquisitions by Conseco in 1996 and 1997.  The loss experience on these products has been worse than we originally expected.  Although we anticipated a higher level of benefits to be paid on these products as the policies aged, the paid claims have exceeded our expectations. . . .  This adverse experience is reflected in our high benefit ratios.

(Ex. D at 50.)  Conseco also disclosed that it periodically had been required substantially to increase claim reserves for its LTC business:

---

[3] Conseco continued to sell new long-term care insurance through Bankers Life (Ex. A at 9) but this business is not the subject of the SAC.

> We have incurred significant losses beyond our estimates as a result of actual claim costs and persistency of our long-term care business included in the other business in run-off segment.  For example, we increased claim reserves by $130 million during 2002 and $85 million during the eight months ended August 31, 2003, as a result of adverse developments and changes in our estimates of ultimate claims for these products.

(Id. at 32.)  Nor did Conseco minimize the fact that the LTC business faced significant operational and systems challenges:

> We have implemented several initiatives to improve operating results, including: . . . (v) stabilizing the profitability of the long-term care block of business in run-off sold through independent agents through premium rate increases, improved claim adjudication procedures and other actions.  Many of our initiatives address issues resulting from the substantial number of acquisitions of our predecessor.  Between 1982 and 1997, our predecessor completed 19 transactions involving the acquisitions of 44 separate insurance companies.  Our efforts involve improvements to our policy administration procedures and significant systems conversions, such as the elimination of duplicate processing systems for similar business.  These initiatives may result in unforeseen expenses, complications or delays, and may be inadequate to address all issues.

(Id. at 29.)

Moreover, Conseco did not obscure the fact that setting reserves for the LTC business presented unique challenges because of its nature and the use of many assumptions and estimates:

> The limited historical claims experience on our long-term care products could negatively impact our operations if our estimates prove wrong and we have not adequately set premium rates.

> In setting premium rates, we consider historical claims information and other factors, but *we cannot predict future claims with certainty.  This is particularly applicable to our long-term care insurance products*, for which we have relatively limited historical claims experience.  Long-term care products tend to have fewer claims than other health products such as Medicare supplement, but when claims are incurred, they tend to be much higher in dollar amount.  Also, long-term care products have a much longer tail, meaning that claims are incurred much later in the life of the policy than most other supplemental health products.  As a result of these traits, longer historical experience is necessary to appropriately price products.

6

\*       \*       \*

    The long-term care insurance businesses included in the other business in run-off segment were acquired through acquisitions completed in 1996 and 1997.  The majority of such business was written between 1990 and 1997.  *The experience on these acquired blocks has generally been worse than the acquired companies' original pricing expectations*. . . .  If future claims experience proves to be worse than anticipated as our long-term care blocks continue to age, our financial results could be adversely affected.

(Id. at 31 (emphasis added).)

    Finally, Conseco did not hide the seriously weakened financial condition of its subsidiary, CSH, in which most of the LTC business was held.[4]  Although the SAC purports to quote from Conseco's 2Q 2005 10-Q, it omits all of these important disclosures.  Contrary to the core allegation of the SAC, Conseco never told the investing public that it was "making progress as a corporate entity" without contemporaneously describing in detail the ongoing problems with its LTC business.

### Conseco's Disclosures from August 2005 through 2006

    Conseco continued regularly to disclose the challenges faced by the LTC business and its ongoing efforts to stabilize it.  (See Exs. E at 32-33, 53-54 (efforts to improve performance); F at 4 (new actuarial valuation system and new claim cost study); A at 22, 24, 29, 119 (efforts to improve block; development of claims cost study; contribution of capital to CSH; $40 million increase of LTC claim reserves); G at 45, 62 (upgrades to reserve valuation system); H at 50 ($24 million in increased claims exposure).)  The SAC omits all of this.

    The SAC's repeated selective reference to excerpted (and often ellipsed) quotes from public filings or transcripts is highly misleading.  For example, in connection with Conseco's 2Q 2006 earnings release, in SAC ¶ 194, which challenges a quote at the end of ¶ 193, Plaintiff

---

[4] The 10-Q disclosed that CSH was rated "B" from A.M. Best (7th of 16 possible ratings), "CCC" from Standard & Poors (18th of 21 possible ratings), and "Caa1" from Moody's (17th of 21 possible ratings).  Id. at 29.

omits the paragraph in the release that immediately precedes the phrase, "[T]hese events . . ."
The "events" were a tax settlement and a litigation settlement, neither of which had anything to
do with Conseco's LTC business.  Plaintiff then omits the very next and relevant paragraph, in
which Conseco specifically warned investors of the deterioration in the LTC business:

> Notwithstanding this progress, second quarter was a difficult quarter in certain
> of our health businesses, with incurred claims exceeding expectations in . . .
> the run-off long-term care block.  Although we are responding to these
> challenges with increased claims management focus and pricing initiatives
> where appropriate, . . . we are lowering our outlook for 2006 operating
> earnings . . . .

(Ex. I at 2.)  Likewise, in accusing Defendants of fraud based upon a snippet from the August 3,
2006 analyst call (SAC ¶ 195), Plaintiff includes no reference to the preceding five paragraphs,
in which Defendant Hohmann discussed what Conseco was doing about the challenges Conseco
faced in its LTC business.  (See Ex. J  at 2-3.)

     Even more telling are Plaintiff's selective allegations as to Conseco's reported results for
3Q 2006.  Whereas for other quarters Plaintiff relies upon stray snippets from transcripts of
analyst calls, the SAC completely ignores Conseco's actual disclosures in the November 2, 2006
analyst call and the slides Conseco filed on Form 8-K and made available to the public.  (See Ex.
K.)  As set forth in the 8-K and the 3Q 2006 earnings release, Conseco disclosed that the LTC
business had deteriorated markedly.  Conseco explained management changes to address this
business, its ongoing work on technology, and the work done by two independent consulting
firms on claims leakage and the actuarial assumptions used by Conseco to establish LTC claim
reserves (slides 37-39).  Conseco's efforts to address LTC's problems also were discussed at
length in the analyst call.  (See Ex. L at 7-9.)[5]  Similarly, Conseco disclosed in its 3Q 2006 10-Q

---

[5] Plaintiff's omission of the disclosures made in the November 2, 2006 analyst call is telling in
light of its repeated allegations, based in part on cherry-picking excerpts from other analyst calls,

*(cont'd)*

the steps it was taking to address operational issues in the LTC business.  (See Ex. M at 52-53.)

**Conseco's Disclosure of Its Material Control Weakness**

On February 23, 2007, Conseco issued a press release stating:

> During the year-end closing process, management determined that an extended review is required of the claim reserves and internal controls over financial reporting related to its long-term care run-off block.  The Company expects to record estimated after tax reserve adjustments of approximately $39 million related to long-term care claim reserves in the run-off block . . .

(Ex. N.)  On March 6, 2007, Conseco announced full year 2006 results, and that it had identified

control deficiencies that, when taken in the aggregate, constituted a material control weakness.

(See Ex. O.)  Although SAC ¶ 207 purports to quote from this release, it omits the detailed

discussion of the deterioration in the LTC business, and the substantial $54.1 million claim

reserves increase taken in 4Q 2006.  (Id.)  Conseco did not downplay the material weakness:

> [W]e have concluded that, as of December 31, 2006, we did not maintain effective control over certain actuarial financial reporting processes. The related control deficiencies, taken in the aggregate, constitute a material weakness. None of the adjustments were material individually, or in the aggregate, to our current year or prior period financial statements taken as a whole. We have taken steps to address the control deficiencies which will not be considered fully remediated until the revised control processes have been operating for a sufficient period of time to provide reasonable assurance as to their effectiveness.

(Id.)  Notably, Conseco emphasized that the remediation would take time, and that it could not

comment on the company's overall outlook because the significant losses incurred in the LTC

business had led to corrective action plans involving, among other things, enhanced care

management and claim adjudication practices.  (Id.)  Conseco made clear that it could not yet

reach any conclusions as to whether these changes had been effective, stating that "more time is

necessary to achieve the necessary visibility to improving trends in operating results in order to

---

that Conseco concealed these issues from the public.  See, e.g., SAC ¶¶ 166-71, 177-78, 195-98, 210-19, 234-41, 247-52.

provide any commentary on outlook."  (Id.)

On its conference call with analysts the next day, March 7, 2007, Conseco further explained the reason for the determination of the existence of a material weakness, which related directly to reserves and included a $7.1 million increase in LTC claim reserves.  (Ex. P at 2.) Plaintiff's allegation that Conseco "told investors that it was unlikely that future reserve strengthening would be required unless there was 'future deterioration of claims incidents and severity'" (SAC ¶ 12) is highly misleading.  A review of the transcript demonstrates that Defendants never stated or even implied that future reserve strengthening was unlikely.  Rather, Defendant Prieur stated that "what we set aside [for reserves] is what we think is the appropriate amount," and Defendant Bullis made clear that "[i]f there is future deterioration of claims incidents and severity further increases, then that will impact the results of the book."  (Ex. P at 12; SAC ¶ 216.)  Conseco also described the volatility in the LTC business, and underscored that it was likely to continue for a few more quarters.  (Id. at 8; see also id. at 2 ("passage of time is required before assertions can confidently be made as to the effectiveness of the remediation").)

Significantly, although the SAC purports to quote and challenge a number of statements made during the March 7, 2007 analyst call, it does so only by taking excerpts out of context.  In ¶ 211, the SAC quotes only two of the six paragraphs in which Defendant Wells described the condition of the LTC run-off block, and then purports to challenge his statement about the use of a technology tool based upon a report that purportedly was written later in the summer of 2007. Likewise, in attacking statements with respect to the reserves set for year-end 2006, Plaintiff accuses Defendants Prieur and Bullis of fraud for allegedly having no basis upon which to set reserves.  (SAC ¶¶ 216-17.)  But the quoted language omits the very next Question-and-Answer:

> **Tom Van Buskirk** – McMahan Securities – Analyst
> Do you have outside actuarial firms go over those reserves?  And if so, how

often?
**Gene Bullis** – Conseco, Inc. – CFO
Yes, and quarterly.

(Id. at 12.)  Thus, Plaintiff's allegation that Defendants lacked a basis to believe the reserves were appropriate deliberately attempts to hide Conseco's disclosure of the fact that independent outside actuarial firms reviewed those reserves on a quarterly basis.

Similarly, although the SAC attacks a few excerpted passages from the 2006 10-K, that 10-K was clear in disclosing the challenges confronting the LTC block.  These disclosures included (1) that Conseco had contributed $80 million in capital to CSH (Ex. B at 14); (2) that CSH had weak rating agency rankings (id. at 14-15); (3) the risk that the limited historical claims experience for LTC could adversely affect Conseco (id. at 21-23); (4) the risk arising from the material control weakness (id. at 23); (5) efforts that had been undertaken to improve policy administration procedures had caused increased policyholder complaints and, in some cases, inquiries from regulators (id. at 27); (6) substantial increases to LTC reserves taken during 2006 as a result of actual experience being worse than prior estimates (id. at 63); and (7) an explanation of the 4Q LTC reserves increases (id. at 64).  The SAC ignores all of this.

**Conseco's Disclosures Relating to Reserves**

Each quarter, Conseco undertook to set appropriate reserves for its LTC business. Conseco repeatedly explained the challenges associated with this task.  Its Q2 2005 10-Q stated the following risk factor, which was reiterated in subsequent public filings:

> Our *reserves* for future insurance policy benefits and claims *may prove to be inadequate* . . . .
>
> We calculate and maintain reserves for the estimated future payment of claims to our policyholders primarily *based on assumptions made by our actuaries*. . . .
>
> Many factors can affect these reserves and liabilities, such as economic and social conditions, inflation, hospital and pharmaceutical costs, regulatory actions, changes in doctrines of legal liability and extra-contractual damage

awards.  Therefore, *the reserves and liabilities we establish are necessarily based on estimates, assumptions and prior years' statistics*.  It is possible that actual claims will materially exceed our reserves and have a material adverse effect on our results of operations and financial condition.  *We have incurred significant losses beyond our estimates* as a result of actual claim costs and persistency of our long-term care business included in the other business in run-off segment.  For example, we *increased claim reserves by $130 million during 2002 and $85 million during the eight months ended August 31, 2003*, as a result of adverse developments and changes in our estimates of ultimate claims for these products.  Our financial performance depends significantly upon the extent to which our actual claims experience is consistent with the assumptions we used in setting our reserves.  *If our assumptions with respect to future claims are incorrect, and our reserves prove to be insufficient to cover our actual losses and expenses, we would be required to increase our liabilities*, and our financial results could be adversely affected.

(Ex. D at 31-32 (emphasis added).)[6]  Conseco likewise discussed during its analyst calls the inherent uncertainties in setting LTC reserves.[7]  As noted, in 2006 and thereafter, Conseco disclosed its use on a quarterly basis of an independent actuarial consultant to ensure that Conseco was setting appropriate LTC reserves.  (See Ex. L at 8.)

When it announced its 1Q 2007 results, Conseco stated that it was increasing reserves by $22 million in the LTC business (Ex. P at 2), and discussed steps being taken to improve that business' operations.  Here, again, in quoting Defendants Prieur (in ¶ 235) and Wells (in ¶ 239), the SAC omits significant information, including Prieur's statement that it would take "quarters" before the improvements to the LTC business had a positive impact and Wells' statement that the improvements would "take time" (Ex. P at 2, 4).[8]

---

[6] See also Exs. E at 34-35, A at 24, G at 62, H at 68, M at 34.

[7] See Exs. Q at 14 ("as claim development reflects improvements from claims adjudication then it's possible to change the underlying assumptions in your claims reserve and we might see some of that"); J at 3 ("it is challenging to determine the extent to which slight timing or method differences influence ratios or the extent to which underlying premium and claim developments are fluctuations or trends"); L at 14 ("we could have fluctuations in those claim reserves as experience related to how those claims run-off on already incurred claims develop").

[8] Again, the SAC (¶ 241) fails to explain how Wells can be accused of fraud with respect to his statements in May 2007 based upon a purported document created in the summer of 2007.

On August 6, 2007, Conseco announced its 2Q 2007 results, including that it was strengthening its claim reserves for the LTC business by $110 million.  (Ex. R at 1, 4.)  The next day, Conseco explained in detail the bases for its determination to increase reserves, including its decision to modify the assumptions used to set those reserves.  (Ex. S at 2, 3-4.)  Again, the SAC engages in highly selective excerpting:  it omits (a) any reference to the extensive commentary given by Conseco's chief actuary explaining the reserve increase (id. at 3-4); (b) Defendant Wells' statement that the improvements in administration of the LTC business would take time (id. at 5); and (c) the fact that Conseco had announced three weeks earlier that it had undertaken for review a proposal from an outside consulting firm, Long Term Care Group, Inc. ("LTCG"), to take over much of the back-office administration of the LTC business.[9]

Conseco explained that it had determined to strengthen its reserves based primarily upon changes to important assumptions resulting from Conseco's ongoing experience with LTC claims.  Conseco's chief actuary, Mark Alberts, stated:

> In Q2, even before the reserve adjustments, we observed that our estimates of prior-period-incurred claims were continuing to develop adversely in spite of our past strengthening efforts.  *As we do each quarter, we closely reviewed our methods and assumptions in light of this emerging experience, and made adjustments that our reserve calculations did not adequately capture the recent experience.*  It is very important to understand that *this quarter we went a step farther* and made a decided effort to get ahead of the experience rather than just keeping up.  Our claim *reserves now reflect for the first time an assumption that policyholders will remain on claim longer in the future than our historical assumptions would suggest.* . . . these [2Q loss] results reflect a $118 million increase in our estimates of claims incurred in prior-periods, including a $110 million of reserves strengthening that resulted from improvements in our reserving methods and assumptions.  As I have already

---

[9] In November 2007, Conseco announced the execution of that agreement with LTCG.  Ex. T.  Plaintiff's allegation that "LTCG rejected [Conseco's] request to assist with the setting of reserves because of the utter mess of Conseco's systems and lack of access to information necessary to perform actuarial science" (SAC ¶ 248; see id. ¶ 129) is conclusory and makes no sense given that Conseco had already engaged a different independent actuarial firm to review its LTC reserves on a quarterly basis.

discussed, this level of strengthening reflect our efforts to use more forward-looking assumptions in light of our past efficiencies [sic] and recent experience.

(Id. at 3 (emphasis added).)

Further, although the SAC omits this, Conseco's 2Q 2007 10-Q detailed the methodologies used to set the reserves and that Conseco continued to have an independent actuarial firm review its LTC reserves on a quarterly basis. (Ex. U at 52.) Conseco again explained that "[a]s additional experience emerges and other data become available, [its claims reserve] estimates and judgments are reviewed and may be revised." (Id.) It further stated that the $118 million increase included $110 million of adjustments related to updates to Conseco's reserve assumptions and methodologies "to reflect emerging trends in [Conseco's] claim experience," including, among other things, changing trends in the future duration of existing claims, fluctuations in claim inventories, and recent claims experience. (Id.)

Thereafter, Conseco continued through 2007 to update investors, in its earnings releases and 10-Qs, on the results of operations and on its remediation to address the control weakness. Conseco's 3Q 2007 10-Q stated that it continued to be actively engaged in these remediation efforts and that it expected to complete that effort by year end. (Ex. W at 75.)

**Conseco's February and March 2008 Disclosures and Restatement**

Following its substantial remediation efforts, Conseco announced on the morning of February 25, 2008 that it would delay the filing of its 2007 10-K in order to complete its financials and incorporate the correction of errors, "the majority of which were identified during the remediation of the material weakness in internal controls." (Ex. X at 1.) Conseco also announced that it would restate its financial statements for 2005 and 2006, and quarterly information for 2006 and the first three quarters of 2007. (Id.) Conseco estimated that the correction to net income (loss) would not exceed plus or minus $15 million for any prior annual

14

period, and stated that it would also correct "previously identified immaterial errors, which had been recognized through cumulative adjustments to previously issued financial statements." (Id.)  Notably, Conseco's share price declined only $0.03 per share after this announcement before rebounding the next day.  It closed at $12.10 on February 22, 2008, $12.07 on Monday, February 25, and at $12.33 on February 26.  (Ex. Y.)[10]

Shortly thereafter, on February 28, 2008, Conseco learned that the SEC disagreed with the "pivot method" Conseco had adopted to account for the impact of increasing premiums on its long-term care insurance.[11]  Conseco promptly announced the SEC's position and that this would cause additional delay in finalizing its 2007 financial statements.  (Ex. Z.)  On March 17, 2008, Conseco announced its preliminary financial information for the 4Q and full year 2007 and confirmed that it would issue its restated financial statements shortly.  (Ex. AA at 2.)

On March 28, 2008, Conseco completed its restatement and filed its 2007 10-K before the market closed.  Conseco's stock price closed at $10.32 on March 27, 2008, at $10.41 on March 28, at $10.20 on Monday, March 31, at $10.55 on April 1, and at $11.29 on April 2.  (Ex. Y.)  In the 2007 10-K, Conseco explained the restatement in detail.  (See Ex. C.)  As set forth in Note 2 to Conseco's financial statements, the restatement corrected:

- errors which had been identified through the 2007 remediation process;
- errors arising from Conseco's disclosed use of the "pivot method," which was disapproved by the SEC on February 28, 2008; and
- errors which had previously been identified and already recognized by Conseco through cumulative adjustments in its financial statements.

---

[10] The Court "'may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.'"  Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007).

[11] Conseco had fully disclosed the accounting treatment that it had used for these premium rate increases at the time it was adopted.  See, e.g., Ex. B at 46 (adoption of the "pivot method").  PricewaterhouseCoopers had previously audited and signed-off on Conseco's financial statements using that method.  See, e.g., id. at 90-91.

(Id. at 107-14.)  The impact of the adjustments for 2006 was to increase Conseco's net income from $96.5 to $106.0 million and the impact on 2005 was to decrease net income from $324.9 to $312.7 million.  (Id. at 111-12.)  The balance sheet impacts were similarly minor:  the net effect of all items identified during remediation was to reduce shareholder's equity at December 31, 2006 by $20.6 million.  (Id. at 113.)  In the context of Conseco's total shareholders' equity of more than $4.7 billion (Ex. B at 35), this was a *de minimis* reduction of less than 0.5%.

Not only was the effect of the restatement minimal, very few of the restated matters arose from issues with the LTC business.  As disclosed in Note 2, only three of the remediated items requiring restatement concerned this business:  a $10.7 million understatement of, a $5.3 million overstatement of, and a portion of a $1.0 million understatement of shareholders' equity.  (Ex. C at 108-09 (footnotes v, viii, and ix).)  Notably, the effect of Conseco's adoption of the SEC's interpretation on premium rate increases, as opposed to Conseco's "pivot method," was to *increase* net income for 2006.  (Id. at 111.)  Finally, only one of the items that Conseco had previously corrected through a cumulative adjustment involved the LTC business:  a $7.1 million understatement of reserves.  (Id. at 110.)  Significantly, Conseco did not restate its prior period financials with respect to its quarterly increases to the LTC reserves, including the $118 million increase in August 2007, because such adjustments had been proper at the time they were made.[12]  In short, Conseco's restatement was extremely modest, and largely unrelated to the LTC business.  The restatement provides no support for Plaintiff's claim of fraud.

---

[12] Plaintiff cannot seriously contend otherwise, as Conseco's auditors would have required a restatement of reserves amounts had they determined that Conseco's prior reserve estimates had not been stated in accordance with GAAP.  See SFAS No. 60 at ¶ 21 ("Changes in the liability for future policy benefits that result from [a company's] periodic estimation for financial reporting purposes shall be recognized in income in the period in which the changes occur."); SFAS No. 5 at ¶ 10 ("disclosure of the [loss] contingency shall be made when there is at least reasonable possibility that a loss or an additional loss may have been incurred") .

**The Multistate Examination and Congressional Inquiry**

Between July 9, 2007 and October 19, 2007, a group of state insurance regulators conducted a multistate examination of certain Conseco subsidiaries (the "Multistate Exam"). (SAC ¶¶ 148-50.)  Conseco disclosed the Multistate Exam to the public in its 2Q 2007 10-Q shortly after it had started:

> The states of Pennsylvania, Illinois, Texas, Florida and Indiana are leading a multistate examination of the long-term care claims administration and complaint handling practices of Conseco Senior Health Insurance Company and Bankers Life and Casualty Company . . . This examination commenced in July 2007.  More than 30 other states have joined or expressed an interest in joining the multistate examination.  This examination will cover the years 2005, 2006, and the first quarter of 2007.

(Ex. U at 28.)[13]  The SAC alleges that the Multistate Exam reported on Conseco's "bundling of claims" and "problems with Conseco's computer systems" (SAC ¶¶ 152-53), but fails to specify how such findings contradicted Conseco's disclosures or otherwise support an inference of fraud.

In May 2007, the House Committee on Energy and Commerce also asked Conseco for information.  (SAC ¶¶ 161-63.)  Again, Conseco promptly disclosed in its 10-Q this investigation and its compliance with Congress' requests:

> Conseco received a letter from the Congressional Committee on Energy and Commerce (the "Committee") dated May 23, 2007 indicating the Committee is conducting an investigation of companies that underwrite, market, and sell long-term nursing home and home health care insurance policies.  In that letter, the Committee requested various documents from Conseco with regard to long-term care insurance.  Representatives from Conseco subsequently met with the Committee staffers and reached an agreement on the scope of the documents requested.  Conseco responded to all agreed upon document requests by June 27, 2007.  Conseco intends to continue to fully cooperate with regard to this investigation.

---

[13] After the end of the class period, on May 7, 2008, the National Association of Insurance Commissioners announced a 40-state settlement pursuant to which Conseco paid a $2.3 million fine and agreed to invest in system upgrades and improved claims administration.  SAC ¶ 151.  Plaintiff's conclusory allegation that Conseco had known about the Multistate Exam well before it was started (¶ 148) is unsupported.

(Ex. U at 28.)

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Having now had an opportunity to attempt to cure its defects, Plaintiff's SAC is notable for what it did and did not change.  In response to Defendants' demonstration in their initial motion to dismiss that Conseco disclosed the problems it faced in the LTC business, Plaintiff has abandoned its initial (and false) claim that Conseco had told investors that "all was fine."  (Am. Compl. ¶ 98.)  In its place, the SAC now contends that Conseco committed fraud when it said that it was working on issues and "making progress as a corporate entity."  (SAC ¶ 115.)  But the SAC brings forward the same selective and excerpted quotes from Conseco's public disclosures as were included in the Amended Complaint.  These no more support Plaintiff's new theory than they did Plaintiff's abandoned theory.

Indeed, the SAC is notable in that it fails to add any significant new factual allegations. The few documents that it newly identifies do not demonstrate either the existence of any false statement or the existence of scienter.  In short, Plaintiff continues to allege a hodgepodge of misstatements and omissions, and essentially claims that almost everything Conseco said about its LTC business was fraudulent.  Although Plaintiff's allegations are unfocused and vague, they can be grouped into five categories: (1) operation of the LTC business; (2) remediation of the material weakness in internal controls; (3) reserves; (4) financial performance and operations; and (5) customer claims handling and supervision by regulatory agencies.

### 1.    Improvement of the LTC Run-off Business

Plaintiff asserts that Conseco misled investors to believe that Conseco was improving the LTC business, while Conseco was secretly seeking to sell or otherwise dispose of it.  (See, e.g., id. ¶¶ 207-08, 235-36, 247-48, 251-52.)  Plaintiff omits Conseco's repeated disclosures, in the very documents upon which it relies, that Conseco was considering transactions with respect to

its LTC business, including reinsurance as well as a possible sale or other disposition.[14]  Plaintiff also essentially ignores that Conseco repeatedly advised the public that its LTC business faced serious challenges and that improvement would take significant time.[15]  Indeed, Plaintiff's own allegations about internal Conseco documents contradict its core allegation and reflect that Conseco was working to make progress on various LTC initiatives.  (See, e.g., SAC ¶¶ 57-59, 86-87, 90, 97, 104, 105, 114, 130.)[16]

### 2.    Remediation of The Material Weakness in Internal Controls

Plaintiff alleges that, following Conseco's March 2007 disclosure of a material control weakness, Conseco misrepresented that it was actively engaged in the implementation of remediation efforts, misled investors as to the costs that would be required to remediate Conseco's problems, and failed to disclose that it allegedly was not willing to dedicate the resources required to correctly fix internal control deficiencies.  (See, e.g., id. ¶¶ 212(ii), 218-29, 239-50, 253-54, 258.)  But Conseco repeatedly disclosed that its remediation would take

---

[14] See Ex. J at 20 ("Q: What consideration have you given to reinsuring [the LTC block] and removing the earnings volatility from your ongoing earnings picture?"  Hohmann: "Well, I think we always look at all options for all of our business. . .") & 22-23 ( "Q: . . . [I]s there a point at which you look at the run-off block as something that can basically be, in one way or the other, separated from the rest of Conseco?"  Hohmann: ". . . certainly [there] would be some strategic alternatives, I think the implementation of them would be a question. . . .  While it's theoretically of interest and would be always of interest, I don't know that it's really something we could implement effectively.");  Ex. L at 11 & 13 (when asked how might Conseco divest the LTC business, Prieur responded that "everything is on the table").

[15] See, e.g., Ex. L at 2-3 (volatility and poor experience in LTC business) & 8 ("while improved performance in the LTC book is going to be a logical consequence of these actions I've described, it will take time to materialize"); P at 8 (LTC business volatility was likely to continue for a few more quarters as Conseco fixed its claims management); V at 6 ("turning around the LTC run-off business will take a few quarters, and we're likely to have volatility in reported earnings during this interim period").

[16] The allegations that (i) Conseco retained Milliman "to review the information utilized by Conseco in establishing reserves;" (ii) consultant Milliman issued a list of recommendations about "how to improve Conseco's actuarial science;" and (iii) at least some of the recommendations were admittedly implemented (SAC ¶ 130), affirmatively plead that Conseco was actively seeking to remediate problems in the LTC business.

significant effort and time, updated the public on its progress, and announced that it had engaged LTCG to take over many of the LTC-related functions.

### 3.    Reserves

Plaintiff makes a number of allegations regarding the calculation and appropriateness of the LTC reserves.  (See, e.g., id. ¶¶ 12, 191-92, 197-98, 201-02, 216-17, 239, 245-47, 278-83, 286-89.)  Plaintiff claims that Conseco failed to disclose that it lacked the "actuarial science" necessary to calculate reserves, did not have access to policy information, and did not maintain accurate or detailed claims data and, therefore, "did not have a reasonable basis to set reserves." (Id. ¶ 50; see id. ¶¶ 49-50, 61-62, 83-91, 102-09, 165(d), (i), & (j), 171, 173, 176, 178, 180, 183, 186, 190, 194, 196, 200, 206, 225, 238, 240, 248, 254, 258.)  Plaintiff contends that Conseco's $118 million LTC claims reserve increase resulted from these deficiencies and "was due to an artificial overstatement of the Company's pre-tax earnings during the first quarter of 2007 and periods prior to 2007 of $20 million and $98 million, respectively."  (Id. ¶ 263.)

Conseco, however, disclosed clearly (i) the actuarial intricacies and challenges in setting the reserves for its LTC business; (ii) that its reserves had been increased significantly in the past based upon adverse developments and changes in estimates; and (iii) that it hired outside actuaries to review its LTC reserves on a quarterly basis.  It also explained that the $118 million reserve increase in Q2 2007 reflected changes to assumptions based upon emerging trends in claims experience.  Notably, Plaintiff does not allege any basis for its conclusory assertion that this reserve increase demonstrated an overstatement of income for earlier periods.

### 4.    Financial Performance and Operations

Plaintiff broadly contends that Conseco's quarterly and full year financial results for 2Q 2005 through 3Q 2007 were fraudulently misstated, and that Conseco made misleading statements about those financials in its press releases, 10-Qs, 10-Ks, certifications, and analyst

calls during the class period.  (See id. ¶¶ 164-277.)  According to Plaintiff, the fact of the

restatement makes all of Conseco's statements about its financial results fraudulent.  (See id. ¶

261.)  As detailed above, however, the restatement in its entirety was very small, with both

favorable and unfavorable adjustments, and the restated items relating to the LTC business were

immaterial.

### 5.    Customer Claims Handling and Regulatory Examinations

Plaintiff alleges that Conseco made misleading statements about its customer claims

handling and examination by regulatory agencies.  (See, e.g., id. ¶¶ 166-69, 207-08, 211-12, 222-

23, 232-33, 239-41, 247-50.)  Plaintiff alleges that many of Conseco's public statements were

misleading because it failed to disclose that it allegedly delayed or eliminated customer claims,

compensated and rewarded employees for denying claims, manipulated claim ratios through

"bundling," did not comprehend the terms of its insurance policies, and omitted the true nature or

extent of these problems.  (See id. ¶¶ 165(e)-(h), 171, 173, 176, 178, 180, 183, 186, 190, 194,

196, 200, 206, 212(i), 225, 238, 240, 248, 254, 258.)

These allegations are belied by Conseco's disclosures discussing its LTC claims-handling

and technological challenges.[17]  Plaintiff's claim that Conseco misstated in March 2007 that it

did not expect regulators to take any actions against it (id. ¶¶ 222-23) also contradicts the

allegation that the Multistate Exam was conducted later in 2007 and that it was promptly

---

[17] See, e.g., Ex. D at 29 (challenges from combining operations of numerous insurance
subsidiaries acquired in the late 1990s); L at 8 ("you can see that we have launched several IT
related initiatives to better support the LTC operation and improve claims management . . . we
continue to address deficiencies in the historically acquired platforms through manual processes .
. . we have retained LifePlans to attack claim leakage . . . we have asked a major actuarial
consulting firm, Milliman, to review our claims information to ensure that we capture and share
all of the qualitative, as well as quantitative, information that would be helpful with establishing
our claim reserves").

disclosed to the public.[18]

**Plaintiff's Allegations Based On Confidential Witnesses**

A number of Plaintiff's allegations are based on purported information provided by five confidential witnesses (the "CWs"), former employees who are described as follows:

- CW1, a Director and Vice President, was responsible for auditing and monitoring key risk areas, and directly reported to the Chief Compliance Officer, who reported to "senior executives."  (Id. ¶ 36.)
- CW2, a Director and Vice President, "worked closely with, and participated in many meetings with" Defendant Wells, and was "directly involved" with the implementation of software projects and with Conseco's closed block LTC business. (Id. ¶ 37.)
- CW3, a "VP of Financial Operations," reported to Conseco's CEO, and was involved in performing internal audits and administering financial systems.  (Id. ¶ 38.)
- CW4, an Internal Auditor, reported to Conseco's CEO.  (Id. ¶ 39.)
- CW5, an actuary, participated in "regular meetings" with "Conseco executives," was "directly involved" with the setting of reserves, and is "knowledgeable about the numerous problems at Conseco."  (Id. ¶ 40.)

Plaintiff does not allege the CWs' specific dates of employment or the locations or sectors in which they worked.  The SAC is also almost completely devoid of any allegations of specific interactions of any CW with particular Individual Defendants.  It is not even clear whether any CW actually worked in the LTC business.  Although Plaintiff purports to attribute much to the CWs, the CW allegations are consistently vague and often contradict Plaintiff's other allegations.

**Plaintiff's Scienter Allegations**

As for scienter, the SAC clumps the Individual Defendants together, and conclusorily alleges that the Individual Defendants were privy to confidential and proprietary information concerning Conseco's operations, and had general access to material adverse non-public information.  (See, e.g., id. ¶¶ 24-28, 306-07.)  Plaintiff repeatedly alleges that "Defendants" "knew," "were aware of," or "recklessly disregarded" facts that it claims were omitted from

---

[18] Plaintiff offers no factual allegations supporting its illogical contention that Conseco knew about the Multistate Exam "well before it was started."  Id. ¶ 148.

public disclosures, without any particularized basis for such allegations.  (See id. ¶¶ 6, 24, 61, 64, 66, 92, 106, 110, 111, 118, 119, 126, 160, 165, 188, 198, 213, 217, 219, 223, 226, 228, 231, 243, 246, 250, 262, 279, 283, 285, 286, 288, 291, 301, 302, 306.)  In the few instances when the Individual Defendants are mentioned by name, the allegations lack factual basis and are unspecific as to the particular Defendant's involvement in the alleged meeting or issue.[19] Moreover, there is not one single allegation regarding Defendant Dubes other than the identification of his corporate title.  (Id. ¶ 22(c).)[20]

Plaintiff's allegations concerning internal Conseco documents do not support a conclusion that any Individual Defendant reviewed or even had access to information contradicting Conseco's public disclosures.  (See id. ¶¶ 57-59, 86-87, 90, 97, 104-105, 110, 114, 130, 160, 214, 241(d).)  They simply assume that the Individual Defendants had access to and/or knowledge of internal Conseco documents based solely upon their positions at Conseco.  (See, e.g., id. ¶¶ 6, 24.)

Significantly, Plaintiff does not allege that any Individual Defendant had any personal financial (or other) incentive to mislead the public as to Conseco's financial health or future.  Nor does Plaintiff allege any stock sales by the Individual Defendants during the class period.  Indeed, several of the Individual Defendants actually *increased* their holdings during the class period.  (See Exs. BB at 2; CC at 2; DD at 2; EE at 2; FF at 3.)

---

[19] See, e.g., SAC ¶¶ 81 ("Conseco executives, including Defendant Wells, . . . were all 'very aware' of these bundling issues"); 106 ("CEO Bill Shea and Defendant Hohmann were involved in this decision [to cancel the Genelco Project]"); 113 ("CW5 participated in quarterly meetings with senior personnel in Conseco's Finance and Actuarial Departments, including Defendant Bonach, where lots of data issues were discussed."); 115 ("each individual who held the position of CEO, including Defendants Prieur and Kirsch, held and participated in meetings in the War Room"); 198 ("Defendant Bullis knew or recklessly disregarded that Conseco manipulated data that impacted the loss ratio and Conseco was unable to accurately calculate reserves").

[20] Notably, Mr. Dubes was President of Conseco Insurance Group, which had nothing to do with the LTC business.  See SAC ¶ 22(c); Ex. A at 3.

## ARGUMENT

Because the SAC purports to allege securities fraud, it must satisfy the heightened

pleading standards mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA.  See

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); ATSI Commc'ns Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ("private securities fraud actions must also meet the

PSLRA's pleading requirements or face dismissal"); Lentell v. Merrill Lynch & Co., 396 F.3d

161, 168 (2d Cir. 2005) (Rule 9(b) "is applied assiduously to securities fraud.  This Circuit's

strict pleading requirements in securities-fraud cases . . . were (essentially) codified in the

[PSLRA].").[21]  The SAC does not meet these stringent pleading requirements.

## I.    PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED.

### A.    The SAC Does Not Plead Scienter.

To plead a Section 10(b) claim, a plaintiff must show that defendants acted with scienter,

"a mental state embracing intent to deceive, manipulate, or defraud."  Tellabs, 551 U.S. at 319.

A complaint must be dismissed unless it pleads "with particularity facts giving rise to a strong

inference" of scienter (15 U.S.C. § 78u-4(b)(2)) and "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged."  Tellabs, 551 U.S. at 324.  Thus, "a court must consider plausible

nonculpable explanations for the defendant's conduct, as well as inferences favoring the

plaintiff."  Id. at 323-24.  A plaintiff can plead the requisite strong inference of scienter "(a) by

alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

---

[21] Courts need not credit conclusory or unsupported factual assertions, or factual allegations that
are "contradicted either by statements in the complaint itself or by documents upon which its
pleadings rely, or by facts of which the court may take judicial notice."  In re Livent, Inc.
Noteholders Sec. Litig., 151 F. Supp. 2d 371, 404, 405-06 (S.D.N.Y. 2001).

recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).  The inference of scienter

must be strong and "at least as compelling" as any competing inference.  Teamsters Local 445

Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008).  Here, the

SAC does not plead a strong inference of scienter.

### 1.   Plaintiff's Allegations Of Fraud By Hindsight Do Not Plead A Strong Inference Of Scienter.

Plaintiff's claims are constructed around two false premises:  that, because Conseco

significantly increased its LTC claims reserves in August 2007, Defendants must have known

that earlier reserves had been too low; and that, because Conseco restated its financial results in

March 2008, Defendants must have known, at the time of original reporting, that its financials

were inaccurate.  Thus, Plaintiff claims, Conseco's problems must have been worse than

represented and Defendants must have defrauded the public.  This is classic fraud by hindsight.

Plaintiff alleges that Defendants lacked a basis (i) for their statements about Conseco's

LTC business and (ii) to set reserves.  This claim of fraud is largely based upon the fact that

Conseco restated its financial statements in March 2008.  But Conseco's restatement was very

modest in nature, and Conseco did not restate its prior period financials with respect to the

periodic increases to the LTC reserves (other than the *de minimis* $7.1 million reserve increase

that Conseco disclosed in its 2006 10-K).  Taken as a whole, Plaintiff's allegations amount at

most to allegations of corporate mismanagement and the quintessential "fraud by hindsight" that

courts have routinely rejected as a basis for a securities fraud complaint.  See Stevelman v. Alias

Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("arguments with regard to accounting

irregularities and overly optimistic disclosures, by themselves, appear to amount to allegations of

'fraud by hindsight'"); Acito v. Imcera Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere

allegations that statements in one report should have been made in earlier reports do not make

out a claim of securities fraud"); In re Loral Space & Commc'ns Ltd. Sec. Litig., 2004 WL

376442, at *13 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.) ("'[M]isguided optimism is not a cause of

action, and does not support an inference of fraud.  We have rejected the legitimacy of alleging

fraud by hindsight'").[22]

Indeed, a failure "to identify problems with the defendant-company's internal controls

and accounting practices does not constitute reckless conduct sufficient for [§] 10(b) liability."

Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).  Allegations of restatements, failures to

comply with GAAP, and material control weaknesses are similarly insufficient.  Id.; In re

DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 573-74 (S.D.N.Y. 2007) (scienter not alleged

despite allegations of material control weaknesses and a restatement that was not large); In re

Hudson Techs., Inc. Sec. Litig., 1999 WL 767418, at *5 (S.D.N.Y. Sept. 28, 1999) (Koeltl, J.)

(GAAP violations and restatement insufficient to allege scienter).

Courts in this Circuit have likewise routinely dismissed allegations of scienter based upon

increases in reserves.  See, e.g., Stevelman, 174 F.3d at 84-85 (allegations that the defendant

violated GAAP by failing to establish greater reserves insufficient); In re CIT Group, Inc. Sec.

Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) ("That defendants later decided to revise the

amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for

concluding that defendants did not think reserves were adequate at the time."); In re MSC

Industrial Direct Co., 283 F. Supp. 2d 838, 849 (E.D.N.Y. 2003) (scienter not alleged with

respect to reserve manipulation claims).[23]

---

[22] See Santa Fe Indus. v. Green, 430 U.S. 462, 479 (1977) ("Congress by [§] 10(b) did not seek
to regulate transactions which constitute no more than internal corporate mismanagement.").
[23] See also Miller v. Champion Enters., Inc., 346 F.3d 660, 687-89 (6th Cir. 2003) (rejecting as
fraud by hindsight allegations about setting of reserves).

**2.     Plaintiff's Allegations Based On Confidential Witnesses Do Not Plead A Strong Inference Of Scienter.**

a.     The CWs do not allege contact with the Individual Defendants.

Where allegations are based on confidential witnesses, the witnesses must be "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" in order to support the requisite strong inference of scienter.  In re Loral Space, 2004 WL 376442 at *11.[24]

Plaintiff's description of the CWs does not support that they would possess the information alleged.  The SAC does not allege the dates of the CWs' employment, the business unit in which they worked, or even whether they worked in the LTC business, much less describe interaction with the Individual Defendants.  See Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009) (discounting witness allegations where complaint did not allege dates of employment, job description, employment location/sector, or interaction with defendants).  Further, the CWs do not appear to have been in positions where they would have had sufficient access to the Individual Defendants to possess information about their knowledge of the allegedly omitted facts.  For example, CW1 did not report directly to (or even work with) any senior executive or Individual Defendant.  (See SAC ¶ 36.)  CW1's lack of contact with the Individual Defendants renders not credible his/her contentions regarding the Defendants' purported knowledge.

Plaintiff's allegations with respect to CW2 are likewise deficient.  Although CW2 is vaguely described as "work[ing] closely with . . . and participat[ing] in many meetings with[] Defendant Wells" (id. ¶ 37), s/he is not described as either reporting to Wells, or even reporting to someone who reported to Wells.  Nor did CW2 have access to any other Individual Defendant.

---

[24] See New York State Teachers' Ret. Sys. v. Fremont Gen. Corp., 2010 WL 1473265, at *2 (C.D. Cal. Mar. 29, 2010) (witness' position not linked to any personal knowledge that would indicate scienter).

CW2 conclusorily alleges that daily meetings began in the War Room "where the question 'What the h*** are we going to do?' was often asked in response to some new development involving LTC" (id. ¶ 115), but the claim that CW2 "worked closely" or "participated in many meetings" with Wells does not support an inference that CW2 would have known that Wells (or any other Defendant) had knowledge of facts rendering any of Conseco's public statements misleading.  If anything, the allegations demonstrate that CW2 does *not* know what Wells knew, because CW2 does not reference any specific discussions with Wells, statements by Wells, or facts concerning Wells' access to information contradicting Conseco's public statements.  Cf. In re American Express Co. Sec. Litig., 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) ("None of the confidential sources specifically states that any Individual Defendant had information or access to information . . . that contradicted the Company's statements."); In re Bausch & Lomb, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008) (neither confidential source stated that any defendant had direct contradictory information or access to such information).

Plaintiff's descriptions of the remaining CWs are similarly deficient.  CW3, for instance, is alleged to have reported to CEOs (SAC ¶ 38), but it is unspecified as to whom, when, where, and on what subjects.  Moreover, CW3 makes no allegations about any of the Individual Defendants or their knowledge with respect to Conseco's public statements.  (See, e.g., id. ¶ 99 (alleging that CW3 had discussions with "a lot of people").)  Plaintiff's descriptions of CW4 and CW5 also are devoid of allegations about their contact with the Individual Defendants or other individuals responsible for Conseco's financial reporting or disclosures.  (See, e.g., ¶ 39 (failing to allege that CW4 reported to or worked with any senior executive or Individual Defendant); ¶ 40 (not identifying a single senior executive with whom CW5 is claimed to have worked).) Neither CW4 nor CW5 is the source of a single allegation regarding the Individual Defendants or

anyone in Conseco senior management.

        b.      The CW allegations are vague and conclusory.

Vague statements by a confidential witness alleging that defendants knew or were aware of problems within a company "cannot support an inference of scienter, much less a 'strong inference.'" In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (disregarding confidential witness allegations); see In re IAC/InterActiveCorp Sec. Litig., 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) ("sketchy" and "uncorroborated" confidential witness allegations "d[id] not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible"); New York State Teachers' Ret. Sys., 2010 WL 1473265, at *2 (confidential witness's vague statements not indicative of scienter).  In In re Loral Space, 2004 WL 376442, at *11, this Court found that a confidential witness' conclusory statement that defendants knew certain projections were unrealistic was not specific enough to raise a strong inference of fraudulent intent.  As this Court explained:

> To plead scienter, the information alleged to be contradictory must suggest that the defendants knew, or were reckless in not knowing, that the subscriber projections were false or without any reasonable basis. . . . The plaintiffs also do not allege that the unnamed Globalstar manager ever stated that the projections could not be achieved by the end of 2000. While the plaintiffs conclusorily allege that the defendants knew that the delay in rolling out gateways made the subscriber projections unrealistic, they provide no factual basis for that assertion.

Id.

The facts and holding of In re Elan Corp., 543 F. Supp. 2d at 204-05, are also instructive. In Elan, plaintiffs offered statements by several witnesses suggesting that the defendant knew or should have known, but did not reveal, that its drug caused an unintended side effect.  The court rejected one CW's statement that "senior management was aware . . . that [the drug] left patients 'vulnerable' to opportunistic infections" because the statement was "far too vague with respect to

what information was actually communicated and what conclusions any defendant actually reached."  Id. at 220.  Another CW's statement that "Defendants were aware of any concerns relating to the clinical trials" was also rejected as too vague.  Id. at 221.

The CW allegations here are just as amorphous.  CW1 states that "material weaknesses in internal controls were brought to the attention of *Conseco management*," and that "a recommendation to remediate problems through the development of a 'procedures manual' was flatly rejected by *Conseco executives*."  (SAC ¶ 126 (emphasis added).)  CW2 claims that "there were conversations among Conseco personnel '*all the time*' that there were problems with Conseco's financial statements," that "Conseco's *top management knew* about the problems with the data but refused to address the problems in a meaningful fashion," and that "CW2 was often alarmed at how *Conseco management* chose to address and disclose certain matters because they misrepresented facts to investors."  (Id. ¶¶ 110, 118, 140 (emphasis added).)

The statements attributed to the other CWs are equally vague and conclusory.  CW3 states that s/he "discussed with '*a lot of people*' in Conseco's corporate accounting department that accounting information being reported to investors was not correct," and that "numerous reports provided to *senior executives* of the Company mentioned the significant problems with LTC and indicated that Conseco was 'under-reserved' and 'the expenses [of Conseco] had been underestimated.'"  (Id. ¶¶ 99, 121 (emphasis added).)  CW4 states that "[t]he results of [internal audit's] detailed audit [of Conseco's LTC business] were submitted to the Company's audit committee of the board of directors"  (Id. ¶ 123), but does not elaborate as to the substance of the purported audit report, who received it, or whether Conseco's actions or public statements were in any way inconsistent with it.  CW5 likewise claims that s/he "participated in quarterly meetings with senior personnel in Conseco's Finance and Actuarial departments, including

Defendant Bonach, where *'lots of data issues' were discussed*." (Id. ¶ 113 (emphasis added).)

These allegations attribute no specific knowledge or action to the Individual Defendants. They do not specify with particularity *what* information any Defendant knew, or *when* and *how* the Defendants acquired that knowledge. Such allegations do not support an inference of scienter. See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (witness reports that problems were "well known" to management team were insufficient); see Konkol, 590 F.3d at 400-01 (rejecting witness claims that practices were "obvious" and "openly known").

Likewise, the CW allegations concerning purported meetings and reports (e.g., SAC ¶¶ 112-15, 118, 120, 121, 126) are "so vague as to be meaningless, because [they] contain[] . . . no information regarding how extensively or in what manner the reports were discussed." In re Doral Financial Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008); see In re American Express, 2008 WL 4501928 at *7. Plaintiff's allegations, newly added to the SAC, concerning purported internal documents do not state that any Individual Defendant received or reviewed them, let alone discussed them.

c.      The CW allegations are contradictory.

Where confidential witness allegations of a defendant's knowledge of purported fraud contradict other witness statements, such inconsistencies also "severely undermine the reliability of the confidential witnesses and, as a result, are insufficient to support a finding of scienter." In re Downey Sec. Litig., 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (discounting allegations where different witnesses made contradictory statements); see Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc., 2009 WL 4282940, at *13 (S.D. Ind. Dec. 1, 2009) ("inconsistent, uncorroborated, and vague" witness allegations did not support inference of knowledge).

Plaintiff's CW allegations contain a number of significant inconsistencies that seriously

31

undermine them.  For instance, CW1 and CW2 make contradictory allegations concerning management's involvement in remediating weaknesses identified in the LTC business. According to CW1, during the class period Conseco "dedicated an entire conference room known as the 'War Room' solely for discussing the multiple and serious problems with LTC." (SAC ¶ 112.)  Likewise, CW2 states that "throughout the Class Period until December of 2006, each individual who held the position of CEO, including Defendants Prieur and Kirsch, held and participated in meetings in the War Room - on a daily basis - to discuss problems in LTC."  (Id. ¶ 115.)  These allegations directly contradict the contentions by these very same CWs that other managers attempted to ignore LTC problems.  (Compare id. ¶ 120 with ¶ 126.)

The CWs make similarly contradictory statements regarding the extent to which outside auditors were aware of the issues affecting Conseco's LTC business.  CW1's allegation that "Defendants hid many of the problems from its outside auditors" who "did not examine . . . problems with the handling of claims by Conseco" (id. ¶ 119) is contradicted by CW2's statement that Conseco had worked closely with other independent consultants, including Deloitte & Touche, Long Term Care Group, and Milliman, who, according to Plaintiff, were well aware of Conseco's problems (id. ¶ 128-30).  Indeed, these consultants were retained specifically to assist Conseco in addressing those problems.  (Id.)  CW4's allegations also conflict.  His/her claim that "during the Class Period, Conseco's internal audit staff 'were not welcomed' by the managers of Conseco's various departments" (id. ¶ 141) is completely inconsistent with his/her claim that "internal Conseco auditors performed a detailed audit lasting approximately nine months and developed 'a real handle on what was going on and knew the nuts and bolts' of the problems with the LTC segment" (id. ¶ 123).  Such contradictory statements plainly "undermine the reliability of the confidential witnesses," and should be

discounted.  In re Downey, 2009 WL 2767670, at *10.[25]

### 3.     Plaintiff Does Not Allege Any Motive.

"[A]llegations of motive are sufficient if they 'entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.'  The plaintiffs 'must assert a concrete and personal benefit to the individual defendants resulting from the fraud.'  Motives generally possessed by most corporate directors and officers do not suffice."  In re Loral Space, 2004 WL 376442, at *6.  Allegations of "a type of benefit that most corporations and insiders seek" are legally insufficient.  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) (desire to increase stock prices, earn bonuses, and reduce credit exposure did not establish motive).

Plaintiff has not come close to pleading motive.  Plaintiff alleges no concrete or personal benefit to any Individual Defendant.  There are no allegations of extraordinary salary or bonus payments to, nor any stock sales by, any Individual Defendant.  Indeed, several of them *increased* their holdings of Conseco stock during the class period.  (See Exs. BB at 2; CC at 2; DD at 2; EE at 2; FF at 3.)  This "'suggest[s] the absence of any nefarious motives.'"  In re Sec. Capital Assurance, Ltd. Sec. Litig., 2010 WL 1372688, at *24 (S.D.N.Y. Mar. 31, 2010); see Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("CIBC") ("It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings").

Moreover, Plaintiff's conclusory allegations that senior management "deliberately

---

[25] See also In re Silicon Storage Tech., Inc., Sec. Litig., 2007 WL 760535, at *26 (N.D. Cal. Mar. 9, 2007) (allegations that defendant kept secret information were inconsistent with allegations that the information was "talked about openly").

misled" investors and that Defendants "phased" their disclosures and prepared in advance for the quarterly analyst conference calls (SAC ¶¶ 7-9, 125, 139-40, 227, 241(d)) do not constitute allegations of any concrete or personal benefit to any Defendant.  Indeed, it is hard to imagine that the executives of any public corporation would not prepare prior to issuing disclosures or making public statements.

Similarly, Plaintiff's contention that Defendants were supposedly downplaying problems in the LTC business because they sought to sell it is both plainly false in light of Conseco's extensive disclosure of problems with the LTC business[26] and insufficient as an allegation of motive to commit securities fraud.  See In re Loral Space, 2004 WL 376442, at *6 ("generalized motives . . . do not suffice to establish scienter").  A goal to sell successfully a portion of a company is not a legally sufficient motive because it is "a type of benefit that most corporations and corporate insiders seek."  In re JP Morgan Chase, 363 F. Supp. 2d at 620; see Kalnit, 264 F.3d at 141 ("the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired"); AOL Time Warner Sec. and ERISA Litig., 2004 WL 992991, at *15 (S.D.N.Y. May 5, 2004) (rejecting generalized allegations of motive to inflate stock price to effectuate a merger).

### 4.    Plaintiff Does Not Allege Conscious Misbehavior Or Recklessness.

Nor does the SAC allege conscious misbehavior or recklessness.

> [P]laintiffs can plead scienter based on recklessness when they "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements."  In some cases, recklessness can be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful. . . ."  In any event, the facts alleged must be sufficiently strong circumstantial

---

[26] Conseco's public statements clearly belie this "motive."  As discussed above, the LTC business was a run-off block of business with well-publicized, significant operational and profitability issues.  Plaintiff's intimation that Conseco could or would try to pull the wool over the eyes of a potential buyer of this business is illogical and unsupported.

evidence of the alleged recklessness that the alleged facts give rise to a strong
inference of fraudulent intent.

In re Loral Space, 2004 WL 376442, at *8 (citing Second Circuit cases).  Where the plaintiff has

pleaded no motive for the alleged fraud, as here, the allegations of conscious misbehavior or

recklessness must be even stronger.  Kalnit, 264 F.3d at 142.  Plaintiff has not alleged facts

establishing conscious misbehavior or recklessness by the Defendants.[27]

> a.   The existence of a restatement does not constitute strong
>       circumstantial evidence of conscious misbehavior or recklessness.

Plaintiff's reliance on Conseco's restatement as evidence of conscious misbehavior or

recklessness is misplaced.  The law is clear that a failure "to identify problems with the

defendant-company's internal controls and accounting practices does not constitute reckless

conduct sufficient for § 10(b) liability."  Novak, 216 F.3d at 309.  Allegations of failure to

comply with GAAP also do not establish recklessness.  See, e.g., id.; In re Hudson Techs., 1999

WL 767418, at *5 (GAAP violations and restatement insufficient to allege scienter); Stevelman,

174 F.3d at 84-85 (allegations that defendant violated GAAP by failing to establish greater

reserves and restated its financials did not plead scienter); In re DRDGOLD Ltd., 472 F. Supp.

2d at 573-74 (allegations of material control weaknesses and restatement insufficient).[28]

---

[27] Allegations that Defendants Kirsch, Bullis and Prieur signed certifications as required by the
Sarbanes-Oxley Act (see SAC ¶¶ 187, 230) do not support an inference of scienter.  See, e.g., In
re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) (certification
not probative of scienter where no allegation that defendants possessed or had access to specific,
contemporaneous information that contradicted public statements).

[28] See also In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 566-68 (S.D.N.Y. 2004)
(allegations of conscious misbehavior and recklessness based on accounting errors insufficient);
Horizon Asset Mgmt Inc. v. H & R Block, Inc., 580 F.3d 755, 763-64 (8th Cir. 2009)
(allegations of accounting and internal control issues leading to restatements insufficient where
management promptly disclosed its control weaknesses).

   b. Plaintiff's allegations are too vague to constitute strong
     <u>circumstantial evidence of conscious misbehavior or recklessness.</u>

   Plaintiff's allegations regarding the Defendants' states of mind are vague and conclusory and thus cannot constitute strong circumstantial evidence of conscious misbehavior or recklessness.  The SAC impermissibly clumps the Defendants together and contains no specific facts demonstrating that any Individual Defendant knew of contrary information at the time of the alleged misstatements.  As discussed, the CW allegations are insufficient, and Plaintiff's conclusory assertion that Defendants "knew" public statements were false is entitled to no weight.  <u>See</u> <u>Coronel v. Quanta Capital Holdings Ltd.</u>, 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009) ("because the Complaint alleges no specific facts demonstrating that Defendants possessed . . . information contradicting their statements, fraud has not been shown"); <u>Malin</u>, 499 F. Supp. 2d at 141 (sources' statements that accounting deficiencies were well known were insufficient to establish scienter: "none . . . present any evidence that they communicated . . . the alleged problems . . . to any of the Individual Defendants or that the [they] knew about [them]").

   Plaintiff's scattered references to documents purportedly contradicting Conseco's public statements also do not support conscious misbehavior or recklessness.  "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  <u>Novak</u>, 216 F.3d at 309; <u>see</u> <u>Teamsters Local 445</u>, 531 F.3d at 196 (same).  With respect to several of the documents cited, Plaintiff does not identify the titles, dates, authors, or recipients of documents, nor does Plaintiff identify in any particularized fashion what the purported documents state.[29]  Such vague allegations consistently have been

---

[29] <u>See</u>, <u>e.g.</u>, SAC ¶ 60 ("Conseco documents generated during the summer of 2006 listed numerous material deficiencies in Conseco's LTC group . . ."); ¶ 121 ("numerous reports provided to senior executives of the Company mentioned the significant problems with LTC and indicated that Conseco was 'under-reserved' and 'the expenses [of Conseco] had been

                            *(cont'd)*

rejected.  See, e.g., In re Loral Space, 2004 WL 376442, at *10 ("Because the plaintiffs have not

alleged with sufficient particularity the nature, the content, the reliability, or the availability of

the allegedly contradictory internal reports, the allegations concerning this information do not

provide sufficient circumstantial evidence to raise a strong inference of the defendants'

fraudulent intent"); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris

Cos., Inc., 75 F.3d 801, 812-13 (2d Cir. 1996) ("general claim of the existence of confidential

company sales reports that revealed the larger decline in sales" was insufficient).

Even where Plaintiff's allegations provide the title and description of specific documents

that purportedly discuss particular problems, Plaintiff nonetheless does not allege that any

Individual Defendant reviewed or had access to any particular document.  (See SAC ¶¶ 57-59,

86-87, 90, 97, 104-105, 110, 114, 130, 160, 214, 241(d).)  Rather, Plaintiff alleges only that these

documents "were provided to senior Company executives" and that "the Individual Defendants

had access to . . . internal corporate documents . . . reports and other information provided to

them in connection therewith."  (See id. ¶¶ 6, 24.)  Such allegations, based merely on

Defendants' corporate positions, are insufficient because Plaintiff must provide "specific

allegations that show the Defendants' knowledge of information contradicting their statements."

Ashland Inc. v. Morgan Stanley & Co., Inc., 2010 WL 1253932, at *12 (S.D.N.Y. Mar. 30,

2010); see In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527, 550 (S.D.N.Y. 2007) ("plaintiffs

[have] the burden of alleging that defendants had knowledge of specific facts or documents").

Similarly inadequate is Plaintiff's allegation that Defendant Wells attended a "LTC

Closed Block off-site retreat" for which a "LTC Claims Support Department document" was

---

underestimated.'"); ¶ 241(d) ("Defendant Wells received weekly updates regarding the status of
[the accumulator] project's scope, definition, and timeframe that described the problems with the
project.").

prepared.  (SAC ¶ 114.)  Not only does Plaintiff fail to specify what public disclosure this

supposed document contradicted, Plaintiff does not even allege that this document was presented

or disseminated at the retreat, let alone to Wells.  Nor does Plaintiff allege any other facts

demonstrating that Wells had any knowledge of the contents of this purported document.

Plaintiff's vague allegations of meetings and conversations fare no better.  Plaintiff does

not allege which (if any) Individual Defendants participated in any particular meetings or

conversations, what (if anything) they stated, who the other participants were, or what in

particular was discussed.  (See, e.g., ¶¶ 67, 71, 74, 110, 113, 115, 118, 126, 139, 241(d), 289.)[30]

Such allegations are plainly insufficient.  See, e.g., In re 2007 Novastar Fin., 2008 WL 2354367,

at *4 (dismissing complaint where plaintiff did not explain how alleged meetings alerted

defendant that public statements were false because conduct such as attending meetings is

"normal and expected, and does not indicate fraudulent intent").[31]

> c.   Conseco's repeated disclosures of the difficulties with its
>      LTC business and Plaintiff's allegations regarding internal
>      Conseco documents make the inference of non-fraudulent intent
>      <u>far more compelling than any inference of scienter.</u>

In assessing scienter, the Court is to consider the allegations and Conseco's actual

disclosures in their totality.  For this case to proceed, the inference of scienter must be both

---

[30] Notably, the SAC includes no additional information regarding the meetings and conversations that were alleged in the first amended complaint – no doubt because there is no such information that would support Plaintiff's claims.  As explained above, the new allegation regarding the "LTC Closed Block off-site retreat" (id. ¶ 114) does not provide any information concerning any meetings or discussions at the retreat, let alone involving any Defendants.

[31] See also McCasland v. FormFactor Inc., 2009 WL 2086168, at *5 (N.D. Cal. July 14, 2009) (finding insufficient allegations that defendants attended regular meetings at which a project was discussed because the complaint did not allege that any confidential witnesses provided any specific information to defendants or that defendants received any such information from any other source); Ong ex rel. Ong v. Sears, Roebuck & Co., 2005 WL 2284285, at *23 (N.D. Ill. Sept. 14, 2005) ("Plaintiffs once again fail to identify a single meeting that these Defendants attended, much less the specific information they purportedly reviewed at those meetings.").

strong and at least as compelling as any opposing inference of non-fraudulent intent.  Thus, in In re Loral Space, supra, at *8-12, this Court concluded that there was no sufficient basis for an inference of scienter based on the totality of the allegations of the complaint.  This Court considered not only the vague and unsupported allegations of internal documents and meetings, but also the full content of the company's disclosures, which undercut plaintiffs' allegations of fraud.  Id.[32]  The same conclusion is warranted here.

As detailed above, Conseco's public filings and the statements that Plaintiff claims were fraudulent in fact disclosed the following:

- Conseco had ceased selling new policies in the LTC business because the financial results had been poor.
- Conseco had, in the past, substantially increased its reserves for the LTC business because of adverse claims experience.
- Conseco necessarily used a number of estimates to calculate the appropriate level of reserves, and it therefore underscored how small changes in those estimates could cause changes to the reserves.
- Conseco regularly during the class period increased the reserves for the LTC business as new calculations showed the need.
- Conseco used external actuaries on a quarterly basis to assist with its LTC reserves.
- Conseco strengthened its LTC claims reserve by  $118 million in August 2007 in order to reflect changes to assumptions based upon emerging trends in its claims experience.
- Conseco had significant operational issues with respect to its LTC business because it had acquired those businesses from multiple companies in the late 1990s.
- Conseco made ongoing capital infusions into CSH because of its poor performance and substantially weakened financial condition.
- Conseco would consider a sale or other disposition of the LTC business.
- A material control weakness had been identified and a remediation process was underway.
- Conseco undertook various steps to improve the operations of the LTC business.
- Conseco hired LTCG to take over a number of the functions of the LTC business.
- The existence of the Multistate Examination and the Congressional inquiry promptly after their commencement.

---

[32] See PXRE Group, LTD., Sec. Litig., 600 F. Supp. 2d 510, 534 (S.D.N.Y. 2009) (finding inference that defendants "simply failed in their various models and internal mechanisms to calculate accurately the full extent of losses … more compelling than plaintiff's purported inference of scienter").

- A restatement that was very modest in amount, that included positive as well as negative adjustments, and of which only a trivial amount related to the LTC business.

In fact, Conseco's disclosures, viewed in context, preclude an inference of scienter.

Moreover, Plaintiff's allegations, newly added to the SAC, about internal Conseco documents confirm that the inference of non-fraudulent intent is far more compelling than any inference of scienter.  These allegations, taken as true, reflect that Conseco was working to make progress on various LTC initiatives.  For instance, although Plaintiff claims that Conseco erred by not implementing steps recommended by consulting firm Deloitte, the fact that Deloitte was retained to recommend steps to address the problems across Conseco's business lines, and made presentations to that effect, if anything, supports a conclusion that Conseco was working to address its problems.  (See SAC ¶¶ 57-59.)  The alleged documents concerning problems resulting from the lack of a central policy repository (id. ¶¶ 86-87, 90), the potential Genelco project (id. ¶¶ 104-05), and the status of the accumulator project (id. ¶ 97) also demonstrate that Conseco was addressing its challenges.[33]  Plaintiff also affirmatively pleads that Conseco engaged the consulting firm Milliman to assist in the establishment of reserves.  (Id. ¶ 130.) Although Plaintiff alleges without any support that Conseco failed to implement most of Milliman's recommendations, there is no allegation that Milliman ever expressed any disagreement with the reserves that Conseco set.  (Id.)  These allegations cannot support an inference of fraud, as it would defy logic for Defendants to engage experts to review Conseco's reserves if they were engaged in a fraudulent scheme to conceal these issues.

---

[33] For example, according to Plaintiff, the "Accumulator Product Information System" document states that the "Create Plan Map/Set-up Tables" task was 11% complete (id.), undoubtedly reflecting initial progress.

**B.     The Alleged Misstatements And Omissions**
        **Relating To Reserves Are Not Actionable.**

Plaintiff's allegations concerning Conseco's LTC reserves are also not actionable for

several additional reasons.  First, notwithstanding Plaintiff's repeated reference to "actuarial

science," Conseco was clear at all times that its reserves were based on actuarial *estimates*.  The

reserves, therefore, are akin to projections and predictions, which cannot form the basis of a

fraud claim absent allegations that they were knowingly false when made.  See Zirkin v. Quanta

Capital Holdings, Ltd., 2009 WL 185940, at *11 (S.D.N.Y. Jan. 23, 2009) ("any hint of falsity in

the initial estimate is belied by the fact that insurance reserves established for losses that have

been incurred but not yet reported to an insurance company are, by their nature, 'extremely

conjectural, and may need adjustment as time passes and their accuracy can be tested in

retrospect'"); Malin, 499 F. Supp. 2d at 146 ("the process of estimating loss reserves is a difficult

one, and even following these accounting policies might not result in adequate loss reserves . . .

Plaintiffs must provide evidence of fraud, aside from the mere fact of the loss reserve increases,

to prevail").  Reserve determinations are not false unless there was no good faith basis for them

*at the time they were made*.  See Malin, 499 F. Supp. 2d at 148 (no allegation that reinsurance

reserves were inaccurate at the time reported); Zirkin, 2009 WL 185940, at *11 ("no allegation

that estimate of losses was a material untruth at the time it was made).[34]  Plaintiff here has not

plausibly alleged that Conseco's LTC reserves were false when made.  Indeed, Conseco's

repeated warnings regarding the difficulties and uncertainties in setting reserves preclude any

---

[34] See also In re National Auto Credit, Inc. Sec. Litig., 1999 WL 33919791, at *13-15 & 17
(N.D. Ohio Oct. 12, 1999) (allegations of "fraud by hindsight" that a company's reserves were
inadequate were not sufficient); cf. Tsereteli v. Residential Asset Securitization Trust, 692 F.
Supp. 2d 387, 395 (S.D.N.Y. 2010) (allegations that rating agencies used out-of-date models
were insufficient to support inference that they did not truly believe their ratings at the time they
were made).

such inference, and the fact that Conseco's quarterly review of its LTC claims reserves led it to increase them by $118 million in August 2007 does not support a conclusion that the reserves previously set were inaccurate.  See Malin, 499 F. Supp. 2d at 146 (increase in loss reserves was not evidence that prior statements were false).[35]

Nor does Plaintiff's claim that Conseco lacked the "actuarial science" to accurately set reserves support any inference that its reserves were false, because that claim is based on the insufficient CW allegations discussed above.  Moreover, such a claim cannot be squared with the fact, conceded by Plaintiff, that Conseco engaged independent actuaries to review its reserves each quarter.  Indeed, it is significant that when Conseco made its restatement in March 2008, it did not restate prior period financials with respect to any periodic increases to the LTC reserves other than the single $7.1 million reserve increase that Conseco previously had disclosed in its 2006 10-K.  Conseco would have been required to restate financials that were impacted by reserves that were wrong at the time they were made.  (See supra, n.12.)

Moreover, Plaintiff's supposed theory of fraud is inconsistent with Conseco's $118 million reserves increase.  If Defendants had been engaged in a fraudulent scheme to hide Conseco's problems, it would make no sense for them to significantly increase LTC claims reserves in August 2007.  As Defendant Prieur explained during the August 7, 2007 analyst call, "$110 million [of the increase] was a deliberate increase in the claims reserves that we chose to take . . . [W]e have incorporated [] new assumptions that are much more forward-looking than before . . . This is a very conservative move, which should improve the stability of the results of this [LTC] block moving forward."  (Ex. S at 2.)  The far more plausible inference – if not the

_____

[35] See In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951, 964 (S.D. Ohio 2009) ("Huntington may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made."); In re 2007 Novastar Fin., 2008 WL 2354367 at *3 (same).

only plausible inference – is that Conseco revised its reserves estimates and judgments based on changing experience and data.  Nothing in this suggests an inference of fraud.[36]

The alleged misleading statements about the adequacy of Conseco's reserves are also not actionable under the PSLRA statutory safe harbor for forward-looking statements.  See 15 U.S.C. § 78u-5(c).  Under the safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language."  Slayton v. American Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).  Conseco's alleged misleading statements about reserves were identified as forward-looking statements and accompanied by such cautionary language.  For example, the August 6, 2007 statements, alleged to be misleading in SAC ¶¶ 245-47, were identified as forward-looking statements and were accompanied by the following specific cautionary language:  "Assumptions and other important factors that could cause our actual results to differ materially from those anticipated in our forward-looking statements include . . . mortality, morbidity, usage of health care services, persistency, the adequacy of our previous reserve estimates and other factors which may affect the profitability of our insurance products [and] changes in our assumptions related to the cost of policies produced or the value of policies . . ."  (See Ex. R at 6.)  The statements made in the Management's Discussion and Analysis and Risk Factors sections of Conseco's public filings, alleged to be misleading in SAC ¶¶ 282-83, were also identified as forward-looking statements and directly followed by specific cautionary language.  (See, e.g., Ex. A at 24, 35, Ex. B at 23-24, 36, Ex. E at 29, 34-35, Ex. D at 26-27, 31-32.)  For instance, in the 2005 10-K, the paragraph following the

---

[36] To the extent Plaintiff's claims are based on the allegation that Defendants represented that "future reserve strengthening was unlikely" (SAC ¶ 12), they must be dismissed because Defendants made no such statement.  To the contrary, Defendants stated that "what we set aside [for reserves] is what we think is the appropriate amount" and that "[i]f there is future deterioration of claims incidents and severity further increases, then that will impact the results of the book."  Id. ¶ 216; Ex. P at 12.

allegedly misleading statement quoted in SAC ¶ 282 set forth that "[m]any factors can affect these reserves and liabilities," that Conseco's reserves and liabilities "are necessarily based on estimates, assumptions and prior years' statistics," and that "[i]t is possible that actual claims will materially exceed our reserves and have a material adverse effect on our results of operations and financial condition."  (Ex. A at 24.)[37]  Accordingly, Conseco's forward-looking statements about reserves are protected by the PSLRA safe harbor.  See Hess v. American Physicians Capital, Inc., 2005 WL 459638, at *6-7 (W.D. Mich. Jan. 11, 2005) (statements concerning adequacy of reserves in SEC filings, press releases, and conference call transcripts protected under safe harbor).[38]

Conseco's alleged statements about the adequacy of its reserves also are not actionable under the PSLRA safe harbor because Plaintiff has not alleged that they were "made with actual knowledge that [they] were false or misleading."  Slayton, 604 F.3d at 766.  Where a plaintiff does not allege facts supporting a motive to defraud, the "circumstantial evidence of actual knowledge must be correspondingly greater."  Id. at 776.  The "actual knowledge" standard for

_____

[37] The statements made during the 3/7/07 analyst call, alleged to be misleading in SAC ¶¶ 216-17, also were identified as forward-looking statements subject to a number of risks, and investors were referred to the risk factors set forth in the previous day's earnings release.  See Exs. P at 2, O at 6-7.  Statements concerning the adequacy of a company's reserves, as well as calculations of reserves (see, e.g., SAC ¶¶ 288-89), are inherently forward-looking because reserves are predicated on projections of future events.  See, e.g., In re Kindred Healthcare Inc. Sec. Litig., 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) ("The amount Kindred keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings. . . . It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA."); Hess v. American Physicians Capital, Inc., 2005 WL 459638, at *6-7 (W.D. Mich. Jan. 11, 2005) (same); In re America Serv. Grp., Inc., 2009 WL 1348163, at *37 (M.D. Tenn. Mar. 31, 2009) (same).

[38] For the same reasons, the alleged misstatements concerning reserves also are not actionable under the "bespeaks caution" doctrine, which provides that alleged misrepresentations "are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of [accompanying] adequate cautionary language.'"  In re Loral Space, 2004 WL 376442, at *18.

forward-looking statements is "stricter than for statements of current fact," and "liability . . . attaches only upon proof of knowing falsity." Id. at 773.  In Slayton, the Second Circuit found protected by the safe harbor a company's optimistic, but ultimately erroneous, statements about its potential future losses from investments after it had announced a $182 million loss from those investments. Id. at 762-63.  The company stated that future losses were expected to be "substantially lower," but then investigated the risks of the investments, "crunch[ed] the numbers using a conservative set of assumptions," and subsequently took an additional $826 million loss. Id. at 764, 777.  The Court noted that the investigation following the initial loss disclosure was "a prudent course of action that weakens rather than strengthens an inference of scienter," and concluded that "[t]hese facts do not support an inference that American Express was trying to hide anything from its investors.  Rather, they suggest that [it] had disclosed its losses . . .  and that it was endeavoring in good faith to ascertain and disclose future losses." Id. at 777.

Here, as in Slayton, Plaintiff has not alleged Defendants' *actual knowledge* of any facts suggesting that Conseco's reserves were inadequate.  Plaintiff has not identified any facts or documents provided to the Individual Defendants contradicting their statements regarding Conseco's reserves.  To the contrary, Plaintiff's allegations demonstrate that Conseco announced (1) a material weakness in its internal controls and a reserve increase of $61 million in 1Q 2007; (2) subsequent reserve increases of $22 million and $118 million in May and August 2007, respectively; and (3) a restatement of prior financial statements in 1Q 2008.  These allegations do not evidence fraud, but rather "a prudent course of action that weakens rather than strengthens an inference of scienter." Id.[39]

---

[39] See also CIBC, 694 F. Supp. 2d at 301 ("incremental measured response" did not support inference of fraud"); Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a

*(cont'd)*

C.       **The Alleged Misstatements And Omissions
         Are Not Actionable For Additional Reasons.**

1.       **The Forward-Looking Statements Are Not Actionable.**

Many of the other misstatements alleged in the Complaint are also forward-looking and thus not actionable under the PSLRA safe harbor and/or the bespeaks caution doctrine.  (See, e.g., SAC ¶¶ 197 (expectations for run-off book), 213 (expectations for reducing claim leakage), 222 (expectations concerning future regulatory actions).)  As discussed, Plaintiff alleges no facts demonstrating that these statements were made with knowledge or recklessness, let alone actual knowledge that they were false or misleading.  See Slayton, 604 F.3d at 766.

Moreover, each of these statements was accompanied by meaningful cautionary language.  For example, Defendant Bullis' statement on the 8/3/06 analyst call that "[we] think that over time, we can manage [the run-off] book reasonably consistent with what our expectations are" (SAC ¶ 197) was accompanied by cautionary language in the conference call transcript.[40]  The transcript for the 3/7/07 analyst call, in which Defendant Wells described various LTC initiatives and stated that "[w]e expect that these improvements will reduce our claim leakage by more than $10 million per quarter by the end of 2007" (SAC ¶ 213) included similar cautionary language.  (See Ex. P at 2.)  Likewise, Conseco's statement in the 2006 10-K that "[b]ased on our discussions with state insurance departments, we do not expect the regulators to take any actions against [CSH] or Conseco Life due to the causes of our statutory losses and the actions being undertaken by the Company" (SAC ¶ 222) was also accompanied by

---

full story to reveal.")

[40] See Ex. J at 2 (noting that "the forward-looking statements being made today are subject to a number of factors which may cause actual results to be materially different than those contemplated by the forward-looking statements" and referring to the risk factors set forth in the 2Q 2006 10-Q).

cautionary language.  (See Ex. B at 36 (noting possibility of regulatory actions).)  Accordingly, these forward-looking statements are not actionable.

**2.      Many Of The Misstatements and Omissions Are Immaterial.**

Many of the alleged misstatements and omissions are immaterial.  "[I]n order for [a] misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009).  Thus, materiality depends on all relevant circumstances, and a complaint may be dismissed where the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Id.

Many of the alleged misstatements and omissions are so obviously unimportant that they are not actionable.  First, the alleged misstatements relating to Conseco's financial performance are not material for Section 10(b) purposes.  The SAC assumes the materiality of these statements because Conseco restated its financial results but, when the restatement is viewed in its entirety and context, its overall effect simply was not material to Conseco's overall business.  In particular, Conseco's 2007 10-K setting forth the restatement made clear that it included three portions, including placement into the proper period of certain *immaterial* items that had already been disclosed.  Indeed, the actual impact of the restatement was to *increase* Conseco's net income for 2006 from $96.5 million to $106.0 million.  (Ex. C at 111.)  Moreover, the net effect of all items identified during remediation was to reduce shareholder's equity at December 31, 2006 by $20.6 million.  (Id. at 113.)  In the context of Conseco's total shareholders' equity of more than $4.7 billion (Ex. B at 35), this *de minimis* reduction of less than 0.5% is immaterial as a matter of law.  Notably, Plaintiff does not even claim that there was any stock drop when

47

Conseco finalized its restatement on March 28, 2008, because there was none.  Conseco's stock price closed at $10.41 on March 28, up nine cents per share over its close the previous day.  (Ex. Y.)  Conseco's stock declined to close at $10.20 on the next trading day, March 31, 2008, then rose to close at $10.55 on April 1, 2008, and at $11.29 on April 2.  (Id.)[41]  The alleged prior misstatements concerning Conseco's financial results cannot be considered material under these circumstances.  See In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) ("[A]n inflation of $217 million in the Company's revenues for the relevant period amounts to about 0.3% of Duke Energy's total revenues for that period [,] an immaterial percentage as a matter of law."); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546-47 (8th Cir. 1997) (alleged overstatement of assets by 2% was immaterial).

The SAC's alleged misstatements and omissions about the maintenance of policy and claims information and computer systems and coding issues are likewise immaterial.  The disclosure of details regarding computer and document organization issues in the LTC business could not have been viewed by a reasonable investor as having significantly altered the total mix of information as to Conseco's overall business, particularly in light of Conseco's repeated disclosures of the difficulties it was encountering in the LTC business.  See Geiger v. Solomon-Page Group, Ltd., 933 F. Supp. 1180, 1188 (S.D.N.Y. 1995) (Koeltl, J.) (finding omitted information immaterial based on its "plain unimportance").

---

[41] The market's reaction to the restatement is relevant to its immateriality.  See In re Allied Capital Corp. Sec. Litig., 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003) (finding omitted information immaterial where stock price declined for only one day after disclosure before recovering); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997) ("Because the market for [defendant's] stock was 'efficient' and because the July 29 disclosure had no effect on [stock] price, it follows that the information disclosed on September 20 was immaterial as a matter of law.").

>    3.    **The Alleged Omissions Are Not Actionable Because Conseco Had No Duty To Disclose The Information At Issue.**

To the extent Plaintiff's claims are based upon alleged omissions, they fail because Conseco had no duty to disclose that information.  There is no liability for an omission unless there is a specific duty to disclose the omitted information or the disclosure is necessary to make other *statements* not misleading.  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts"); Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading").

Plaintiff here does not allege any duty to disclose much of the allegedly omitted information on which its claims are based, because there is no such duty.  For example, Conseco had no duty to disclose information relating to technical computer issues with respect to its LTC business.  Nor did it have any duty to disclose the details of how it maintained policy and claims information or the specifics relating to integration of information from its various legacy companies.  Many companies deal with these types of operational issues, and requiring them to disclose such information would bury shareholders in lengthy and useless public filings.  See San Leandro, 75 F.3d at 810 ("to require the public announcement of each [study] would risk 'bury[ing] the shareholders in an avalanche of trivial information'").

## II.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

Because Plaintiff has failed to plead a primary violation by any Defendant, Plaintiff's Section 20(a) claim must also be dismissed.  See Endovasc Ltd. v. J.P. Turner & Co., 2004 WL 634171, at *14 (S.D.N.Y. Mar. 30, 2004).

In addition, Plaintiff does not plead that any Individual Defendant was a culpable participant in the alleged fraud.  As one court explained:

> The weight of Second Circuit precedent favors the view that a Plaintiff plead "culpable participation" to state a section 20(a) claim, and that such participation must be plead with particularity. Thus, in order to withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness.

Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007).  Here, Plaintiff fails to allege any involvement by the Individual Defendants in the alleged fraud, and therefore does not allege any culpable participation.  See In re Razorfish, Inc. Sec. Litig., 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (dismissing § 20(a) claim where complaint failed to allege false statement "made with the requisite fraudulent scienter").[42]

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the SAC with prejudice.

Dated: New York, New York
      August 2, 2010

SIDLEY AUSTIN LLP

By: _____
    Andrew W. Stern
    astern@sidley.com
    Dorothy J. Spenner
    dspenner@sidley.com
    Tom A. Paskowitz
    tpaskowitz@sidley.com
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300

    – and –

    Walter C. Carlson (admitted *pro hac vice*)
    wcarlson@sidley.com
    One South Dearborn Street
    Chicago, Illinois  60603
    Telephone: (312) 853-7000
    *Attorneys for Defendants*

---

[42] Notably, the SAC added no new allegations concerning the Individual Defendants, demonstrating that no such facts exist.