UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

PLUMBERS AND PIPEFITTERS LOCAL UNION
NO. 719 PENSION TRUST FUND, ON
BEHALF OF ITSELF AND ALL OTEHRS                09 Civ. 6966 (JGK)
SIMILARLY SITUATED,

                                               OPINION AND ORDER

                    Plaintiff,

            - against -

CONSECO INC., WILLIAM KIRSCH, EUGENE
BULLIS, MICHAEL DUBES, JAMES
HOHMANN, JIM PRIEUR, EDWARD BONACH,
AND JOHN WELLS,

                    Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiff, Plumbers and Pipefitters Local Union No. 719

Pension Trust Fund, brought this securities class action against

Conseco, Inc. ("Conseco") and seven of its current and former

officers.  The plaintiff alleges violations of Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 ("the Exchange

Act"), as amended by the Private Securities Litigation Reform

Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b), 78t, 78u-4, and

Securities and Exchange Commission Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5.  The putative class consists

of persons who purchased Conseco common stock between August 4,

2005, and March 17, 2008.[1]  Compl. ¶ 29.

─────────────────
[1] A class has not yet been certified in this case.

1

On January 12, 2010, the plaintiff filed an amended complaint, and on June 2, 2010, pursuant to a stipulation between the parties, it filed a second amended complaint ("the Complaint").  See Corrected Second Amended Complaint for Violation of the Federal Securities Laws, Plumbers v. Conseco, 09 Civ. 6966 (S.D.N.Y. June 2, 2010).  The defendants have now moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, primarily on the ground that the plaintiff has failed to allege facts supporting a strong inference of scienter.

### I.

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the Complaint are accepted as true.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The

Court should not dismiss the Complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Twombly v. Bell Atl. Corp., 550 U.S. 544 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); see also Hart v. Rick's Cabaret Int'l, Inc., No. 09 Civ. 3043, 2010 WL 5297221, at *2 (S.D.N.Y. Dec. 20, 2010).

Moreover, allegations of securities fraud under Section 10(b) and Rule 10b-5 are subject to Federal Rule of Civil Procedure 9(b) and the PSLRA's requirements regarding scienter. See 15 U.S.C. § 78u-4(b)(2); Chill v. General Elec. Co., 101 F.3d 263, 266 (2d Cir. 1996); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127-28 (2d Cir. 1994). Under the PSLRA, plaintiffs "must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, the intent to "deceive, manipulate, defraud, or knowing misconduct." Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 537-38 (2d Cir. 1999) (internal quotation marks omitted); see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). The inference that the defendant acted with scienter

must be "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

In deciding the motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." In re Loral Space & Commc'ns Ltd. Sec. Litig., No. 01 Civ. 4388, 2004 WL 376442, at *2 (S.D.N.Y. Feb. 27, 2004) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)); see also LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 153-55 (2d Cir. 2003). Such "matters" include public disclosure documents that are required by law to be filed with the Securities and Exchange Commission. See Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991). This includes not only documents that contain the allegedly inadequate or misleading statements, but "related documents that bear on the adequacy of the disclosure[s]," provided that the documents are "public disclosure documents required by law to be filed." Id. at 774. "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration

4

in deciding the defendant[s'] motion to dismiss, without converting the proceeding to one for summary judgment." Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995) (internal quotation marks and citation omitted).

### A.

Conseco engages in the development, marketing, and administration of supplemental health insurance, individual life insurance and annuities, and other insurance products for the senior and middle-income insurance markets in the United States. Compl. ¶¶ 2, 41. During the class period, the company's business was organized into three primary operating segments (Bankers Life and Casualty Company, Conseco Insurance Group, and Colonial Penn), a closed block of "run-off" business from prior acquisitions, and corporate operations. Compl. ¶¶ 8, 42, 82. Conseco managed and received premiums on the "long-term care" ("LTC") policies that are the focus of this action as part of its closed block. See Compl. ¶ 82.

The individual defendants were all officers of Conseco during some portion of the class period. Defendant William Kirsh served as President and Chief Executive Officer ("CEO") of Conseco from August 2004 until May 2006. Compl. ¶ 22(a). Defendant Eugene Bullis served as Executive Vice President and

Chief Financial Officer ("CFO") of Conseco from November 2002 until May 2007.  Compl. ¶ 22(b).  Defendant Michael Dubes served as President of Conseco Insurance Group from May 2005 until December 2007.  Compl. ¶ 22(c).  Defendant James Hohmann served as Executive Vice President and Chief Administrative Officer of Conseco from December 2004 until September 2006, during which time he oversaw Conseco's LTC business.  From May 2006 to September 2006, Hohmann was also Interim CEO of Conseco, and from September 2006 to December 2006, he was President and Chief Operating Officer of the company.  Compl. ¶ 22(d).  Defendant Jim Prieur became CEO of Conseco in September 2006, and remained in that position at the time of the filing of the Complaint. Compl. ¶ 22(e).  Defendant Ed Bonach became Executive Vice President and CFO in May 2007, and remained in that position at the time of the filing of the Complaint.  Compl. ¶ 22(f). Defendant John Wells became Senior Vice President of the LTC group in December 2006.  Compl. ¶ 22(g).

From 1997 to 2000, several long-term care insurance companies merged into or were acquired by Conseco.  Compl. ¶ 47. Those companies used different operating procedures, practices, policy provisions, and computer systems.  Compl. ¶¶ 48, 85.  As a result, during the class period, the company used as many as nineteen different computer systems, which created difficulties with compiling, organizing, and computing data.  Compl. ¶¶ 98,

100-01.  Because the company lacked a central repository for individual policies, Conseco could not electronically access the policy or coverage information of particular policyholders. Compl. ¶¶ 89, 91, 94.  Because of these deficiencies, Conseco was often unable to determine whether policy limits had been reached or exceeded, and regularly paid claims in excess of the benefit maximums.  Compl. ¶¶ 5, 54, 96-97.

According to the plaintiff, this absence of reliable computerized information made it impossible for the company to evaluate accurately the financial health of its LTC business, which meant that it could not reliably set "reserves" for its LTC claims.  Compl. ¶ 3.  Securities and Exchange Commission ("SEC") accounting regulations require that financial statements account for and disclose existing uncertainties as to probable losses.  Compl. ¶ 280.  Because insurance companies regularly pay claims after the end of the accounting period in which they accrue, they are required to establish a balance sheet liability to account for insurance claim costs incurred but unpaid. Compl. ¶ 281.  Such companies are required to establish reserves both for claims that have been reported but not paid ("RBNP") and those that have been incurred but not reported ("IBNR"). Compl. ¶ 281.  According to the plaintiff, as a result of Conseco's failure to integrate satisfactorily the LTC businesses of the companies it acquired, in addition to other mismanagement

discussed below, Conseco's actuaries were not able to set reserves accurately.  Compl. ¶¶ 283-91.

The Complaint alleges that Conseco had various problems in the recording and payment of claims, particularly in its LTC business.  In 2005, Conseco sought to reduce the number of platforms and systems the company used by initiating a "health system simplification" project, using an application from Genelco Software Solutions ("Genelco").  Compl. ¶ 102.  The Genelco project was a computer program that would automate Conseco's claims handling and claims payments and the setting of reserves for claims across all its business lines.  Compl. ¶ 102.  The defendants, however, cancelled the project because of "cost issues."  Compl. ¶ 106.

After the termination of the Genelco project, Conseco tried to implement a lower-cost alternative called the "Groomer system" to determine the company's claims exposure and set reserves.  Compl. ¶¶ 107-08.  The Groomer system was, however, less sophisticated than the Genelco system, and did not aggregate certain important information, which allegedly prevented it from reliably setting reserves.  Compl. ¶ 108.

According to the plaintiff, the company also took affirmative steps to hide its claims exposure, so as to under-represent its liabilities.  It improperly delayed and eliminated claims made under its policies through the "no letter close"

("NL Close") process.  Compl. ¶¶ 64-75.  This process was intended to eliminate redundant claims that would otherwise be included in the reserves calculation.  Compl. ¶ 65.  However, Conseco abused the process across its lines of business to eliminate legitimate, non-redundant claims.  Compl. ¶ 66.  A claim that was eliminated through the NL Close process would not result in any notification to the policyholder, and would create no record at the company, so the claim would have to be resubmitted, provided that the policyholder noticed the error at all.  Compl. ¶¶ 69-70.  This practice artificially deflated the number of claims to be included in the company's actuarial assumptions, resulting in lower reserves.  Compl. ¶ 72.

Conseco also allegedly engaged in a process known as "bundling."  Compl. ¶ 79.  Customers often submitted individual claims on different dates within a specified time period.  When claims were "bundled," multiple claims submitted by a customer on different dates would be counted as a single claim and paid at once.  Compl. ¶ 79.  Bundling multiple claims in this manner reduced the total number of claims in a given period, because several individual claims were treated as a single claim. Compl. ¶ 79.  Conseco took advantage of this process to bundle or unbundle claims to achieve the claims volume and denial rate it deemed most advantageous to the company.  Compl. ¶ 80. During the class period, the company held quarterly meetings to

decide whether to bundle or unbundle claims to achieve the desired statistical effects.  Compl. ¶ 80.

   The Complaint also alleges that non-defendant Ali Inanilan, the head of the LTC business, pressured employees to eliminate claims and, in violation of state insurance regulations, rewarded them for doing so.  Compl. ¶ 76.  He allegedly implemented a program to reward LTC claims adjusters with televisions, gift cards, and other perquisites based upon the number of claims the adjuster denied.  Compl. ¶ 77.  Inanilan directed employees to deny claims "whenever and however possible."  Compl. ¶ 78.

   In April 2007, forty state regulators began an investigation into improper business practices at Conseco. Compl. ¶ 148.  The investigation, which was formally conducted between July 9, 2007, and October 19, 2007, was intended to determine whether Conseco had maintained and was maintaining appropriate business practices, particularly with respect to its LTC insurance lines.  The investigation covered the time period between January 1, 2005, and April 30, 2007.  Compl. ¶ 149. Conseco disclosed the investigation in its Form 10-Q covering the second quarter of 2007, which was filed shortly after the investigation officially began.  Declaration of Andrew W. Stern in Support of the Defendants' Motion to Dismiss the Corrected Second Amended Complaint ("Stern Decl.") Ex. U at 28, <u>Plumbers</u>

v. Conseco, No. 09 Civ. 6966 (S.D.N.Y. Aug. 2, 2010).  On May 7, 2008, the National Association of Insurance Commissioners announced a settlement between the state regulators and Conseco as a result of the investigation.  Conseco agreed to pay a $2.3 million fine, and to make $26 million in improvements to its claims handling procedures.  Compl. ¶ 151.

In 2007, the House Committee on Energy and Commerce of the United States House of Representatives began an investigation and requested that the company provide it with "anything in writing" that indicated Conseco encouraged employees to deny claims.  Compl. ¶ 161.  This request was also disclosed in Conseco's 10-Q for the second quarter of 2007.  Stern Decl. Ex. U at 28.  The Complaint alleges that Conseco employees prepared approximately 40 bankers boxes of materials, including manuals and descriptions of internal controls, but that a non-defendant executive asked Conseco employees "whether it was possible to not turn over some of the materials," and "indicated that materials should be destroyed as opposed to turning them over." Compl. ¶ 163.  The documents were, however, in fact turned over to Conseco's attorneys.  Compl. ¶ 163.

**B.**


The Complaint alleges that the defendants made several statements during the class period that were, in light of the circumstances described above, materially misleading.  The Complaint is exceedingly prolix.  It contains lengthy quotes from numerous public disclosure documents and then, often without citing specific alleged misstatements, claims that the passages are "false and misleading" because they failed to disclose the plaintiff's pejorative characterization of the state of Conseco's reserves, record keeping, and claims payment process.

On August 4, 2005, Conseco issued a press release announcing its financial results for the second quarter of 2005. Compl. ¶ 164.  The release contained a statement by defendant Kirsch that "During the past 12 months, . . . [w]e have fundamentally strengthened our balance sheet, expense management, operations, product offerings, distribution systems, internal controls and, most importantly, our management team." Compl. ¶ 164.  During an accompanying conference call, Kirsch told analysts that the company was "continu[ing] to make progress improving our operating platform."  Compl. ¶ 166. Kirsch made similar statements with respect to corporate progress and, in particular, system improvements, in a November

3, 2005 press release and analyst call accompanying Conseco's announcement of its third-quarter financial results, Compl. ¶¶ 175, 179, and a February 27, 2006 press release announcing Conseco's fourth-quarter and year-end results for 2005, Compl. ¶ 182.

Conseco's Form 10-Q, filed with the SEC on August 8, 2005, reiterated that Conseco's "efforts include[d] . . . significant system conversions, such as the elimination of multiple systems for similar lines of business," and noted that "[d]uring the first six months of 2005, [Conseco] implemented new administrative systems for certain life and long-term care products."  Compl. ¶ 172.

Despite the notes of progress, Conseco did not hide the problems it faced with its LTC business.  In other portions of the Form 10-Q, not cited in the Complaint, Conseco made clear that it faced significant problems with the business, and specifically in its ability to set sufficient reserves:

> This segment includes long-term care insurance inforce, substantially all of which was issued through independent agents by certain subsidiaries prior to their acquisitions by Conseco . . . .  The loss experience on the products has been worse than we originally expected.  Although we anticipated a higher level of benefits to be paid on these products as the policies aged, the paid claims have exceeded our expectations. . . .  This adverse experience is reflected in our high benefit ratios.

Stern Decl. Ex. D at 50.  Conseco also disclosed that it had

previously been required to increase substantially claim

reserves for the LTC business:

> We have incurred significant losses beyond our
> estimates as a result of actual claim costs and
> persistency of our long-term care business included in
> the other business in run-off segment.  For example,
> we increased claim reserves by $130 million during
> 2002 and $85 million during the eight months ended
> August 31, 2003, as a result of adverse developments
> and changes in our estimates of ultimate claims for
> these products.

Stern Decl. Ex. D at 32.  Conseco also noted that the LTC

business faced serious challenges:  "Many of our initiatives

address issues resulting from the substantial number of

acquisitions of our predecessor. . . .  These initiatives may

result in unforeseen expenses, complications or delays, and may

be inadequate to address all issues."  Stern Decl. Ex. D at 29.

Conseco noted as a specific risk factor for the company: "Our

results of operations may be negatively impacted if we are

unable to achieve the goals of our initiatives to restructure

our principal insurance businesses."  Id.

The Form 10-Q also discussed the difficulties the company

faced in setting claims reserves for the LTC business:

> The limited historical claims experience on our long-
> term care products could negatively impact our
> operations if our estimates prove wrong and we have
> not adequately set premium rates.
>
> In setting premium rates, we consider historical
> claims information and other factors, but we cannot

14

predict future claims with certainty. This is
particularly applicable to our long-term care
insurance products, for which we have relatively
limited historical claims experience. Long-term care
products tend to have fewer claims than other health
products such as Medicare supplement, but when claims
are incurred, they tend to be much higher in dollar
amount. Also, long-term care products have a much
longer tail, meaning that claims are incurred much
later in the life of the policy than most other
supplemental health products. As a result of these
traits, longer historical experience is necessary to
appropriately price products.

. . .

The long-term care insurance businesses included in
the other business in run-off segment were acquired
through acquisitions . . . . The experience on these
acquired blocks has generally been worse than the
acquired companies' original pricing expectations. . .
. If future claims experience proves to be worse than
anticipated as our long-term care blocks continue to
age, our financial results would be adversely
affected.

Stern Decl. Ex. D at 31.

Notwithstanding these disclosures, and indeed without even

referring to them, according to the plaintiff, the statements in

Conseco's Form 10-Q and press releases were materially false and

misleading when made because they failed to disclose that

Conseco lacked the internal controls necessary to report

properly its liabilities and reserves; that Conseco's financial

statements were not prepared in accordance with GAAP; that it

"lacked the actuarial science necessary to calculate reserves";

that it had abused the NL Close and bundling processes; that it

rewarded employees for denying claims; that it did not maintain

a central, integrated database of policy information, and did
not have access to the detailed claims data necessary for
accurate calculation of reserves; and that, as a result of these
issues, the "[d]efendants lacked a reasonable basis for their
positive statements about the Company, its corporate governance
practices, its financial results, its prospects and earnings
growth." Compl. ¶ 165.[2]

On March 15, 2006, Conseco filed its Form 10-K with the
SEC. Compl. ¶ 184. It contained a statement that "[b]ased on
our assessment we have concluded, as of December 31, 2005, the
Company's internal control over financial reporting was
effective based on those criteria." Compl. ¶ 185. It also
contained statements identical to those described above. Compl.
¶ 185. According to the plaintiff, these statements were
materially false and misleading when made because they failed to
disclose the true internal state of affairs at Conseco, as
described in paragraph 165 of the Complaint. Compl. ¶ 186.
Defendants Kirsch and Bullis certified that the Form 10-K had
been prepared in accordance with GAAP. Compl. ¶ 187. The
plaintiff alleges that this certification was materially false

---

[2] The Complaint makes the same boilerplate allegation, by
referring to paragraph 165, with respect to virtually every
allegedly material misstatement it discusses. These blanket
allegations will not be repeated throughout this discussion of
the Complaint, but they were thoroughly considered in each case
by the Court in deciding the motion.

and misleading because the company's financial statements failed
to conform to GAAP disclosure requirements.  Compl. ¶ 188.

On May 4, 2006, Conseco announced its financial results for
the first quarter of 2006.  Compl. ¶ 189.  On May 8, 2006, the
company filed its Form 10-Q, which stated:

> During the first quarter of 2006, we upgraded the
> prior version of the valuation system used to
> determine reserves for the long-term care block of
> business in run-off.  The new version includes
> enhancements to more precisely estimate insurance
> liabilities for policies with return of premium
> benefits.  The effect of this refinement and certain
> other reserve adjustments resulted in decreases to our
> insurance liabilities of approximately $14 million in
> the first quarter of 2006.

Compl. ¶ 191.  This language also appeared in Conseco's second-
quarter Form 10-Q, which it filed with the SEC on August 8,
2006.  Compl. ¶¶ 199, 201.  According to the plaintiff, the
language was false and misleading because because Conseco "was
unable to 'precisely estimate insurance liabilities' and any
small changes Conseco may have made did not change this fact."
Compl. ¶¶ 192, 201.

On August 2, 2006, Conseco issued a press release
announcing its financial results for the second quarter of 2006.
Compl. ¶ 193.  The Complaint does not allege that any of the
specific figures were inaccurate, but faults the disclosure for
not including the plaintiff's characterization in paragraph 165.
Compl. ¶ 194.  The Complaint also refers to a statement by

17

Hohmann quoted in the press release:  "We are making significant strides on many fronts as we establish Conseco as a leading provider of financial security for the life, health and retirement needs of middle market America."  Compl. ¶ 193.  This statement is also alleged to be false and misleading for not including the plaintiff's characterization in paragraph 165. However, the Complaint ignores the following paragraph in the press release, in which Hohmann specifically discussed the problems in the LTC business and its effect on earnings:

> Notwithstanding this progress, second quarter was a difficult quarter in certain of our health businesses, with incurred claims exceeding expectations in the Bankers' long-term care block, specified disease and in particular, the run-off long-term care block. Although we are responding to these challenges with increased claims management focus and pricing initiatives where appropriate, based on our results in the first half of 2006 and our expectations for the balance of the year, we are lowering our outlook for 2006 operating earnings to between $1.65 and $1.75 of operating income per share, excluding the after-tax litigation charges recorded in the first half of 2006.

Stern Decl. Ex. I at 2.

On August 3, 2006, Conseco held a conference call with investors to discuss the quarterly results.  Compl. ¶ 195. During the call, defendant Hohmann discussed changes within the LTC business:

> Bankers [Life and Casualty Company] has already completed an LTC claim leakage study and implemented the findings.  We are performing a similar analysis on the closed block.  We expect improvements in the closed block beginning in 2007.

> Compliance is and has been a focal point.  While not an explicit revenue generator, it is part of the Conseco value system and a necessary component of any claims management initiative.  We have embedded a legal and compliance function within our closed block and we have conducted an external review of our procedures.  We have established a compliance oversight committee that meets regularly and monitors business compliance.

Compl. ¶ 195.  As the defendants point out, the Complaint fails to point out that Hohmann prefaced these comments by saying:

> One of the more challenging parts of this assessment is the significant amount of recent activity surrounding our long-term care book . . . . [W]ith so many moving parts, it is challenging to determine the extent to which slight timing or method differences influence ratios or the extent to which underlying premium and claim developments are fluctuations or trends.

> As a result, we believe there is some noise in the ratios for the second quarter which complicate our assessment of the remainder of the year.  However, it is true that initial claims and claims paid were up in the second quarter.  Accordingly, in evaluating for the remainder of the year, we have anticipated a higher level of claims and we have reflected that in our outlook for long-term care and specified disease.

Stern Decl. Ex. J. at 2-3.

Notwithstanding this discussion, according to the plaintiff, Hohmann's statements were false and misleading because they made it appear Conseco was "taking meaningful steps to improve claims management even though significant and fundamental problems existed that needed to be addressed before any real progress could have been made."  Compl. ¶ 196.

During the same call, in response to two analysts'
questions on the conservativeness of Conseco's assumptions with
respect to future losses, defendant Bullis stated:

> We do have renewed focus on claims management. This
> book is running off. There are policy limits
> associated with the policies underlined in the book.
> So we think that while we are concerned about the
> volatility and frankly our visibility into benefit
> ratios has to realistically have a range of outcomes.
> We think that over time, we can manage this book
> reasonably consistent with what our expectations are.
>
> . . . . [I]n taking a look at the back half of the
> year, we have not expected that the full severity of
> the experience that we saw in the third quarter will
> continue, but we're also not considering that it's a
> complete anomaly and isolate it out from our
> expectations. So we try to take a balanced view that
> there's a bit of a spike, but we're not prepared to
> believe that it's going to fully reverse itself. And
> frankly, it's not knowable. We're going to have to
> see how claims develop before we can take a more
> precise view.

Compl. ¶ 197. According to the plaintiff, these statements were
false and misleading because Conseco manipulated data that
impacted the reliability of its assumptions, and the company was
therefore unable to accurately calculate reserves. Compl. ¶
198.

On November 1, 2006, Conseco announced its financial
results for the third quarter of 2006. Compl. ¶ 203. An
accompanying press release stated:

> We expect the performance of our core businesses in
> the fourth quarter to approximate third quarter
> results. We are responding with increased focus and
> urgency to the emerging trends in the long-term care

> block in the non-core run-off segment, through
> vigilant claims management and a comprehensive premium
> re-rate process. However, these steps will likely
> take several quarters to influence results. The
> impact of small experience-driven changes in the
> approximately $3.3 billion of reserves held on this
> block can produce volatility in quarterly earnings.

Compl. ¶ 203.  Additionally, during an analyst call on November

2, 2006, the company disclosed that the LTC business had

deteriorated substantially.  Defendant Hohmann described the

quarter as "very disappointing . . . in the LTC closed block,"

and discussed in extensive quantitative detail the causes of the

block's poor performance, and the company's efforts to remediate

it.  Stern Decl. Ex. L at 8-9.  In the transcript of the call,

these comments span 17 paragraphs, and are accompanied by seven

slides.  Stern Decl. Ex. L at 8-9; see also Stern Decl. Ex. K at

34-40 (attachments to Form 8-K for third quarter of 2006).

    Notwithstanding these disclosures, according to the

plaintiff, Conseco's statements in its November 1 press release

were false and misleading because they failed to disclose the

true state of affairs at the company, particularly because

"Conseco was not – nor was it capable of – 'vigilant claims

management' due to the significant problems with claims

management and material internal control deficiencies."  Compl.

¶ 204.

    On March 6, 2007, Conseco issued a press release announcing

its year-end and fourth-quarter financial results for 2006, and

announcing that Conseco had identified a material internal
control deficiency.  Compl. ¶ 207.  A statement by defendant
Prieur indicated that the results were poor, but that "[t]he
results for the quarter reflect a number of adjustments, many of
which we believe are one-time in nature, and there are many
signs of progress, including strong full year sales growth in
our core operating businesses, emerging efficiencies from the
consolidation of our back office operations, and progress on our
initiatives to improve the performance of our run-off long-term
care block."  Compl. ¶ 207.

The press release described in detail Conseco's conclusion
that its internal controls were deficient:

> As a result of certain adjustments identified by
> management and made during our year-end closing
> process, we have concluded that, as of December 31,
> 2006, we did not maintain effective control over
> certain actuarial financial reporting processes.  The
> related control deficiencies, taken in the aggregate,
> constitute a material weakness.  None of the
> adjustments were material individually, or in the
> aggregate, to our current year or prior period
> financial statements taken as a whole.  We have taken
> steps to address the control deficiencies which will
> not be considered fully remediated until the revised
> control processes have been operating for a sufficient
> period of time to provide reasonable assurance as to
> their effectiveness.
>
> . . .
>
> The significant losses recently incurred in our run-
> off block of long-term care insurance have led to
> corrective action plans involving accelerated premium
> increase activity, enhanced care management and claim
> adjudication practices, upgrading of management talent

and focused accountability, and improved technology
based tools.   However, more time is necessary to
achieve the necessary visibility to improving trends
in operating results in order to provide any
commentary on outlook.   As these results are
significant to our overall operating performance, we
cannot comment on overall outlook at this time.

Compl. ¶ 207.

Despite the plainly negative information provided by these
disclosures, according to the plaintiff, these statements were
materially false and misleading for a number of reasons:  they
failed to disclose the true nature and extent of the problems
with Conseco's claims procedures, the steps that would be
required to fix them, and that Conseco was not willing to devote
the resources necessary to fix them.  Compl. ¶ 208.
Additionally, the plaintiff alleges that adjustments were in
fact material when made because the company was ultimately
required to restate the relevant items, as discussed below.
Compl. ¶ 209.  Finally, according to the plaintiff, the
statements made it appear as though the defendants had already
taken steps to correct the problems they had identified, but
"many of the problems could not be adequately addressed by any
steps that had been taken at that time," and the defendants "did
not take the steps that were required to fix the problems."
Compl. ¶ 209.

On March 7, 2007, Conseco held a conference call with investors to discuss the results, on which defendant Wells stated:

> We're beginning to see the positive effects of changes in our protocols for administering claims. We have engaged two leading LTC administration companies to conduct studies of our claims practices and are in the process of implementing many improvements. These practice improvements will help us more accurately adjudicate claims in accordance with contract provisions. We expect that these improvements will reduce our claim leakage by more than $10 million per quarter by the end of 2007.
>
> . . .
>
> In the fourth quarter, we implemented a new work flow system which will help us better manage our claims. We're also making progress in another important technology initiative, which is an improved integrated policy benefit repository and accumulator tool. The tool will enhance electronic access to policy benefit and payment history, which will drive more accurate efficient claim adjudication and reduce leakage. We're also in the process of selecting a claim processing system that together with the changes in claim protocols, will better enable us to pay claims more accurately and reduce claim leakage.

Compl. ¶¶ 210-11. According to the plaintiff, these statements were materially false and misleading because they failed to disclose the extent of the problems with the Conseco's claims procedures; because proper remediation would require the company to incur significant costs; and because the company was not willing to dedicate the resources required to fix the problems, "because it sought to sell or dispose of LTC." Compl. ¶ 212. Additionally, the plaintiff claims that there was no reasonable

24

basis for the $10 million figure, because it represented a target set by Conseco executives, but was considered "arbitrary" by actuaries and claims personnel. Compl. ¶ 213. The plaintiff further alleges that Conseco was not "making progress" on an accumulator tool, because a report prepared five months later revealed that "the status of the Accumulator project was 'Yellow/Red' and . . . accumulator functionality is in jeopardy and . . . the conversion effort is at 'risk.'" Compl. ¶ 214.

Later in the same analyst call, defendants Prieur and Bullis stated that reserves had been set at an appropriate level. Compl. ¶ 216. They noted that outside actuarial firms reviewed the reserves on a quarterly basis. Stern Decl. Ex. P at 12. Bullis explained:

> The accounting would require that we reflect what we think the claim experience on existing claims is. The net present value of all of those claims have to be recorded. So we think that given the way that we're required to account for the book, that it is at its current level. If there is future deterioration of claims incidents and severity of further increases, then that will impact the results of the book.

Compl. ¶ 216. According to the plaintiff, this statement was materially false and misleading because "due to the significant problems with the setting of reserves and the lack of actuarial science to set reserves, Conseco had no basis to represent that its reserves were, or could be, accurate." Compl. ¶ 217.

Bullis was then asked, "[A]re there any material costs associated with some of the remediation of the control weaknesses?  Or is it more process oriented?"  He responded: "It's principally process oriented.  There aren't any one-time incremental costs, except overtime."  Compl. ¶ 218.  According to the plaintiff, this statement was materially false and misleading because "there were significant costs associated with remediation, including fees paid for legal services, to external contractors and third-parties and significant regulatory fines." Furthermore, the plaintiff contends that the statement failed to disclose the fact that Conseco was not willing to devote the resources that would be required to address the extent of the problems with its claims procedures.  Compl. ¶ 219.

On March 9, 2007, Conseco filed its 2006 Form 10-K, in which it included the statement: "During 2006, we implemented new actuarial valuation systems for our long-term care products in our Other Business in Run-off segment."  Compl. ¶ 220.  The plaintiff alleges that this statement was materially false and misleading because Conesco had not actually implemented a new valuation system yet, and instead was relying on "its old and inadequate computer systems even though it was recommended by outside consultants that a new system needed to be implemented." Compl. ¶ 221.

The Form 10-K also disclosed that state insurance regulators had requested documents from two Conseco subsidiaries because they had incurred losses in excess of a statutory threshold.  It further stated: "Based on our discussions with state insurance departments, we do not expect the regulators to take any actions against [the two subsidiaries] due to the causes of our statutory losses and the actions being undertaken by the Company."  Compl. ¶ 222.  According to the plaintiff, this statement was materially false because "Conseco's legal and claims departments modified their specific operating budgets for very expensive market conduct exams, outside legal fees, and forecasted reserves for regulatory fines and remediation costs during this timeframe."  Compl. ¶ 223.

The Form 10-K also described the company's efforts aimed at remediating the material control weakness it had identified. Compl. ¶ 224.  According to the plaintiff, these statements were materially false and misleading when made because the efforts described would not be adequate to fix the problems Conseco faced in trying to set its reserves.  Compl. ¶ 226.  Moreover, "[the d]efendants portrayed the problems as being the result of innocent mistakes as opposed to knowing or reckless conduct[,] . . . only generally described a limited number of issues, hid numerous problems from investors, and attempted to give comfort to investors that Conseco was addressing the problems."  Compl.

¶ 227.  Although a company is not required to disclose accurate information in the most pejorative light, the plaintiff faults Conseco because it alleges that the company was engaged in "sanitized disclosures" with respect to the regulatory scrutiny it faced, in order to minimize the effect of the information on the price of Conseco's common stock.  Compl. ¶ 227.

The Form 10-K contained a number of additional disclosures not referenced in the Complaint, including: (1) that Conseco had contributed $80 million in capital to the subsidiary that held the LTC block, Stern Decl. Ex. B at 14; (2) that the subsidiary had weak agency ratings, id. at 14-15; (3) the risk that Conseco's limited historical claims experience for LTC could adversely affect the company, id. at 21-23; (4) that efforts that had been undertaken to improve policy administration had caused increased policyholder complaints and, in some cases, inquiries from regulators, id. at 27; and (5) substantial increases to LTC reserves taken during 2006 as a result of actual experience being worse than prior estimates, id. at 63.

Defendants Prieur and Bullis certified that the Form 10-K did not contain any untrue statements of fact or omit to contain any facts necessary to make the statements not misleading. Compl. ¶ 230.  The plaintiff alleges that this certification was materially false and misleading because the company's financial

statements failed to conform to GAAP disclosure requirements. Compl. ¶ 231.

On May 8, 2007, Conseco announced its financial results for the first quarter of 2007, which were again below expectations. Compl. ¶ 232.  It noted that it would increase reserves by $22 million for a small block of business within the LTC group. Stern Decl. Ex. V at 3.  In a press statement, defendant Prieur noted: "We experienced reduced losses in our other business in run-off segment, where we are beginning to see the anticipated improvements in claims management as well as the positive impact from the re-rate program.  As we have reported previously, improvement in the performance of that block is expected to occur over several quarters."  Compl. ¶ 232.  According to the plaintiff, these statements were materially false and misleading because they created the impression that Conseco had achieved meaningful improvements to claims management, when it had not. Compl. ¶ 233.

During an analyst call on May 9, 2007, Prieur reiterated that the first quarter had "produced some real progress in the core business and improvements in the underlying economics of the run off Long Term Care business."  He noted that, in the LTC block, "there was progress in both the rerates where we now achieved our planned goal for rerates submitted to regulators, and with the management of claims where we're making significant

progress in improving claims management." Compl. ¶ 235.
According to the plaintiff, these statements were materially
false and misleading because "Claim Management team projects and
initiatives were over budget and experiencing significant delays
and Conseco was not 'making significant progress in improving
claims management.'" Compl. ¶ 236.

During the same conference call, defendant Wells discussed
improvements in the LTC block in detail:

> [T]he claims processes that we have implemented are
> beginning to show positive results. Through
> partnership with leading LTC administration companies,
> results are emerging that include both accuracy of
> payment to policy language, and enhanced customer
> experience. We expect that these operational
> improvements will drive increasingly material
> financial benefits as 2007 progresses. . . . This
> impact comes at the same time with strength in
> compliance, meaning that the claims management
> improvements benefit . . . both our overall in-force
> policy base and our shareholder returns.
>
> . . . We also continue to retain Long Term Care
> industry experts to assist us in improving our
> operational efficiency and Customer Service. . . .
>
> We are on track to implement an integrated policy
> benefit repository and accumulator tool in the middle
> of this year. This tool will enhance electronic
> access to policy benefits and payment history, which
> will drive more accurate and efficient claim
> adjudication . . . .
>
> . . . We remain focused on managing the LTC Closed
> Block initiatives as previously noted and fully expect
> accelerating progress, process, and financial
> implementation to become evident as we progress
> through 2007. In summary, LTC Closed Block financial
> results are again volatile, but reflect an improvement
> since the fourth quarter. . . .

Compl. ¶ 239.  According to the plaintiff, these statements were
false and misleading for a number of reasons: significant and
material internal control problems still existed and were not
being addressed; the re-rate program was behind schedule; "LTC
Claim Management did not improve the claim adjudication process
as later revealed by regulatory findings, consent orders and
stipulations"; and the company was not "on track to implement an
integrated benefit repository and accumulator tool" by the
middle of the year.  Compl. ¶ 241.  In reality, the plaintiff
alleges, the accumulator project missed so many deadlines that
the company implemented a "phased" approach to "mislead
investors by representing that progress was being made on the
project" even though no benefits would be realized until all
work was complete.  The plaintiff again points to a report,
prepared in August 2007, that found that during the summer of
2007, "the status of the Accumulator project was Yellow/Red' and
. . . accumulator functionality [was] in jeopardy."  Compl. ¶
241.

     On May 9, 2007, the company filed its first-quarter Form
10-Q with the SEC, in which it noted it was "actively engaged in
the implementation of remediation efforts to address the
material weakness in internal control over financial reporting."
Compl. ¶ 242.  The plaintiff alleges that this statement was

materially false and misleading because "proper steps were not being taken to fully correct the problems." Compl. ¶ 243.

On August 6, 2007, Conseco issued a press release in which it announced its financial results for the second quarter of 2007, and revealed that it was increasing LTC reserves by $118 million. Compl. ¶¶ 245, 293. The release included a statement by defendant Bonach that "We have made every effort to ensure that our claim reserves are appropriate and forward looking. This action, which primarily relates to claims incurred in prior quarters, reflects our efforts to improve our [reserving] process, using more detailed data and reserving techniques, and carefully evaluating new experience emerging in recent periods." Compl. ¶ 245. While the plaintiff does not dispute that Conseco increased its reserves by $118 million, according to the plaintiff, these statements were materially false and misleading because the defendants had not "'ma[d]e every effort' to correctly fix Conseco's problems and . . . Conseco's reserves were not accurate." Compl. ¶ 246.

In a follow-up analyst call on August 7, 2007, defendant Prieur reiterated the contents of the press release, and stated that the company had "taken significant steps to reduce claim reserve volatility." Compl. ¶ 247. Conseco's chief actuary, Mark Alberts, discussed the decision to increase reserves:

> In Q2, even before the reserve adjustments, we
> observed that our estimates of prior-period-incurred
> claims were continuing to develop adversely in spite
> of our past strengthening efforts.  As we do each
> quarter, we closely reviewed our methods and
> assumptions in light of this emerging experience, and
> made adjustments that our reserve calculations did not
> adequately capture the recent experience.
>
> It is very important to understand that this quarter
> we went a step further and made a decided effort to
> get ahead of the experience rather than just keeping
> up.  Our claim reserves now reflect for the first time
> an assumption that policy holders will remain on claim
> longer in the future than our historical assumptions
> would suggest. . . .   [T]hese [2Q loss] results
> reflect a $118 million increase in our estimates of
> claims incurred in prior-periods, including a $110
> million of reserves strengthening that resulted from
> improvements in our reserving methods and assumptions.

Stern Decl. Ex. S at 3.  While the plaintiff quotes other

portions of this conference call, it does not cite the

acknowledgment of problems by the complaint's chief actuary.

Defendant Wells then turned to the company's remediation

efforts, which he discussed in detail:

> As in last quarter's call, we would like to provide an
> update on our program for improvement, which includes
> premium re-rates, claims management improvements,
> technology, and organizational design.  Important
> progress is being made in each of these areas . . . we
> continue to make steady progress toward our goal of an
> estimated $35 million in net revenue enhancement from
> this first round of rate increases. . . .
>
> . . . In the area of claims management, we continued
> to implement claims best practices by partnering with
> LTC administration companies.  The results include
> improved accuracy of claim payments in accordance with
> policy language, enhanced customer service and
> stronger compliance. . . .

> . . . [A] positive development on the technology and
> organizational design fronts . . . is our study of a
> system and operational solution for a run-off long-
> term care group, better known as LTCG. . . .

Compl. ¶ 247.  According to the plaintiff, these statements were
materially false and misleading because they failed to disclose
the true state of affairs at Conseco, and because they failed to
disclose that "LTCG rejected the Company's request to assist
with the setting of reserves because of the utter mess of
Conseco's systems and lack of access to information necessary to
perform actuarial science."  Compl. ¶ 248.

Later during the same conference call, in response to a
question about the progress of remediation efforts, defendant
Prieur indicated that the company expected that "the bulk of the
fixing would get done in the first three quarters of this year."
Compl. ¶ 249.  According to the plaintiff, this statement was
materially false and misleading for all the reasons previously
discussed.  Compl. ¶ 250.  Defendant Prieur also stated, in
response to a question about the possibility of a reinsurance or
securitization of the LTC block, that "at some point" the
company would "search out ways" to reduce the weight of the LTC
block on its balance sheet, but that the company was continuing
to try to improve the block's performance, "because we feel that
that's where you have to start first."  Compl. ¶ 251.  According
to the plaintiff, these statements were materially false and

misleading because "at that time Conseco was actively seeking to sell or otherwise dispose of LTC."  Compl. ¶ 252.

On August 9, 2007, Conseco filed its second-quarter Form 10-Q with the SEC, and reiterated the statements found in its press release.  Compl. ¶ 253.  The Form 10-Q indicated that $110 million of the reserves adjustment related to updates to the company's reserve assumptions and methodologies.  Compl. ¶ 293. The plaintiff alleges that these representations were materially false and misleading because the adjustment was actually the product of "long-time systemic problems with the company's processing of LTC claims."  Compl. ¶ 294.  The 10-Q also noted that the company continued to have an independent actuarial firm review its LTC reserves on a quarterly basis and explained that additional changes to reserves might become necessary "[a]s additional experience emerges and other data become available." Stern Decl. Ex. U at 52.

On October 31, 2007, Conseco issued a press release in which it announced its financial results for the third quarter of 2007, in which it stated that "continued progress . . . was evident on the turnaround in our run-off long-term care block, with our claims reserve volatility reduced this quarter following the [reserve] strengthening of the previous quarter. With only a small loss in the quarter, we are on target for that block to [become] profitable next year."  Compl. ¶ 257.

According to the plaintiff, this statement was materially false and misleading for the reasons discussed above.  Compl. ¶ 258.

On February 25, 2008, Conseco issued a press release announcing that it would delay filing its 2007 Form 10-K, and that its previously issued financial reporting for years 2003-2006, in addition to its quarterly financial statements for 2006 and 2007, were materially misstated and "should no longer be relied upon."  Compl. ¶ 264.  The press release indicated that the statements had to be corrected to incorporate the correction of errors, "the majority of which were identified during the remediation of the material weakness in internal controls." Compl. ¶ 264.  On March 3, 2008, the company informed the SEC that its 2007 Form 10-K would be filed late, and disclosed that the SEC had informed the company that its method of accounting for certain rate changes was not consistent with financial accounting standards.  Compl. ¶ 265.

On March 28, 2008, the company filed its 2007 Form 10-K, in which it specifically identified the mistakes and accounting errors that necessitated its reissuance of prior periods' financial statements.  Compl. ¶¶ 269-71.  The correction of some of these errors decreased income or increased losses for Conseco; the correction of others increased income or decreased losses.  Compl. ¶ 270-71.  In addition, Conseco corrected an accounting impropriety identified by the SEC, which had caused

Conseco to misstate its 2006 and 2007 pre-tax income by $14 million and $12 million, respectively.  Compl. ¶ 272.

The aggregate impact of the restatement was to reduce the company's net income for 2005 from $324.9 to $312.7 million, and to increase its net income for 2006 from $96.5 to $106 million. Stern Decl. Ex. C at 111-13.  The balance sheet effect of all items identified during the remediation was to reduce shareholder equity by $20.6 million, in the context of Conseco's total shareholder equity of $4.7 billion.  Stern Decl. Ex. C at 113; Stern Decl. Ex. B at 35.  Only three of the restated matters related to the LTC business: a $10.7 million understatement and a portion of a $1.0 million understatement of shareholders' equity, and a $5.3 million understatement of reserves.  Stern Decl. Ex. C at 108-09.

In the Complaint, the plaintiff purported to calculate the effect of the restatement for the year ended December 31, 2005, and for each quarter after that until September 30, 2007, as well as the year ended December 31, 2006.  When certain errors in the chart were corrected, the plaintiff conceded that the restatement showed that income was understated or losses overstated in five of the eight periods for which calculations were made.  Hr'g Tr. 58-60, Mar. 16, 2011.

Notwithstanding the modest nature of these adjustments, according to the plaintiff, Conseco's restatement of prior

37

periods' income constituted an acknowledgment that the company had "issued materially false financial statements to investors that significantly distorted its true operating results during the Class Period."  Compl. ¶ 276.

## C.

Finally, the Complaint alleges a number of additional facts with respect to the individual defendants' knowledge of or access to information that the plaintiff contends shows that the public statements of the defendants were false.  Specifically, with respect to the general state of disarray within the LTC block, the Complaint alleges that:

- A December 9, 2004 "Claims Transformation Roadmap," prepared by consulting firm Deloitte at the behest of Conseco's "[s]enior leadership," discussed the need for the company "to improve adjudication accuracy, timeliness, and consistency"; to reduce "manual and inefficient processes"; and to replace "ad-hoc processes and deploy[] . . . a standardized approach across all product lines."  Compl. ¶ 58.
- A February 15, 2005 Deloitte presentation recognized that the company lacked a central database or system for compiling information about policies and claims.  Compl. ¶ 59.
- Conseco documents generated during the summer of 2006 indicated that (1) the company did not have a comprehensive understanding of all policy contracts; (2) that it overpaid providers; (3) that problems arose from the fact that claims processing was conducted manually; (4) that Conseco faced serious problems with claims leakage; and (5) that the company did not maintain claims accumulators.  Compl. ¶¶ 60, 86-87, 110.

- "[T]op executives" were aware of the company's need for an automated system to process claims.  Compl. ¶ 61.
- Conseco employees told "Conseco's executives" about coding problems that caused the company's actuarial assumptions to be inaccurate.  Compl. ¶ 101.
- There were conversations among "Conseco personnel" with respect to the problems in the company's financial statements on account of its unreliable data.  Compl. ¶ 110.
- From 2004 until 2006, the company dedicated a conference room, known as the "War Room," to discussing the problems with LTC.  Compl. ¶ 112.  During this period, defendants Prieur and Kirsch regularly participated in "War Room" meetings where the serious problems facing the LTC block were discussed.  Compl. ¶ 115.
- In 2006 and 2007, defendant Bonach participated in meetings with senior personnel in Conseco's finance and actuarial departments, where data aggregation issues were discussed.  Compl. ¶ 113.
- A document prepared for a December 2006 retreat that defendant Wells attended noted that the LTC business was "largely focused on transactional clean-up projects rather than strategic initiatives."  Compl. ¶ 114.
- "[S]enior Company executives" were aware of serious problems with the company's data.  Compl. ¶ 118.
- Reports provided to "senior executives" indicated that Conseco was "under-reserved."  Compl. ¶ 121.
- Material weaknesses in internal controls were brought to the attention of "Conseco management."  Compl. ¶ 126.
- Before analyst calls in 2007 and 2008, the defendants held in-person meetings to strategize on how to respond to potential questions from analysts.  Compl. ¶ 139.

## II.

The defendants contend that the plaintiff's Section 10(b) and Rule 10b-5 claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because the plaintiffs have

failed adequately to plead scienter pursuant to Federal Rule of

Civil Procedure 9(b) and the PSLRA.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

provides in relevant part:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange –
>
> . . .
>
> (b) To use or employ, in connection with the purchase
> or sale of any security registered on a national
> securities exchange or any security not so registered
> . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

Similarly, Rule 10b-5, promulgated under Section 10(b) and

codified at 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any
> facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to
> defraud,
>
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or
>
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person, in connection with the
> purchase or sale of any security.

In order to state a claim brought pursuant to Section 10(b) and Rule 10b-5, a plaintiff must allege sufficiently that the defendant: (1) made a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) with scienter; (5) that the plaintiff relied upon; and (6) that caused the plaintiff to suffer damages.  See, e.g., Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

In the context of securities fraud statutes, scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct."  S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir.1996) (citations omitted); see also S.E.C. v. Todt, No. 98 Civ. 3980, 2000 WL 223836, at *9 (S.D.N.Y. Feb. 25, 2000).  In addition to intent, "recklessness is a sufficiently culpable mental state for securities fraud in this circuit."  ECA, 553 F.3d at 198.  Scienter may be inferred from proof of "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or from proof that a defendant had "both motive and opportunity to commit fraud."  Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000); see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Chill, 101 F.3d at 267.  An "egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."  Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (quotations omitted).

Moreover, allegations of securities fraud under Section 10(b) and Rule 10b-5 are subject to Federal Rule of Civil Procedure 9(b) and the PSLRA's requirements regarding scienter. See 15 U.S.C. § 78u-4(b)(2); Chill, 101 F.3d at 266; Acito, 47 F.3d at 52; Shields, 25 F.3d at 1127-28. Under the PSLRA, "[p]laintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, the intent to "deceive, manipulate, or defraud, or knowing misconduct." Press, 166 F.3d at 537-38; see also ECA, 553 F.3d at 198. The inference that the defendant acted with scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324; see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. ___ (2011) (slip op., at 19).

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128, quoted by Press, 166 F.3d at 538. The plaintiff concedes that it has not alleged fraud on a "motive-and-opportunity" theory. See Pl.'s Mem. of L. in Opp. to Defs.' Mot. to Dismiss, Plumbers v. Conseco, 09 Civ. 6966 (S.D.N.Y. Oct. 1, 2010), at 21

n.5.[3]  Accordingly, in order to survive the motion to dismiss, the Complaint must plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.

When a plaintiff proceeds on a "conscious misbehavior or recklessness" theory, "the strength of the circumstantial allegations must be correspondingly greater" than on a "motive and opportunity" theory.  Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987), overruled on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989) (en banc).  "To survive dismissal under the 'conscious misbehavior' theory, the [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is at the least[] conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the

---

[3] The plaintiff does allege that the defendants made misleading statements because they hoped to conceal the true financial condition of the LTC business, to make it more attractive to potential purchasers.  See, e.g., Compl. ¶ 132.  This is implausible as an explanation for why the defendants would have attempted to conceal the status of the LTC business, because any potential purchaser would not have relied on the defendants' public statements, but would have conducted independent due diligence prior to an acquisition.  Moreover, many of the defendants actually increased their stock holdings during the class period, Stern Decl. Exh. BB at 2; CC at 2; DD at 2; EE at 2; FF at 3, which makes more implausible any inference that the defendants had a motive for engaging in the alleged fraud.  See In re Sec. Capital Assurance, Ltd. Sec. Litig., 729 F. Supp. 2d 569, 594 (S.D.N.Y. 2010); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

danger was either known to the defendant or so obvious that the
defendant must have been aware of it." <u>Honeyman v. Hoyt (In re
Carter-Wallace, Inc. Secs. Litig.)</u>, 220 F.3d 36, 39 (2d Cir.
2000)(internal quotation marks and citations omitted).


**A.**

    The plaintiff alleges that the defendants acted in a highly
unreasonable way because they knew facts or had access to
information suggesting that their public statements were not
accurate.  <u>See</u> <u>Novak</u>, 216 F.3d at 311.  The plaintiff
effectively alleges that the defendants had access to two types
of such information: information related to the LTC business's
prospects, reserves, and record keeping; and information
suggesting that Conseco was engaged in wrongdoing (that is,
information related to the NL Close process, claims bundling,
and improper denial of claims).


**1.**

    As described in detail above, <u>see</u> Section I(C), <u>supra</u>, the
Complaint alleges that the defendants had access to a number of
sources, documentary and otherwise, that revealed the serious
problems faced by the LTC business.  The defendants argue that

44

the plaintiff has either failed to identify these sources with particularity or failed to allege that the defendants actually had access to them.  See Mem. of L. in Supp. of Defs.' Mot. to Dismiss the Second Am. Compl., Plumbers v. Conseco, 09 Civ. 6966 (S.D.N.Y. Aug. 2, 2010), at 36-38.[4]

It is not necessary for the Court to determine, however, whether the Complaint has adequately alleged that the defendants had access to these sources of information.  That is because, even if the defendants had access to the information alleged, the plaintiff has still failed to allege scienter adequately.

According to the Complaint, sources of information to which the defendants had access revealed: that the company needed "to improve adjudication accuracy, timeliness, and consistency," to reduce "manual and inefficient processes" and to replace "ad-hoc processes and deploy[] . . . a standardized approach across all product lines," Compl. ¶ 58; that the company lacked a central database or system for compiling information about policies and claims, Compl. ¶ 59; that the company did not have a comprehensive understanding of all policy contracts, that it overpaid providers, that problems arose from the fact that claims processing was conducted manually, that the company faced

---

[4] The plaintiff relies on a series of allegations by confidential informants, but the confidential informants fail to provide specific factual allegations with respect to the knowledge of the individual defendants, and their assertions are often general in nature.

serious problems with claims leakage, and that the company did
not maintain claims accumulators, Compl. ¶¶ 60, 86-87, 110; that
the company needed an automated system to process claims, Compl.
¶ 61; that coding problems were causing the company's actuarial
assumptions to be inaccurate, Compl. ¶ 101; that there were
problems with Conseco's financial statements because of its
unreliable data, Compl. ¶ 110; that the LTC block in particular
faced serious problems, Compl. ¶ 115; that the LTC business was
"largely focused on transactional clean-up projects rather than
strategic initiatives," Compl. ¶ 114; and that there were
problems with the company's data aggregation, reserves, and
internal controls, especially as they related to the LTC
business, Compl. ¶¶ 113, 118, 121, 126.

     None of this information, however, supports a strong and
plausible inference that the plaintiffs made any of the
challenged public statements with knowledge that they were false
or with reckless indifference – "an extreme departure from the
standards of ordinary care," Honeyman, 220 F.3d at 39 – as to
their truth.  To the contrary, nearly all of this information
was addressed in some form in the company's lengthy and thorough
public disclosures.  The plaintiff fails to cite some of the
public disclosures which describe in detail the problems faced
by the LTC business and the difficulty in calculating reserves

for that business.  It ignores the import of other disclosures
that it does refer to:

- The company's Form 10-Q for the second quarter of 2005
  disclosed that the LTC business's losses had been larger
  than expected, Stern Decl. Ex. D at 50; that the company
  had been required to increase claim reserves for that
  business by over $200 million in the preceding three
  years because the company's assumptions and estimates had
  been wrong, Stern Decl. Ex. D at 32; that addressing the
  problems with the LTC business "may result in unforeseen
  expenses, complications or delays, and may be inadequate
  to address all issues," Stern Decl. Ex. D at 29; that the
  company's "limited historical claims experience" in LTC
  meant that its assumptions and estimates might be
  incorrect, Stern Decl. Ex. D at 31; and that LTC had
  historically underperformed, and might continue to do so,
  in which case the company's "financial results could be
  adversely affected."  Stern Decl. Ex. D at 31.

- On an August 3, 2006 phone call to discuss the company's
  second-quarter results, defendant Hohmann described the
  "challenging" task of assessing the LTC block and the
  factors that made it difficult to establish reliable
  expectations for future results.  Stern Decl. Ex. J. at
  2-3.  During the same call, defendant Bullis stated that
  that company was "concerned about the volatility and
  frankly our visibility into benefit ratios" for the LTC
  block, and described precise expectations as to future
  loss ratios as "not knowable," noting, "We're going to
  have to see how claims develop before we can take a more
  precise view."  Compl. ¶ 197.

- During a November 2006 conference call to discuss
  financial results for the third quarter of 2006, the
  company disclosed that the LTC business had deteriorated
  substantially, and that its efforts to address problems
  in the block might not yield results for several
  quarters.  Compl. ¶ 203; Stern Decl. Ex. L at 8-9.

- A March 6, 2007 press release announcing Conseco's year-
  end and fourth-quarter results and announcing that the
  company had identified a material internal control
  deficiency described the company's efforts to address
  "significant losses" in the LTC block, but cautioned that
  the company could not provide "any commentary on
  outlook," because more time was necessary to evaluate its
  status.  Compl. ¶ 207.

- On a March 7, 2007 conference call to discuss these results, defendant Bullis noted that, while the company believed its reserves, which were reviewed quarterly by independent actuaries, were appropriately set, Compl. ¶ 216; Stern Decl. Ex. P at 12, any future deterioration of the LTC business would affect results, Compl. ¶ 216.

- The company's Form 10-K for 2006 disclosed: that the company had contributed $80 million in capital to the subsidiary that housed the LTC block, and that the subsidiary had weak agency ratings, Stern Decl. Ex. B at 14-15; that the company's limited historical claims experience for LTC might adversely affect its results, Stern Decl. Ex. B at 21-23; that efforts that had been undertaken to improve policy administration had caused increased policyholder complaints and inquiries from regulators, Stern Decl. Ex. B at 27; and that LTC reserves had been substantially increased during the year as a result of actual experience being worse than the company's prior estimates, Stern Decl. Ex. B at 63.

In light of extensive disclosures such as these, it simply cannot be said that an inference that the defendants acted with scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Rather, the most compelling inference is that the defendants actively and diligently sought to apprise the market of information relevant to Conseco's corporate prospects, and the risks and prospects of the LTC business and the challenges it faced, particularly with respect to reserves. The most compelling inference, in the face of the extensive negative information that was disclosed, is that the defendants were unaware of any more severe material adverse information, and that much of what the plaintiff calls inadequate disclosures are simply pejorative characterizations of what was disclosed.

Additionally, it should be noted that the fact that the company was required, in 2008, to restate several prior periods' financial results does not indicate that the defendants had previously made false statements with scienter.  A failure "to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."  Novack, 216 F.3d at 309. Allegations of failure to comply with GAAP do not suffice to allege scienter.  See, e.g., id.; In re Hudson Techs., Inc. Sec. Litig., No. 98 Civ. 1616, 1999 WL 767418, at *5 (S.D.N.Y. Sept. 28, 1999) (allegations of GAAP violations and restatement insufficient); Stevelman v. Alias Research, Inc., 174 F.3d 79, 84-85 (2d Cir. 1999) (allegations of GAAP violations, insufficient reserves and restatement insufficient); In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 573-74 (S.D.N.Y. 2007) (allegation of restatement insufficient).  This is especially true in light of the modest size of the restatement, which reduced corporate income for 2005 from $324.9 to $312.7 million, and increased it for 2006 from $96.5 to $106 million. Stern Decl. Ex. C at 111-13.

**2.**

The Complaint also alleges that the defendants' statements were misleading because they failed to disclose that the company had abused the NL Close and claims bundling processes and that employees had been encouraged to wrongfully deny claims.  These allegations also fail because the plaintiff has failed to adequately plead scienter.

A plaintiff may plead scienter based on recklessness by specifically alleging the defendants' knowledge of facts or access to information contradicting their public statements. Novak, 216 F.3d at 308.  In certain circumstances, recklessness may also be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful." Chill, 101 F.3d at 269 (internal quotation marks and citation omitted).  In any event, the facts alleged must be sufficiently strong circumstantial evidence of the alleged recklessness that the alleged facts give rise to a strong inference of fraudulent intent.  See id. (collecting cases).

In this case, the Complaint is wholly devoid of any particularized allegation connecting the individual defendants to information suggesting unlawful activity within the company. It alleges only: (1) that the fact claims were being improperly denied was discussed with "senior Conseco employees," including

one vice president who reported to defendant Wells, Compl. ¶ 71;
(2) that the fact Conseco needed to stop improperly denying
claims was discussed with "Conseco executives," Compl. ¶ 74; (3)
that non-defendant Inanilan was "a key player in authorizing the
improper use of the NL Close" process and "reported to whoever
was CEO of Conseco," Compl. ¶ 75; and (4) that "Conseco
executives" including defendant Wells were "very aware" of the
company's bundling practices.  Compl. ¶ 81.

Such vague allegations simply do not give rise to a "strong
inference of fraudulent intent."  Chill, 101 F.3d at 269
(internal quotation marks omitted); see also In re Loral Space,
2004 WL 376442, at *11 ("Because the plaintiffs have not alleged
with sufficient particularity the nature, the content, the
reliability, or the availability of the allegedly contradictory
internal reports, the allegations concerning this information do
not provide sufficient circumstantial evidence to raise a strong
inference of the defendants' fraudulent intent.").


**B.**


A finding that the Complaint fails to allege scienter with
respect to any individual defendant does not necessarily, as a
matter of law, preclude a finding that it adequately alleges
scienter with respect to a corporate defendant.  Rather, "[w]hen

the defendant is a corporate entity, . . . the pleaded facts
must create a strong inference that someone whose intent could
be imputed to the corporation acted with the requisite
scienter." Teamsters Local 445 Freight Div. Pension Fund v.
Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

Under this standard for corporate liability, the plaintiff
must demonstrate a misrepresentation significant enough to raise
a strong inference that a corporate officer whose intent may be
imputed to the corporation was aware of the misrepresentation.
For example, in Teamsters, the Second Circuit Court of Appeals
cited with approval an example of such a pleading from a Seventh
Circuit opinion:

> Suppose General Motors announced that it had sold one
> million SUVs in 2006, and the actual number was zero.
> There would be a strong inference of corporate
> scienter, since so dramatic an announcement would have
> been approved by corporate officials sufficiently
> knowledgeable about the company to know that the
> announcement was false.

Id. at 195-96 (citing Makor Issues & Rights, Ltd. V. Tellabs,
Inc., 513 F.3d 702, 710 (7th Cir. 2008)). Similarly, in In re
MBIA, Inc., Sec. Litig., 700 F. Supp. 2d 566, 574 (S.D.N.Y.
2010), the court found sufficient an allegation of "corporate
scienter" with respect to the non-disclosure of an $8.1 billion
exposure to collateralized debt obligations, and in In re
NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 299-300
(S.D.N.Y. 2009), the court found sufficient an allegation with

respect to the misrepresentation of $4.4 billion in capital costs.

The misstatements alleged in the Complaint do not approach this magnitude, and no "strong inference" arises that someone whose intent may be imputed to the corporation made materially false or misleading misrepresentations with scienter. Therefore, the plaintiff has failed to allege that Conseco acted with the requisite state of mind.

Accordingly, none of the allegations in the Complaint, either individually or in combination, give rise to the strong inference of scienter required by Rule 9(b) or the PSLRA. Therefore, the defendants' motion to dismiss the Section 10(b) and Rule 10b-5 claim for failure to state a claim is granted.[5]

---

[5] The defendants also argue that their alleged misstatements are not actionable for a variety of other reasons.  There is plainly merit to some of these arguments, because certain of the plaintiff's allegations amount to nothing more than a demand that the defendants characterize financial information in a particular way, and many of the defendants' alleged misstatements are plainly inactionable puffery.  Nonetheless, the defendants concede that these arguments would not dispose of all of the alleged misrepresentations in this case, and therefore the Court will not reach the alternative arguments.

III.

The defendants also move to dismiss the plaintiff's claim against the individual defendants under Section 20(a) of the Exchange Act.

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t.  To make out a prima facie case under Section 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  First Jersey Sec. Inc., 101 F.3d at 1472 (internal quotation marks and citations omitted).  For the reasons stated above, the plaintiff has failed to allege sufficient facts to demonstrate a violation of Section 10(b) of the Exchange Act and Rule 10b-5; therefore, the plaintiff has not satisfied the first element of a Section 20(a)

54

claim.  Consequently, the Section 20(a) claim against the

individual defendants is dismissed.

## CONCLUSION

The Court has considered all the remaining arguments of the

parties.  To the extent not specifically addressed above, they

are either moot or without merit.  For the foregoing reasons,

the defendants' motion to dismiss is **granted.**  The Clerk is

directed to enter judgment dismissing the case and closing all

pending motions.

SO ORDERED.

Dated:    New York, New York
          March 29, 2011

                                    John G. Koeltl
                              United States District Judge

55